# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 2:16-CR-160 JVB |
| James Snyder, | |
| Defendant. | |

## OPINION AND ORDER[1]

Writing to Corinthians, Apostle Paul cautioned: "'Everything is lawful,' but not everything is beneficial. 'Everything is lawful,' but not everything builds up." 1 Cor. 10:23 (New American Bible). And so it is in this case: while in obtaining and screening Defendant Snyder's emails, the government remained (largely) within the bounds of the law, its tactics—given that Mr. Snyder's attorney, Thomas Kirsch, had a good reputation and was cooperative—created a potential for violating Mr. Snyder's right to a fair. What the government did, it could do: the law is in its favor, even if the prudence of its actions can be questioned.

In filtering out emails that contained privileged attorney-client communications, the government employed a process where the only check against privileged information crossing over "the Chinese Wall" was the integrity of its attorneys and the FBI agents working on this case. To be sure, there's nothing to suggest that the agents involved in the case improperly

---

[1] In the evolution of briefing the attorney-client privilege, the filings began in the open and the Court held open hearings. As the case progressed, in the interest of caution, some of the filings were sealed and even sealed from the trial team, with AUSA Timothy Chapman of the Chicago United U.S. Attorney's office doing the briefing. At the same time, some of the filings continued in the open. In ruling on the matters before it, the Court has determined that this order does not have to be filed under seal as it does not reveal any information that is prejudicial to Mr. Snyder and the public's interest in the transparency of litigation outweighs any privacy concern that Mr. Snyder or the government may have.

handled Mr. Snyder's emails or that the agent in charge was peaking behind the curtain of the privilege. However, any process that leaves government agents unchecked is problematic. That is, while Special Agent Eric Field appears to be an honest man, will every other agent in his situation also be honest? Likewise, although the trial team consists of two attorneys of impeccable integrity, the government, with its almost infinite resources, must be kept in check, because the temptation to skirt the safeguards of the attorney-client privilege is ever-present and next attorneys may not be as conscientious as the current set.

I.

Mr. Snyder claims that the government violated his Fourth, Fifth, and Sixth amendment rights when they seized his work and personal emails pursuant to a warrant. In particular, Mr. Snyder contends that the government knew that, at the time the warrant was to be executed, he had already retained counsel, Thomas Kirsch,[2] to assist him in dissuading the government from filing charges, and that the government knew that a broad sweep of his emails would inevitably seize privileged communications with his attorney. Furthermore, Mr. Snyder accuses the government of failing to set up a process that would protect privileged emails from reaching the trial team attorneys and agents. Mr. Snyder points to over forty emails that he insists are privileged and yet were not shielded from the trial team. He claims that the government was able to glean information from those emails that gave it an unfair advantage, prejudicing him to the

---

[2] Kirsch is no longer representing Mr. Snyder as he was confirmed to the position of the United States Attorney for the Northern District of Indiana. Kirsch and all the government attorneys in the Norther District of Indiana are recused from this case, with the exception of AUSAs Phil Benson and Jill Koster. These two are supervised by the U.S. Attorney's office in Chicago.

2

point of no return. Mr. Snyder asks that the Court dismiss the indictment as a sanction for government's violations or, in the alternative, remove the prosecution team.

The government maintains that it's seizure of emails was appropriate, the three-tier review process to prevent privileged emails from reaching the trial team worked (for the most part), the emails that Mr. Snyder challenges are not privileged (again, for the most part) and, in any case, Mr. Snyder has suffered no undue prejudice.

The parties have filed multiple and voluminous briefs on the issues before the Court, and the Court held evidentiary hearings and oral arguments. The Court even conducted an ex parte hearing with Mr. Snyder's counsel. Through it all, what has become clear is that, with the exception emails containing QuickBooks data, the government trial team is not in possession of privileged materials and that the privileged financial data has not unduly prejudiced Mr. Snyder. Thus, while the Court finds no fault with the taint team process, even if the process had been faulty as Mr. Snyder argues, no error has been introduced that would necessitate either dismissal of this case or recusal of the trial team.

II.

Before delving into Constitutional questions, the Court will first address the challenged emails to determine if any of them are privileged under the attorney-client privilege doctrine.

The attorney-client privilege is carefully guarded by the Courts but its violation does not rise to a violation of a constitutional right; rather, it remains an evidentiary rule. *See United States v. White*, 970 F.2d 328, 336 (7th Cir. 1992) ("The attorney-client privilege is a testimonial privilege. Consequently, so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results."). The privilege protects communications between

attorney and client that are conducted in confidence and for the purpose of seeking or providing legal assistance to the client. *See United States v. BDO Seidman*, 492 F.3d 806, 815 (7th Cir. 2007). The knowing disclosure to a third party of an otherwise privileged communication eliminates the privilege. *See In re Pebsworth*, 705 F.2d 261, 263 (7th Cir. 1983). Likewise, there's no privilege for statements made to one's attorney in the presence of a third party. *See Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007). "The party seeking to invoke privilege bears the burden of proving all its essential elements." *United States v. Evans* 113 F.3d 1457, 1461 (7th Cir. 1997).

The attorney-client privilege extends to confidential communications passing from one party to the attorney of the other party or vice versa for a common purpose related to the defense of both. *See Evans*, 113 F.3d at 1467). The joint defense doctrine applies so long as the attorneys "engage in a common legal enterprise." *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985).

An attorney's agents—such as paralegals, investigators, secretaries, etc.—are also within the realm of the privilege if they are engaged to assist the attorney in providing legal services for the client. The same does not extend to a defendant's agents.

In addition to privileged communications, materials prepared by attorneys in anticipation of litigation are also protected from the eyes of the government. This is known as the work-product doctrine and it "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1974). The work-product doctrine also protects the work prepared by the attorney's agents. "As with the attorney-client privilege, documents that are not primarily legal in nature are not privileged under the work product doctrine." *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209,

217 (N.D. Ill. 2013) (citing *Loctite Corp. v. Fel–Pro, Inc.*, 667 F.2d 577, 582 (7th Cir.1981) ("Only where the document is primarily concerned with legal assistance does it come within [attorney-client or work product] privileges.")). "[T]he work-product doctrine is intended to guard only against divulging the attorney's legal impressions and strategies. The doctrine cannot be used to protect the underlying facts found within work-product." *United States v. Dean Foods Co.*, 2010 WL 3980185, at *2 (E.D. Wis. Oct. 8, 2010) (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession."))

The Court will review the emails in light of the law stated above.

A. *Grand Jury Subpoenas (Exhibits 12–14, 20)*

The day Mr. Snyder received multiple grand jury subpoenas he retained Mr. Kirsch as his counsel and emailed him copies of the subpoenas (Exhibit 13). Mr. Kirsch immediately responded confirming his receipt of the email (Exhibit 12). Several months later, Mr. Snyder retransmitted the same email to Mr. Kirsch "so it is fresh" (Exhibit 14) and Mr. Kirsch emailed Mr. Snyder two subpoenas (Exhibit 20).

These emails are not privileged as they contain no request for nor give any legal advice. Likewise, they contain no privileged materials.

B. *Press inquiries and newspaper article (Exhibits 5, 6, 16, 19)*

Several times, when Mr. Snyder received inquiries from the press, he forwarded them to Mr. Kirsch without discussion. He also forwarded to Kirsch a newspaper article. These emails are not privileged.

C. *Scheduling phone calls (Exhibits 17, 24,26)*

Three emails relate to scheduling phone calls between Mr. Snyder and Mr. Kirsch. These are not privileged emails.

D. *SRC's corporate status (Exhibits 15, 22)*

Mr. Kirsch emailed Mr. Snyder with a subject line, "Is SRC an S Corp?"[3] Mr. Snyder responded the same day with one line: "Just confirmed at SOS website that it is LLC thanks." Mr. Kirsch's request for publicly available information is not privileged nor is Mr. Snyder's response that is based on that publicly available information. The emails contain neither legal advice nor a request for such advice.

E. *Emails copied to Joseph Calhoun and Amanda Lakie (Exhibits 1, 2)*

The government agrees that Mr. Snyder's October 21, 2014, email to Mr. Kirsch and his other attorney, Mr. Dogan, was privileged. But Mr. Snyder forfeited that privilege when he forwarded the same email to Calhoun.[4] Calhoun responded the next day at which time Mr.

---

[3] SRC stands for Citizens for Snyder.

[4] Mr. Calhoun was the Director of Administration and Emergency Management for the City of Portage.

Snyder added Lakie[5] to the chain. Mr. Kirsch did not represent either Calhoun or Lakie, nor is there a joint defense between them and Mr. Snyder. Moreover, although she was Mr. Snyder's administrative assistant, Lakie wasn't Mr. Kirsch's agent so as to create a privileged relation with Mr. Snyder.

F. *Fraternal Order of Police (Exhibits 23, 27)*

Mr. Snyder emailed Kirsch the meeting minutes of the Fraternal Order of Police. The meeting minutes themselves are not privileged and the emails contain no request for legal advice. There's no basis here for Mr. Snyder's claim of the government's intrusion upon his right to counsel.

G. *Fronius Corporation Trip (Exhibits 36--38)*

When the FBI agents interviewed Mr. Snyder in July 2014, they interviewed him about his use of taxpayer money for his trip to Austria to visit Fronius Corporation and questioned whether he illegally solicited and received funds from Great Lakes Peterbilt (GLPB) that Mr. Snyder later used to reimburse the City of Portage for the trip. In two emails Mr. Snyder sent a letter from Fronius to Kirsch and a series of letters on the city's letterhead that were used to solicit money to pay for the trip. There's no request for legal advice nor legal advice in any of the emails so as to make them privileged. The attached letters fare the same

---

[5] Ms. Lakie was the Administrative Assistant to the Mayor or Portage.

### H. Cassie Teesdale (Exhibits 21, 33)

Cassie Teesdale is Mr. Snyder's administrative assistant at his company, First Financial Trust Mortgage. On November 19, 2014, the Agents interviewed her, and the next day Mr. Snyder asked her, possibly at Kirsch's request,[6] to summarize her recollections of the agents' questions and her answers. She did as asked. Mr. Kirsch responded in an email, simply saying "thanks."

These emails are not privileged. Teesdale did not have a joint defense, she was not Kirsch's agent, the emails do not deal with asking or receiving legal advice, and the emails contain only factual information.[7] Nor is Teesdale's email attorney work-product as it does not divulge Kirsch's legal impressions and strategies and the email itself is fact-based.

### I. Mr. Snyder's GLPB Timeline (Exhibits 3, 4)

On September 14, 2014, Mr. Snyder emailed the city attorney, Gregg Sobkowski, a timeline summary of the bidding and award process for the City of Portage's purchase of three garbage trucks from GLBP. He attached to the email a bid tabulation charts prepared by Randy Reeder, the Assistant Superintendent of Streets. Mr. Snyder copied Mr. Kirsch and Reeder.

These emails are not privileged. Sobkowski was the attorney for the City, not Mr. Snyder. The emails were not sent in confidence to Kirsch, and Reeder was not in joint defense with Mr. Snyder.

---

[6] When Kirsch testified, often times he would phrase his answers in terms of what he would have done as opposed to what he clearly did. Chapman asked him to clarify what he meant by saying "I would have (done this or that)," and Kirsch answered that sometimes he actually did what he said "I would have done" and at other times his "I would have done" meant to say that such and such was his customary practice. As a result, it is not completely clear which actions Kirsch remembers actually doing as opposed to what his customary practice was.

[7] While not dispositive of the issue, it's interesting to note that Kirsch himself testified at the hearing that he didn't see Teesdale's email as privileged. (Tr. 58–59.)

### J. Cummins Engines (Exhibits 7–11, 25, 35)

A company called PACCAR manufactured the garbage trucks purchased by the City. For a time, the agents believed that the trucks did not meet the bidding requirements as they did not contain Cummins engines as specified in the bid. Unbeknownst to them, PACCAR uses Cummins engines for its trucks. Mr. Snyder sent this information to Kirsch so that he could clarify this to the government. The emails contain publically available information and none of them constitute privileged attorney-client communications.

### K. Kent Martin (Exhibits 28, 29)

Mr. Snyder forwarded to Kirsch and Dogan two email exchanges between himself and Ken Martin, Mr. Snyder's campaign manager in 2011. The first email (Exhibit 28) contains no substantive statements. Its subject line references an attached Excel document called "Summary Quickview." The second email has subject line "CFA Workbook in Progress" and indicates that an Excel spreadsheet is attached. The emails were released to the prosecution team but not the attachments. While Mr. Snyder claims that the attachments were created by Martin at Kirsch's direction and therefore constitute attorney work product, the fact is that the attachments were quarantined from the trial team. The emails themselves, even though referencing the attachments, do not constitute attorney-client communications.

### L. Fact Sheets (Exhibits 30, 32)

Mr. Snyder sent two emails to Kirsch and Dogan with subject lines "City Fact Sheet" and "Citizen Fact Sheet." The attachments with these emails were quarantined from the trial team.

The emails don't contain any legal discussion or request for legal advice. As such, they are not privileged.

*M. Dan Pickart (Exhibit 31)*

In one email, Kirsch directs Mr. Snyder's accountant Dan Pickart to begin preparing defendant's taxes. That's it. As such it's not a privileged communication.

*N. SRC Rental Agreement (Exhibits 34, 42)*

In two emails, Mr. Snyder forwarded to Kirsch and Dogan (at separate times) a draft lease agreement between SRC and Citizens for Snyder that was sent to him by Steve Lakie, the husband of Amanda Lakie). Steve Lakie is not affiliated with either attorney and the emails don't contain any legal discussion. In short, they are not privileged.

*O. NWI Times Complaint Email (Exhibit 43)*

Mr. Snyder emailed Dogan, without any substantive comment, a press inquiry about a lawsuit filed against the City of Portage by two of its former employees. Mr. Snyder was not sued personally. The press inquiry and the civil complaint attached to the email are not privileged.

*P. "James, what is the status of the document scanning?" (Exhibit 18)*

That's the email from Kirsch to Mr. Snyder. The subject line ("document subpoenas.") doesn't add much more: Needless to say, the email is not privileged.

*Q. Ron McColly Services Agreement (Exhibit 40)*

Ron McColly owned Community Title Company. In January 2014, Mr. Snyder enlisted Dogan as his personal attorney to draft a consulting agreement between Mr. Snyder and Community Title Company. Dogan sent the draft of the consulting agreement to Mr. Snyder's email account at City of Portage and from there Mr. Snyder forwarded the email to his personal account. Dogan's email states: "Also, I must advise you to seek independent legal advice concerning how you wish to carry out the services utilizing the agreement. I am not very familiar with the laws concerning government elected officials and the private enterprises they participate in."

This email is privileged as it contains legal advice. The government passingly argues that the email is not privileged because it was sent to Mr. Snyder's publicly owed email account, so that the privilege had been waived. Yet this argument is not supported by either law or the specific facts in this case.

*R. Leo Hatch Jr. Consulting Agreement (Exhibit 41)*

Dogan also emailed to Mr. Snyder's City of Portage email account a draft consulting agreement with Leo Hatch Jr. This email, too, provides Mr. Snyder with legal advice and is privileged. The government makes the same argument about the email being sent to Mr. Snyder's City of Portage email account, but it's unavailing.

*S. QuickBooks Compilation (Exhibit 39)*

Kirsch directed Mr. Snyder to generate QuickBooks financial records for various entities associated with Mr. Snyder because his financial records were in disarray. Mr. Snyder used Intuit

online software multiple times to email himself such records. The emails from Intuit contained various financial data in the body of the emails. He would then forward these to his attorneys. The emails from Intuit to Snyder (generated by Snyder) slipped through the government's filter process, and the government now concedes that those documents should not have been made available to the prosecution team because they constitute attorney work- product. However, the same data that was forwarded to the attorneys was quarantined.

At the evidentiary hearing, Kirsch testified that he provided some QuickBooks data to the government. However, Kirsch did not know which precise documents were given to the government, as one of the associates was in charge of this task. Some of the documents provided by Kirsch overlap with the documents sent from Intuit to Snyder's email account.

To decide the remedy for the government viewing the privileged materials, the Court must determine whether the government did so intentionally and what the applicable law is.

III.

As discussed above, only three sets of documents contain privileged materials that the government's trial team has in its possession. Mr. Snyder claims that the process of screening the emails for privileged materials was inherently flawed and had no way of filtering out the attorney work-product. In addition, Mr. Snyder insists that the government should not have wholesale seized Mr. Snyder's emails in the first place as they knew that Mr. Snyder was represented by Kirsch and they would certainly be seizing attorney-client communications. Moreover, Mr. Snyder insists that the government's intrusion upon his relationship with his attorneys was inevitable given that the government decided to undertake the matter by itself rather than employing the assistance of a magistrate judge or Mr. Snyder's attorneys.

The Court held an evidentiary hearing to determine whether the screening process for emails that contain privileged attorney client communications was flawed as claimed by Mr. Snyder. While Mr. Snyder asks the Court to infer that Special Agent Eric Field must have reviewed privileged emails because Google sent all the files to him directly, the Court finds that he did not do so. The Court credits his testimony that he merely passed the files over to BIDMAS at the FBI headquarters and did not review them. Mr. Snyder is correct that it would have been better had the files been sent to a person behind "the Chinese Wall" as that would have added credibility to the screening process, but in this case, there was no harm sending the files directly to Field.

Agent Field provided a list of search terms for BIDMAS to identify potentially privileged materials.[8] BIDMAS, which was administered by FBI officials in Washington, D.C., flagged materials it deemed privileged and quarantined them. Out of 109,000 emails, BIDMAS quarantined about 8,600 of them. At that point, the quarantined data was provided to a "filter team" of FBI employees who were not involved in this case. The employees were not lawyers, but Field instructed them to err on the side of caution in flagging communications as privileged. These agents boiled down the 8,600 quarantined emails to 900.

Next, AUSA Maria Lerner reviewed the 900 emails. Although she works in the Hammond office, Lerner is not part of the prosecution team; she was and continues to be sequestered from this case. Lerner reduced the list to some 300 emails as privileged, which are not available to the prosecution team. It turns out she missed the series of emails related to Mr. Snyder's QuickBooks file and two emails from Dogan.

---

[8] Among other things, the search terms related to Kirsch's and Dogan's email addresses and website domains associated with them.

The Court agrees with Mr. Snyder that the government could have cooperated with Kirsch to filter out privileged communications, at least in the last stage of review. But, while such cooperation may have been prudent, it was not legally required. Mr. Snyder also suggests that the government could have asked a magistrate judge to carry out such a review. While the Court does not know if that would have been a practical idea, there's no guarantee that a magistrate judge would have done better than the taint team, unless, again, Kirsch would have been asked to be part of the review process. But that too is not required by law. Rather, the Court finds that, *as carried out in this case*, the filter process worked sufficiently, even if the process itself has inherent flaws (it has s semblance of the fox guarding the hen house). That is, there's no evidence, or even suggestion, that persons behind "the Chinese Wall" passed on privileged information to the prosecution team or that releasing the QuickBooks files and two Dogan emails to the prosecution team was done with the intention that the privileged documents be used to prosecute Mr. Snyder.

IV.

Mr. Snyder argues that, by seeing the QuickBooks files and the Dogan emails, the government unlawfully gained an advantage over him that cannot be undone. He insists that the government thus violated the Fifth and Sixth Amendments to the Constitution. Therefore, according to Mr. Snyder, this violation warrants the dismissal of the indictment against him or at least the removal of the trial team.

The Court finds no violation of the Sixth Amendment. The Sixth Amendment right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated against [a defendant]," *Kirby v. Illinois*, 406 U.S. 682, 688 (1972), either "by way of formal

charge, preliminary hearing, indictment, information, or arraignment," *Id*. at 689. Here, the emails were seized and underwent the filter process long before the indictment was filed on November 17, 2016. The fact that Mr. Snyder had an attorney during that time changes nothing, and the Supreme Court has noted so:

> Questions of precedent to one side, we find respondent's understanding of the Sixth Amendment both practically and theoretically unsound. As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the "'prosecutorial forces of organized society.'" By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing."

*Moran v. Burbine*, 475 U.S. 412, 430 (1986) (citations omitted).

Mr. Snyder relies on *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997), a district court case in the District of Columbia, for proposition that the Sixth Amendment right to counsel extends to the pre-indictment stage. But *Neill* neither controls this case nor is it consistent with the Seventh Circuit's jurisprudence that is in line with *Kirby*. *See e.g. United States ex rel. v. Lane*, 815 F.2d 457, 465 (7th Cir. 1987) ("[Defendant], however, cannot claim the protection of the sixth amendment merely because he retained counsel prior to the filing of charges against him.").

In addition, Mr. Snyder argues that this case falls within the purview of the Sixth Amendment because the government retained privileged information post indictment. That's a

novel argument but not a convincing one, as it would turn the Sixth Amendment jurisprudence on its head. After all, in every case where the government obtains privileged information before the indictment, such information is retained, if nowhere else, in the minds of the attorneys and agents and thus exist post indictment. Yet the courts differentiate between information obtained before and after the indictment and address such violations under two different standards.

Mr. Snyder also argues that, if the Court rules against him on the Sixth Amendment issue, the government will be able seize a suspect's privileged attorney-client emails one day and charge him the next, thus avoiding the Sixth Amendment scrutiny. Two things must be noted: first, the Court is obliged by the precedent; second, if the government makes use of pre-indictment *privileged* attorney-client communications, they do not go scot-free, making Mr. Snyder's scenario unlikely. Moreover, the cases upon which Mr. Snyder is relying do not deal with privileged communications.

The Court considers the government's infringement of the privileged documents in the context of testimonial privilege." [S]o long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results." *United States v. White*, 970 F.2d 328, 336 (7th Cir. 1992). The Court finds that Mr. Snyder suffered some prejudice in that the disorganized financial data may have been more difficult for the government to analyze. However, Kirsch made some of this information available to the government in the same or a slightly amended version, and the information itself is factual in nature and does not reflect Kirsch's legal opinions or strategies. (Arguably, that's one of the reasons why Kirsch could make it available to the government.) Nevertheless, since the government's viewing of these attorney work-product

documents constitutes a violation of the attorney-client privilege, the Court will preclude the government from using the contents of Exhibit 39 at trial or any evidence stemming from it.[9]

However, the Court finds that Mr. Snyder did not suffer prejudice from the trial team obtaining the two Dogan emails (40 & 41). In both instances, the government had obtained the agreements long before the emails were seized. Having received the same documents later, the government wasn't accorded any new insights into them and the accompanying messages from Dogan make no new revelations.

It is also worth noting briefly that none of the emails, aside from the ones in Exhibit 39 were unfairly prejudicial to Mr. Snyder. Many of the emails contain information already known to the government. Others, such as "I will call you in five minutes," do not provide any information at all. And some emails forward to Kirsch publically available information, news coverage, or media inquiries, none of which create undue prejudice.

As for the Fifth Amendment, Mr. Snyder suggests that the government induced Kirsch to have Mr. Snyder organize his financial statements so they could use those statements against him. There is no such evidence, and Mr. Snyder's creation of cohesive records at Kirsch's request does not amount to forced self-incrimination. Also, for the reasons noted above, the use of the taint team in this case did not constitute outrageous conduct that shocks "the universal concept of justice." *United States v. Miller*, 891 F.2d 1265, 1267 (7th Cir. 1989).

Finally, Mr. Snyder has not shown that seizing the emails violated a particularity requirement of the Fourth Amendment. Federal Rule of Criminal Procedure 41(e)(2)(B) allows warrants for seizing electronic storage media that will be searched later for information as

---

[9] Of course, the government is not precluded from using the information it received from Kirsch, even if that information is identical to data in Exhibit 39.

provided in the warrant. This rule recognizes the nature of electronic information and that there is no practical way to seize only certain information contained in the emails. The Court finds no fault with either the affidavit presented to the magistrate judge to get a warrant nor with how the search was executed.

V.

For all these reasons, the Court denies Mr. Snyder's motion to dismiss the indictment or to disqualify the government's trial team (DE 40). However, the Court will preclude the government from using the contents of Exhibit 39 or any evidence stemming from it at trial. *See White*, 970 F.2d at 336 (7th Cir. 1992).

SO ORDERED on September 27, 2018.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE