```
1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF INDIANA
2                        HAMMOND DIVISION

3      UNITED STATES OF AMERICA        )  Cause No.:
                                       )  2:16-cr-160
4           vs.                        )
                                       )
5      JAMES E. SNYDER,                )  Hammond, Indiana
                                       )  January 15, 2019
6               Defendant.             )
                                       )
7      _____   )

8
                                VOLUME 2
9                     TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE JOSEPH S. VAN BOKKELEN
10

11    APPEARANCES:

12    For the Government:     PHILIP C. BENSON
                              JILL R. KOSTER
13                            ASSISTANT UNITED STATES ATTORNEY
                              UNITED STATES ATTORNEY'S OFFICE
14                            5400 Federal Plaza, Suite 1500
                              Hammond, Indiana  46320
15                            (219) 937-5500
                              Philip.Benson@usdoj.gov
16                            Jill.koster@usdoj.gov

17
      For the Defendant:      JACKIE M. BENNETT, JR.
18                            JAYNA M. CACIOPPO
                              VIVEK R. HADLEY
19                            TAFT STETTINIUS & HOLLISTER, LLP
                              One Indiana Square, Suite 3500
20                            Indianapolis, Indiana 46204
                              (317) 713-3500
21                            Jbennett@Taftlaw.Com
                              Jcacioppo@taftlaw.com
22                            Vhadley@taftlaw.com

23

24
      Proceedings reported by stenotype.  Transcript produced by
25    computer-aided transcription.
```

1    APPEARANCES (Continued):

2    For the Defendant:        NEAL A. BRACKETT
                               BARNES & THORNBURG, LLP
3                              11 South Meridian Street
                               Indianapolis, Indiana 46204
4                              (317) 236-1313
                               Neal.Brackett@btlaw.com
5
                               THOMAS M. DOGAN
6                              MATTHEW B. DOGAN
                               DOGAN & DOGAN
7                              1605 Adler Circle, Suit G
                               Portage, Indiana 46368
8                              (219) 764-0100

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

2    **Court's Preliminary Instructions**                    **5**

3    **Opening Statement – Government**                       **12**

4    **Opening Statement – Defendant**                        **34**

5                    **INDEX OF WITNESSES**

6    **WITNESSES FOR THE GOVERNMENT:**                        **PAGE**

7    <u>**ELIZABETH McQUEN**</u>
     Direct Examination by Mr. Benson                         75
8    Cross-examination by Ms. Cacioppo                        102
     Redirect Examination by Mr. Bennett                      117
9    Further Redirect Examination by Mr. Benson               122

10   <u>**GERARD HATAGAN**</u>
     Direct Examination by Mr. Benson                         124
11
                     **INDEX OF EXHIBITS**
12
                          * * *
13
     **FOR THE GOVERNMENT**                                   **PAGE**
14
     Exhibit No. 1                                            83
15   Exhibit No. 2A-B                                         83
     Exhibit No. 4                                            138
16   Exhibit No. 5A                                           139
     Exhibit No. 6A-C                                         142
17   Exhibit No. 7A-C                                         143
     Exhibit No. 8A-B                                         144
18   Exhibit No. 9A-B                                         171
     Exhibit No. 10A-B                                        171
19   Exhibit No. 11                                           192
     Exhibit No. 12                                           192
20   Exhibit No. 13A-B                                        192
     Exhibit No. 14A-C                                        201
21   Exhibit No. 15A-D                                        201
     Exhibit No. 16A-C                                        201
22   Exhibit No. 17A-B                                        201

23
                          * * *
24

25

1     (The following proceedings were held in open court

2     commencing at 9:07 a.m., reported as follows:)

3    (Call to Order of the Court.)

4        **THE COURT:** You can all be seated.

5        First, I apologize for being late today. It's on

6  me. I'll tell the jury it's on me.

7        I'll do better. Did we turn the jury questionnaire

8  back into -- okay. Jay got those.

9        If there is anything you want to take up we'll take

10  it up. Can it wait until after opening statement and take it

11  up if there is anything at that point?

12        **MS. KOSTER:** Yes.

13        **MR. BENSON:** Yes, Your Honor.

14        **THE COURT:** Okay. Normally, what I would do is

15  start and say, "anything you want to do," but since I'm late we

16  need to get the jury in here so they won't blame anybody for

17  this other than who they should blame, which is me. Is that

18  okay from the defense standpoint?

19        **MR. BENNETT:** Yes, Your Honor.

20        **MR. BENSON:** Judge, the only thing, were they sworn

21  in at the close of business yesterday?

22        **THE COURT:** I think they were.

23        **THE DEPUTY CLERK:** Yes, they were.

24        **THE COURT:** Bring those up. I'm at the point I do

25  this enough, sometimes I assume I have done it and I'm three

1    trials back.

2         **MR. BENSON:**  I was worn out.  I thought maybe it was

3    a mirage.

4         **THE COURT:**  Right.  Anything else from that in a

5    procedural standpoint we might need to take up first?  Okay.

6         Can we bring the jury in?

7         First, Mr. Snyder, how are you feeling today?

8         **THE DEFENDANT:**  I feel good.

9         **THE COURT:**  Okay.  Thank you.  Bring the jury in.

10    (Jury in at 9:23 a.m.)

11         **THE COURT:**  You can all be seated.

12         First, I want to thank you very much for being here

13    on time.  Everybody in this courtroom was here on time:  The

14    attorneys, the parties, you all.  This guy wasn't.  So I

15    apologize.  I will do better and make sure we start on time so

16    we can move this case through expeditiously.  But, again, I

17    want to make sure you know it's nobody else's fault.  It's my

18    fault today.

19         Members of the jury, now that you have been sworn, I

20    will give you some preliminary instructions to guide you in

21    your participation in this trial.  It will be your duty to find

22    from the evidence what the facts are.  You and you alone will

23    be the judges of the facts.  You will then have to apply them,

24    those facts, to the law as I give it to you.  And you must

25    follow the law whether you agree with it or not.  Nothing I may

1  say or do during the trial is intended to indicate or should be

2  taken by you as indicating what your verdict should be.

3        The evidence from which you will find the facts will

4  consist of testimony of witnesses, documents, and other things

5  received into the record as exhibits and any facts the lawyers

6  agree or stipulate to or that I may instruct you to find.

7  Certain things are not evidence and must not be considered by

8  you.  Let me list them for you.

9        First, statements, arguments, and questions by

10  lawyers are not evidence.  Objections to questions are not

11  evidence.  Lawyers have an obligation to their clients to make

12  objections when they believe evidence being offered is improper

13  under the rules of evidence.  You should not be influenced by

14  the objection or by my ruling on it.  If I sustain the

15  objection, just ignore the question and any answer that may

16  have been given in response to that question.

17        If I overrule the objection, then you should treat

18  the answer like any other.  If I instruct you that some item of

19  evidence is received for a limited pursuant only, you must

20  follow that instruction.  Testimony that I exclude or tell you

21  to disregard is not evidence and must not be considered by you.

22        And, finally, anything you may have seen or heard

23  outside the courtroom is not evidence and must be disregarded.

24  You are to decide this case solely on the evidence presented

25  within this courtroom.  There are two kinds of evidence, direct

1    and circumstantial.  Direct evidence is direct proof of a fact

2    such a testimony of an eyewitness.  Circumstantial evidence is

3    proof of facts from which you may infer or conclude that other

4    facts exist.  I will give you further instructions on these as

5    well as other matters at the very end of the case, but keep in

6    mind that you may consider both kinds of evidence, direct and

7    circumstantial.  It will be up to you to decide which evidence

8    to believe, which witnesses not to believe, and how much of any

9    witness's testimony to accept or reject.  I will give you some

10   guidance for determining the credibility of witnesses at the

11   end of the case.

12          The charges against Mr. Snyder are contained in the

13   Indictment.  The Indictment is simply the description of

14   charges against Mr. Snyder.  It is not evidence of anything.

15   Mr. Snyder has pled not guilty to the charges and has denied

16   committing the offenses.  Mr. Snyder is presumed innocent and

17   you may not find Mr. Snyder guilty unless all of you

18   unanimously find that the government has proven Mr. Snyder's

19   guilt beyond a reasonable doubt.

20          Now, a few words about your conduct as jurors.  You

21   as jurors must decide the case solely on the evidence presented

22   here within the four walls of this courtroom.  This means that

23   during the trial, you must not conduct any independent research

24   about this case, the matters in the case, or the individuals

25   involved in the case.

1        In other words, you should not consult dictionaries

2   or reference materials, search the internet, websites, blogs,

3   or use other electronic tools to obtain information about this

4   case or help you decide the case.  Please do not try to find

5   out information from any source outside the confines of this

6   courtroom.

7        Until you retire to deliberate, you may not

8   communicate about or discuss this case with anyone, even your

9   fellow jurors.  This includes all kinds of communication

10  including electronic communications.  After you retire to

11  deliberate, you may begin discussing the case with your follow

12  jurors; but you cannot communication about it or discuss the

13  case with anyone else until you have returned a verdict and the

14  case is at an end.  If anyone should try to talk to you about

15  this case, anyone at all, bring it to my attention promptly.

16  Finally, do not form an opinion until all the evidence is in

17  and you have been instructed on the law.

18        If you would like to take notes during the trial --

19  Carlos, have we given them copies of notebooks?

20        **SECURITY OFFICER VELEZ:**  Yes.

21        **THE COURT:**  Okay.  They are on the seats.

22        If you would like to take notes during the trial,

23  you may do so.  On the other hand, you are not required to take

24  notes if you do not want to.  That will be left up to you

25  individually.  Notepads and pencils have been made available to

1   you.

2          If you decide to take notes, be careful not to get

3   so involved in note taking that you become distracted from the

4   ongoing proceedings.  You should only use your notes as aids to

5   your memory.  If you take notes, you may not take them home

6   with you during the trial.  You must leave them here at the end

7   of the day.  At the end of the trial, the courtroom deputy will

8   collect the notes, and none of the lawyers, parties, or

9   witnesses or any court personnel will see them.

10         Any notes taken by any jurors should not be

11  disclosed to anyone other than a fellow juror and only then

12  after you commence your deliberations.

13         If you do not take notes, remember that it's your

14  own individual responsibility to listen carefully to the

15  evidence.  You cannot give this responsibility to another juror

16  who is taking notes.  You should not be influenced by the notes

17  of another juror.  You must rely on your own recollection of

18  the testimony.  Notes taken by any juror are not evidence and

19  must not be given any greater weight than the recollection or

20  impression of each juror concerning the evidence received in

21  the case.

22         Please remember too that my job during the trial is

23  different from yours.  So you should not think it important

24  whether or not I take notes of things during the trial.

25         As members of the jury, you will be permitted to

 1    submit questions for a witness after the lawyers have finished

 2    questioning the witnesses.  Here is how that is going to work.

 3    After each witness has testified and the lawyers have asked all

 4    their questions, I will turn to the jury to see if anyone has

 5    any additional questions.  If you have any questions, you

 6    should write it down and give it to the court security officer.

 7    And, again, make sure if you have a question that you get the

 8    court security's attention because he will get my attention.

 9    Sometimes I forget to even ask.  So I apologize -- I will have

10    notes all over this place to remind me to ask you questions.

11    Notwithstanding that, sometimes I just plain forget.  If you

12    have a question, give it to the court security officer so he

13    can bring it to me.  You may submit a question for a witness to

14    clarify or help you understand the evidence.

15         If you submit a question, the court security officer

16    will hand it to me, and I will share your questions with the

17    lawyers in the case.  If your question is permitted under the

18    rules of evidence, I will read your question to the witness so

19    that the witness may answer it.  In some instances, I may

20    modify the form or phrasing of a question so it is proper under

21    the rules of evidence.

22         On other occasions, I may not allow the witness to

23    answer the questions either because the question cannot be

24    asked under the law or because another witness is in a better

25    position to answer the question.  Of course, if I cannot allow

1   a witness to answer a question, you should not draw any

2   conclusion from the fact or speculate on what the answer might

3   have been.  Here is several important things to keep in mind

4   about your questions to witnesses.

5           First, all questions must be submitted in writing.

6   Second, the witness's may not be recalled to the witness stand

7   for additional juror questions.  So if you have a question for

8   a particular witness, you should submit it at the end of that

9   witness's testimony.

10          Finally, as jurors, you should remain neutral and

11  open-minded throughout the trial.  As a result, you should

12  always phrase any question or questions in a neutral way that

13  does not express an opinion about the case or a witness.

14  Remember that at the end of the trial you will be deciding the

15  case.  For that reason, you must keep an open mind until you

16  have heard all the evidence and the closing arguments of

17  counsel and I have given you the final instructions on the law.

18          At the end of the trial, you will have to make your

19  decision on the basis of what you remember about the evidence.

20  It is unlikely that a written transcript will be available to

21  you to read, and it is difficult and time consuming for the

22  court reporter to read back testimony.

23          I urge you to pay close attention to the testimony

24  as it is presented.  This trial will proceed in the following

25  order:  Each side will have an opportunity to make a brief

1    opening statement to you.  Note that I use the word statement,

2    for the attorneys are not permitted at this time to argue their

3    case.

4         Their opening statements will be limited to a

5    recitation of what they expect the evidence to show or not

6    show; that is, an outline of the factual background of the case

7    they expect to be developed by the evidence.  Openings

8    statements are neither evidence nor argument.  Next, the

9    government may call witnesses and present evidence.  Then

10   Mr. Snyder may call witnesses and present evidence, but he is

11   not required to do so.

12        I remind you that Mr. Snyder's presumed innocent and

13   the government must prove the guilt of Mr. Snyder beyond a

14   reasonable doubt.  Mr. Snyder has no requirement to prove his

15   innocence.

16        After presentation of evidence is completed, I will

17   give you instructions on the applicable law.  After that, the

18   lawyers will address you to make their final arguments to

19   summarize and interpret the evidence for you.  Then you will

20   retire to deliberate on the case.

21        Is the government ready for its opening statement?

22        **MS. KOSTER:**  Yes, Your Honor.

23        **THE COURT:**  Okay.

24              **OPENING STATEMENT - GOVERNMENT**

25        **MS. KOSTER:**  We are here today because the defendant

1  James Snyder does not think rules apply to him because when he

2  and his business owed money, tens of thousands of dollars to

3  the IRS between 2010 and 2013.  He chose to hide his income and

4  his assets from the IRS rather than pay his fair share.  We are

5  here because after he became mayor of Portage, Indiana,

6  James Snyder, with the help of a friend, steered $1.125 million

7  worth of city contracts to a local business so he could solicit

8  from them a payment of $13,000.

9         We are here because in 2016, despite knowing he was

10 under investigation by the FBI and the IRS, James Snyder

11 arranged for another friend, and that friend's partner, to get

12 lucrative city towing business after they paid him a bribe of

13 $12,000.

14        James Snyder is charged with three crimes:  The

15 first is obstructing and impeding the IRS's collection efforts;

16 the next, corruptly soliciting a bribe or a gratuity of

17 $13,000; and finally, corruptly soliciting a bribe of $12,000.

18        Good morning.  My name is Jill Koster and along with

19 my co-counsel, Phil Benson, I have the honor of representing

20 the people of the United States in this case.

21        We have the burden of proof.  It's our job to bring

22 forth to you evidence that convinces you beyond a reasonable

23 doubt that the defendant is guilty of the crimes which he has

24 been charged.  We will meet that burden of proof, and I'm about

25 to show you how.

 1           First, the tax charge.  The evidence in this case

 2   will show that the defendant had a business, a business called

 3   FFTM, which stood for First Financial Trust Mortgage.  He was

 4   in the business of helping people get mortgages, mortgage loans

 5   from lenders.  That business was located at 5955 Central Avenue

 6   in Portage, Indiana.  That address becomes important, and you

 7   will see why in the minute.

 8           James Snyder was the general manager of that

 9   business.  He was responsible for paying employees and for

10   paying withholding from employees' paychecks to the IRS.

11           So FFTM would pay its employees, and a portion of

12   their salary, a portion of what they had earned, is held back.

13   It's call withholding.  It's income taxes.  It's Medicare and

14   it's Social Security taxes.  You may be familiar with the term

15   FICA taxes.  Well, those taxes that are withheld by an employer

16   have to be paid over to the IRS.  The evidence will show that

17   in 2007, 2008, and 2009, James Snyder failed to make those

18   payments in full to the IRS.

19           The IRS sent FFTM a Notice of Intent to Levy on July

20   13th, 2009.  So at this point, July 13, 2009, James Snyder

21   knows:  The IRS knows I owe them money, and they're coming

22   after me for that money.  They're coming to collect that money.

23   That's what the IRS's job is.

24           As of November 30, 2009, James Snyder on behalf of

25   FFTM owed the IRS $97,000.  Despite that, James Snyder in 2009

1    alone paid himself from FFTM over $110,000.  So James Snyder

2    had a problem.  Realizing that any money flowing into FFTM

3    could be subject to levies by the IRS, he devised a scheme, a

4    scheme to obstruct the IRS from collecting the money he owed

5    them.

6           He established a shell company and a bank account

7    for that shell company.  The company was called SRC Properties,

8    and you'll note that it had the very same address, 5955 Central

9    Avenue in Portage, Indiana.  And James Snyder was the only

10   member of that limited liability company.  In other words, it's

11   a one person company, and he is the only employee.

12          So he established this company, SRC Properties, and

13   he also obtained a, "doing business as," a d/b/a, and

14   registered that with the Secretary of State in Indiana as well.

15   And that company was called -- I'm sorry, I'm blanking -- that

16   company was called SRC Marketing.

17          Next, James Snyder convinced one of the lenders with

18   whom he was doing business, a company by the name of GVC

19   Mortgage, to essentially take over FFTM and hire him and all of

20   his employees.  But you'll hear he didn't tell GVC that he owed

21   the IRS money, $97,000.  And they didn't agree to pay that

22   money.  But they did agree to pay James Snyder.  He signed an

23   Employment Agreement with GVC Mortgage.  That agreement is

24   dated January 27, 2010.

25          And you will see that what James Snyder was agreeing

1   to do in signing this Employment Agreement was to be the branch

2   manager essentially -- he identifies himself on this form as

3   the president -- but the branch manager of GVC Mortgage doing

4   business in the same building and operating essentially as

5   FFTM.

6          So they're going to pay him to essentially continue

7   doing the business he was doing before he got into debt with

8   the IRS, and they agreed to not just pay James Snyder but to

9   pay his employees as well.

10          Now, this arrangement caused it to look like FFTM

11   couldn't afford to pay James Snyder or its employees.  So the

12   IRS sees FFTM not making any payments to its employees

13   beginning in 2010.  But there was one more problem remaining:

14   What to do with the commissions that he was earning and his

15   employees were earning on all those loans they were writing for

16   GVC.

17          If the money came to him, he would have to pay taxes

18   on it.  If it went to FFTM, the IRS would probably take it.  So

19   he concocted invoices on SRC letterhead purporting to show work

20   formed on behalf of FFTM.  So I'm just going to let that sink

21   in for a minute.

22          James Snyder, the only employee of SRC, his company,

23   is billing his other company for supposed work, including

24   consulting, which becomes relevant later, that he performed on

25   behalf of his own company.  And then he's billing GVC with

1  these invoices.  He's sending these invoices to GVC saying,

2  Look at this work that SRC did on behalf of FFTM, and GVC

3  reimburses SRC.  Problem solved.

4        But there was yet another problem remaining.  FFTM

5  still owed the IRS $97,000.  So James Snyder concocted another

6  scheme.  He made what's called an Offer in Compromise and

7  submitted it to the IRS.  An Offer in Compromise is essentially

8  telling the IRS, I acknowledge that I owe you money.  I can't

9  pay you all of the money, so will you take some of the money?

10        And sometimes the IRS says:  Yes, we agree you can't

11  pay us everything.  Can't get blood out of a turnip, as they

12  say, so we will accept less.  So what James Snyder was offering

13  to pay on behalf of FFTM to settle the $97,000 in tax debt was

14  a mere $5,000, or 5.15 percent of what he owed.

15        Let's talk now about Mr. Snyder's personal tax debt.

16  In 2009 the IRS concluded an audit of James Snyder 's 2005,

17  2006 and 2007 personal taxes, and they said:  You owe as of

18  March 29, 2009, $31,369.  That's a problem.

19        But, once again, James Snyder had a plan.  In March

20  of 2010, he submitted an Offer in Compromise to the IRS to

21  clear up this personal tax debt, and by this time, his tax debt

22  had grown to nearly $40,000.  So James Snyder submits to the

23  IRS this Offer in Compromise, and he offers to pay a mere

24  $1,000 out of the $40,000 he owes personally, or 2.5 percent.

25        And in both of these Offers in Compromise that he

1    submitted to the IRS, he tells the IRS that there is doubt as

2    to collectability, meaning -- can't get blood out of a turnip.

3    I don't have the money.  That was his representation.

4          But when he filled out these forms, ladies and

5    gentlemen, the evidence will show that he did not tell the IRS

6    the truth about his financial situation.  He did not disclose

7    that he was an employee of FFTM -- excuse me -- of GVC.

8          Remember that Employment Agreement that I showed you

9    where he signed and wrote president next to it?  That

10   Employment Agreement was dated January of 2010.  But when he

11   submitted these forms just a few months later, he didn't tell

12   them that he was employed by GVC Mortgage.  So the IRS didn't

13   know about that income, right?

14         He also didn't tell them about the existence of that

15   shell company, SRC:  SRC Properties, SRC Marketing, the one-man

16   show, the SRC, his company, only his company.  He didn't tell

17   them about it, and he didn't tell them about SRC's bank

18   account, so they didn't know about all the money that was going

19   from GVC to SRC.  And I know there is a lot of acronyms, but

20   hopefully throughout the trial all of this will eventually sink

21   in.

22         So in filling out these forms, and in not disclosing

23   the existence of SRC and its bank account, James Snyder

24   deceived the IRS.  He prevented the IRS from having all of the

25   information that it needs to make a decision.

1          So he's charged with obstructing and impeding the

2    IRS's collection efforts.  Now, some time goes by after he

3    files these Offers in Compromise, which, by the way, were

4    rejected by the IRS.  Some time goes by and he says:  How about

5    we agree I'll pay installments?  I'll get on an installment

6    plan because I don't have the money to pay you.  Again, he's

7    telling them: I don't have the money to pay you.  I want an

8    installment plan.

9          So in January of 2011, he submits another 433-A,

10   which, again, does not identify SRC or its bank accounts into

11   which tens of thousands of dollars have by this time flowed.

12   And when you submit a 433-A in support of an Installment

13   Agreement, something very important happens, something very

14   important to the taxpayer who is trying not to pay the IRS.

15   The IRS stops its collection efforts.

16         So if they could levy a bank account, they stop.

17   They don't.  If they could take money out of your salary or

18   your work, they don't.  All of those actions that the IRS can

19   take, they stop taking if they accept your Installment

20   Agreement.  And in this case, James Snyder deceived the IRS,

21   once again, by hiding his income and his assets, SRC and its

22   bank accounts, from the IRS.  And they granted him that

23   Installment Agreement.

24         They allowed him to pay a mere $112 a month, $112 a

25   month.  Some people pay more than that just for their cell

1  phone.  And that's what they allowed him to pay.  And he wanted

2  to keep that Installment Agreement, so on April 2, 2013, when

3  there was some danger of it being taken away, he submitted

4  another 433-A.  And he, again, failed to disclose information

5  to the IRS that was capable of affecting its decision.

6        Now, over this time period that I have been

7  discussing, 2010, 2011, 2012 and into 2013, when James Snyder

8  is working as the branch manager of GVC and getting paid by GVC

9  but still holding himself out and his employees out to be FFTM

10 Mortgage, and he has this side company, SRC, of which he is the

11 only employee, a lot of money changes hands during this time

12 period, money which the IRS didn't know about.

13        $326,000 went to James Snyder from GVC during that

14 time period, and over $400,000 went to SRC.  But by the time

15 the IRS figured out the defendant's complicated scheme, the

16 money was gone.  And that's how James Snyder obstructed and

17 impeded the IRS from collecting the tax debt that he owed

18 personally and that FFTM owed as well.

19        I'm going to talk next about the truck bribe or

20 gratuity because James Snyder's crimes didn't stop with

21 obstructing and impeding the IRS.  They continued after he

22 became mayor of Portage, Indiana.

23        You'll hear evidence that when James Snyder ran for

24 mayor of Portage, Indiana, he ran on a platform of wanting to

25 automate its trash collection system.  This was a good idea

1    because automated trucks -- and by automate, that refers to

2    trucks that have an arm that picks up the trash and dumps it

3    into the trash container on the back of the truck -- that saves

4    city employees from having to do that backbreaking work, and

5    that's a good idea in theory.

6            And when you're running on a platform of wanting to

7    automate the city's trash collection program, it doesn't take a

8    rocket scientist to figure out that you might get a lot of

9    support from people who sell trucks.

10           So the defendant went to Great Lakes Peterbilt, and

11   he introduced himself to the owners of this business.  He told

12   them about his desire to automate the city's trash program.

13   And at this point in time, the city didn't have any trucks that

14   were automated.  Eventually, they do get two Mack trucks from

15   the City of Valpo.  Valpo just gave Portage two of their

16   automated Mack trucks.

17           But at this point in time, there were no automated

18   trucks in the City of Portage.  And he goes to Great Lakes

19   Peterbilt and he said, I'm going to automate.  We're going to

20   be buying trucks.

21           Not surprisingly, he gets some support.  He talks to

22   Steve Buha and Bob Buha.  They're brothers, and they were the

23   longtime owners of Great Lakes Peterbilt.  But as you will hear

24   during the trial, their business was not doing well.  2012,

25   2013, the business was failing.  They were losing money.  It

1   was not a dealership that was excelling.

2           So they see this opportunity to sell trucks to the

3   City of Portage and even, perhaps more importantly, to do

4   service on those trucks for the City of Portage going forward.

5   Because you'll hear that these trucks, although they cost about

6   $200,000 to $250,000 each -- they're very expensive -- the

7   money to be made on them is not so much in the selling of the

8   truck but in the servicing of the truck after it's sold.

9           And you are going to hear that in 2012 and 2013,

10  after James Snyder becomes mayor, Great Lakes Peterbilt, Bob

11  and Steve Buha's failing business, was awarded two different

12  contracts by the City of Portage by the Board of Works.  And

13  the Board of Works is an entity within the city.  It is the

14  entity that approves expenditures such as this.  And you will

15  hear, conveniently James Snyder is the head of the Board of

16  Works.  He sits on it.  He's in charge.  I think he's called

17  the president.  I could be wrong about that.

18          But he's in charge of the Board of Works.  There is

19  two other members, and he appoints both of them.  So the Board

20  of Works that James Snyder sits on awards two contracts worth

21  over $1.125 million to Great Lakes Peterbilt.  And within days,

22  less than two weeks later, Great Lakes Peterbilt writes a check

23  and that money goes to James Snyder.  But what is so

24  interesting about that check, ladies and gentlemen, is that

25  unlike previous donations Steve and Bob Buha and Great Lakes

1   Peterbilt made to James Snyder -- and there are many; these are

2   just two of the larger ones.

3          Unlike previous donations, which went to James

4   Snyder's campaign or to his golf outing, which is campaign,

5   this check -- this $13,000 check from Great Lakes Peterbilt was

6   made out to SRC Consulting.  So we have SRC Properties, SRC

7   Marketing, and now a check to SRC Consulting.  Well, guess

8   what?  There is no such thing as SRC Consulting.  There is no

9   company by that name registered in the State of Indiana.

10          In fact, SRC Properties and SRC Marketing by this

11   point in time had been dissolved, so they didn't even exist in

12   the state of Indiana.  So the shell company that the defendant

13   set up that he is the only employee of, SRC, had disappeared.

14   And, yet, it's getting $13,000 in income from Great Lakes

15   Peterbilt.

16          And interestingly, SRC's bank account, which was

17   through Horizon Bank, lists SRC as a mortgage company.  So is

18   James Snyder performing mortgage consulting for Great Lakes

19   Peterbilt?  Good question.

20          Law enforcement wanted to know the answer to that.

21   And on July 21, 2014, they interviewed James Snyder, and they

22   asked him where did this $13,000 come from.  What is SRC

23   exactly?  And James Snyder lied.  He told the FBI and the IRS

24   agents who were interviewing him that that money to SRC

25   Consulting, that was for consulting that he was doing on

1   healthcare and IT matters.

2        But you're going to hear, ladies and gentlemen --

3   first of all, that law enforcement subpoenaed records from

4   James Snyder showing healthcare and IT consulting.  Do you have

5   a contract to do this consulting?  Are you licensed to do this

6   consulting?  Do you have work product that shows you actually

7   did this consulting?  And what about communications or memos?

8   Do you have any documents that show that you actually did

9   healthcare and IT consulting?  And they got nothing.

10        And you will hear during this trial that healthcare

11  consultants in the state of Indiana must be licensed.  And

12  James Snyder has never been licensed as a health care

13  consultant.  You will also hear that James Snyder is not

14  qualified to perform healthcare consulting and also not

15  qualified to perform IT consulting.  The evidence will show

16  instead that when James Snyder or the City of Portage or any of

17  the companies that he has owned or worked for and all these

18  different acronyms, whenever those companies have needed

19  healthcare or IT consulting, they hire people who are

20  qualified.  He, himself, has hired consultants to perform

21  healthcare and IT consulting.

22        So if this consulting scheme sounds familiar, I want

23  to remind you about James Snyder sending invoices on behalf of

24  his own company claiming to have performed consulting for his

25  other company so that GVC would pay that other company, SRC.

1          But there is one thing James Snyder said to law

2   enforcement that we can't argue with.  He said, I earned that

3   money.  Well, guess what?  He did earn that money but not in

4   the way that he claimed.  He earned it because he steered those

5   truck contracts to Great Lakes Peterbilt, and you will see how

6   he did that during this trial.

7          The first thing he did was he had his friend, Randy

8   Reeder, who he had appointed to be the assistant superintendent

9   of the Streets and Sanitation Department in Portage, he had his

10  friend, Randy Reeder oversee the bid process and bid selection

11  of these trucks.

12         And that was unusual.  And that raised questions

13  within the Streets and Sanitation Department because in the

14  past, it was always the superintendent, not the assistant

15  superintendent, who performed that task, who was in charge of

16  the bid process when trucks were going to be bought.  And that

17  superintendent was very experienced in the bid process, but

18  Randy Reeder was not, not at all.

19         In fact, he had never prepared a bid.  He had never

20  worked for city government before he was appointed as assistant

21  superintendent.  He had never worked in Streets and Sanitation

22  before he got this job from James Snyder.

23         And one of the ways that they steered contracts to

24  Great Lakes Peterbilt is they purchased a truck that didn't

25  meet even the general terms on the invitation to bid that was

1    prepared by Randy Reeder.  Those general terms required that

2    all equipment furnished in the bid process to the city must be

3    new, unused, and the same as the manufacturer's current

4    production model.

5         But this truck that you see here was purchased by

6    the City of Portage for over $200,000.  This truck was not the

7    same as the manufacturer's current production model.  Great

8    Lakes Peterbilt put in a bid to sell the city a truck that was

9    two years old that had been sitting on their lot.

10        Now, you're going to learn a little bit about trucks

11   during this case.  Chassises of trucks, that's the cab portion

12   where the person driving the truck sits.  And the body, that's

13   the back part.  That's the part that contains the mechanical

14   arm.  Different companies sell each part of these trucks.

15        And you are going to hear that each model of these

16   trucks gets more expensive than the last because more and more

17   innovation is included in these trucks.  And, importantly, this

18   truck, which was a model year 2012.  Though it was

19   manufactured, it was built, in 2011, it was a model year 2012.

20   So it's engine could only meet the EPA standards that existed

21   at that time.  But the EPA standards changed in 2013, and this

22   truck didn't meet them.

23        The other individuals who were participating in the

24   bid at the time this truck was sold to the city, they were

25   selling 2014 model trucks, trucks that did meet the new EPA

1   standard, trucks that had more extensive engines.

2           Now, if two companies are selling trucks and one is

3   an older model truck, it's like comparing apples and oranges.

4   The company that's selling the newer truck can't compete

5   against a company that's selling the older truck because they

6   can sell it for less.  They paid less from the manufacturer,

7   and it's worth less.  So, of course, they can offer a low bid

8   that will be accepted, and they're incentivized to do that.

9           Great Lakes Peterbilt specifically you will hear was

10  incentivized to do that because they had what's called floor

11  plan financing on these trucks.  So when a dealership obtains

12  trucks from a manufacturer to sell, they take out a loan on

13  those trucks, and it's called a floor plan.  And they pay the

14  manufacturer, or it could be a lender instead of the

15  manufacturer.  They pay.  They have to make periodic monthly

16  payments, and then they have to make periodic balloon payments.

17  And that balloon payment, you will hear, is made because these

18  trucks depreciate over time, and the manufacturer wants to,

19  number one, incentivize the dealer to sell these trucks.  So

20  you want to get them out off the lot before the balloon payment

21  becomes due.

22          And, number two, they want to pay down the principal

23  on the loan to reflect the depreciation of the truck.  Great

24  Lakes Peterbilt, when they sold this truck to the city, had a

25  balloon payment that had come due and not been paid.  They had

1    many payments that had not been paid.  You will hear testimony

2    that Steve Buha -- actually, you will see documents that show

3    he had to take $150,000 out of his own Edward Jones retirement

4    401(k) account to keep Great Lakes Peterbilt operating during

5    this time.

6            And that truck, that two-year-old truck, it had been

7    sitting on Great Lakes Peterbilt's lot for two years exposed to

8    the elements here in this area where winters can be brutal.

9    Rust can build up.  Animals, critters, can climb into trucks

10   and chew on wires.

11           The truck was outdated, but James Snyder didn't

12   inform the other members of the Board of Works who voted to buy

13   this truck.  He didn't tell them that it was two years old.

14           And there is another round of trucks, as you saw.

15   There were two different rounds of trucks.  There's another

16   round of trucks where James Snyder and Randy Reeder concocted

17   some urgency in needing to buy these trucks.  They claimed:  We

18   need them right away.

19           Now, this is a complicated charge.  And what I want

20   to show you the highlighted line is Great Lakes Peterbilt's

21   bid.  As you can see here, there were lower bids, much lower

22   bids.  In fact, almost $60,000 lower than Great Lakes

23   Peterbilt's bid.  But the thing that differentiated the low bid

24   from Great Lakes Peterbilt's bid is because these manufacturers

25   couldn't deliver the trucks as quickly as Great Lakes Peterbilt

1    could.  And you will hear the reason Great Lakes Peterbilt

2    could is because their trucks, their chassises, were in less

3    demand at this time.  And demand can fluctuate.  You might sell

4    trucks to Republic, which is a large trash collection company.

5    If you get a bid order, you're backordered.  Your delivery

6    times go way up.

7         So at this particular time, Great Lakes Peterbilt

8    was the only chassis manufacturer that could meet that 150-day

9    deadline.  But the city employees, the mechanics, the people

10   who were actually going to be operating these trucks, they said

11   there was no urgency in getting the trucks.  There was no

12   reason we had to have it in 150 days.

13        Moreover, the trucks that were purchased ultimately

14   were not what the mechanics wanted.  And in the past, the

15   mechanics had always determined the specs of what they were

16   looking for and gotten the trucks that they wanted, the trucks

17   that they believed were best for the city because they would

18   know.  They're the ones who operate these trucks.  They're the

19   mechanics.  They fix them.  They maintain these trucks.  So

20   everything about this bid process with Great Lakes Peterbilt

21   was fishy.

22        And when the $13,000 payment afterwards was found

23   and James Snyder's lies about that payment and claims about

24   consulting on healthcare and IT came to light, that's the

25   evidence that supports the second bribery charge.  But

 1  James Snyder's crimes didn't stop there.

 2          The City of Portage maintains a list of companies

 3  that are called when the police need to tow a vehicle,

 4  typically three companies at a time.  In 2016, two businessmen

 5  joined together to pay a bribe to James Snyder to get on that

 6  tow list.

 7          One of those businessmen was John Cortina.  And you

 8  will hear John Cortina was a friend of James Snyder.  He owned

 9  a body shop and a tow yard; but he didn't own any tow trucks,

10  so he would partner with people who did own tow trucks.  He

11  teamed up with a man by the name of Scott Jurgensen, who also

12  owned -- who did own tow trucks, and the two discussed a plan

13  to pay a bribe to James Snyder.

14          Now, make no mistake about it, this was a bribe.

15  John Cortina knew it was a bribe.  Scott Jurgensen knew it was

16  a bribe.  And each of them contribute $6,000 of the $12,000

17  bribe.  And these are the checks.  They are cashiers' checks

18  that made up that bribe.  They are obtained by John Cortina,

19  who received $6,000 in cash from Scott Jurgensen.

20          Now, while the two men got together and were talking

21  about these checks, guess who called?  James Snyder called on

22  the phone.

23          And he said:  What's happening, brother?  JS is

24  James Snyder.  JC is John Cortina.

25          Cortina says:  Hey, Christmas is here.

1          James says:  Are you running?

2          No, I'm not running, but I got Christmas.

3          All right.  Where you want -- where you want me to

4   go for you?

5          You can come to the mortgage office, Snyder says.

6          What time, 15 minutes?

7          And Snyder tells Cortina in this call, in this

8   conversation -- I didn't give you the whole transcript -- I'll

9   be there.  And he leaves, and he goes to see James Snyder at

10  his mortgage office.

11         So this is Kustom Auto Body.  This is John Cortina's

12  business.  Now -- I'm sorry.  I got a slide out of order.

13         What Cortina didn't know at the time and what

14  James Snyder didn't know at the time was that Scott Jurgensen

15  was working with the FBI.  Scott Jurgensen is a former

16  Merrillville police officer.  He had left the police department

17  and started a tow company.  And he came forward to the FBI

18  because he became frustrated -- he began to observe that city

19  contracts for towing, getting on city tow lists, seemed to

20  require the payment of bribes.

21         And he believed that was wrong, so he went to the

22  FBI and told the FBI what he knew about that, and they used him

23  as a confidential human source or CHS.  So what Cortina didn't

24  know when he is describing the bribe payment as Christmas and

25  what James Snyder didn't know when he knows exactly what

1  Cortina means by Christmas, it's a bribe, is that Scott

2  Jurgensen was wearing a wire.  And that's how we know exactly

3  what was said during that conversation.  And the FBI was

4  watching.  So when Cortina left his business to go see

5  James Snyder, the FBI followed him.  And they see Cortina go in

6  the business; James Snyder come out after Mr. Cortina talking

7  on the phone with a smile on his face.

8           Now, the larger of the two checks for $10,000,

9  something important takes place on this check.  Scott Jurgensen

10 will testify that when he saw this check, it just had the word,

11 "donation," in the memo line.  Yet, sometime between when

12 Cortina takes that check to James Snyder and when James Snyder

13 cashes it at the bank or deposits it at the bank, somebody has

14 crossed out, "donation," and put, "loan," and the initial JS

15 for James Snyder.  The evidence will show it is James Snyder

16 who did that.

17          Later on, Scott Jurgensen asks Cortina about the

18 loan.  Was it really a loan?  And they discuss it.  And

19 John Cortina you will hear says -- and pardon my language; this

20 is his language not mine -- he calls it fucking loans.  He

21 calls it loans.  And the CHS Scott Jurgensen says:  You call it

22 juice money.

23          And Cortina says:  I call it fucking juice.  I call

24 it what it is.  What the fuck.  Call it juice money.  Now,

25 there is one more conversation that you're going to get to hear

1    for yourself that you will want to listen closely for at trial.

2    It take place on November 10, 2016.  And it involves

3    John Cortina, James Snyder, Cortina's wife Margaret, and a few

4    others are in the room.  And they are discussing search

5    warrants that had been executed that day at various locations

6    in the city.  And they're talking about bribes, loans and

7    bribes.  And Cortina says to James Snyder:  But they don't see

8    here, here they know that when you work for the city, most of

9    the time you got to give favors to get the job from the city.

10   They know that.

11           And Snyder says tellingly:  You just can't say that,

12   right?

13           And Cortina says:  Well, you can't say it that way,

14   but we're stupid if we don't say amongst ourselves what's --

15   what's going on.

16           Listen carefully during the trial for what

17   James Snyder says after that.  Because it speaks values.  It

18   tells you everything you need to know.

19           We are here today because James Snyder does not

20   believe that rules apply to him.  But throughout this trial, we

21   will prove him wrong about that.  We will prove him guilty

22   beyond a reasonable doubt.  Thank you.

23           **THE COURT:**  Thank you, Ms. Koster.

24           Defendant.

25           **MR. BENNETT:**  Yes.

**OPENING STATEMENT - DEFENDANT**

1

2          **MR. BENNETT:**  May it please the Court, counsel, and

3    members of the jury.  My name is Jackie Bennett.  We were

4    introduced during the voir dire process, but I am here with my

5    client, James Snyder; several colleagues, Jayna Cacioppo, you

6    will hear from her, Neal Brackett, and Vivek Hadley.  There

7    will be a number of us that you hear from, and I just wanted to

8    let you know their names one more time.

9          I want to take just a moment to thank each of you

10   for agreeing to serve as jurors in this matter.  Jury service

11   can certainly be a nuisance.  It can be inconvenient and time

12   consuming, but it is extremely important to our system of

13   justice.

14         And after what you just heard, I appreciate our

15   system of justice and the ability of an accused person, a

16   falsely-accused person, to have their day in court and to

17   present their information and truthful evidence.

18         But thank you for the role that you have agreed to

19   play in this process.  Ladies and gentlemen, the allegations in

20   this Indictment are straightforward, fairly straightforward.

21   Count 1 alleges that James Snyder solicited and received

22   $12,000 in bribes in exchange for placing a towing company on a

23   list of three companies authorized to do towing work within the

24   City of Portage.  That allegation is false.

25         Count 3 of the Indictment alleges that James also

1   solicited and accepted $13,000 in bribes to influence the

2   awards of public contracts to a local vendor known as Great

3   Lakes Peterbilt.  Probably you have seen the business in

4   driving around town.  That was to manufacture specialized

5   garbage trucks, garbage trucks that had these articulated arms

6   that would save the body's wear and tear on the drivers who had

7   been having to hump those very heavy containers.  And they also

8   allege something about he also helped obtain a road

9   construction project.  Those allegations are false.

10          And, finally, in Count 4 he is charged not with tax

11   evasion and not with failing to pay his taxes as owed but

12   instead with supposedly obstructing the IRS during its efforts

13   to collect unpaid taxes.  That allegation, too, is false.  Each

14   of the allegations made by the government against James Snyder

15   in these three counts are false.  I will be more direct.  These

16   allegations are lies.  And on behalf of James Snyder, we're

17   going to prove it.

18          As I am sure you know and as the Court will instruct

19   you, the government alone bears the burden of proof in a

20   criminal matter.  It has to prove its allegations beyond a

21   reasonable doubt.  The defendant, on the other hand, has no

22   obligation to prove anything in a case.  But as I stand before

23   you people in this courtroom here today, I'm making a pledge to

24   you and I'm making you this promise, even though we bear no

25   burden of proof -- we bear no burden of proving anything in

1    this case -- but as the lawyers for James Snyder, we're going

2    to assume a burden regarding what the evidence is going to show

3    you.

4         And we're simply not denying the charges.  We're

5    going to prove to you that these allegations are false.  So how

6    did we -- how do we go about doing this?  We're going to do

7    this by proving to you what really did happen, by showing you

8    how and why, for example, the towing companies were either put

9    on or taken off a list of authorized tow operators in the City

10   of Portage.

11        We're going to prove to you exactly how it was that

12   the awards for the manufacturer of garbage trucks were made,

13   who was involved in the process, how the city's business was

14   handled correctly and with integrity, and it involved a number

15   of people who work for the city.  The implication you got is

16   that the mayor just kind of decided he wanted to send the bid

17   to build these expensive garbage trucks to a local vendor.  He

18   made the decision, and that's all there was to it.

19        You've heard nothing about how numerous other people

20   were involved in the process.  And he couldn't have done this

21   himself if he wanted to.  If he wanted to be corrupt, he

22   couldn't have done so.

23        We're going to show you that.  We're going to tell

24   you the rest of the story on that.  We're going to prove that a

25   small road widening project that they alleged was somehow part

 1   of a corrupt act on his part was instead a routine safety

 2   matter that was handled by the city and that it had nothing

 3   whatsoever to do with bidding on these garbage trucks, simply

 4   didn't.

 5          The neighborhood in which Great Lakes Peterbilt

 6   operated was an industrial area.  There were other

 7   manufacturers out there who also used semis, and there was an

 8   intersection that had too narrow a turning radius.  The city

 9   widened it.  They didn't do so at the request of anybody at

10   Great Lakes Peterbilt.  They did it because the other

11   businesses out there asked for it.  Somehow they've alleged

12   that that's part of what he was paid for by Great Lakes

13   Peterbilt.

14          Finally, we're going to prove to you that the

15   allegations in Count 4, the claims that James Snyder actually

16   impeded the IRS in its effort to collect its taxes, are

17   completely bogus.  You're going to learn, for example, that

18   with the assistance, advice, and competent counsel of his

19   well-regarded CPA, James Snyder tried in absolute good faith to

20   negotiate with the IRS the terms of paying and satisfying his

21   tax debt.

22          And during and as a part of his efforts to do so, he

23   was required to provide certain financial information to the

24   revenue office at the IRS who was handling his file.  With the

25   assistance of his accountant, he did so.  But he did neglect to

1  include the existence of a bank account he had set up a few

2  years earlier to handle transactions involving a small rental

3  property he owned.  He owned a rental property, and he set up a

4  bank account simply for that purpose.  Gave it a name, SRC.  He

5  named it after -- used the initials of three of his children:

6  Silas, Reagan, and Carolyn.

7        And he had this bank account that was available and,

8  yes, moneys were deposited.  And, yes, monies were expended

9  from it.  The government would pretend that every dollar that

10  came into that account from the mortgage company that he

11  affiliated with eventually -- he essentially sold it or merged

12  with it and took over as the local office manager -- they want

13  to pretend that every dollar that went through that was money

14  that should have been available immediately to be paid toward

15  his tax debt.  But he had other bills.  He had to pay payroll.

16  He had overhead and those such things.

17        There has been no consideration at all given by them

18  for what the money coming in was for and the expenditures.  And

19  so they've greatly inflated here and elsewhere the amount of

20  money we're talking about.

21        That particular bank account was not his primary

22  bank account.  It was used as a pass through to handle business

23  bills in his mortgage business.  But, again, the failure to

24  list that account on a form that he was required to submit to

25  the IRS was not even intentional.  And we're going to give you

1    proof on that as well.  He didn't even intend not to disclose

2    the existence of that on a form.  And there is an explanation.

3    You will hear that.

4          The account never really held much money.  The

5    government has gone through and added up every dime that went

6    into the account over a period of years, and I forget how many

7    hundred thousand dollars.  But as we all know in our own

8    checking accounts, that's not how it works.  You get paid, and

9    then you paid your bills.  And if you want to go at year's end,

10   you can say, my gosh, we had 80- or $100,000 deposited into

11   this account.  If you had 80- or $85,000 that went out in

12   bills, it may be income, but it's not all taxable in the

13   fashion that the government would argue if you had a tax debt.

14         On the very day this form was first submitted to the

15   government, that bank account in question did not even have in

16   it $150.  Years later when the government went looking to find

17   a third count to add to an indictment to bolster up these two

18   corruption allegations, it pretends that not learning about the

19   existence of that bank account at that moment in time somehow

20   obstructed its efforts to get paid.

21         What is generally noteworthy about the tax count is

22   that without regard to the existence of the bank account, the

23   IRS still rejected his Offer in Compromise.  And so the

24   submission of this form was during a period of time that,

25   again, working on consultation with his accountant, he was

1   trying to come to terms so that he could find a way to pay off

2   this tax debt.  And even though he submitted this form and even

3   though it didn't have in -- one of the forms he submitted did

4   not disclose to existence of this account, the IRS still

5   rejects his Offer in Compromise and instead assessed him the

6   full tax debt, the amount of principal that he owed under the

7   tax claim, plus penalties, plus interest and fees.

8           Because he was unable to pay his tax debt on time,

9   they put him on an installment schedule.  I don't know if

10  anybody has ever heard of that.  That's how they go about -- if

11  they don't accept in compromise something less than you owe,

12  they will put you on a payment schedule.  That's what they did

13  with him.

14          That's what they did with him after he submitted

15  this form that they're saying was so important.  And over the

16  next five years, James Snyder made monthly payments on the

17  debt.  We can laugh about it and mock him and say $112 a month

18  isn't really significant.  Well, it's not for a lot of us.  If

19  you've got a new car payment or something, 112 would be a low

20  payment.

21          But for somebody whose business has failed like his

22  had in the mortgage industry, at that point in time when after

23  some of our marvelous government policies led to the failure of

24  large banks and lending institutions --

25          **MS. KOSTER:**  Objection, Your Honor, this is way off

1  point and argumentative.

2      **THE COURT:**  I'm going to sustain that objection.

3      **MR. BENNETT:**  All right.

4      During the time in which his inability to pay his

5  taxes was at issue, 2007, 2008, and 2009 time era, you can

6  recall what our national economy was doing at that point in

7  time.  All of you are sufficient age.  You should remember

8  that.

9      **MS. KOSTER:**  Objection.  Same objection.

10     **THE COURT:**  Ladies and gentlemen, opening

11  statements, as I said before, are merely each side's -- what

12  they think the evidence is going to show.  If the evidence

13  doesn't show it, you should disregard it.  So proceed.

14     **MR. BENNETT:**  So that was the circumstance in which

15  the negotiations with the IRS surfaced.  Now, he had two

16  components.  He owed on his personal taxes, and he owed on

17  payroll taxes that he had kept track of, what should have been

18  paid to his employees, but when the time came to pay those, he

19  didn't have it.  And so like a lot of businesses, he withheld

20  it.  We can look at the records and figure out what should have

21  been paid, and that's what happened here.  And that's the

22  amount that he was assessed.

23     Over the next five years, from that point in time in

24  response to this payment schedule the IRS put him on, he made

25  monthly payments on the debt.  He never missed any monthly

1    payments during that time.  And any year -- and his employment

2    changed.  He became elected mayor.  He had a regular salary.

3    And he used his salary as mayor to make installment payments on

4    his aging tax debt.  He never missed a payment, and any tax

5    refunds that he had due were also applied to that tax debt.

6         Did the failure to disclose the existence of that

7    bank account with $140 in it on that day impede honestly the

8    IRS's ability to -- its collection activities?  It did not.

9         We know that because in the spring of 2016, more

10   than six months before he was indicted on the charges you are

11   hearing right now -- six months before the Indictment was

12   returned, he paid off a hundred percent of his personal debt,

13   plus penalties, plus interest.

14        And to be sure, he still owed on his payroll taxes,

15   and he has continued to make those payments.  But for you to

16   convict him on the count they're talking --

17        **MS. KOSTER:**  Objection, Your Honor, argumentative.

18        **THE COURT:**  Overruled.

19        **MR. BENNETT:**  You have to understand that they're

20   claiming they're impeded on something that they got 100 percent

21   of the amount, penalties, and interest.

22        In the coming days, you're going to hear in much

23   greater detail the responses of James Snyder to all of these

24   charges, not just the tax charges, and you are going to learn

25   that James Snyder committed none of the crimes alleged in the

 1    Indictment, none of them.

 2            To the contrary, you're going to learn that at all

 3    times, James Snyder engaged in what he believed to lawful,

 4    legitimate, and honest conduct in his dealings with the IRS

 5    regarding his taxes, in his dealings with a local vendor, Great

 6    Lakes Peterbilt, regarding the truck building and the road

 7    widening project, and with John Cortina regarding the Portage

 8    towing list.

 9            So I want to take a moment to tell you a little bit

10    about James Snyder.  Who is this person, James Snyder?  And

11    I'll be candid with you.  I'll tell you with all due respect

12    for him, he's probably pretty different from most of us.  He

13    was raised in a very religious household.  He comes from a

14    church --

15            **MS. KOSTER:**  Objection, Your Honor, relevance.

16            **THE COURT:**  Overruled.

17            **MR. BENNETT:**  He comes from a church that can be

18    best described, I think, as a fundamentalist Baptist.  When he

19    grew up, his parents did not allow a television in the home.

20    He didn't go to movies when he was growing up.  I suspect that

21    most people in this room -- I'm not asking about any of you,

22    but I suspect most of you grew up in homes with television

23    sets, and most of us went to movies at least occasionally.

24            To this day, Mr. Snyder has never had a drink of

25    alcohol.  I'm not sure many could -- I certainly could not make

1   that claim if I was asked.  Now, I'm not telling you this about

2   who he is to be critical in any way.  There is nothing in that

3   background and the way he was raised to criticize.  He was

4   raised in a manner his parents saw fit, and we should respect

5   that without qualification.  But there's also no denying that

6   James Snyder was socialized at least a little bit differently

7   than I think most people would we encounter in our daily lives

8   probably were.

9         You know, if you grew up watching, you know, *Rhoda*

10  or *Miami Vice* or *The Simpsons* or something like that on

11  television, you might have a different -- at least a slightly

12  different world view and socialization skills than somebody who

13  never watched television at all.  And I mention that because I

14  think that's a factor here in Mr. Snyder's communications with

15  various witnesses in the case.

16        James Snyder was raised with a very strong work

17  ethic.  You will hear evidence about this over the course of

18  the trial.  When he was a teenager he started a small lawn

19  mowing business in South Haven.  He became sufficiently in

20  demand that he had to hire his younger brother Jon to also work

21  for him, and they would cut 50 or 60 lawns per week for

22  neighbors in the area.

23        In keeping with his religious background and, again,

24  from a very conservative religious background, he began working

25  with underprivileged children in Hobart and Lake Station.

1  While he was attending college, he spend most weekends working

2  with African American children in Gary and in Michigan City and

3  even giving them rides to church.

4          Through those activities in time, he established

5  close friendships with people throughout the region, including

6  a number who has risen to some political prominence, and you

7  may hear from some of them.

8          Following his graduation from college in 2000, James

9  went to work in the mortgage industry.  He went to work for

10  another company.  And then after about five or six years,

11  shortly after he became married in his mid 20s, he started his

12  own mortgage business.  It's called FFTM, First Financial Trust

13  Mortgage.  He set up offices in Portage and began writing

14  mortgage and refinance applications to generally Porter County

15  residents.

16          He also became involved in politics, got involved in

17  Porter County politics.  Now, Porter County -- I am not asking

18  anybody's political registration.  I don't care.  Although

19  Porter County has a significant majority --

20          **MS. KOSTER:**  Objection, Your Honor, this is

21  improper.

22          **THE COURT:**  Let me do it this way so the jury gets

23  an understanding.  As I said before, this is merely opening

24  statements.  It's not evidence in any respect whatsoever.  If

25  you find that the evidence does not support what was said in

1  the opening statement, you should disregard what the open

2  statement said.  With that caveat, continue.

3      **MR. BENNETT:**  James Snyder became involved in

4  republican party politics in Portage and Porter County.  In

5  2007, again mid 20s at this point, the republican nominee for

6  the mayor of Portage, who was a close friend of his, a guy

7  named David Highlands, unfortunately during the campaign died

8  of a heart attack.

9      And so at age 27, James was picked by the local

10  party officials to replace Highlands on the ticket for mayor.

11  And so he ran for the 2007 mayor's seat in Portage, and he lost

12  to a woman named Olga Velazquez.  Close race, only a couple

13  hundred votes.  But she won a four-year term for office.

14      Following the 2007 race in which he lost, he

15  returned to his mortgage business at FFTM.  But he had gained a

16  lot of name recognition by running for office, and the Portage

17  republican party supported him for the next election that was

18  going to be in four years down the road.  And soon he became

19  sort of the prohibitive favorite to win that.

20      During this same time period, 2007 and 2008, while

21  his political success -- well, he's starting to gain some

22  political traction, call it, in the years that followed, the

23  nation economy continued to suffer.

24      And, again, most of you recall what it was like

25  during that period of time.  It's been called the Great

 1    Recession.  And at the time the impact was felt, you know,

 2    around the world from the world's biggest banks to the smallest

 3    mom-and-pop businesses in every community.  It was just a

 4    trying time.  But it was felt particularly hard both in the

 5    mortgage industry because people couldn't come up with money to

 6    buy houses or refinance houses.  And it was hit especially hard

 7    in Northwest Indiana.  Northwest Indiana suffered more than its

 8    fair share from an abysmal national economy at that time.

 9          **MS. KOSTER:**  Objection, Your Honor, relevance.  This

10    wouldn't be relevant if he tried to put it in through a witness

11    at trial.  He shouldn't be allowed to talk about it in the

12    opening.  It is not relevant to the charges.

13          **THE COURT:**  Well, we don't know at this time.

14    Ladies and gentlemen, as I said, if the evidence -- it's not

15    evidence.

16          If anything that's said in the opening statement,

17    evidence is not presented concerning, then you should disregard

18    it entirely.  So that's the best way to look at this whole

19    thing.  On both sides, if the evidence is not presented, there

20    is not evidence at the end of the day, you should disregard

21    what was said in the opening statement.  I'm sure Mr. Bennett

22    would agree with me on that.

23          **MR. BENNETT:**  I do, Your Honor.  And this is merely

24    by way of a background.

25          So James Snyder is at that point in time, his career

1   interest are starting to go in a different direction to

2   politics, and he has reason to believe he will remain involved

3   in running for politics.  Yet, he is in a mortgage industry

4   that is suffering very badly, and it was one of those that was

5   hit hard by the depression -- by the recession.

6          The money supply tightened up.  Businesses that

7   relied on a healthy lending environment suffered, and he was in

8   one of those businesses unfortunately.

9          So he struggled to keep alive this small mortgage

10  business, FFTM, that he had set up just few years earlier.  And

11  I think at the time he employed about 15 people there.  You may

12  hear from some of them.  And he was struggling to stay in

13  business and keep them employed.  And he was able to mitigate

14  some of the financial losses for people who were trying to

15  obtain finance, home financing, by spending hours with them

16  trying to help them repair their credit and that sort of thing

17  and to keep the business afloat.

18          In the end he failed.  Not a sin.  Not a crime.  In

19  the end, his business essentially failed.  Now, it took a while

20  to fail because he essentially merged with a bigger company

21  called GVC out of central Indiana, and for a while he was the

22  general manager of what had been his business.  It was now

23  affiliated with another company.

24          But the merger allowed him to continue managing the

25  business and keep jobs, at least for a while, for some of his

1    employees there at FFTM.  Even as his business was struggling

2    with the economic situation that we discussed at length now,

3    and having only lost narrowly as a stand-in candidate for the

4    deceased politician, the party again asked him to serve as

5    candidate for mayor.  James began to work very hard for the

6    2011 race.  He started knocking on doors, and he did so on a

7    bipartisan basis.  Knocked on doors without regard to party

8    affiliation and asked for support during the election, 2011.

9    He fairly easily won the mayor's race.  He took a four-year

10   term of office beginning in January of 2012.

11          Now, a couple of things are noteworthy about that

12   first successful mayor's campaign.  First, the main issue he

13   ran on was to automate the city's sort of antiquated garbage

14   pickup operations.  James ran for the Mayor of Portage position

15   on an explicit promise that he was going to automate the

16   process of trash collection.  You saw the photograph of the

17   garbage trucks with the grapple arms, the hydraulic grapple

18   arms.  That process and that technology replaced what all of us

19   had seen in our lifetimes until that came out.  And that's, you

20   know, the garbage truck driving around the neighborhood with

21   usually one or two guys on the back.  And they had to reach and

22   haul it.  That process of dumping those sometimes very heavy

23   garbage trucks -- garbage totes damaged people.  The people who

24   worked in that industry had all kinds of physical ailments.

25   They are a constant source of being off work due to back

 1   injuries, knee injuries.

 2          I think you're going to hear from a couple of

 3   drivers who worked for the city before they went automated.

 4   These are young men, late 20s, who are talking about:  Well,

 5   I've had two surgeries on this shoulder and my knee also, in

 6   their mid to late 20s.  So those are people who benefitted from

 7   automating the trash collection process.

 8          And so this was a big deal, and this was something

 9   that he advocated in running for office.  And by the time he

10   was elected, it had some popular support.

11          Prior to being able to administratively go through

12   the steps that were required for the city to purchase these new

13   garbage trucks with the grapple arms and that kind of thing,

14   there were large expenses on behalf of the city for injuries,

15   workers comp claims, health insurance claims, the days of work

16   lost.  All of those things have economic costs.

17          And so when he was elected and they go through the

18   process of going about buying the trucks -- and Portage was one

19   of the last cities in the area to do this.  Lots of big cities

20   in the area -- larger cities or at least smaller cities that

21   are in the area had already gone to these grapple trucks.

22          And so Portage was a little late to the game, but

23   they got into it and followed the process that is typically

24   followed by a municipality when you are going to make a large

25   expenditure like that.  That requires you have to do research

1    and figure out what you want.  There were probably all kinds of

2    garbage trucks that were available with grapple arms and that

3    sort of thing.  But the question is, what works best for

4    Portage, what works best for an area with wildly varying

5    weather conditions.  So research had to be done.  So it was

6    delegated to somebody in the street department.  It wasn't

7    delegated to the head of the street department as the

8    government imposing its view seems to think should have

9    happened but instead to the assistance streets superintendent.

10           They went out and went to trade shows.  They invited

11   people from other cities to show the products they had

12   purchased.  They went to see vendors who manufactured these

13   things.  Show us what your trucks do.  And over time they put

14   together the specifications they thought were needed.  And

15   following a perfectly lawful process involving agencies within

16   the city government, they released bids to purchase these

17   trucks.

18           Those bids were reviewed by city attorney to make

19   sure that they comported with state law.  Everything was filed

20   in the order it was supposed to, and none of it was anything

21   that Mayor Snyder could have done on his own no matter how

22   corrupt -- if he were corrupt and wanted to do it.  He could

23   not have done that by himself.  It was an entire process with

24   lots of people involved.  You didn't hear that.

25           So, in addition, at the time this was going on, the

1   city was in the red about two and a half billion dollars for

2   trash pickup related issues, for a variety of issues.  And

3   these expenditures, although expensive, I think the five trucks

4   we're talking about that Great Lakes Peterbilt won as low

5   bidder under the appropriate procedures that they followed,

6   followed state law and nobody from the Indiana State Board of

7   Accounts had a problem with it, those that were awarded were a

8   little over a million dollars.  I think it was $1.125 million

9   for five of these garbage trucks.

10          What they didn't tell you was $1.125 million was not

11   what Great Lakes Peterbilt received in a profit.  In other

12   words, the allegedly corrupt mayor of Portage didn't hand them

13   over a million dollars.  Their actual margin for these five

14   trucks came down to about $35,000.  And I think you'll hear

15   that in testimony.

16          In other words, to build a truck that you can sell

17   for over a million -- five trucks to sell for over that amount,

18   there is a lot of other expenses that go into it.  The actual

19   margin is very modest.  So we're talking about whether a

20   company, in order to build five garbage trucks where they were

21   only going to make an aggregate of $35,000 total on them, were

22   inclined to do something corrupt for that purpose.  You hadn't

23   heard that before.

24          So that was a major expenditure.  It was done

25   according to the rules.  It was done with the involvement of

1    other people.  It was not a solo decision by the mayor who was

2    in his own, secret, furtive way steering business to a favored

3    vendor.

4          Now, to be sure, another component of what he wanted

5    to do when he ran for the mayor position, he did favor local

6    businesses.  He wanted that if it were all possible for the

7    city to have expenditures for whatever the vendor did, that the

8    city tried to favor local vendors.  They still got bids and

9    they still had to be competitive.  But they did what every city

10   does and favors its own, if at all possible.  All things being

11   equal, they want the money to stay locally.  It happened that

12   Great Lakes Peterbilt was the local entity.

13         There is no allegation that there was some secret

14   exchange of information, so you sometimes hear allegations in

15   contract work that somebody gets an inside deal with the low

16   winning bid.  None of those allegations here.  It did not

17   happen.

18         So I'm going to say a few words about the City of

19   Portage itself because I think this is something you also need

20   to understand about the city, its government, its employees.

21   There's a lot of evidence you're going to see and hear in this

22   case that touches on the people who were employed by the city.

23         Portage has a population of about 38,000, at least

24   according to some Google research I did a couple days ago.  And

25   I don't know whether you would call that a medium-size city or

 1    a small city or how you would describe a city of that

 2    population.  It's surely a big enough place that it has some of

 3    the same problems you'll find in municipalities of other sizes

 4    including large cities.

 5           No matter where you live in this country, Portage,

 6    Indiana or New York City, you are going to find people who hold

 7    widely different opinions, political views, outlooks on life --

 8           **MR. BENSON:**  Judge, can we approach, please?

 9           **THE COURT:**  Yes, you may.

10       (Bench conference.)

11           **MR. BENSON:**  A couple things, counsel is talking

12    about widely held political views in New York.  First of all,

13    why is that even relevant?  Second of all, Judge that has

14    nothing to do with this case.  What about -- why are the views

15    in New York relevant to anything that's going to go on in this

16    case.  I know it's opening, but there are some constraints on

17    opening.  There are certain things you can't talk about.  Also,

18    he started talking about the defendant's fundamental religious

19    beliefs.  Rule 610 specifically forbids any testimony about a

20    witness's religious beliefs.

21           **THE COURT:**  To be used against him.

22           **MR. BENSON:**  No, to be used to support him though.

23           **THE COURT:**  The government -- I understand 610.

24    What I'm saying is that, again, in deference to Ms. Koster, she

25    went to areas I would have probably objected to.

 1          **MR. BENSON:**  Yeah.  They chose not to.  We are.

 2          **THE COURT:**  You have objecting and you have every

 3    right to do that.  What I'm saying again is I don't know how

 4    many times I can drill down.  There is going to be a four-week

 5    trial, Mr. Benson, and if you think these jurors are going to

 6    remember what was said in opening statement -- most of them

 7    aren't even taking notes.

 8          **MR. BENSON:**  I know, Judge.  And it's going to be

 9    seven weeks if the rules of evidence aren't applied.  That's

10    what's going to happen.

11          **THE COURT:**  I understand the rules of evidence.

12          **MR. BENSON:**  There is a scope.  There is a limit to

13    opening.  He's supposed to be talking about the facts.  He's

14    arguing.  He's comparing the political beliefs in New York to

15    Portage.  How is that not argumentative?

16          **THE COURT:**  The first three objection made by

17    Ms. Koster were all sustained.  I'm trying to get through his

18    opening statements right now.  And you're absolutely right.

19    And I don't think New York has much to do with -- what he was

20    saying is the problem New York has are some of the problems

21    that Portage has.  I think he over --

22          **MR. BENSON:**  I think New York's problems are a lot

23    worse, and it's incredibly argumentative.

24          **THE COURT:**  Okay.  I'm just saying -- I agree.  I

25    think he should move on.

1          **MR. BENSON:**  And that's fine.  I'm just asking that

2    it be sustained.  That's all.

3          **THE COURT:**  He's just going to move on.  Are you

4    going to move on?

5          **MR. BENNETT:**  Yes, Your Honor.

6          **THE COURT:**  Okay.

7      (End of bench conference.)

8          **MR. BENNETT:**  The point I'm making is that no matter

9    where you live and no matter what size city, you encounter some

10   of the same attitudes and problems.  People have differences.

11   People have political differences, et cetera.  Portage is no

12   different from any other country in the world in that regard.

13         You may have -- you may be familiar, Normam Rockwell

14   was a sort of painter from an earlier generation who painted

15   these kitschy paintings, and there was one about freedom of

16   speech.  It's a really sentimental picture, but it isn't real

17   life.  It isn't what the mayor encountered in Portage.  What he

18   encountered in Portage was a lot of political opposition from

19   opponents who were not of his party.

20         **MS. KOSTER:**  Objection, Your Honor, what is the

21   relevance of this to the charges in this case?

22         **THE COURT:**  It could go to some issues.  Again,

23   opening statements -- I'm going to drill this down as much as I

24   can drill them down -- is not evidence.  If at the end of the

25   day there is no evidence on what was said in open statement,

1   you should absolutely wipe it out of your minds and disregard

2   it.   That's about the best way I can put it.

3           With that being said, Mr. Bennett, move on.

4           **MR. BENNETT:**   Another feature, it is common

5   politically when you are elected from a new political party,

6   lots of people not from that party or incumbents lose their

7   jobs.   That didn't happen here.   One of the things, and part of

8   this story and part of the evidence you are going to hear has

9   to do with the fact that political opponents still worked in

10  the city, still worked in the agencies, and were opposed to

11  some of the policies that are now under indictment.   And you

12  are going to hear about those.

13          At some point in time, James Snyder came under

14  investigation by federal law enforcement authorities.   You

15  know, how and when and why did that happened exactly, it's hard

16  to say.   The FBI, the Justice Department, they don't share that

17  information typically.   But there are a few interesting facts

18  that you are going to hear in this case.   One name that you're

19  going to hear is the name of Mark Becker.

20          Mark Becker spent over 30 years an as FBI agent,

21  many of them in Northwest Indiana.   And when he retired in

22  2007, he became the Chief of Police in Portage, Indiana.   He

23  was appointed by the mayor's predecessor Olga Velazquez.   And

24  she was defeated four years later by James Snyder.   Mark Becker

25  wanted to keep they position.   He was told:   You back my

1    opponent, you're going to have to find another position.  I

2    want my own police chief.

3         **MS. KOSTER:**  Objection, Your Honor, again,

4    relevance.  He's now talking about the prior chief of police.

5    It has nothing to do with the charges in this case.

6         **THE COURT:**  Overruled.

7         **MR. BENNETT:**  And by the way, there is no

8    requirement that you keep a predecessor's political appointees.

9    It's common a new administration gets to put in the people they

10   want.  And so he did so.  He brought in a new chief of police.

11   But Mark Becker wanted to stay in that position, and he

12   resigned.  Very quickly got a job down the road as chief of

13   police of East Chicago.  But he told James Snyder, you're going

14   to regret not hiring me.  This was a guy who had been with the

15   FBI 32 years.  And did he maintain contacts with any of the

16   people in this courtroom --

17        **MS. KOSTER:**  Objection, Your Honor, may we approach?

18        **MR. BENNETT:**  Your Honor, I'll move on.  I'll

19   withdraw this entire part and move on.

20        **MR. BENSON:**  It is subject to a motion in limine.

21        **MS. KOSTER:**  The Court has ruled regarding the

22   arguments he's making.  He is violating an order.

23        **THE COURT:**  Well, he said he's going to move on.

24        **MR. BENNETT:**  So what I would like to talk about now

25   is, as we have said, the new garbage trucks were bid on, were

 1  built, were paid for, and were spectacularly successful.  And,

 2  yet, there were rumors from anonymous employees of the city,

 3  many of them ridiculous.  But the government investigators

 4  devoted lots and lots of resources to chasing them down.  I'm

 5  not going to at this point list what they are, but I expect a

 6  lot of them will come up during witness testimony.

 7          I will say, they were all proved to be false.  But

 8  federal investigators looked into them.  They spent -- they

 9  issued --

10          **MS. KOSTER:**  Objection, Your Honor, this also

11  violates the Court's order.

12          **THE COURT:**  I'm trying to find that order right now.

13          **MS. KOSTER:**  May we approach?  I can explain.

14          **THE COURT:**  Mr. Bennett, can you just move on.

15          **MR. BENNETT:**  I'm trying to, Your Honor.

16          **THE COURT:**  I know.  I understand.

17          **MR. BENNETT:**  For example, for example, in the

18  bidding process in which the bid was awarded to Great Lakes

19  Peterbilt, specifications were created.  Those specifications

20  included a requirement that a Cummins engine was the preferred

21  spec for the garbage truck.  The winning bid was for garbage

22  trucks that had Paccar engines.  The federal authorities spent

23  God knows how many hours trying to disprove that Paccar was a

24  Cummins and only dropped it after we presented definitive proof

25  that Paccar is a division of Cummins and, therefore, did

1   qualify under that spec, but not before they did everything

2   they could to disprove that and make it out to have been a

3   contract that somehow got steered to a favored vendor.  Not

4   true.

5          That's not the only example.  There was one that

6   Ms. Koster mentioned about 150 days being the time that the

7   invited bidders had.  And you saw on a chart that she had used,

8   there was kind of a wide range of how long it would take any of

9   the bidders to produce a truck pursuant to the specs.  And they

10  had different pricing.  A lower price required in one case, if

11  memory serves, you know, something close to 215 days whereas

12  the spec called for 150 days.

13         Now, if nobody could have met the 150-day spec, then

14  they would have had to have taken that into account, but Great

15  Lakes Peterbilt was able to do so.  So the government's

16  allegation is, well, you must have tailored that so that only

17  they could do it.  Anybody who devoted the resources, if it was

18  important to them to get this bid, could have done it in

19  150 days.  But they didn't.  They said it will take longer.

20  We'll charge you less.  And then it's a different equation.  Is

21  it worth the city paying 40,000 or $50,000 more to get it four

22  or five or six months earlier in light of all the injuries and

23  things that were happening to their drivers.  The government

24  wants to superimpose its judgment on that process, and we think

25  that's illegitimate.  You're going to hear more evidence of

1    that.

2         Lots of investigation, you know, subpoenas issued to

3    church members --

4         **MS. KOSTER:**  Objection, Your Honor.

5         **THE COURT:**  He didn't finish the sentence even.

6         **MS. KOSTER:**  I don't think he needs to.

7         **THE COURT:**  Okay.  What's the objection?

8         **MS. KOSTER:**  Relevance, improper, and I do believe

9    this also is covered by the order.

10        **THE COURT:**  Well, I read the order and what you said

11   before is not correct.

12        **MS. KOSTER:**  Well, may I be heard at sidebar or do

13   you want me to argue --

14        **THE COURT:**  No, I want him to move on and finish his

15   opening statement is what I want.

16        And ladies and gentlemen, again, I'll say it for the

17   last time maybe:  If the evidence does not comport with an

18   opening statement that you hear, just strike that out of your

19   mind.  Totally disregard it.

20        Finish, Mr. Bennett.

21        **MR. BENNETT:**  Thank you, Your Honor.

22        Government spared no expense in turning over every

23   stone to try and look at every financial record of James Snyder

24   and in many cases financial records of somebody he happened to

25   know, his pastor, his pastor's son, his pastor's son's soccer

 1   team, telephone records.  They looked everywhere trying to find

 2   evidence.  What you -- what we have out of that are allegations

 3   that he got a $13,000 payment for the award of garbage trucks

 4   for over a million dollars where the profit was $35,000 and

 5   where the owners of the company will testify there was no

 6   bribe.  There was no consideration given, improper

 7   consideration.

 8            After the contracts were awarded and only after the

 9   contracts were awarded, this individual's not making enough

10   money as mayor.  He does what a lot of us do if we're not

11   making enough money in our jobs.  He goes and looks for a

12   second job, but he gets extra attention because he's the mayor.

13   And one of the companies he goes to and says, I can do

14   consulting.

15            They ask him:  Do you want cash?  Do you want us to

16   just give you money?

17            No, I want a job.  I want to earn the money.  That's

18   going to be the testimony.

19            But somehow that gets morphed into because he went

20   to them, they agreed that's a bribe.  By the way, he did lots

21   of work for them.  Now, they don't think it's important work.

22   They don't think that work that he did giving this company

23   counsel on insurance issues is something that you should be

24   persuaded by because he is not a registered insurance salesman.

25   As mayor of Portage, he had just gone through the Affordable

1   Care Act, ObamaCare, and had just gone through the economic

2   analysis which led to the City of Portage employees being put

3   under the Affordable Care Act.  So he knew some of the big --

4   you know, the high-level economic considerations of that and

5   was actually well-positioned to give advice to these people

6   about that.  They took the advice.  They followed it, and they

7   prospered from it.

8           Another one was a tax issue.  They had a property

9   tax question.  He referred them to a law firm that saved them

10  well over $30,000 on their taxes.  He got paid $13,000, and he

11  gave value to the company for over $100,000.  But he didn't

12  give the receipts that they're happy with.  And he didn't get

13  an insurance salesman's license in order to talk about these

14  things, even though the consulting he did was very valuable.

15          And so they want you to come in and say under these

16  circumstances he's guilty of taking a bribe when he actually

17  did work for the modest amount he got.  And, oh, by the way,

18  they have also alleged that somehow as the mayor, he authorized

19  the widening of this turning radius on a dangerous intersection

20  near Great Lakes Peterbilt's offices where the semis come out.

21  They come to a T, and before they either had to swing out into

22  oncoming traffic which was dangerous, or they had to do what

23  they were doing, which was cutting over the corner and creating

24  mud in the business on the corner.

25          And so the businesses out there asked that the city

1   can widen the turning radius.  Will you widen the berm?  They

2   did.  That project cost $13,000.  It came in under budget.  It

3   had nothing to do with Great Lakes Peterbilt, and yet somehow

4   it's included in their allegations.  So there are false

5   allegations in this Indictment.

6         The last thing I want to talk about is this question

7   of awarding rights to serve as a tow operator in Portage.  Now,

8   there has been a lot of news coverage.  It is a common practice

9   for municipalities to have towing companies that become

10  approved to do business within their municipal regions.

11        So if you are driving through Merrillville or

12  East Chicago or some place and you slide off the road or you're

13  in a car wreck or you're pulled over for drunk driving,

14  anything that might require a tow truck and a police officer,

15  they'll come out.  They will assess the problem.  And they are

16  to phone in on a rotating basis to tow companies.  And

17  different sized cities have different numbers of authorized tow

18  operators.  Portage had three.  It wasn't written in stone

19  anywhere.  It wasn't the law.  It was within the discretion of

20  the city administrators.  But their practice was that we think

21  it makes sense that only three tow companies be on our list at

22  any one time so that our police officers can call them on a

23  rotating basis.  If there are five wrecks in a day, they rotate

24  in the order of the event.

25        And then those tow trucks are to tow them to a

1    designated location where the car gets worked on or somebody

2    comes and pays a fee to get it out of the lot.  It was

3    important to the mayor of Portage, like I'm sure it is the

4    administrations of a lot of cities that there be a physical

5    impound lot for cars that are towed for whatever reason within

6    their city limits.  So if you live in Portage, you don't want

7    to pull into a snow bank in Crown Point and have somebody tow

8    you to, you know, Merrillville.  And, you know, you're not near

9    your home.  You're not near where the accident occurred.

10   You're at the impound lot that the tow company had that's

11   remote from you.

12         So it was an important practice to say, if you're

13   going to be on our list of authorized -- the three companies

14   that are authorized to do business here, you're going to have

15   an impound lot for the convenience of the people in Portage.

16   So that's the background to this.

17         Mr. Cortina, who I'm sure you will be hearing from,

18   was a longtime friend and political backer of James Snyder.  He

19   owned a paint shop, a body repair shop.  That shop had a big

20   fenced in area that was suitable for serving as an impound lot.

21   So in the past, he had paired up with another company to use

22   his site to tow Portage tows.  That partner of his who did that

23   did a very poor job.  There were lots of complaints about

24   showing up in a timely fashion, whether the people were

25   professional, whether things were being stolen from cars that

1    got towed, that kind of thing.  And they were finally fired

2    from the list.

3           So of the three vendors that were doing towing

4    there.  One of them, the one that his good friend and political

5    backer was affiliated with, got fired.  Not really because of

6    him but because of the role of his partner and the way the

7    employees were behaving.  That created another opening, a third

8    position.

9           And this by the way happened in November -- I'm

10   sorry -- in August of 2015, just a few months before the

11   election.  So here is a guy who is supposed to be in bed with a

12   political backer, and he's firing that guy and he's cutting off

13   his ability to get earnings from towing with his partner.  And

14   he's doing it on the eve of election.  That's how corrupt he

15   is.  He is firing one of his biggest backers.  He had given the

16   guy plenty of breaks, and they did a bad job, and he fired them

17   and they brought in a new company.

18          And in January of 2016, new agreements were signed.

19   John Cortina was not among them.  There were three other

20   companies that were on.  In January -- now, the background of

21   all of this has been that James Snyder has been under criminal

22   investigation on these tax counts for a couple of years.  He

23   had a lawyer.  He had a prominent lawyer and an expensive

24   lawyer, and he owed him money.  And the lawyer said:  You've

25   got to get me some money so I can continue to represent you in

1   the investigation that's being conducted.

2           So he goes to his friend, James [verbatim] Cortina,

3   and he says:  Look, every year you donate $2,000 to my -- they

4   call it business roundtable.  It's like a Rotary Club or

5   Kiwanis Club for his political campaign.

6           So three, four, five times a year they would have a

7   golf outing.  They might go to a Cubs game.  They might go to a

8   Blackhawks' game.  Might have a boat ride.  There were

9   different things.  And politicians do this as fundraisers.  You

10  pay your annual fee.  It's $2,000.  You can be in our marvelous

11  presence and ask questions about city government.  That's the

12  notion.

13          John Cortina had made that $2,000 payment for

14  several years in a row to James Snyder, and so he was free to

15  make his 2012 contribution of $2,000.  James Snyder needed more

16  money to pay his lawyer.  And so he said, John, can I borrow --

17  can I borrow --

18          **MS. KOSTER:**  Objection, Your Honor.  May we

19  approach?

20          **THE COURT:**  Yeah, come on up.

21     (Bench conference.)

22          **MS. KOSTER:**  Judge, in our pretrial motion we filed

23  a motion to exclude statements of the defendant if offered by

24  the defense, and you indicated that before any such statements

25  were to come into evidence, defense counsel were to alert the

1  government and the Court in advance.  He is testifying to

2  statements of the defendant in his opening.  That's a violation

3  of the Court's pretrial order.  And, furthermore, previously he

4  argued that his client was -- has been selectively prosecuted

5  apparently because Mark Becker has some angst --

6      **THE COURT:**  With regard to the motion in limine,

7  there is nothing about Becker whatsoever in the --

8      **MS. KOSTER:**  Judge, it's a selective prosecution

9  argument.  It's a claim that the government has targeted him

10  because in this case, he is arguing Mark Becker doesn't like

11  him.  That's selective prosecution.  That was covered by the

12  Court's order.  The Court indicated that before anybody was to

13  get into that, that they were supposed to notify government and

14  the Court.

15      **THE COURT:**  Okay.  Your whole issue is about the

16  notification.

17      **MS. KOSTER:**  And --

18      **MR. BENNETT:**  The allegation was that he's a

19  politician and he has political enemies, and here are a couple

20  of examples.  And those examples are going to inform some of

21  the evidence in the case.  That's all --

22      **MS. KOSTER:**  That's selective prosecution, classic.

23      **THE COURT:**  One thing, you need to make your points

24  a little quicker and not go embellish the point.  I think part

25  of the problem that's drawing these objections is probably the

 1   way you phrase it.

 2          **MR. BENNETT:**  Noted.

 3          **THE COURT:**  Not so much in some case what you're

 4   saying but the way you are phrasing it, it sounds like an

 5   argument being made.  You know, what the government said:

 6   Here, I'm going to tell you this.  And I just think you

 7   probably need to state it in a more -- I'm not telling you how

 8   to do it, but just a little less.

 9          **MR. BENNETT:**  Just for guidance, I had understood

10   that whatever they state in theirs was kind of fair game.

11          **THE COURT:**  Oh, it is fair game.

12          **MR. BENNETT:**  Okay.

13          **THE COURT:**  I'm just saying, it seems to be made in

14   an --

15          **MS. KOSTER:**  We're well beyond that.

16          **THE COURT:**  -- in an argumentative way, which is

17   beyond --

18          **MR. BENNETT:**  Yes, Your Honor.

19          **THE COURT:**  -- what opening statement is.  That's

20   all.

21          **MR. BENNETT:**  I'm almost done.

22          **THE COURT:**  Okay.

23          **MR. BENNETT:**  How much time -- Ms. Koster took close

24   to --

25          **THE COURT:**  You have about ten minutes.

1          **MR. BENNETT:**  I don't know if I'll use that, but

2     I'll track -- -

3          **THE COURT:**  I'm trying to figure it out with the

4     objections and everything in.

5          **MR. BENNETT:**  Okay.

6       (End of bench conference.)

7          **MR. BENNETT:**  So the evidence in this case is going

8     to show -- you will hear evidence in this case that will show

9     -- that will contradict what you were told by counsel.  And it

10    will contradict it in this fashion.

11         There was a $2,000 on an annual basis, and it was

12    due for that annual installment for 2012, $2,000.  It was in

13    the form of a check, and it was written out to the -- his

14    campaign committee.  Now, you will also learn it is lawful for

15    a campaign committee to pay certain expenses including legal

16    fees.  And he needed money for legal fees.

17         And so he said:  I need to borrow $10,000 explicitly

18    for legal fees.  I need that as a separate check.  He got it as

19    a separate check.  You know, didn't ask for cash.  If he's a

20    corrupt politician who's simply on the take, a lot of people

21    like that will take cash.  He asked for a check, and he got

22    cashier's checks.

23         When Mr. Cortina delivered it to him, by this time

24    Mr. Cortina has been in a relationship with Scott Jurgensen,

25    the secret witness, for some period of time.  And he's saying

1    all kinds of things that James Snyder doesn't hear.  He's not

2    party to it.  He has no idea what this guy is saying.  But this

3    guy is saying he needs money.  He's broke.  He needs it for his

4    lawyer.  I'm going to give it to him, and that will get us on

5    the list.

6          So in January he calls him and says:  I've got the

7    money for you.

8          And he says:  Bring it to my campaign office.  Not

9    to his mortgage office.  He had offices for his campaign within

10   his mortgage office.  And so he takes it there -- and it's

11   interesting.  I think you're going to see photographs taken by

12   the government from outside where they tail these people, high

13   drama.  You've got a guy recording secretly in John Cortina's

14   office about it.  And then you see John Cortina leaving,

15   driving across town, giving over -- well, you don't see that.

16         He goes in a building and he comes out a few minutes

17   later, and they're out there taking photographs with the

18   telephoto lenses from across the street.  You see James Snyder

19   come out on the phone.  I don't know if they did any

20   investigation on that phone call.  I suspect they did.

21         Here's what I know they didn't do.  In the three

22   years since that happened, nobody walked across the street from

23   where they were taking their telephoto lenses, taking

24   photographs of this in a very furtive-looking fashion, handoff

25   of a loan and ask anybody in the building:  By the way, did you

1   see what just went on in here?  Did you hear any conversation?

2        You had eyewitnesses to the transaction within the

3   building, and to this day they have never walked in and

4   interviewed them.  So I mention that because a lot of resources

5   were devoted to this investigation, but going to talk to

6   eyewitnesses wasn't one of them.

7        There is a lot of other evidence you are going to

8   hear.  One of them is Scott Jurgensen earlier going -- I'm sure

9   at the direction of the federal authorities because he's

10  wearing a secret recording device.  He has a button camera.

11  And he goes in to see James Snyder, and he's saying:  I want to

12  get on your list.  I'll be your guy.  You can rely on me.

13       And it's funny, and this is goes to sort of the

14  cultural references, people having different backgrounds.

15  James Snyder says:  Yeah, you know, towing's important.  If we

16  get a little old lady who runs over in a ditch, I want to be

17  able to count on our tow guys to pull them out and maybe not

18  charge them if they don't have the money, that kind of thing.

19       It isn't, I want to have my palm greased in exchange

20  for you getting on the list.  It's:  How can I engage in good

21  government and do what the police officers, who are working,

22  will facilitate their job; and the residents in this city, what

23  will help them?  I want tow truck operators, if they're on our

24  list, I want them to do those things.

25       He said nothing in response to that invitation or

1    invitations that came from Scott Jurgensen later to pay money.

2    He wasn't even thinking along those lines.  It did not happen.

3            So ladies and gentlemen, this trial is going to go

4    on for a couple of weeks.  We apologize for its length.  We

5    thank you for the attention that we know you're giving to it.

6    Please keep your mind open and listen to all of the evidence

7    because it is not what has been portrayed.  Thank you.

8            **THE COURT:**  Thank you, Mr. Bennett.

9            Ladies and gentlemen, you are going to have lunch

10   brought to you in the jury room today and tomorrow.  Do you

11   want to take a short break and then come back?  We'll probably

12   run to about 12:30 or so.  I probably need a break.

13           Let me just make a call here.  This is not a

14   democracy.  Let's take about a 15 minute break.  Try to do it

15   as quick as you can do it, and then at 12:30 we will break for

16   lunch.

17           During this recess and all recesses, don't talk to

18   anybody about this case.  This includes your follow jurors.

19   Don't let anybody talk to you about the case.  If somebody

20   tries to talk to you about this case, bring it to my attention.

21   We'll be in recess for about 15 minutes.

22       (Jury out at 11:16 a.m.)

23           **THE COURT:**  Court will be in recess about

24   15 minutes.

25       (Recess at 11:16 a.m.)

1    (The following proceedings resumed in open court commencing

2     at 11:35 a.m., reported as follows:)

3            THE COURT:  You can all be seated.

4            Is the government ready to proceed?

5         MR. BENSON:  We are, Your Honor.

6         THE COURT:  Defense ready to proceed?

7         MR. BENNETT:  Yes, Your Honor.

8         THE COURT:  Mr. Snyder, how are you feeling?

9         THE DEFENDANT:  I feel good, sir.

10        THE COURT:  Okay.  Bring the jury in.

11    (Jury in at 11:37 a.m.)

12        THE COURT:  You can be seated.

13        Mr. Benson.

14        MR. BENSON:  The United States would call

15    Elizabeth McQuen.

16        THE COURT:  Before you get too comfortable there,

17    turn, face my courtroom deputy, and he'll place you under oath.

18    (The oath was duly administered.)

19        THE WITNESS:  I do.

20        THE COURT:  You can be seated.

21        One thing before we go ahead, which I didn't get

22    here -- we're jumping back and forth a little bit.  This is

23    obviously the starting of the evidence.  First evidence is

24    offered by the government, which they are doing here, and then

25    by Mr. Snyder.  Rebuttal evidence may be introduced.  When all

1  evidence is in, I will instruct you of the applicable law, the

2  instructions of law, and I will tell you to apply the law to

3  the facts as you and you alone find from the evidence.

4          Then the attorneys will make their closing

5  arguments.  After that, you will retire to the jury room to

6  deliberate.  Faithful performance of these duties is vital to

7  the administration of justice.  I should have said that before

8  that witness got up here.

9          Okay.  Proceed, Mr. Benson.

10          **MR. BENSON:**  Thank you, Your Honor.

11          **THE COURT:**  Sorry.

12          **ELIZABETH McQUEN, GOVERNMENT'S WITNESS, SWORN**

13                    **DIRECT EXAMINATION**

14  BY MR. BENSON:

15  **Q.**  Could you please state and spell your first and last name

16  for the Court.

17  **A.**  Elizabeth McQuen, E-L-I-Z-A-B-E-T-H M-C-Q-U-E-N.

18  **Q.**  And where are you currently employed?

19  **A.**  Internal Revenue Service.

20  **Q.**  And how long have you worked with them for?

21  **A.**  Over 31 years.

22  **Q.**  And could you tell us a little bit about the various

23  positions that you've held in your tenure with the IRS?

24  **A.**  I started with the revenue -- as a revenue officer.  I held

25  the revenue officer position for 25 years.  I have since been a

1   fraud technical advisor/revenue officer for the last over six

2   years.

3   **Q.**  Now, the IRS is composed of two separate sides, a civil and

4   a criminal, correct?

5   **A.**  Yes.

6   **Q.**  And you work in which area?

7   **A.**  Civil.

8   **Q.**  And you said -- what was your position that you held for

9   25 years?

10  **A.**  Revenue officer.

11  **Q.**  Could you explain just briefly to the ladies and gentlemen

12  of the jury what you do in that position?

13  **A.**  As a revenue officer, our function is to resolve delinquent

14  tax cases, either unfiled returns or balances due, and we look

15  at different options that we have available to us to help bring

16  the case to a resolution.

17  **Q.**  And does that involve -- did you work in a section that is

18  just simply individual taxes or business taxes or is it mixed

19  in your duties?

20  **A.**  Mixed.  We did both.

21  **Q.**  And you said you worked in another section for the last six

22  years, was it?

23  **A.**  Fraud technical advisor.  I still work with revenue

24  officers, but I help them to develop their cases that have the

25  potential to maybe have fraudulent activity in them.  We

1  identify indicators of fraud and see if they develop into

2  something we may refer to the criminal side, or we find other

3  options on the civil side to still resolve the case.

4  **Q.**  In your 30-plus years of internal revenue experience, have

5  you had dealings in Offer in Compromises and installment

6  agreements?

7  **A.**  Both of those are tools we use to resolve cases, so, yes.

8  **Q.**  Let's talk about one of them and a little bit about that

9  process.  Can you explain to the jury just briefly a little bit

10  about what this Offer in Compromise process is?

11  **A.**  The Offer in Compromise is where we look at the financial

12  situation of a taxpayer on the collection side, and they have

13  to submit a request to do a compromise.  Once the request is

14  issued -- and it kind of depends on where in the case the

15  revenue officer may be.  We may have a little more knowledge or

16  we may have had time to do a little more investigation on the

17  collection side of it.  Once the offer has been submitted, we

18  refer the Offer in Compromise to what we call an officer

19  specialist.

20  **Q.**  And the Offer in Compromise, can you explain to us how that

21  differs from an installment plan and what an installment plan

22  is?

23  **A.**  An Installment Agreement is something we can look at in

24  order to set up regular payments for someone to resolve their

25  tax liabilities.  And during that process, we expect them to

1   remain current and continue with whatever program we have set

2   them up on.  It's a payment plan.

3   **Q.**  And an Offer in Compromise is sort of a one-shot deal, fair

4   to say?

5   **A.**  Yes.  It can be set up as a lump sum payment, and it can be

6   set up for a short-term payment agreement, but it compromises

7   the balance of the liability if you meet all the terms of the

8   compromise.

9   **Q.**  And where an installment plan is something you are doing a

10  little bit each month, fair to say?

11  **A.**  Yes.

12  **Q.**  Now, in this Offer in Compromise process, are there certain

13  forms or in the installment process, are there certain forms

14  that the taxpayer has to submit and sign under oath in order to

15  engage in that type of process or negotiation?

16  **A.**  Yeah.  We are looking at the financial situation of the

17  individual or business in order to determine the best way to

18  resolve the case.  Financial forms are a 433-A for an

19  individual and a 433-B for the business.

20  **Q.**  And that 433-A or B, what types of items?  What type of

21  form is that, and what information are you gathering through

22  the use of those forms?

23  **A.**  We are trying to get a full and complete financial picture

24  of the individual that we are working with.

25  **Q.**  And how does that affect the decision of the IRS to enter

1    into an Offer in Compromise, this full financial picture?

2    **A.**  Well, with the information that is provided to us on this

3    form, we are going to look at it and we will investigate things

4    we question.  We will talk to the taxpayer or their

5    representative, and in order to determine on our side what we

6    can -- what would be a viable option, we need a complete

7    picture so that we can make a fair assessment.

8    **Q.**  And what kind of information on this 433-A or B, generally

9    what kind of information are you asking from the taxpayer to

10   provide to you so you guys can make an assessment of what Offer

11   in Compromise might be viable?

12   **A.**  We're looking at income and potential sources of income.

13   We're looking at assets, possible loan values.  We're looking

14   at expenses.  It's a complete picture that we're trying to come

15   up with.

16   **Q.**  Would it be fair to say the information you are looking for

17   on that 433-A is similar to what a bank might want before it

18   loaned money?

19   **A.**  Mortgages I've requested, yes, it was quite intensive.

20   **Q.**  And you said there is a 433-B Form also?

21   **A.**  That is for business.

22   **Q.**  Fair to say it's similar information, similar form?

23   **A.**  Yes, it's so we can assess the business, the business's

24   financial status at that time.

25   **Q.**  And now, when the IRS gets that information from the

1    taxpayer, that financial information of their debts and their

2    expenses and income, what happens?  What do you guys do with

3    it?

4    **A.**  If the revenue officer has got the case for a while,

5    they're going to look at the different information that was

6    provided, compare it to other information that we may have

7    online through our systems or other information we may have

8    gathered through the investigation.  If we have questions,

9    we'll ask the questions.  We look for documentation to support

10   what they have put on the financials so that we can take a look

11   at it and see what way -- what is the best option for us to

12   resolve the case.

13   **Q.**  Is there normally another form that's submitted with the

14   433-A or B called a Form 656?

15   **A.**  That's the Offer in Compromise form, and it's not always

16   submitted with the 433-A or B depending on what the taxpayer --

17   what options they're taking.

18   **Q.**  And so the 656 is actually the actual offer someone would

19   make, fair to say?

20   **A.**  Yes.

21   **Q.**  Where the 433-A is the financial information that supports

22   that request?

23   **A.**  Yes.  The 433-A and B are going to be submitted to us in

24   most any collection case we're working.  That's one of our

25   starting points.

1    **Q.** Now, prior to meeting here today, did you have the

2    opportunity to review some blank Form 656 and Form 433-A and B

3    with myself and revenue agent Gerald Hatagan?

4    **A.** Yes.

5              **MR. BENSON:** Judge, may I approach for a second?

6              **THE COURT:** Yes, you may.

7              **MR. BENSON:** For the record, I'm presenting them

8    with Binder No. 1, and I'll ask her to look at a few exhibits

9    for authentication.

10   **BY MR. BENSON:**

11   **Q.** Could you please take a moment to look at Government's

12   Exhibit 1, 2A and 2B in the binder. Take a moment to flip

13   through those and make sure you know what they are.

14   **A.** Okay.

15   **Q.** Do you recognize those forms?

16   **A.** Yes.

17   **Q.** Could you tell us without going into detail its contents.

18   What is Government's Exhibit 1 that you have before you?

19   **A.** That is the Offer in Compromise form that is submitted to

20   request an Offer in Compromise.

21   **Q.** And that's a blank one, correct?

22   **A.** Yes.

23   **Q.** And what's the number of that form?

24   **A.** This is Form 656.

25   **Q.** And Government's Exhibit 2A and 2B, can you tell the jury

1  generally what those are in front of you?

2  **A.**   2A is a Form 433-A; and 2B is also is 433-A, different

3  revisions.

4  **Q.**   And what year is the first Form 433-A from?

5  **A.**   January, 2008.

6  **Q.**   And the second Form 433-A that you have there?

7  **A.**   December, 2012.

8  **Q.**   And then Government's Exhibit 3 that you have before you,

9  what is that?

10  **A.**   Three?

11  **Q.**   Yes.

12  **A.**   Is the 433-B.

13  **Q.**   And are those true and accurate copies of the forms as they

14  existed at that time as referenced on the forms?

15  **A.**   As far as I know, yes.

16  **Q.**   Those are the ones you are used to seeing and working with,

17  right?

18  **A.**   Yes.  We get different revisions, but yes.

19          **MR. BENSON:**  At this time I would move to admit

20  Government's Exhibit 1, 2A, 2B, and 3 into evidence, please.

21          **THE COURT:**  It's 1, 2A --

22          **MR. BENSON:**  2B --

23          **THE COURT:**  -- 2B.

24          **MR. BENSON:**  -- and 3, please.

25          **THE COURT:**  Any objection?

1          **MS. CACIOPPO:**  No objection.

2          **THE COURT:**  Government's Exhibit 1, 2A, and 2B are

3   admitted without objection.

4          **MR. BENSON:**  May I please retrieve the binder?

5          **THE COURT:**  Yes, you way.

6          **MR. BENSON:**  With the Court's permission, I would

7   like to work with some of these forms on the ELMO and display

8   them to the jury, only the ones admitted, Your Honor.

9          **THE COURT:**  Okay.  These should show up, not only on

10  up there, but on your monitors in front of you too.

11  **BY MR. BENSON:**

12  **Q.**  For the record, I'm going to start showing the witness

13  Government's Exhibit 2A and 2B first.  Let's take a look at the

14  first page of Government's Exhibit 2A.

15         **THE COURT:**  If you need that made larger or

16  something, just tell Mr. Benson that.  He can make it larger.

17         **THE WITNESS:**  Thank you.  It's fine.

18  **BY MR. BENSON:**

19  **Q.**  Start at the top.  For the record, this is Government's

20  Exhibit 2A.  In Section 1, what type of information is the

21  taxpayer supplying?

22  **A.**  Name, address, phone numbers, relationship of dependents,

23  their Social Security number, birth date, driver's license

24  numbers, marital status, and their spouse's information.

25  **Q.**  And then moving on to Section 2, what kind of information

1    is being sought in that section?

2    **A.**   Employment information:  Their employer, their contact

3    information, the address of the employer, exemptions claimed on

4    the W-4 Form and how often they're paid.

5    **Q.**   And why is this information important to the IRS in trying

6    to determine whether to offer an installment plan or offer an

7    Offer in Compromise?

8    **A.**   We are looking at the income that has been provided through

9    this form, so the employer would be very important aspect.  For

10   a collection standpoint, it's -- we would look at this in order

11   to determine another resolution for the case.

12   **Q.**   I see there is room for taxpayer's employer information and

13   also the spouse.

14   **A.**   Yes.

15   **Q.**   What if someone has more than one employer, where does the

16   information go?

17   **A.**   We can add sheets to our 433-As.

18   **Q.**   Let's move down to the third section, other financial

19   information.  And for the record, let's move to the very bottom

20   right of the form.  There's a year there.  What year would this

21   form have been in affect?

22   **A.**   It was effective January of 2008.

23   **Q.**   And that would be moved forward to the other revision form,

24   2B, from 2012; is that correct?

25   **A.**   Yes.

1  **Q.** So this third section, there is a couple questions about

2  different types of businesses someone may be involved in.

3  Could you tell us a little bit about what information the IRS

4  is seeking there?

5  **A.** Well, we're looking for whether or not they are involved in

6  any lawsuits. We're looking to determine if they have filed

7  any bankruptcies. Any anticipated increases or decreases in

8  income, business or personal. We are looking to find out if

9  they are a beneficiary to a trust, a state, or a life insurance

10 policy and whether or not they have resided outside of the

11 United States for periods of six months or longer in the last

12 ten years.

13 **Q.** And why does the IRS care whether they're anticipating an

14 increase or decrease in income like Item A or if they're the

15 beneficiary of a trust like Item 9. Why is that important to

16 the IRS to know that information?

17 **A.** It would have a bearing on their financial status or future

18 potential collection potential.

19 **Q.** And could it affect a subsequent acceptance or denial of an

20 Offer in Compromise?

21 **A.** Probably, yes.

22 **Q.** I would like to move on to the second page of Government's

23 Exhibit 2A. Let's take a look at the top portion of it. This

24 section, what's the title of Section 4?

25 **A.** Personal asset information for all individuals.

1    **Q.**  Let's look at Item 11.  Can you read what it says there

2    under personal bank accounts?

3    **A.**  "Cash on hand."

4    **Q.**  Uh-huh.

5    **A.**  "Including all checking, online bank accounts, money market

6    accounts, savings accounts, stored value cards, payroll cards,

7    government benefit cards, et cetera.  List safe deposit boxes

8    including location and contents."

9    **Q.**  So if someone had an account that they -- you know, a

10   regular checking and savings account, you would expect to see

11   that there, wouldn't you?

12   **A.**  Yes.

13   **Q.**  Let's talk about the next section.  Section -- the

14   beginning of Section 13 where it says investments, can you read

15   what that says there?

16   **A.**  "Include stocks, bonds, mutual funds, stock options,

17   certificates of deposits and retirement assets such as IRAs

18   Keoghs, and 401(k) plans.  Include all corporations,

19   partnerships, limited liability companies, or other business

20   entities in which the individual is an officer, director,

21   owner, member, or otherwise has a financial interest."

22   **Q.**  So what kind of information are you gathering there?

23   That's not what would be considered W-2 income, is it?

24   **A.**  No, this would be -- it's stocks.  If they've got

25   investment accounts.  If they've got retirement accounts.  If

1  they are involved in any businesses that they have a financial

2  interest in.

3  **Q.**  So if I owned a company, you would expect to see that on

4  that form, wouldn't you?

5  **A.**  Yes.

6  **Q.**  If I was the president of some company, you would expect to

7  see that on that form, wouldn't you?

8  **A.**  An officer, yes.

9  **Q.**  If I had an employment contract with some company, you

10  would expect to see that on that form, wouldn't you?

11  **A.**  The employment contract, if you're as an employee, would be

12  on the front of the form.

13  **Q.**  Should be on the front, right, not there?

14  **A.**  Right.

15  **Q.**  So this is more covering your interest in any company you

16  may have a financial stake in?

17  **A.**  Yes.

18  **Q.**  And does your interest in other companies and the financial

19  stake you have in those companies have the ability to influence

20  the IRS as to whether or not they engage in an Offer in

21  Compromise?

22  **A.**  Yes.

23  **Q.**  Let's move down to Section 14, available credit.  Can you

24  read what it says there?

25  **A.**  On 14?

1  **Q.**  Right above 14A.

2  **A.**  "Available credit.  List bank issued credit cards with

3  available credit."  That would just be any credit cards.

4  **Q.**  And does the credit or the large debit balances you might

5  have affect the IRS's Offer in Compromise position?

6  **A.**  Yes.

7  **Q.**  Let's talk a little bit about what's in Section 15, some

8  questions about life insurance.  Why is that important for the

9  IRS to know that before they enter into an Offer in Compromise?

10  **A.**  Some life insurance policies do have a cash value.

11  **Q.**  Moving on to the third page of Government's Exhibit 2A, the

12  top Section 16, can you read what that says?

13  **A.**  "In the past ten years, have any assets been transferred by

14  the individual for less than full value?"

15  **Q.**  Why is that important?  What are you looking for there?

16  **A.**  There's times where people have transferred assets to maybe

17  a family member or something for less than the actual value of

18  the asset.

19  **Q.**  And then what's this real property section?  Can you read

20  that?

21  **A.**  "Include all real property and land contracts."  This is to

22  determine their interest in any real estate.

23  **Q.**  So you would expect to see not only land contracts or

24  rentals where they're getting money in, but also if they are

25  paying money out?

1  **A.**  If they have a personal residence or rental properties that

2  they're paying a mortgage on or something, yes, those are all

3  assets and should be disclosed.

4  **Q.**  And Line 17, personal vehicles leased or purchase, that's

5  sort of self-explanatory.  You are trying to get an inventory

6  of all the vehicles they might own?

7  **A.**  Yes.

8  **Q.**  And Line 18, personal assets, can you read that?

9  **A.**  "Include all furniture, personal effects, artwork, jewelry,

10  collections, which include guns, coins, et cetera, antiques or

11  other assets."

12  **Q.**  Is it fair to say these kinds of sections here, you're

13  looking for stuff the taxpayer might be able to sell to pay

14  part of their debt to the IRS?

15  **A.**  Yes.

16  **Q.**  Moving on now to the fourth page of Government's

17  Exhibit 4A, the section here, Items 20 to 45, the top of this

18  page, what information is being gathered here?

19  **A.**  All their monthly income and expenses.

20  **Q.**  It says, "if the taxpayer is self-employed."  Is that first

21  section on the first page if you have an employer who is paying

22  you wages, or would that also be self-employment you could list

23  on that first page?

24  **A.**  You could notate the business that you are -- your

25  self-employed business, you could notate that on the front, but

1  there is another section to fill out for the self-employed

2  business.

3  **Q.**  But here this section is for self-employed; not if I'm

4  getting a W-2 from an employer, correct?

5  **A.**  This is for everything.

6  **Q.**  For everything.  Okay.  So we have one column is total

7  income, and the other is total living expenses; is that

8  correct?

9  **A.**  Yes.

10 **Q.**  And is it fair to say these Items 1 through 11 sort of

11 dictate what you have to list on there?

12 **A.**  Yes.

13 **Q.**  And then moving down a little bit further, there is a

14 certification above the taxpayer's signature line.  Can you

15 read what that says?

16 **A.**  "Under penalties of perjury, I declare that to the best of

17 my knowledge and belief this is statement of assets,

18 liabilities, and other information is true, correct, and

19 complete."

20 **Q.**  And then underneath there is some attachments required for

21 wage earners and self-employed individuals.  Can you read what

22 it says underneath that?

23 **A.**  "Copies of the following items for the last three months

24 from the date this form is submitted.  Check all attached

25 items."

1   **Q.**  So you're looking for the three months following the

2   submission of this document, correct?

3   **A.**  Last three months is usually up to the date.  When we're

4   collecting this, we're gathering three months so we can do an

5   average.

6   **Q.**  Okay.  I'd like to continue on with the next page of that

7   form where it asked for some business information.  Can you

8   read what it says there?

9   **A.**  This is business information.  This would be for the --

10  "Section 5 and 6 must be completed only if the taxpayer is

11  self-employed."

12  **Q.**  So if you had a corporation or two or business that you

13  owned, you would expect to see it in that section of the form,

14  fair to say?

15  **A.**  This is more self-employed, so this is a lot of the

16  schedule C people.

17  **Q.**  Could you explain what that means?  Some people may not

18  know what you mean when you say schedule C.

19  **A.**  A schedule C is attached to your 1040 Form, and it provides

20  the income and expenses of your business.  If it's a

21  corporation or partnership or something, we also do the 433-B.

22  These are usually smaller businesses.

23  **Q.**  And you're asking for the business name, website, things

24  like that, information about the business that they may own,

25  right?

1  **A.**  Yes.

2  **Q.**  And moving down a little bit, we have a couple similar

3  questions to the personal questions, but this is business cash

4  on hand and accounts and notes receivable.  What are you

5  looking for there?

6  **A.**  Income sources.  And on the collection side, these could be

7  potential levy sources for us.

8  **Q.**  When you say levy, what do you mean by levy?  Could you

9  explain what that means and what that process is to the ladies

10  and gentlemen of the jury?

11  **A.**  A levy is an enforcement tool collection uses to attach to

12  funds that are owed to the taxpayer, such as a bank account.

13  The bank is holding it for the taxpayer, and we can access that

14  with a levy.  Accounts receivable would be the same.

15  **Q.**  And moving on to the last page of that form, in the section

16  business assets, could you read what that says?

17  **A.**  "Business assets.  Include all tools, books, machinery,

18  equipment, inventory or other assets used in trade or business.

19  Include uniform commercial code, which is UCC, filings.

20  Include vehicles and real property owned, leased, rented by the

21  business if not known in Section 4."

22  **Q.**  And then this other Section 6, what is this about?

23  **A.**  This is the income and expenses of the sole prop.  So the

24  sole proprietorship information, monthly business income, total

25  monthly business expenses.

1   **Q.**  And Government's Exhibit 2B, I'm not going to go through

2   the whole thing.  This is the later version from 2012, correct?

3   **A.**  Yes.

4   **Q.**  And that's noted on the bottom, right-hand corner?

5   **A.**  Yes.

6   **Q.**  Now, we talked also about a Form 433-B.  What is that for?

7   **A.**  433-B is for the financial status of a business.

8   **Q.**  So if when you say a business, it's a business that the

9   taxpayer would own or be a part of?

10  **A.**  Yes.

11  **Q.**  And for the record, I am showing the witness what has been

12  admitted as Government's Exhibit 3, the first page of that.  We

13  is the number up top, 433-B?  Can you read what the note says?

14  **A.**  "Complete all entry spaces with the current data available

15  or N/A, not applicable.  Failure to complete all entry spaces

16  may result in rejection of your request or significant delay in

17  account resolution.  Include attachments if additional space is

18  needed to respond completely to any question."

19  **Q.**  So we have some informational items on the left:  Business

20  name, business street address.  What's on the right side, 2B?

21  What information are you looking for there?

22  **A.**  "The employer identification number; type of entity,

23  whether or not it is a partnership, corporation, limited

24  liability; the date it was incorporated or establishes; the

25  number of employees; gross monthly payroll; frequency of tax

1    deposits; and is the business enrolled in electronic federal

2    tax payment system."

3    **Q.**   What is that?

4    **A.**   That's where they make their deposits online for their

5    employment taxes.  I'm not sure.  They might be able to make

6    estimated tax payments through that system also, but for a

7    collection person, it is more about the employment taxes.

8    **Q.**   Okay.  And then the next section down is a payment

9    processor.  What's that all about?

10   **A.**   If the business accepts credit cards, they will have a

11   payment processor, and they get their funds through the payment

12   processor.

13   **Q.**   Why does the IRS care about that when trying to evaluate an

14   Offer in Compromise or Installment Agreement?

15   **A.**   It's an income source.

16   **Q.**   Moving on to Section 2, what information is here?

17   **A.**   This is the business personnel and contacts for partners,

18   officers, LLC members, major shareholder, et cetera.

19   **Q.**   And that would be for the information for the business

20   that's stated up here in Section 1A, correct?

21   **A.**   Yes.

22   **Q.**   Moving on to the second page of 2B, generally these are

23   similar questions that are asked about the business that were

24   asked about the personal on Form 433-A; is that correct?

25   **A.**   Yes.

1  **Q.**  "9, is the business a party to a lawsuit?  10, has the

2  business ever filed bankruptcy?  11, do any related parties

3  have outstanding amounts owed to the business?"

4         The taxpayer who is requesting the Offer in

5  Compromise would have to list all that information in there

6  that applies to them, correct?

7  **A.**  Yes.

8  **Q.**  And, once again, down in this Section 15 and 16, bank

9  accounts -- can you read what it says there about bank

10  accounts?

11  **A.**  Business bank accounts?

12  **Q.**  Yes.

13  **A.**  "Include online bank accounts, money market accounts,

14  savings accounts, checking accounts, and stored value cards

15  such as payroll cards, government benefit cards, et cetera.

16  List safety deposit boxes including location and contents."

17  **Q.**  Moving on to the fourth page of that agreement, we have

18  some other request for information, "real property," and then,

19  "total equity," and then, "leased or purchased vehicles."  Why

20  is that information important to the IRS?

21  **A.**  They're assets.  So they can have a value that might be

22  very helpful in determining how to resolve a collection case or

23  whether or not an offer would be accepted.

24  **Q.**  I'm going to the next page of that form, the top part.

25  What kind of information is being sought in that section?

1    **A.**  "Business equipment.  Include all machinery, equipment,

2    merchandise, inventory, and/or other assets."

3    **Q.**  And then the last page of Government's Exhibit 2B, what is

4    that?

5    **A.**  Monthly Income and Expense Statement for business.

6    **Q.**  Similar to what we saw on the personal 433-A?

7    **A.**  Yes.

8    **Q.**  And, once again, moving down towards the bottom where it

9    says certification, can you read what it says there?

10   **A.**  "Under penalties of perjury, I declare that to the best of

11   my knowledge and belief this statement of assets, liabilities

12   and other information is true, correct, and complete."

13   **Q.**  And, once again, under the attachments required, what does

14   it say there?

15   **A.**  "Copies of the following items for the last three months

16   from the date this form is submitted.  Check all attached

17   items."

18   **Q.**  And what kind of items are listed there?

19   **A.**  "Banks and investments:  Statements for all money market,

20   brokerage, checking and saving accounts, certificates of

21   deposit, stocks, bonds, assets, statements from lenders on

22   loans, monthly payments, payoffs and balances for all assets.

23   Include copies of UCC financing statements and accountant's

24   depreciation schedules.

25          "Expenses:  Bills or statements for monthly

1   recurring expenses of utilities, rent, insurance, property

2   taxes, telephone and cell phone, insurance premiums, court

3   orders requirement payments, other expenses.

4          "Other:  Credit card statements, profit and loss

5   statements, all loan payoffs, et cetera.  Copy of the last

6   income tax returns filed, Form 1120, 1120-F, 1065, 1040, 990,

7   et cetera."

8   **Q.**  Now, you referred also to another form, a 656.  What is

9   that, again?

10  **A.**  656 is the Offer in Compromise form.

11  **Q.**  I'd like to show you what has been admitted as Government's

12  Exhibit 1.  Is that the Form 656 that you referenced?

13  **A.**  Yes.

14  **Q.**  And, once again, what does this form, if accepted by the

15  taxpayer -- what happens?  What goes on between the taxpayer

16  and the IRS?  If they fill out this form, the 433-A accurately,

17  that accurately, what's the benefit?

18  **A.**  The Offer in Compromise is to compromise a tax liability.

19  This form allows the offer specialist to make a determination

20  as to whether or not it is in the best interest of the

21  government to accept the offer.

22  **Q.**  Is it fair to say that decision can never be made properly

23  unless you have the -- all the information you need from the

24  taxpayer?

25  **A.**  That is part -- that is required.  Yes, you are supposed to

1    submit a complete financial picture so the offer specialist can

2    make those determination.

3    **Q.**  Because on those forms, am I correct, in the certification

4    you are swearing under oath what you are giving them, the IRS,

5    is all the complete and truthful information, right?

6    **A.**  Yes.

7    **Q.**  So we have Section 1 here, once again, basically just the

8    background information of the taxpayer?

9    **A.**  That's the taxpayer contact information, name, address,

10   Social Security number.

11   **Q.**  Let's move down to Section 2.  What's going on in there?

12   What's going on?

13   **A.**  Here they're identifying what their -- what taxes they are

14   trying to compromise.  They'll check what they're submitting to

15   compromise.

16   **Q.**  So 1040, 1120, would be income from either a business or

17   your personal, right?

18   **A.**  Yes.

19   **Q.**  941, employer's quarterly, what's that?

20   **A.**  That's employment taxes.  If they haven't made all their

21   employment tax deposits or they have balances due remaining on

22   any of their employment tax forms.

23   **Q.**  940, FUTA, what that's?

24   **A.**  That's the unemployment.

25   **Q.**  And the next one is what?

 1    **A.**   Trust fund recovery penalty.  The trust fund recovery

 2    penalty is an assessment that is made against the responsible

 3    parties of a business when they have not paid over the trust

 4    fund portion of the employment tax that was withheld from their

 5    employees' paychecks.

 6    **Q.**   So the taxpayer -- because you could be submitting Offer in

 7    Compromises on different issues with the IRS, right?

 8    **A.**   Yes.

 9    **Q.**   And this is identifying which situation you're seeking the

10    Offer in Compromise for, correct?

11    **A.**   Yes.

12    **Q.**   And moving down to Section 3, what do we have there?

13    **A.**   That is --

14    **Q.**   It says, "reason for Offer in Compromise."  What's going on

15    there?

16    **A.**   They'll check either, "doubt as to collectability," or,

17    "effective tax administration."

18    **Q.**   Okay.  Could you read doubt as to collectability, what it

19    says.

20    **A.**   "I have insufficient assets and income to pay the full

21    amount.  You must include a complete collection information

22    statement, 433-A, or Form 433-B."

23    **Q.**   Where it says you must include the Form 433-A or B, is that

24    because you use that to determine whether or not the taxpayer

25    has sufficient assets and income to not pay the full amount?

1  **A.**  Yes.

2  **Q.**  And what's effective tax administration?  What's going on

3  there?

4  **A.**  That is a special circumstance that the offer specialist

5  will make the determination on.  It may not have anything to do

6  with actual collectability.

7  **Q.**  And then, lastly, the section Offer in Compromise terms,

8  can you tell the jury what's going on in that section?

9  **A.**  Here the taxpayer is submitting what terms they would like

10  to pay the offer, that they are seeking, off in.

11  **Q.**  And that's determined solely by the taxpayer; the IRS

12  doesn't fill that section out or have anything to do with it

13  except look at it and determine whether or not they will accept

14  it?

15  **A.**  The taxpayer fills this portion out, and then the offer

16  specialist as they've done their investigation -- my

17  understanding is they can negotiate that.  They don't have to

18  accept it as submitted.

19  **Q.**  Okay.  I'd like to move on to the second page of Form 656.

20  There's some deferred periodic payment offer.  What's that

21  about?

22  **A.**  That's another option that the offer specialist and

23  taxpayer may decide as to how to pay off the offer.

24  **Q.**  Okay.  And then down here is the following conditions that

25  informs the taxpayer what they need to do and how this is going

1    to be used, fair to say?

2    **A.**  Yes.

3    **Q.**  Moving on to the third page of the 656 Form, we have a

4    continuation of the conditions.  But then we have this

5    explanation of circumstances.  And this is, once again, filled

6    out by the taxpayer when it's submitted?

7    **A.**  Yes.

8    **Q.**  And then Section 7, what purpose does that serve?

9    **A.**  This is the taxpayer advising the Internal Revenue Service

10   where the funds are coming from to make the offer.

11   **Q.**  For the offer?

12   **A.**  Yes.

13   **Q.**  And going to the last page of Government's Exhibit 656,

14   once again, it says taxpayer attestation.  Can you read what

15   that says?

16   **A.**  Okay.  "If I/we submit this offer on a substitute form,

17   I/we affirm that this form is a verbatim duplicate of the

18   official Form 656, and I/we agree to be bound by all the terms

19   and conditions set forth in the official Form 656.  Under

20   penalties of perjury, I declare that I have examined this

21   offer, including accompanying schedules and statements, and to

22   the best of my knowledge and belief it is true, correct, and

23   complete."

24   **Q.**  And down here, this is stuff the IRS fills out, official

25   use only?

1    **A.**   That's going to be worked by the offer specialist.

2    **Q.**   Let's move down here under this Privacy Act statement.

3         It says:  "We ask for the information on this form

4    to carry out the internal revenue laws of the United States.

5    Our authority to request this information is Section 7801 of

6    the Internal Revenue Code.  Our purpose for requesting the

7    information is determined if it in the best interest of the IRS

8    to accept an Offer in Compromise.  You are not required to make

9    an Offer in Compromise.  However, if you choose to do so, you

10   must provide all of the taxpayer information requested.

11   Failure to provide all the information may prevent us from

12   processing your request."

13        And is it fair to say if a taxpayer withholds

14   information about his income, if they don't properly fill out

15   these forms and list all that information, it has the ability

16   to affect the IRS's ultimate determination of an Offer in

17   Compromise or installment plan.  Is that fair to say?

18   **A.**   Yes.

19             **MR. BENSON:**  I have nothing further, Your Honor.

20             **THE COURT:**  Cross-examination?

21             **MS. CACIOPPO:**  Yes.

22                  **CROSS-EXAMINATION**

23   **BY MS. CACIOPPO:**

24   **Q.**   Good afternoon.  Just a few follow-up questions for you.

25   There is a number of ways to resolve a taxpayer debt; is that

1  fair?

2  **A.**  Yes.

3  **Q.**  And as a revenue officer, you have a certain amount of

4  discretion in order to resolve these delinquent taxes, correct?

5  **A.**  A certain amount, yes.

6  **Q.**  And that would involve investigating the circumstances

7  underlying each taxpayer's delinquency?

8  **A.**  That's a case by case, yes.

9  **Q.**  Okay.  And I would imagine that the particular reasons for

10  the delinquencies may impact your ability to come to a

11  successful or fair resolution?

12  **A.**  The reasons for the liabilities?

13  **Q.**  Correct.

14  **A.**  The liabilities can be occurred over various issues, but

15  the resolution is going to be based mostly on the financial or

16  current aspect of the taxpayer's situation.

17  **Q.**  Okay.  And you testified that you worked as a revenue

18  officer for 25 years; is that right?

19  **A.**  Yes.

20  **Q.**  Now, over the course of your career, I assume you have been

21  involved in resolving hundreds of taxpayer issues?

22  **A.**  Yes.

23  **Q.**  Thousands?

24  **A.**  Yes.

25  **Q.**  Okay.  Now, in order to resolve these tax issues, you have

1   to collect information from the taxpayer, correct?

2   **A.**  Yes.

3   **Q.**  And that's because in the role of a revenue officer, you're

4   trying to find the best way to collect the outstanding balance;

5   is that fair?

6   **A.**  Yes.

7   **Q.**  And there is a variety of options in terms of collecting an

8   outstanding balance, right?

9   **A.**  Yes.

10  **Q.**  You testified about installment payments?

11  **A.**  Yes.

12  **Q.**  Bankruptcy is another potential option; would you agree?

13  **A.**  Yes.

14  **Q.**  Okay.  And so in this -- what you've just testified about

15  was the process to make an Offer in Compromise, correct?

16  **A.**  Yes.

17  **Q.**  And that's when the taxpayer tries to essentially settle

18  their debt with the IRS, correct?

19  **A.**  Yes.

20  **Q.**  Now, the form that we just looked at, I believe the 433-A

21  Form, that's something that can also be submitted by a

22  taxpayer's accountant through a power of attorney, right?

23  **A.**  Yes.

24  **Q.**  And do you find that those forms are typically filled out

25  in handwriting?

1    **A.**   I have gotten them different ways.  Generally, if it's from

2    a power of attorney, they are quite often typed or processed

3    through a computer.

4    **Q.**   Okay.  And so you have walked the Court and the jury

5    through all of the information that a 433-A seeks, all the

6    different sections of information, right?

7    **A.**   (Nodding head.)

8    **Q.**   And at the end of the day, the goal is to identify the

9    complete picture for a particular taxpayer, correct?

10   **A.**   Yes.

11   **Q.**   And that's because what you're really trying to figure out

12   is what that person's financial status looks like?

13   **A.**   Yes.

14   **Q.**   And you do that by talking about how many wages are coming

15   in and how many expenses are going out; is that fair?

16   **A.**   Yes.

17   **Q.**   And that's because the entire point of the form is to allow

18   the revenue officer to determine the collectability of a

19   taxpayer's debt?

20   **A.**   Yes.

21   **Q.**   Okay.  And so in the role of a revenue officer, you review

22   the information on 433-A, correct?

23   **A.**   Yes.

24   **Q.**   And then the revenue officer, do they determine whether

25   there is enough information to make a determination as to the

1   potential settlement in light of the financial data submitted?

2   **A.**   Yes.  If we need additional information, we will continue

3   our investigation.

4   **Q.**   And there are times when a taxpayer may not provide a

5   complete 433-A, right?

6   **A.**   It happens.

7   **Q.**   And, for instance, the form could be incomplete?

8   **A.**   True.

9   **Q.**   And in such circumstances, the revenue officer would ask

10  the taxpayer for additional information, correct?

11  **A.**   Yes.

12  **Q.**   And sometimes I imagine that taxpayers also make mistakes

13  on a 433-A?

14  **A.**   Yes.

15  **Q.**   For example, you testified that the form requires the last

16  three months of financial information; is that right?

17  **A.**   Yes.

18  **Q.**   But at the end of the day, you are really looking for the

19  average, and that's why it's three months, correct?

20  **A.**   It's generally three months.  I can ask for more.

21  **Q.**   So if the taxpayer prepares one of these 433-A at a point

22  in time, puts together the three months, and then doesn't

23  submit the 433-A until much later, would that be an incorrect

24  submission?

25  **A.**   I would probably ask for updated information.

1    **Q.**   Okay.  But there would be an ongoing dialogue with the

2    taxpayer in terms of finding out what that person's financial

3    status looks like, right?

4    **A.**   Generally, yes.

5    **Q.**   Okay.  And does that happen with some regularity that you

6    get incomplete 433-As?

7    **A.**   Yes.

8    **Q.**   And does it happen with regularity that people make

9    mistakes on the 433-As?

10   **A.**   They do.

11   **Q.**   And do you allow the taxpayer an opportunity to fix those

12   mistakes?

13   **A.**   Generally, yes.

14   **Q.**   Okay.  And so is there ever an instance where a revenue

15   officer would just abandon the negotiation with the taxpayer

16   and stop working in good faith to resolve the debt?

17          **MR. BENSON:**  I would object as to speculation unless

18   it can pertain to this particular individual.

19          **THE COURT:**  Or this particular witness.  Is she

20   aware of cases where, not the IRS as a whole group but her

21   experience particularly as to whether or not --

22          **MR. BENSON:**  My --

23          **THE COURT:**  Go ahead.

24          **MR. BENSON:**  I guess my objection would be relevancy

25   then as to what happens in other cases versus this case,

1    Your Honor.

2         **THE COURT:**  I'm going to let the question be

3    answered if the agent understand it and if you've narrowed it

4    enough.

5         Do you understand the question?

6         **THE WITNESS:**  Please ask the question again.

7    **BY MS. CACIOPPO:**

8    **Q.**  If a mistake is discovered on a 433-A, the revenue officer

9    doesn't just abandon the negotiations with the taxpayer

10   typically, do they?

11   **A.**  It's going to depend on how long the case has been ongoing

12   and how much delay has already been -- how much delay the RO

13   has already had to deal with.

14   **Q.**  And that's because the process could go back and forth

15   several times?

16   **A.**  It can.

17   **Q.**  And that's because the ultimate goal here is for the

18   revenue officer to collect the outstanding balance?

19   **A.**  Yes.  We're trying to collect what is due, yes.

20   **Q.**  The outstanding balance to the IRS is what you are after?

21   **A.**  Correct, yes.

22   **Q.**  Now, it's also possible that a taxpayer's financial

23   information could change during the course of that

24   back-and-forth communication with the revenue officer, fair?

25   **A.**  Yes.

1  **Q.** But those changes don't render the original 433-A

2  submission false, do they?

3  **A.** No. At that point I would request a revised.

4  **Q.** Okay. And I assume that that's something that revenue

5  officers do on a regular basis?

6  **A.** It happens, yes.

7  **Q.** Okay. And a taxpayer -- you can't predict how long this

8  process takes for any given taxpayer; is that fair?

9  **A.** To a point, yes.

10  **Q.** Okay. Well, in your experience at the IRS, do you recall a

11  time in 2008, 2009 where there was a big recession in the

12  United States?

13  **A.** Yes.

14  **Q.** And an increased number of taxpayers were facing tax debt

15  at that time; is that fair?

16  **A.** Yes.

17  **Q.** And in that time frame, people who were working in the

18  mortgage industry may have lost their entire income overnight?

19  **A.** Probably, yes.

20  **Q.** And that could change the information that would go into a

21  433-A on almost a monthly basis, right?

22         **MR. BENSON:** Objection. That's speculation.

23         **THE COURT:** If she knows.

24  **A.** As I said before, I would request a revised financial

25  statement if the circumstances had changed.

1   **Q.**  Okay.  But just to be clear, I've looked through what

2   Mr. Benson just discussed, and I don't see an obligation to

3   update a 433-A submission.  Is there such obligation?

4   **A.**  If you want me to make a determination.  Otherwise, I will

5   still be working off the old stuff; and at that point, I will

6   determine the taxpayer is not working with me, and I can start

7   taking enforced actions.

8   **Q.**  But as you said, you can't estimate how long any of these

9   will actually take; is that fair?

10  **A.**  Revenue officers set deadlines.  And if the taxpayer

11  continues to miss deadlines, those delays start counting

12  against them.  And, yes, we can proceed with enforced actions.

13  **Q.**  Okay.  Now, there is times you mentioned when an Offer in

14  Compromise is rejected.

15  **A.**  Okay.

16  **Q.**  And what are the reasons that an Offer in Compromise can be

17  rejected?

18  **A.**  An offer specialist handles that.  I'm not an offer

19  specialist.  I am a revenue officer and fraud technical

20  advisor.

21  **Q.**  Okay.  So the revenue officer would refer the case to the

22  revenue specialist?

23  **A.**  To an offer specialist.

24  **Q.**  Offer specialist.  And at that point, the Offer in

25  Compromise could be rejected?

1    **A.**   Yes.

2    **Q.**   And there is a number of reasons why it could be rejected;

3    you don't know?

4    **A.**   Yes, there are reasons it would be rejected.

5    **Q.**   Are there any reasons where a revenue officer wouldn't even

6    consider a 433-A form submission?

7    **A.**   Full pay.

8    **Q.**   Excuse me?

9    **A.**   If they came in and full paid.

10   **Q.**   Okay.  Are there other reasons why a revenue officer

11   wouldn't even get to a 433-A?

12   **A.**   If the taxpayer filed bankruptcy or submitted an offer to

13   another area in the Internal Revenue Service bypassing the

14   revenue officer, then it's possible.

15   **Q.**   Would you ever reject the Offer in Compromise because there

16   was incorrect information in the document?

17   **A.**   I'm not an offer specialist.  I am not allowed to reject

18   them.

19   **Q.**   So you don't know?

20   **A.**   No.

21   **Q.**   Now, when an Offer in Compromise is rejected, and unless

22   the taxpayer is explicitly asked to update their financial

23   picture, that means the 433-A Form no longer has any ongoing

24   rule in the resolution of an outstanding tax debt, correct?

25   **A.**   Not necessarily.  The case is probably going to come back

1    to a field revenue officer, and the form will be in there.

2    **Q.**   Okay.  But at that point when you're trying to collect the

3    outstanding balance, the 433-A no longer has any application to

4    the resolution other than being in the file?

5    **A.**   Well, there is probably information on there useful to a

6    revenue officer, yes.

7    **Q.**   And when someone goes outside of the Offer in Compromise

8    route and goes into an installment payment plan, is that Offer

9    in Compromise still discussed with the revenue officer?

10   **A.**   Revenue officers forward Offer in Compromises.  We don't

11   have a lot of function in that area.

12   **Q.**   What you are saying is that if a taxpayer's Offer in

13   Compromise is rejected, then a new process starts within a new

14   area within the IRS?

15   **A.**   If it has not gone through the offer process or been

16   accepted, it's probably going to end up back in the field.  How

17   soon, I don't know.

18   **Q.**   But at that point, the offer is off the table, and now the

19   IRS is working with the taxpayer to collect the entire

20   outstanding debt?

21   **A.**   Yes.

22   **Q.**   And if the IRS collects a hundred percent of a tax debt

23   following the rejection of a 433-A, would you agree with me

24   that there was no harm to the IRS?

25        **MR. BENSON:**  I'd object.  That calls for a legal

1    conclusion.

2              **THE COURT:**  Can you restate your question?

3              **MS. CACIOPPO:**  Sure.

4    **BY MS. CACIOPPO:**

5    **Q.**  If the IRS collects a hundred percent of an outstanding tax

6    debt following the rejection of 433-A, would you agree that the

7    IRS was not harmed?

8              **MR. BENSON:**  Same objection.

9              **THE COURT:**  If she knows she can answer, if she

10   understands the question.

11   **A.**  As a revenue officer, I would accept the full payment and

12   go on to my next case.

13   **Q.**  And --

14   **A.**  What my counsel would say to that, I don't know because

15   if -- if the offer specialist is still involved with it, it may

16   still have --

17   **Q.**  Well, let me ask you this.  In your 30 years of experience

18   with the IRS, has it ever been the instance where you aren't

19   going to collect a hundred percent of the debt because you're

20   going to go down a different route?

21   **A.**  Not generally speaking.  If it's still in the collection

22   area, we're going to take the money.

23   **Q.**  Because that's the goal, to get the full outstanding debt

24   collected?

25   **A.**  For collection, yes, that is our goal.

1   **Q.**  Okay.  Now, I assume in your 25 years as a revenue

2   officer --

3           **THE COURT:**  Ms. Cacioppo, how much longer are you

4   going to be on cross?  The only reason I'm asking is I think

5   they probably have lunch waiting for them or am I wrong?

6           **MS. CACIOPPO:**  Very brief, five minutes.

7           **THE COURT:**  What we're going to do probably --

8   Mr. Benson, how much longer do you think your redirect would

9   be, if any?

10          **MR. BENSON:**  Right now I only have one question.

11          **THE COURT:**  Okay.  We'll stay with that program.

12          **MS. CACIOPPO:**  Okay.

13  **BY MS. CACIOPPO:**

14  **Q.**  So in your role as a revenue officer, I assume you have

15  received hundreds of Offer in Compromises in the past?

16  **A.**  Yes.

17  **Q.**  Okay.  And have you ever referred an Offer in Compromise

18  that has incorrect information directly to the criminal side of

19  the IRS?

20  **A.**  No.

21  **Q.**  Okay.  Are you familiar in your role, your 30-year role in

22  the IRS, have you become familiar with the tax laws?

23          **MR. BENSON:**  I'd object as to overly broad, tax

24  laws.

25          **THE COURT:**  Right.  Do you have a specific thing in

1   mind?

2            **MS. CACIOPPO:**  Sure.

3   **BY MS. CACIOPPO:**

4   **Q.**  Are you familiar with the tax code Title 26, 7212?  This is

5   the statute that Mr. Snyder was charged with here.  Are you

6   familiar with that statute under the tax code?

7   **A.**  Do you want to read it to me?  I don't -- all I was asked

8   to do was forms, blank forms.

9   **Q.**  Okay.  So you don't have any knowledge of the tax code?

10  **A.**  I do know bits and pieces of it that pertain to collection.

11  I cannot recite it to you.  It's a very large book.

12  **Q.**  Absolutely.  In your 30 years of experience at the IRS,

13  have you ever seen anyone indicted for incorrect information in

14  a 433-A?

15           **MR. BENSON:**  Judge --

16           **MS. CACIOPPO:**  Got to ask.

17           **MR. BENSON:**  -- seen anyone indicted?  I'm sure she

18  knows every indictment in the whole country.

19           **MS. CACIOPPO:**  I'm asking if she has had that

20  experience in her career.

21           **THE COURT:**  It's as to what she knows, not the whole

22  IRS.

23           **MR. BENSON:**  Then it's not relevant.

24           **MS. CACIOPPO:**  It's absolutely relevant.  She's the

25  expert who is telling us that she has seen hundreds of these

1  Offers in Compromise.

2          **THE COURT:**  I'm going to let her answer the question

3  to extent she understand the question and to the extent she can

4  answer the question.  But the answer is limited to her

5  experience.

6          **MS. CACIOPPO:**  Absolutely.

7  **BY THE WITNESS:**

8  **A.**  If the 433-A is not accurate, it's incomplete, I feel that

9  information has been left off of it and through the rest of my

10  investigation, I have determined that it is missing stuff, it

11  would probably be part of what I would make a referral to the

12  criminal side of, if my indications of fraud were developed far

13  enough to make the referral.  It could be part of a package

14  yes.

15  **BY MS. CACIOPPO:**

16  **Q.**  In your 30 years, have you ever known a taxpayer to be

17  charged criminally for incorrect statements on a 433-A?

18          **THE COURT:**  It has to be limited to her.

19          **MS. CACIOPPO:**  That's what I said, "has she."

20          **THE COURT:**  If she knows --

21          **MS. CACIOPPO:**  In her 30 years.

22  **BY THE WITNESS:**

23  **A.**  It would be part of the whole, yes.

24  **BY MS. CACIOPPO:**

25  **Q.**  Ma'am, I'm asking you a simple question.  Have you been

1  aware of anybody criminally charged for incorrect statements on

2  a 433-A?

3  **A.**  As I said, it would be part of everything.

4          **MS. CACIOPPO:**  Thank you.

5          **THE WITNESS:**  You're welcome.

6          **THE COURT:**  Mr. Benson, are you still down to one

7  question?

8          **MR. BENSON:**  I'm back and forth between one and two,

9  Judge.

10          **THE COURT:**  Okay.

11                    **REDIRECT EXAMINATION**

12  **BY MR. BENSON:**

13  **Q.**  Counsel asked you, your goal is to get the full tax debt

14  collected; that's the ultimate goal, right?

15  **A.**  For collection, yes.

16  **Q.**  Is it fair to say to get it timely collected with the

17  information the taxpayer gives you?

18  **A.**  Yes.

19          **MR. BENSON:**  Thank you.  I have no further question.

20          **THE COURT:**  That's it?

21          **MS. CACIOPPO:**  Yes.

22          **THE COURT:**  We're going to took our noon recess.  Of

23  course, it's not noon.  It's after noon.  Anyway, this is for

24  lunch.  It's an hour.  Remember the instruction I have given

25  you previously.  I'll give it to you every time we have a

1    recess.

2         Don't talk about this case among each other.  Don't

3    permit anybody else to talk to you.  If somebody tries to talk

4    to you about this case, bring it to my attention.  Enjoy your

5    lunch.  You're excused.

6         **SECURITY OFFICER VELEZ:**  (Indicating.)

7         **THE COURT:**  Wait a minute.

8         When you come back -- you need to stay, probably.

9    Not there.  Just stay here.

10        When you come back, if you have any questions --

11   thank you, Carlos -- if you have any questions, we'll take them

12   up then.  Right now the lunch is sitting out there, and I want

13   to get you to lunch.  You can go.

14        **MR. BENSON:**  Should the witness stay then?

15        **THE COURT:**  The witness needs to stay, not here, but

16   the witness needs to stay where she could be called if there is

17   any questions.

18        **MR. BENSON:**  Called back, yes.

19      (Jury out at 12:41 p.m.)

20        **THE COURT:**  We'll start back at quarter of -- it is

21   12:45 -- about 1:45 we'll try to pick back up again.  See you

22   then.  The court is in recess.

23      (Recess at 12:41 p.m.)

24      (The following proceedings resumed in open court commencing

25       at 1:46 p.m., reported as follows:)

 1          **THE COURT:**  You can all be seated.

 2          Government ready for the jury to be brought in?

 3          **MR. BENSON:**  Yes, Your Honor, we have this witness

 4   available in case the jury has any questions.

 5          **THE COURT:**  Yeah, I'm going to ask that.  If I don't

 6   ask it, make sure I ask it so she can get out of here.

 7          **MR. BENSON:**  Yes, Your Honor.

 8          **THE COURT:**  Defendant, ready for the jury to be

 9   brought in?

10          **MR. BENNETT:**  Yes, Your Honor.

11          **THE COURT:**  Okay.  Mr. Snyder, how are you feeling?

12          **THE DEFENDANT:**  Good.

13          **THE COURT:**  Ready for the jury?

14          **THE DEFENDANT:**  Yes, sir.

15          **THE COURT:**  Okay.  Bring the jury in.  I'm going to

16   advise the jury about the schedule going forward in the week so

17   they can go to work if they want to on Thursday, Friday, and

18   Monday.

19          **MR. BENSON:**  Judge, do you want the witness on the

20   stand when they come in?

21          **THE COURT:**  No.  She can come back up here when they

22   get seated.

23          I want to tell you, I've got a note right there on

24   my computer there.  I've got a note over here.  I managed to

25   ignore all those notes.  I step over things, too, that I put in

1    the doorway to remind me to take something.  I always step over

2    them.  That's been going on forever.

3        (Jury in at 1:49 p.m.)

4            **THE COURT:**  You can be seated.

5            Before we get back to Ms. McQuen, I want to give you

6    a schedule how we will go for the rest of the week.  We will

7    not have court on Thursday and Friday, and Monday is a holiday.

8    The holiday becomes less significant when nobody is getting

9    paid.

10           But there is one of the attorneys involved in the

11   case, who is very involved in the case, has to take care of a

12   personal matter on Thursday and Friday.  Everybody has agreed

13   that she needs to take care of that matter and that we can --

14   the court will be recessed for those two days.

15           And then we'll have Monday off for the holiday and

16   be back on Tuesday.  And at that point on, it will be pedal to

17   the metal and get this thing finished.

18           Do the jurors have any questions from -- I don't

19   want to walk her clear back up here if you have no questions.

20   Do you have any questions for the IRS agent?  You got one,

21   right?

22           Come on up here.  Did anybody else have questions?

23   Just one person have a question?  Okay.

24           Ms. McQuen, remember you're still under oath.

25           Mr. Benson, Ms. Cacioppo.

1      (Bench conference.)

2           **THE COURT:**  I'll have to rephrase it a little bit.

3           **MR. BENSON:**  I think she can answer that if she

4      knows it.  I don't have a problem with that.

5           **MS. CACIOPPO:**  Yeah.

6           **MR. BENSON:**  I think that's a good question.

7           **THE COURT:**  You can stay up here in case there is a

8      follow-up.  No.  Go ahead.

9      (End of bench conference.)

10          **THE COURT:**  The jury has a right to ask questions.

11     If you don't understand -- no is an appropriate answer.  That

12     is an answer.  If the answer is no, that's what it is.  If you

13     don't understand the question, just say that too.  I think you

14     will probably understand both of these, but if you don't know

15     that answer, that's an answer.

16          Does the revenue officer follow the case to the

17     criminal side once it has been referred?

18          **THE WITNESS:**  Not really, no.  Sometimes the revenue

19     officer may be asked questions by the special agent that takes

20     over the case, but the special agent has the option of whether

21     or not they even accept the referral.  And sometimes the case

22     will just come back to the revenue officer to complete.

23          **THE COURT:**  Okay.  Secondly, is the revenue

24     officer's role in the process to only refer to the criminal

25     side?

1          **THE WITNESS:**  I'm sorry?

2          **THE COURT:**  Is the revenue officer's role in the

3     process to only refer to the criminal side?

4          **THE WITNESS:**  No.  Our main function is to resolve

5     the liabilities or the delinquent case on the civil case.  For

6     us to make a refer to the criminal side, there has to have been

7     different things that have taken place in the case that have

8     provided us indicators of fraud, and so we move it over to the

9     other side.  But for the most part, we're civil employees and

10    that's how we resolve our cases.

11         **THE COURT:**  Is there follow-up from the government?

12         **MR. BENSON:**  I just have one question, Your Honor.

13                   **FURTHER REDIRECT EXAMINATION**

14    BY MR. BENSON:

15    **Q.**  Ma'am, are there actual revenue agents who work as part of

16    the criminal section and work with the criminal section?

17    **A.**  Revenue agents, yes.  We do have -- it's a cooperating

18    revenue agent, and I don't know all of that particularly.  On a

19    revenue officer's CI, a special agent can request a cooperating

20    revenue officer.  But with revenue officers, most of the time

21    our part is done once the referral has been accepted.

22         **MR. BENSON:**  Okay.  Thank you very much.

23         **THE COURT:**  Ms. Cacioppo?

24         **MS. CACIOPPO:**  No questions.

25         **THE COURT:**  Thank you very much for hanging around.

1          **THE WITNESS:**  Thanks.

2          **THE COURT:**  Have a good day.

3          Call your next witness.

4          **MR. BENSON:**  We'd ask this witness be released from

5    her subpoena?

6          **THE COURT:**  Any objection?

7          **MS. CACIOPPO:**  No objection.

8          **THE COURT:**  You are released.

9          **MR. BENSON:**  The United States would call revenue

10   agent Gerard Hatagan.

11         **THE COURT:**  Mr. Hatagan, before you're too

12   comfortable, state your name for the record.

13         **THE WITNESS:**  First name is Gerard, G-E-R-A-R-D,

14   last name Hatagan, H-A-T-A-G-A-N.

15         **THE COURT:**  Okay.  Can you face the courtroom

16   deputy, and he'll place you under oath.

17      (The oath was duly administered.)

18         **THE WITNESS:**  I do.

19         **THE COURT:**  You can be seated.  As I think you know,

20   the microphone in front of you is a directional microphone.  It

21   means you have to talk directly into it.  You can pull it from

22   side to side.  You can pull it back and forth.  It just has to

23   follow your mouth.  That's the best way I can describe it.

24

25

**GERARD HATAGAN, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. BENSON:

**Q.**  Could you please tell the ladies and gentlemen of the jury what your duties and responsibilities are as a revenue agent in the capacity in which you work with criminal investigators?

**A.**  I am a special enforcement program revenue agent, and I assist the criminal investigation division of the IRS in conducting criminal investigations.  I provide forensic accounting work in assisting them with their criminal investigations.

**Q.**  And how long have you been with the IRS for?

**A.**  This is my 32nd year.

**Q.**  And can you tell the ladies and gentlemen of the jury what positions you have held in the IRS in that time frame?

**A.**  I have been revenue agent for the entire 32 years.  There has been portions, 9 of those 32 years I spent doing something other than the special enforcement program work.  I did some general program civil tax audits of individuals and entities, and I spent about 15 months working in the IRS not-for-profit section.

**Q.**  And you said you now work in a section called the special enforcement operations; is that what you said?

**A.**  Special enforcement program.

**Q.**  What is that?  Could you explain that to the jury, please.

1  **A.**  Yeah.  It's an area where we specialize in doing forensic

2  type work.  We're involved with working cases with the criminal

3  investigation division.  We often work with the FBI.  We work

4  with the United States Attorney's Office.  Sometimes we will

5  work with other federal agencies, but it's primarily on

6  criminal matters as opposed to civil matters.

7  **Q.**  Now, that's not true for all revenue agents; is that

8  correct?

9  **A.**  No, it is not.

10  **Q.**  Is it fair to say the bulk of them simply work as civil

11  revenue agents just like you did for a long time?

12  **A.**  They do.

13  **Q.**  Did you have occasion to become involved in an

14  investigation of this defendant?

15  **A.**  Yes.

16  **Q.**  And what is his name?

17  **A.**  The defendant's name is James Snyder.

18  **Q.**  And is he seated here in the courtroom today?

19  **A.**  Yes, he is.

20  **Q.**  For the record, can you describe what he is wearing and

21  where he is seated?

22  **A.**  It appears that he is wearing a dark suit.  I see a blue

23  shirt, red tie, seated next to the gentleman with the white

24  hair in the dark glasses.

25          **MR. BENSON:**  If the record could reflect, the

 1    witness has identified the defendant.

 2            **THE COURT:**  The record will so reflect.

 3    **BY MR. BENSON:**

 4    **Q.**  And do you recall approximately how you first -- when you

 5    first became involved in this investigation?

 6    **A.**  I received a request to assist with this investigation in

 7    June, 2014.

 8    **Q.**  Who does that request come from?

 9    **A.**  It comes from the criminal investigation division of the

10    IRS.  They send it over to the SBSE, special enforcement

11    program revenue agent manager, and then they assign an agent to

12    the case.

13    **Q.**  And now there is also something called -- you're called a

14    revenue agent.  There is actually something called a

15    criminal -- a special agent as opposed to a revenue agent; is

16    that correct?

17    **A.**  That is correct.

18    **Q.**  What's their role in a criminal investigation?

19    **A.**  We work side by side a lot in the investigation.  They

20    initiate the investigation.  They manage the investigation.

21    They write up a report of the investigation.  I should say that

22    they pretty much marshal the investigation through the system

23    with my assistance.

24    **Q.**  And when you say you're a revenue agent versus a special

25    agent, the special agents are the badge and guns guys?

1   **A.**   That's correct.

2   **Q.**   You don't have a gun, do you?

3   **A.**   I do not.

4   **Q.**   You don't carry one as part of your duties?

5   **A.**   No.

6   **Q.**   Okay.  And genally in a criminal investigation, once you

7   become involved with the special agent, what is your role?

8   What are you doing in that process?

9   **A.**   A good part of my time is spent analyzing various financial

10  records, and I write reports of my analyses and indicate, you

11  know, the findings of my analyses.  I go out and I assist with

12  conducting tax related interviews on the case.

13          I spend time just monitoring public record

14  information that may be related to the case that's occurring.

15  There's really a variety of tasks that I do to support the

16  case.  I gather the information.  Typically, I will provide it

17  to the special agent I'm working with or I will provide it to

18  the prosecutors we're working with or other special agents from

19  other agencies and share it to see if it has any relevance to

20  the case.

21  **Q.**   And what kind of records -- if you're trying to conduct a

22  financial investigation that's been referred to you for

23  criminal investigation, what kind of records generally are you

24  sort of looking for to take a look at and see if they have any

25  meaning to you or significance?

1   **A.**   A record that we spend quite a bit of time with is we look

2   at a lot of bank records.  But also during the course of the

3   investigation, we'll also analyze books and records that could

4   possibly be maintained by the subject's related entities.

5   **Q.**   And you said you have been working in this area for the IRS

6   for, what, almost the last 9 to 10 years?

7   **A.**   I started back in this area in the year 2006, so it has

8   been from 2006 through the present, so it has been 13 years.

9   And prior to that, I did this kind of work in this area from

10  the years '94 through 2004.

11  **Q.**   Fair to say you have examined tens of thousands of bank

12  records?

13  **A.**   Yes.

14  **Q.**   Business records?

15  **A.**   Yes.

16  **Q.**   Accounting records?

17  **A.**   Yes.

18  **Q.**   Now, when you first became involved in this investigation,

19  when was that approximately again?  I forget.  I'm sorry.

20  **A.**   I was asked to participate in this investigation in June

21  of 2014.

22  **Q.**   And as part of that responsibility, did you examine

23  numerous records, financial records, relating to the defendant?

24  **A.**   Yes.

25  **Q.**   Did you also obtain numerous IRS records relating to the

1   defendant's contact and dealings with the IRS?

2   **A.**  Yes.

3   **Q.**  Could you tell us a little bit about what a levy is?

4   **A.**  A levy is a way that the IRS has to collect delinquent

5   taxes from an individual or entity, and a levy is a way that

6   the IRS can remove money from the bank accounts that are held

7   by the individuals and entities that have outstanding balances

8   owed to the IRS.

9   **Q.**  And what does that allow the IRS to do?

10  **A.**  Based on what the balance is in the bank, they can recover

11  a portion of the money owed to them by that entity or that

12  individual.

13  **Q.**  I'd like to show you what has been marked for

14  identification contained in Binder 1, Exhibits 5 through 8.

15          **MR. BENSON:**  If I could approach, please,

16  Your Honor?

17          **THE COURT:**  Yes, you may.

18  **Q.**  If you could please flip through briefly.  You've seen

19  Exhibits 4 through 8 before, correct?

20  **A.**  I have.

21  **Q.**  Could you please flip through and make sure those are what

22  you reviewed previously?

23          **MR. BRACKETT:**  Your Honor, objection, we have not

24  seen Exhibit 6A before.  We need to do this on a sidebar.

25          **THE COURT:**  Just a second real quick.

1           **MR. BENSON:** Bates No. 25633.

2           **THE COURT:** Okay. Let's come up.

3           **MR. BRACKETT:** I know. It's been altered.

4           **THE COURT:** Let's do a sidebar.

5           **MR. BENSON:** Oh, that didn't need to go to sidebar,

6    did it?

7           **THE COURT:** Ms. Benson, can you come up here.

8           **MR. BENSON:** Well, he shouldn't be accusing the

9    government of --

10          **THE COURT:** He's not accusing the government of

11   anything.

12          **MR. BENSON:** He said it was altered, Judge.

13       (Bench conference.)

14          **THE COURT:** You need to all slide down so there's a

15   microphone in front of you.

16          **MR. BRACKETT:** So the exhibit the witness has here,

17   6A, the Bates number is what Mr. Benson said. This is what was

18   produced to us. They removed another agent's name, so I don't

19   know what starts that document. They've removed the date. I

20   don't know if these are the same. I haven't seen this --

21          **MR. BENSON:** That information would be hearsay.

22   Okay. So just to be clear, all of the financial data is the

23   same. You're not challenging that, right?

24          **MR. BRACKETT:** I don't know. I haven't seen this.

25          **MR. BENSON:** Well, take a look. It's there.

1          **MR. BRACKETT:**  You're going to offer this as --

2          **MR. BENSON:**  Okay.  Right now --

3          **THE COURT:**  One at a time.  She's got to take it

4    down.  One at a time.  Your turn.

5          **MR. BRACKETT:**  So what he's going to do is offer

6    this as --

7          **THE COURT:**  I don't know what he's going to do.

8          **MR. BRACKETT:**  It's a Rule 1006 summary.  It's going

9    to summarize voluminous documents.  I've had to have a chance

10   to look at the one they produced.  They are now using

11   Exhibit 6A, same Bates number, but it's clearly not the same

12   document.  A lot of things are missing.

13         **MR. BENSON:**  No.  You say, "a lot of things."  Could

14   we please identify those?  You said the -- I believe you said

15   the exhibit was some reference to that, which has no relevance

16   as from that SAR report, and the same thing up here is from the

17   SAR report.

18         **THE COURT:**  His only comment was -- he started off

19   was with the document was somewhat different than what he had.

20   The word altered was probably improper, but --

21         **MR. BENSON:**  The irrelevant objectionable stuff was

22   removed.  That's what I tried to accommodate them.

23         **THE COURT:**  Can you point out to him on that one

24   what was taken out?

25         **MR. BENSON:**  I just did.

1        **MR. BRACKETT:**  Your Honor, Joseph Villa's name is on

2   here.  He prepared the document.  And so if he is going to have

3   this witness testify to the origin, we object to that.  There

4   is a Joseph Villa on their witness list.  If they want to use

5   this document, they need to use --

6        **MR. BENSON:**  I can use anybody to authenticate any

7   document that I want.

8        **THE COURT:**  He is correct about this.  Just tell me

9   what the problem is.

10       **MR. BRACKETT:**  This is a Rule 1006 summary, so it's

11  going to show 6B, 6C are all the other records.  Joe Villa put

12  this together.  This is the document that was produced.  Now,

13  we have what appears to be mostly the same document without Joe

14  Villa's name, a different witness on it.

15       **THE COURT:**  The name really doesn't --

16       **MR. BENSON:**  Could the Court see what he's talking

17  about.  That might be more elucidating.  That was taken off,

18  that was taken off, and this is (indicating).

19       **THE COURT:**  The top part?

20       **MR. BENSON:**  Yes.

21       **MR. BRACKETT:**  This is clearly part of a bigger

22  document.  Now, they are separating that --

23       **MR. BENSON:**  But all this stuff references the

24  agent's SAR that they've had for three years.  Okay.  This

25  document is meant to be -- he's right -- a summary of the

1    documents that follow, and this witness will testify that he's

2    reviewed this document.  It is a true and accurate summary of

3    the pages that follow, and that's all the government needs to

4    authenticate this.

5           **THE COURT:**  So what your problem is --

6           **MR. BRACKETT:**  These are the same Bates number, and

7    they're using a different version of the document without

8    telling us.

9           **THE COURT:**  If the agent can -- if he can identify

10   this and you fundamentally have the information, it's just

11   they've changed -- taken some things off of it, you're free to

12   cross on it.

13          **MR. BRACKETT:**  Sure.

14          **THE COURT:**  They can put new summaries together as

15   they choose to show a witness.

16          **MR. BRACKETT:**  Your Honor, I would offer that they

17   need to be a different Bates number.  To represent this

18   document with the same Bates is a misrepresentation.

19          **THE COURT:**  Mr. Benson.

20          **MR. BENSON:**  I'm sorry.  Everything's a

21   misrepresentation, Judge.

22          **THE COURT:**  That's not appropriate either.

23          **MR. BENSON:**  I know.  I apologize, Judge.  I

24   shouldn't have.

25          **THE COURT:**  The --

1      **MR. BRACKETT:**  I don't want to have to look at every

2  document to make sure they haven't changed anything.

3      **THE COURT:**  Well, you may have to.  It's his

4  document.  If he wants to change the Bates number or not change

5  the Bates number, that's his call.  The only thing -- I

6  understand your problem.  You're trying to track whether the

7  document is the same.  It appears like he indicated, at least

8  as to this document, that the only thing changed are things up

9  at the top here and things over here, and Mr. Villa's name is

10  missing.

11      **MR. BRACKETT:**  So we've been working with this

12  document for months.

13      **THE COURT:**  I understand.

14      **MR. BRACKETT:**  We have to take his word for it that

15  nothing's changed.

16      **MR. BENSON:**  Go ahead and check.  We'll take a

17  break.  You can check if you think we're lying.  Please check

18  us.  Please check.

19      **THE COURT:**  Do you want to take time to check it?

20      **MR. BRACKETT:**  I don't.  I can cross him on the

21  numbers.

22      **THE COURT:**  Okay.

23      **MR. BRACKETT:**  But I don't know if this is a --

24      **MR. BENSON:**  But I'm telling you --

25      **THE COURT:**  The witness up there, you can ask him

1   that question.  If you can't get an answer, then we'll get an

2   answer somehow for you.  Okay.

3            **MR. BRACKETT:**  All right.

4            **MR. BENSON:**  That's fine, Judge.

5            **THE COURT:**  Is this yours?

6            **MR. BENSON:**  This is his.

7        (End of bench conference.)

8   **BY MR. BENSON:**

9   **Q.**  Have you ever had a chance to look at those exhibits?  I

10  think it's 4 through 8 in the binder in front of you.

11  **A.**  I did.

12  **Q.**  Are you familiar with those?

13  **A.**  Yes.

14           **MR. BENSON:**  Could I retrieve the binder,

15  Your Honor, please?

16           **THE COURT:**  Yes, you may.

17  **BY MR. BENSON:**

18  **Q.**  Now, when you became involved in this investigation, what

19  kind of issues were you aware of that you were going to take a

20  look at?

21  **A.**  Well, we had taken a look at -- there was some payroll tax,

22  outstanding payroll tax liabilities, related to the defendant's

23  mortgage company.  That was an area we were concerned with

24  based on what we found within the IRS records.

25  **Q.**  And as part of the examination of the IRS civil division

1    records, were you able to determine whether or not there were

2    any Offer in Compromises that were tendered to settle any IRS

3    debt the defendant may have?

4    **A.** Yes.

5    **Q.** And were these for personal debt or the business debt that

6    you mentioned?

7    **A.** Our research showed there were Offers in Compromise

8    tendered both for the defendant personally and for his related

9    mortgage company.

10   **Q.** Did your analysis of these records reveal whether or not

11   the defendant -- what was the defendant's main job at that

12   point in time?  Income, where was he deriving it from or did it

13   change?

14   **A.** In that period, his main source of income came from his

15   related mortgage company.

16   **Q.** And as part of this, did you examine records from any

17   business entities that the defendant may be associated with?

18   **A.** We did look at the business records for his mortgage

19   company.

20   **Q.** And the names of some -- what was the name of his mortgage

21   company?

22   **A.** The mortgage company started out as First Federal Trust;

23   and then there was a name change, and it was changed to First

24   Financial Mortgage, LLC.

25   **Q.** And were there any other documents that you reviewed for

1   companies the defendant was associated with or had an interest

2   in?

3   **A.**   We looked at bank records for other entities that the

4   defendant had.  We also took a look at some of the campaign

5   records for the defendant.  The defendant had sought public

6   office first in 2007 and later again in 2011, so we also looked

7   at those records.

8   **Q.**  And as part of your examination of the records, did you

9   come across a company called SRC Properties or Marketing or

10  Consulting?

11  **A.**   We did eventually become aware that the defendant had

12  formed a company by the name of SRC Marketing, also known as

13  SRC Properties.

14  **Q.**  Did you also have an opportunity to examine records from

15  the company called GVC?

16  **A.**   We did.

17  **Q.**  What was GVC?

18  **A.**   GVC is a mortgage company located in Lebanon, Indiana.

19  They actually write mortgages.

20  **Q.**  I want to go back to Government's Exhibit 4.  Let me put it

21  up.  It's not admitted yet.

22          **THE COURT:**  Ladies and gentlemen of the jury, when a

23  document is admitted, it will come up on your screens.  Until

24  it's admitted, it can be shown to me, shown to the witness, and

25  things like that, but you just don't get to see it yet or maybe

 1  not at all.

 2  **BY MR. BENSON:**

 3  **Q.**  This five-page document, are you familiar what that is?

 4  **A.**  Yes.

 5  **Q.**  Without going specifically into the contents, can you tell

 6  the ladies and gentlemen of the jury what that is?

 7  **A.**  The Notice of Intent to Levy that's issued by the IRS.

 8  **Q.**  And issued to who or what entity?

 9  **A.**  It can be issued to individuals and entities.  In this

10  case, it was issued to First Federal Trust Mortgage, LLC, and

11  it lists the defendant, James Snyder, as a member.

12          **MR. BENSON:**  At this time I would move to admitted

13  Government's Exhibit 4.

14          **THE COURT:**  Any objection?

15          **MR. BRACKETT:**  No objection.

16          **THE COURT:**  Government's Exhibit 4 is admitted

17  without objection.

18  **BY MR. BENSON:**

19  **Q.**  I would like to have -- what you took a look at previously,

20  Government's Exhibit 5A, generally can you tell us what this is

21  without going into specific contents?

22  **A.**  It's a spreadsheet that was prepared to summarize

23  outstanding tax liabilities.

24  **Q.**  Okay.  Outstanding tax liabilities for who or what entity?

25  **A.**  It was for First Financial Trust, and it was for federal

1  payroll taxes, and the date it was prepared was July 24, 2009.

2  **Q.**  There is a chart on the first page, a summary chart.  What

3  follows?  What documents follow?

4  **A.**  The IRS documents upon which the chart was based.

5  **Q.**  And is that summary and the following documents, are those

6  true and accurate documents of the IRS?

7  **A.**  The summary accurately portrays the underlying documents.

8        **MR. BENSON:**  At this time I would move to admitted

9  Government's Exhibit 5A into evidence.

10       **MR. BRACKETT:**  No objection.

11       **THE COURT:**  Government's Exhibit 5A is admitted

12  without objection.

13  **BY MR. BENSON:**

14  **Q.**  I would like to move on to 5B.  Can you tell us, once

15  again, generally what 5B is?

16  **A.**  5B is a spreadsheet summary for First Financial Trust.  It

17  summarizes federal payroll taxes as of November 30, 2009.

18  **Q.**  There is a bunch of other documents attached behind this.

19  Can you tell us generally what those are?

20  **A.**  These are underlying IRS records upon which this summary is

21  based.

22  **Q.**  Are you familiar with the term IRS transcript?

23  **A.**  Yes.

24  **Q.**  What is that?  What is a transcript?

25  **A.**  For each return that gets filed with the IRS, an account is

1    created.  And this transcript basically reflects the activity

2    that takes place within that account, so it would show -- the

3    things that would be shown on an IRS transcript would be the

4    date that the tax return gets filed, the amount of tax that was

5    due on the return that was filed, taxes that may have been paid

6    with the return or prior to the return being filed.  It would

7    also show interest and penalties.

8            So if you can just envision for any form filed with

9    the IRS that has a tax liability attached to it, you can pull a

10   tax transcript for that form, and it will give you like a

11   history of what took place with that IRS form.

12   **Q.**  Fair to say it's sort of like a running narrative about

13   what went on on that particular return or tax debt?

14   **A.**  Correct.

15   **Q.**  And the documents behind 5B are those transcripts that you

16   referenced, correct?

17   **A.**  That is correct.

18   **Q.**  I would like to move forward to Government's Exhibit 6.  We

19   will start with 6A.  You previously have reviewed this

20   document; is that correct?

21   **A.**  I have.

22   **Q.**  And what is this generally without going into its contents?

23   **A.**  The summary of financial transactions that took place

24   between the defendant and his related mortgage company during

25   the calendar year 2009.

1    **Q.**  And there is two other documents in Exhibit 6, 6B and 6C.

2    What are those in relation to that summary?

3    **A.**  Those are the underlying financial records upon which this

4    summary is based.

5    **Q.**  And this summary, this was originally prepared by Agent

6    Joe Villa, Special Agent Joe Villa, correct?

7    **A.**  That is correct.

8    **Q.**  And have you reviewed this document?

9    **A.**  I have.

10   **Q.**  And have you compared it to the contents of 6B and 6C?

11   **A.**  I have.

12   **Q.**  And is it a true and accurate summary of the contents --

13   what's in 6B and 6C?

14   **A.**  It is.

15            **MR. BENSON:**  At this time I'd move Government's

16   Exhibit 6A, B, and C into evidence.

17            **MR. BRACKETT:**  Object to foundation.

18            **THE COURT:**  Help me out with that objection.

19            **MR. BRACKETT:**  He didn't create the document.

20            **THE COURT:**  He doesn't have to create the document

21   to be a sponsor of it.

22            **MR. BRACKETT:**  It's a summary document.

23            **THE COURT:**  Right.

24            **MR. BRACKETT:**  It's created by someone else.  I

25   don't think he has laid the foundation that he can testify to

1   it.

2          **MR. BENSON:**  He reviewed the exhibits, and he said

3   it's a true and accurate summary.  There's nothing more I need

4   to do, Judge.

5          **THE COURT:**  I'm going to overrule the objection.

6   6A, 6B, and 6C are admitted over objection.

7   **BY MR. BENSON:**

8   **Q.**  I would like to move forward to what's been marked for

9   identification but not yet admitted as Government's Exhibit 7A,

10  a three-page document.  Can you tell us generally what this is?

11  **A.**  This is a summary of payments made by GVC Mortgage to SRC

12  Properties over a period of time.  Without seeing the other two

13  pages, I believe the period may run between 2010 and 2012.

14  **Q.**  Let me show you the second and third page.

15  **A.**  Yes.

16  **Q.**  And this is a summary of what?

17  **A.**  A summary of checks that were issues by GVC Mortgage

18  payable to SRC Properties and SRC Marketing, LLC.

19  **Q.**  There's two other documents as part of Exhibit 7, 7B and

20  7C.  Let me put 7B up.  Tell us generally what that is without

21  going into its contents in detail.

22  **A.**  7B would be a reparative sample of a check stub and an

23  invoice that would have been issued to receive the payment

24  reflected by the check stub.

25  **Q.**  And it's one of these payments that's referenced in the

1   previous summary chart; is that correct?

2   **A.**   Yes.

3   **Q.**   And then I would like to show you what has been marked for

4   identification a multipage document as 7C, a series of

5   invoices.  Can you tell us what those are?

6   **A.**   Those are invoices that were issued by SRC Marketing, LLC

7   to GVC.  And they are for some, but not all, of the payments

8   reflected on the schedules that are on 7A and 7B.  Not all the

9   payments on 7A and 7B we were provided with an invoice for.

10          **MR. BENSON:**  At this time I'd move to admit

11  Government's Exhibit 7A, B, and C into evidence.

12          **MR. BRACKETT:**  No objection.

13          **THE COURT:**  Government's Exhibit 7A, 7B, and 7C,

14  correct?

15          **MR. BENSON:**  Yes, Your Honor.

16          **THE COURT:**  They are admitted into evidence without

17  objection.

18  **BY MR. BENSON:**

19  **Q.**   Lastly, I would like to move forward to what has been

20  marked for identification but not yet admitted as Government's

21  Exhibit 8A.  Please take a moment to look at that.  Generally

22  what is that?

23  **A.**   What this is, is it's a document that's used in civil IRS

24  proceedings at the conclusion of a civil tax examination.  This

25  document will be solicited from the taxpayer to sign off on if

 1  they agree with the IRS's civil findings of an audit.

 2  **Q.**  And this is related to who?

 3  **A.**  This document is related to the civil audit conducted on

 4  the individual income tax returns filed by James and Deborah

 5  Snyder for the years 2005, 2006, and 2007.

 6  **Q.**  I would like to move forward to 7B.  Could you tell us what

 7  7B is?

 8          **MR. BRACKETT:**  For the record, I think it is 8B.

 9          **MR. BENSON:**  I'm sorry, I apologize.  Thank you.

10  **BY MR. BENSON:**

11  **Q.**  8B.

12  **A.**  It's a more detailed explanation of the figures contained

13  in 8A.

14  **Q.**  For the same individual?

15  **A.**  Yes, same individual, same periods, same tax liabilities,

16  same penalties.  The only difference between 8A and 8B is that

17  8B shows interest in addition to the tax and penalties.

18          **MR. BENSON:**  At this time I'd move to admit

19  Government's 8A and B, please.

20          **MR. BRACKETT:**  No objection.

21          **THE COURT:**  Government Exhibits 8A and 8B are

22  admitted without objection.

23          **MR. BENSON:**  All the documents I'm going to be

24  referring to now, Judge, are in evidence, so I'd ask that they

25  be displayed to the jury as we're talking about them.

1          **THE COURT:**  Okay.

2    **BY MR. BENSON:**

3    **Q.**  Let's go back to Government's Exhibit 4.  You said this was

4    a levy.

5    **A.**  Correct.

6    **Q.**  And when the IRS is going to levy your property or they're

7    going to take it, this is what they send you?

8    **A.**  They do.  They give the taxpayer notification that they

9    intend to levy, that way they can have what's called a

10   collection due process hearing.  It gives the taxpayer a chance

11   to come in and basically present their side.  If the levy they

12   believe is going to cause an undue hardship, it's an

13   opportunity to them to present their case before the IRS before

14   the IRS actually takes the levy action against the bank

15   account.

16   **Q.**  So let me show you the first page of Government's

17   Exhibit 4.  And who was this sent to?

18   **A.**  It was sent to First Federal Trust Mortgage, LLC at

19   James Snyder as the member in Portage, Indiana.

20   **Q.**  Are you familiar with the address here or not?

21   **A.**  Yes.  I believe that's in a part of Portage that's known as

22   the AmeriPlex.  And based on the records that we had seen in

23   the case, this was the first address used by the defendant

24   early on when he started the mortgage company.

25   **Q.**  And what's the date of this notice?

1   **A.**  It's dated July 13, 2009.

2   **Q.**  And there is a part in the middle.  Can you read that to

3   the jury?

4   **A.**  Yes.  The account summary basically tells the taxpayer

5   what --

6   **Q.**  No.  I meant the part above it under, "urgent."

7   **A.**  Okay.  Yeah.  It basically is a warning to the taxpayer

8   telling them that --

9   **Q.**  Can you read it?

10  **A.**  It says:  "We intend to levy on certain assets.  Please

11  respond now to avoid additional penalty and interest.  Pay the

12  amount you owe within ten days from the date of this notice."

13         It says:  "Our records indicate you haven't paid the

14  amount you owe.  The law requires that you pay your tax at the

15  time you file your return.  This is your notice as required by

16  Internal Revenue Service Section 6331(b) of our Intent to Levy,

17  take any state tax refunds that you may be entitled to if we

18  don't receive your payment in full.  In addition, we will begin

19  to search for other assets we may levy.  We can also file a

20  Notice of Federal Tax Lien if we haven't already done so.

21         To prevent collection action, please pay the current

22  balance now.  If you've already paid, can't pay, or have

23  arranged for an Installment Agreement, it is important that you

24  call us immediately at the telephone number shown below.

25  Current balance may include civil penalty, if assessed."

1   **Q.**  And at this time, where it says, "or have arranged an

2   Installment Agreement," none of that had been done yet,

3   correct?

4   **A.**  That is correct.

5   **Q.**  Let's move down to the account summary.  Can you tell us

6   what going on there?

7   **A.**  This is where they identify the tax form to which this

8   outstanding liability is related.  And in this instance,

9   they're telling them that it is a Form 941 which is an

10  employment tax return --

11  **Q.**  Let me stop you right there.  You say employment tax 941.

12  Tell us what that is and what goes on with that.

13  **A.**  If you have a business and your business has employees, you

14  would file the 941 quarterly.  It summarizes the amount of

15  wages that you've paid to your employees in the quarter, the

16  amount of federal income tax that was withheld from those wages

17  that were paid, and the Social Security tax liability for that

18  quarter.

19  **Q.**  It's basically the withholding -- part of the reason why

20  your check is less than what it says?

21  **A.**  Correct.

22  **Q.**  And this withholding, this payroll tax withholding, when

23  it's withheld, who is withholding it?  The IRS?  The employer?

24  **A.**  The employer withholds it in trust for the employees, and

25  then at such time as required, submits the money to the IRS.

1    **Q.**  So it's money actually withheld from the employee's check

2    that the business keeps, and they're supposed to give it to the

3    IRS, correct?

4    **A.**  Correct.

5    **Q.**  So in this case, it says there's a tax period.  Can you

6    tell us about that?

7    **A.**  The tax period listed here is 12/31/08, and it's a bit of

8    an IRS code.  Basically it means for the quarter ended

9    12/31/08, so that would be for the fourth quarter of 2008.

10   **Q.**  So the payroll taxes, at least for FFTM, were being paid at

11   the end of each quarter?

12   **A.**  They were required based on the size of their payroll and

13   the number of employees that they had to file quarterly.

14   **Q.**  And this notice though is issued about six months later,

15   7/13/09, correct?

16   **A.**  Correct.  The due date for that return would have been

17   January 31st, 2009.  A payroll tax return is due to be filed by

18   the 31st day of the month following the quarter that it covers.

19   **Q.**  So in this case, how much was withheld from employees' pay

20   but not tendered to the IRS?

21   **A.**  It doesn't break it out to that specific, but the current

22   balance that is owed would include interest and penalties.  And

23   in this case, it would not have been a significant amount

24   because not a lot of time had passed from the time the return

25   was due to the time this notice was issued.

1          So I would say a substantial part of the balance was

2    made up of the actual tax liability, which would mean the

3    amount of money that was withheld for federal income tax

4    withholdings and the Social Security tax that was due on those

5    wages.

6    **Q.**  And what's the current balance due and owing?

7    **A.**  The current balance on this notice was $21,315.76.

8    **Q.**  And then there is some kind of thing at the bottom.  Is

9    that just a coupon thing you are supposed to send in when you

10   make the payment?

11   **A.**  Correct.

12   **Q.**  And then the following two pages of Government's Exhibit 4,

13   take a look at those, and we'll have you summarize them.

14   What's Page 2?

15   **A.**  It explains the portion of the $21,000 that was made up of

16   penalties.

17   **Q.**  Okay.  And that would be right here?

18   **A.**  Correct.

19   **Q.**  And it gives some other directions or why they charge that,

20   fair to say?

21   **A.**  Yes.  It talks about when the penalty is imposed.  It talks

22   about potential -- I don't know how to say it.  You can present

23   reasonable cause as a possibility for having the penalty

24   abated, if you had reasonable cause for failing to timely pay

25   the tax or file --

1    **Q.**   It tells you what your options are?

2    **A.**   Yes.

3    **Q.**   Let's go to the third page of Government's Exhibit 4.  This

4    is entitled interest.  Is this number here, the 7840, is that

5    the additional interest that would have been owed to the IRS?

6    **A.**   That is correct.

7    **Q.**   And then the last page of that document is simply the

8    address information, fair to say?

9    **A.**   Yes.

10   **Q.**   I'd like to move forward to what has been admitted as

11   Government's Exhibit 5A.  Let's take a look at that.

12             We see some name and date up here.  What's going on

13   there?

14   **A.**   Yes.  It's a spreadsheet that summarizes the outstanding

15   federal payroll taxes owed by First Financial Trust as of July

16   21, 2009.

17   **Q.**   Let's take a look at this first column.  What's going on

18   there.

19   **A.**   That represents the tax that would have been shown -- the

20   forms that are listed there, all Form 941 forms, and the

21   periods they represent is in that very first column.  And then

22   the total tax would have been whatever the tax liability on

23   that form was.  It doesn't necessarily mean what the

24   outstanding tax liability is because as you move to the right,

25   you'll see there is a column for payments that would have been

1    made.

2    **Q.** Let me back up. We have a bunch of dates. What do these

3    dates represent?

4    **A.** Those dates represent the quarters ended for which the

5    Form 941s were filed.

6    **Q.** Were filed. Okay. But was any tax paid for those years,

7    those quarters?

8    **A.** Yes.

9    **Q.** And let's say June -- let's go to the first one, June 31,

10   2006, what does that zero total tax mean?

11   **A.** Zero total tax means zero tax liability and zero payments,

12   zero outstanding balance due.

13   **Q.** So if we see zeros over here, that means the money's being

14   paid like it should, right?

15   **A.** Correct.

16   **Q.** Let's go to the first one, December 31, 2007. There was a

17   total of $21,751 and some change of tax owed, correct?

18   **A.** Correct.

19   **Q.** And then we have a balance due of $11,176. Can you tell us

20   what happened?

21   **A.** Of the original tax due, the $21,751.33, there was

22   $14,704.74 paid. That left an outstanding balance of

23   approximately $7,000, and the $7,000 of tax that's still owed

24   as of July 24, 2009, plus $2,000 in penalties and $2,100 in

25   interest is what makes up the outstanding balance of $11,000.

1  **Q.** So basically the column on the left is the taxes that were

2  owed, and the column on the far right is the taxes that weren't

3  paid, plus interest and penalties, right?

4  **A.** That is correct.

5  **Q.** So total of 219 approximately was owed. With interest and

6  penalties, 83,000 was still owed to the IRS, correct?

7  **A.** That is correct.

8  **Q.** And what's the date of that debt?

9  **A.** The date that that debt was owed was as of July 24, 2009.

10 **Q.** The documents that follow -- and we are just going to look

11 at one of two or these from Government's Exhibit -- the second

12 page of 5A, you talk previously about these transcripts. This

13 is a summary of the following documents, correct?

14 **A.** It is.

15 **Q.** And let's just take a look at one of those entitled,

16 "account transcript." So this transcript is from what date?

17 **A.** If you take a look in the upper, right-hand corner, I see

18 part of it, you know, in whatever fashion may have been cut

19 off. That's that date of 7/24/2009, which also matches the

20 date of that summary scheduled. So these transcripts were

21 pulled as of that date.

22 **Q.** That's the request date, but the actual tax period we're

23 talking about is what?

24 **A.** This transcript is for the tax period, the quarter ending

25 March 31, 2006.

1    **Q.**   That would line up with this on your summary chart, right?

2    **A.**   Yes.

3    **Q.**   I'm sorry, 2006.

4    **A.**   Yeah.  That's actually -- it would have been above the

5    June 30, 2006.

6    **Q.**   Okay.  And so these transcripts basically provide the

7    numbers that go on your summary chart; is that correct?

8    **A.**   Correct.

9    **Q.**   And, once again, the date of this summary was what?

10   **A.**   July 24, 2009, which was also the same date that those

11   transcripts were requested and provided.

12   **Q.**   And how much was owed to the IRS on that date?

13   **A.**   As of that date, First Financial Trust had an outstanding

14   balance owed to the IRS of $83,101.02.

15   **Q.**   Now, additional payroll taxes are due each quarter for the

16   business that you own, at least in FFTM's case, right?

17   **A.**   Correct.

18              **MR. BRACKETT:**  Objection, leading.

19              **THE COURT:**  It has been answered.  I will let it

20   stand.

21   **BY MR. BENSON:**

22   **Q.**   And FFTM, who owned FFTM?

23   **A.**   It was owned -- in the year 2009, it was owned 80 percent

24   by the defendant and 20 percent by another individual by the

25   name of Jeff Good.

1   **Q.** And moving forward from the previous summary from 7/24/09

2   to 11/30/09, I would like to show you the front page of

3   Government's Exhibit 5B.  Is it fair to say this is just a

4   continuation of that chart up to November 30, 2009?

5   **A.** It is.

6   **Q.** And how much has the tax debt increased to what?

7   **A.** The tax debt increased to $97,429.18.  And a portion of

8   that would be attributable to the filing of the third quarter

9   for 2009.  That is on 5B.  It was not on 5A.  So the third

10  quarter was filed.  Tax was $13,000.  Zero was paid.  So it

11  basically added $13,000 to what that liability was on the

12  previous schedule.

13  **Q.** And, once again, the rest of Government's 5B, can you tell

14  the jury what those are?

15  **A.** Those are the IRS account transcripts for each of the

16  quarters listed on that summary page.  There is an account

17  transcript in there.  It shows the date the return was filed.

18  It shows the tax that was originally on the return.

19          It shows payments that were made.  And about in the

20  middle of the transcript page, there is a line that says,

21  "account balance."  That would line up with what the

22  outstanding balance is as of that date.  So each one of these

23  forms has its own account and has its own balance.

24  **Q.** So based upon that exhibit, is it fair to say that as of

25  November 30, 2009, the defendant owed approximately $97,000.

1   FFTM owed approximately $97,000 to the IRS?

2   **A.**   That is correct.

3   **Q.**   I'd like to move on to Government's Exhibit 6A.  Generally,

4   can you tell us what this is?

5   **A.**   It's a series of financial transactions that took place in

6   the calendar year 2009, and it involved the transfer of funds

7   between the defendant and his related mortgage company, First

8   Financial Trust Mortgage.

9   **Q.**   So these are transferred from FFTM, the mortgage business

10  that the defendant has an 80 percent ownership interest in,

11  correct?

12  **A.**   Correct.

13  **Q.**   To where?

14  **A.**   To the personal bank account held by the defendant at

15  Horizon Bank, and it was checking account ending in 3208.

16  **Q.**   So this isn't some other business account; this is his

17  personal account?

18  **A.**   These are monies going directly from the business account

19  in which the employee monies were held in trust and not paid

20  in.  These were monies that were then transferred to the

21  defendant personally.

22  **Q.**   So at the time he's owing the IRS this 97,000, this money

23  is going into his personal account?

24  **A.**   Correct.

25  **Q.**   And this covered what time period?

1    **A.**  It was the calendar year 2009.  It goes from January 7,

2    2009 through December 31, 2009.

3    **Q.**  For a total of how much money went into his personal

4    account when he wasn't paying the payroll tax that he withheld

5    from the employees?

6    **A.**  It was $111,526.

7    **Q.**  What's this 4,000 thing?  What's going on there?  I don't

8    understand that.

9    **A.**  That was money that went back from the defendant's personal

10   account to the business account, so the net amount transferred

11   that year would have been $107,000.

12   **Q.**  Now, did you also obtain checks related to this account?

13   **A.**  Yes.

14   **Q.**  And what did you -- let's take a look at Government's

15   Exhibit 6B.  Let me put the first page up there of that.  What

16   is 6B?  What are these checks in 6B?

17   **A.**  In 6B these were the items of deposit that we obtained from

18   Horizon Bank for the defendant's personal bank account, which

19   was 8163208.  And so what we have are we have the deposit

20   tickets.  And when the transaction involved the payment being

21   made by check, we have the check that was drawn on the First --

22   at that time it was Federal Trust Mortgage bank account.

23   **Q.**  So let's take a look at 6B and 6A at the same time.  The

24   first line of 6A has a date of 1/7 and a credit of $1,500 from

25   First Federal in the defendant's account, right?

1    **A.**  Correct.

2    **Q.**  And this is the check that actually supports that summary,

3    that statement on that summary, right?

4    **A.**  That is correct.

5    **Q.**  And all those checks referenced on that summary are

6    attached in Government's Exhibit 6B, aren't they?

7    **A.**  There is either a check.  Or if it was done by way of a

8    computer transfer where the defendant would contact the bank

9    and, you know, do a -- do an electronic transfer as opposed to

10   writing a check, there is also slips in there for those.

11          If we had an instance where there was an item on

12   there that was neither supported by a check or by slips

13   representing the contact with the bank, we have also included

14   the bank statement.  And there's an entry on the bank statement

15   that will show the funds going between the accounts ending in

16   0768 and 3208.

17   **Q.**  Let's take a look.  The statements are Government's

18   Exhibit 6C, right?

19   **A.**  Correct.

20   **Q.**  And that's a series of a lot of bank statements for what

21   account?

22   **A.**  Those are for the defendant's personal bank account at

23   Horizon Bank ending in 3208.

24   **Q.**  And these statements, combined with the checks in 6B, they

25   support this summary chart of each and every payment that went

1   to the defendant's personal account while he wasn't paying the

2   payroll tax to the IRS that he kept from the employees,

3   correct?

4   **A.**  That is correct.

5   **Q.**  Going back to 6A again, this covers simply one calendar

6   year, does it not?

7   **A.**  It does.

8   **Q.**  And the total was how much?

9   **A.**  There was 111,000 transferred of which there was 4,000 that

10  went back, so the net was $107,523 that went into the

11  defendant's personal bank account during the calendar year

12  2009.

13  **Q.**  I want to ask you some questions about what has been

14  admitted as Government's Exhibit 7A.  Let's take a look at the

15  first page, second page, and the third page.  Can you tell us

16  what this first page represents of 7A?

17  **A.**  Checks issued by GVC Mortgage to -- in the name of SRC

18  Properties during the period February 5, 2010, through June 10,

19  2010.

20  **Q.**  And what was SRC Properties?

21  **A.**  It was a business that was set up by the defendant in -- I

22  want to say the period was September 2009, and it was set up to

23  do marketing.

24  **Q.**  Is it fair to say SRC was set up after the IRS levied -- or

25  close in time to when the IRS was levying the FFTM account?

1      **MR. BRACKETT:**  Objection.  He just said he doesn't

2  know when it was set up.  He is testifying for him.

3      **THE COURT:**  Repeat your question.

4  **BY MR. BENSON:**

5  **Q.**  SRC, do you know if that was set up -- SRC Properties, do

6  you know when that was set up in relationship to when the FFTM

7  accounts were levied?

8  **A.**  Secretary of State records would show SRC was created, set

9  up, in September of 2009.

10  **Q.**  And that would have been how many months after the levy on

11  FFTM's accounts?

12  **A.**  If we're talking about I believe -- I'll say it was two

13  months after because I believe the date on that levy was in

14  July, 2009.

15  **Q.**  Let's go back and take a look.  I'm showing you

16  Government's Exhibit 4.  What's the date?

17  **A.**  July 13, 2009.

18  **Q.**  So a couple months later after FFTM gets a levied account,

19  SRC is created?

20  **A.**  Correct.

21  **Q.**  And then GVC, what was GVC again?

22  **A.**  GVC was a mortgage company located in Lebanon, Indiana.  I

23  say mortgage company.  I believe what they did was they wrote

24  mortgage loans for mortgage brokers operated by an individual

25  by the name of Brad Voyles.

1   **Q.** And the defendant had an Employment Agreement with GVC,

2   didn't he?

3   **A.** We came to find out he did have an Employment Agreement

4   with GVC.

5   **Q.** And it was listed he was the president of GVC?

6   **A.** Correct.

7   **Q.** So he's the president of GVC at this time. FFTM is getting

8   levied. And he is the owner of SRC, correct?

9   **A.** Correct.

10  **Q.** So tell us a little bit about what goes on, this summary

11  chart here, and what it is, the first page.

12  **A.** Basically, the reference on there to the canceled check

13  page is that in response to a grand jury subpoena, GVC Mortgage

14  provided us copies of the fronts of the checks that were issued

15  by GVC to SRC Properties. So that's the reference you see in

16  the third column. They're just telling us which canceled check

17  page you can find these individual checks that are listed. In

18  this instance --

19  **Q.** Stop a second. The check number is GVC's check number?

20  **A.** These are check numbers of GVC.

21  **Q.** So the first five checks GVC wrote were to SRC Properties?

22  **A.** Correct.

23  **Q.** Go ahead.

24  **A.** And as far as what the amounts represented, to date we have

25  not seen any SRC Property invoices. All we have seen are SRC

1   Marketing invoices, which are part of 7B and 7C.  So we really

2   don't know what these payments were for.

3   **Q.**  But anyway, they're from a company the defendant is

4   president of to a company he owns by himself, SRC?

5   **A.**  Correct.

6   **Q.**  Let's go on to the next page, 7A.  What does this chart

7   represent?

8   **A.**  These are checks issued by GVC Mortgage in the name of SRC

9   marketing, same as on 7A where they make reference to the page

10  of canceled checks as to what page you can find that specific

11  check on.  And in this case, we did have some invoices that

12  gave us a description as to what these payments were for.

13  **Q.**  So the first list are the GVC checks to SRC, right?

14  **A.**  To SRC Properties, correct.

15  **Q.**  And the second checks, the second chart, is to SRC

16  Marketing, correct?

17  **A.**  Correct.

18  **Q.**  Did you discover documents from the State of Indiana that

19  showed SRC Marketing and SRC Properties were the same entity?

20  **A.**  Yes.

21  **Q.**  I am displaying to the jury the third page of Government's

22  Exhibit 7A.  Do you know what the approximate total was of all

23  these payments from GVC to the defendant's company SRC

24  approximately?

25          You don't have to add them up in your head.  I'm

1  just asking if you know from previously reviewing this.

2  **A.**  Yeah.  Well, at a point in time, I did.  But the number at

3  this point in time, I would be total honest in saying that it

4  escapes me.  I did actually sit down and add them up, and if I

5  gave you a figure right now, it would be --

6  **Q.**  That's fine.  I didn't want to you to add them up on the

7  witness stand.  That's all.

8          Now, this is a summary chart, and we have some other

9  exhibits here, 7B and 7C.  Let's talk about 7C first.  Let's

10 put the first one up there.  These are the invoices that go

11 along with those payments that were from GVC to SRC on that

12 chart you just showed us, right?

13 **A.**  Correct.

14 **Q.**  And we have a big stack of them.  There is a whole pile of

15 7C.  And those are all the ones you could get, right?

16 **A.**  Yes, from GVC Mortgage.

17 **Q.**  Let's talk a little bit.  It says SRC Marketing.  There is

18 an address there.  What's that address?

19 **A.**  The address on the invoice says 5955 Central Avenue in

20 Portage.

21 **Q.**  Were you familiar with that address from other records from

22 the defendant?

23 **A.**  Yes.

24 **Q.**  Why?  How did that address show up in other records?

25 **A.**  It was the same address that eventually was used, meaning

1  after the AmeriPlex address we talked about earlier for First

2  Financial Trust, eventual First Financial Trust was operated

3  out of 5955 Central Avenue in Portage.  And we also came to

4  know that address as being the location for the Citizens For

5  Snyder campaign.

6  **Q.**  So that address served three purposes.  It was FFTM's,

7  correct?

8  **A.**  Correct.

9  **Q.**  It was SRC Marketing or Properties, right?

10 **A.**  Correct.

11 **Q.**  And it was the address for his campaign headquarters,

12 right?

13 **A.**  Correct.

14 **Q.**  And this invoice from SRC, it's sent to who?

15 **A.**  It says at the top:  Bill to First Financial Trust

16 Mortgage, 5955 Central Avenue in Portage, Indiana.

17 **Q.**  Did you see any documents that you examined that showed

18 First Financial Trust Mortgage paid any of these invoices that

19 were addressed to them?

20 **A.**  No.

21 **Q.**  Approximately how many invoices are here?  Do you know off

22 the top of your head?

23 **A.**  I do not.  I would say more than 50, and that would be

24 the -- you know, I couldn't give you a specific count.  I know

25 there is at least more than 50 invoices there.

1    **Q.**  And they're all from SRC to bill to FFTM, right?

2    **A.**  They are the same, correct.

3    **Q.**  And did you see a single payment for one of these invoices

4    from FFTM to SRC?

5    **A.**  No.  All payments for the invoices that you have there were

6    made be GVC Mortgage.

7    **Q.**  GVC Mortgage to SRC on behalf of FFTM, right?

8    **A.**  Correct.

9    **Q.**  Well, in terms of avoiding any future levies or the IRS

10   collecting the payroll tax debt, does this have any

11   significance?

12   **A.**  Yes.

13   **Q.**  Explain, please.

14   **A.**  Well, if the payments aren't going directly from GVC to

15   FFTM, First Financial Trust Mortgage, they are not going into a

16   bank account, which would then could potentially be levied by

17   the IRS.

18   **Q.**  So the fact that the money goes someplace else, the IRS

19   will never know because it's not in FFTM's bank account,

20   correct?

21   **A.**  Correct.

22            **MR. BRACKETT:**  Objection.

23            **THE COURT:**  I would sustain that objection.  Restate

24   your question.

25            Again, part of the problem, when you ask a question,

1   you can't just say, "right."  You have to ask the question and

2   let him say if that's right or not.

3           **MR. BENSON:**  Okay.  I guess I'll rephrase it.

4           **THE COURT:**  Just that one question, rephrase it.

5   **BY MR. BENSON:**

6   **Q.**  How does the diverting of revenue away from FFTM's account

7   to another account that the defendant controls affect the IRS's

8   ability to collect the back taxes owed?

9   **A.**  The IRS can only levy bank accounts that it knows of.  And

10  if the funds aren't placed into the bank accounts that the IRS

11  is aware of, they can then not have the opportunity to levy

12  that bank account.

13  **Q.**  And in this case, Government's Exhibit 7C, all of these

14  invoices, these all -- is it fair to say that these all were

15  from SRC Marketing, billed to FFTM, but paid by GVC to SRC

16  Marketing directly?

17  **A.**  Correct.

18  **Q.**  You said previously there was an example.  I want to show

19  you what was admitted as 7B, two things:  An invoice, second

20  page, and then a check.  Can you tell us what going on here

21  with this?

22  **A.**  Yes.  This is just an example of, you know, the kind of

23  check that would have been written by GVC Mortgage to SRC

24  marketing in response to one of these invoices that we had just

25  discussed previously.

1    **Q.**   And this one was for $3,000, right?

2    **A.**   Correct.

3    **Q.**   So the invoice says, "From SRC."  Billed to who?

4    **A.**   It says:  Bill to: First Financial Trust Mortgage.

5    **Q.**   For what?

6    **A.**   It says they billed $2,250 for web hosting and filtering

7    and $750 for data entry.

8    **Q.**   And this is -- First Financial Trust was engaged in what

9    type of business?

10   **A.**   They were a mortgage broker.

11   **Q.**   And this check represents what?

12   **A.**   It represents the payment for Invoice No. 700 issued by GVC

13   Mortgage to SRC Marketing.

14   **Q.**   Not FFTM but SRC?

15   **A.**   Correct.

16   **Q.**   I would like to move on to Government's Exhibit 8A,

17   admitted into evidence.  What's this document?

18   **A.**   That was the document signed by the defendant acknowledging

19   that he was in agreement -- it contains both his signature and

20   his wife's signature, and it is an indication that they were in

21   agreement with the IRS's civil findings for the examination of

22   their individual income tax returns for the years 2005, 2006,

23   and 2007.

24   **Q.**   That's the back taxes owed, basically, and penalties?

25   **A.**   Correct.

1   **Q.**  And then 8B, what is represented in this document?

2   **A.**  8B contains the details showing the civil adjustments that

3   were made to arrive at those tax liabilities.  It's just a more

4   detailed form, but the tax amount and the penalty amounts are

5   the same as what was contained on 8A.  The only thing added on

6   8B is it shows the amount of interest that was owed along with

7   the taxes and the penalties.  And that could be found on Page 2

8   of 8B.

9           **MR. BENSON:**  Can I have one moment, Your Honor, to

10  retrieve an exhibit?

11          **THE COURT:**  Yes, you may.

12  **BY MR. BENSON:**

13  **Q.**  Now, as part of your investigation, did you obtain

14  documents indicating that the defendant had attempted to engage

15  in a reduction or negotiation of this tax debt that was owed?

16  **A.**  Yes.

17  **Q.**  And do you recall when that first approximately occurred?

18  **A.**  What was known as an Offer in Compromise was tendered by

19  the defendant, both for his personal tax liabilities and his

20  outstanding related corporate tax liabilities, on March 21,

21  2010.

22  **Q.**  And that Offer in Compromise, the date of that Offer in

23  Compromise -- let me show you something else.  When was the

24  date again?

25  **A.**  I believe the date was March 21, 2010.

1    **Q.**  Let me go back and show you -- so first there is a levy,

2    correct?

3    **A.**  Correct.

4    **Q.**  And that's in what?

5    **A.**  The Notice of Intent to Levy came about in July of 2009.

6    **Q.**  July 2009.  So then in March of 2010, he makes an Offer in

7    Compromise?

8    **A.**  Correct.

9    **Q.**  But in between these previous invoices, Government's

10   Exhibit 7A that's admitted, what's the date of the payments

11   going on between GVC and SRC Properties and Marketing?

12   **A.**  The payments start February 5, 2010.

13   **Q.**  Before the Offer in Compromise, right?

14   **A.**  Yes.

15   **Q.**  And we'll get to this, but I'll ask you the question.  On

16   the Offer in Compromise, was SRC Properties or Marketing ever

17   listed?

18   **A.**  No.

19   **Q.**  Agent Hatagan, I'd like to --

20          **MR. BENSON:**  Can I approach, Your Honor?

21          **THE COURT:**  Yes, you may.

22          **MR. BENSON:**  For the record, I am presenting the

23   witness with Government's Exhibit 9A through 17B in the binder

24   marked Binder 2.

25

1   **BY MR. BENSON:**

2   **Q.**   Have you had a chance to review the contents of

3   Government's Exhibit Binder 2?

4   **A.**   I have.

5   **Q.**   As a matter of course, you helped put that together with

6   those exhibits, correct?

7   **A.**   That is correct.

8   **Q.**   You spoke previously about an Offer in Compromise, and you

9   said that was approximately March of 2010; is that correct?

10  **A.**   That is correct.

11  **Q.**   And let's take a look at Government's Exhibit 9A.

12  Generally, without going into the contents, can you tell the

13  Court and the ladies and gentlemen of the jury what that is?

14  **A.**   It's a personal financial statement that was tendered in

15  addition to the Offer in Compromise or -- as part of the Offer

16  in Compromise form.

17  **Q.**   And what is that form number commonly known as?

18  **A.**   It's known as a Form 433-A.

19  **Q.**   And that was related to the defendant, his Offer in

20  Compromise?

21  **A.**   That is his personal financial statement.

22  **Q.**   And is that the one you referenced being tendered in about

23  March of 2010?

24  **A.**   It was signed in March --

25  **Q.**   Just approximately.

1    **A.**   -- in March of 2010.  And, yeah, it looks -- the IRS on the

2    Offer in Compromise --

3    **Q.**   That's all, just approximately.

4    **A.**   Okay.

5    **Q.**   And then moving on to Government's Exhibit 9B, what is

6    that?

7    **A.**   9B is the Offer in Compromise that was submitted by the

8    defendant for his individual income taxes for the years 2005,

9    2006, and 2007.

10   **Q.**   Moving on to Exhibit 10A, can you tell us what that is?

11   **A.**   10A is a financial statement for the defendant's business,

12   First Financial Trust Mortgage.  It was tendered along with the

13   Offer in Compromise that was submitted for First Financial

14   Trust Mortgage.

15   **Q.**   And then 10B?

16   **A.**   10B is the Offer in Compromise tendered for First Financial

17   Trust Mortgage.

18   **Q.**   And what's the time frame of these four documents you just

19   discussed?

20   **A.**   The offers, March/April, 2010.

21   **Q.**   So we have two Offers in Compromises and two, 656 Offer in

22   Compromises; is that correct?

23   **A.**   That's correct.

24   **Q.**   And then two of the 433-A and B, the financial data for

25   each of those; is that correct?

1  **A.**   That is correct.

2  **Q.**   Let's move forward to Government's Exhibit 11.

3         **MR. BENSON:**  At this time I would move to admit --

4  first of all, I would move to admitted Government's Exhibit 9A,

5  9B, 10A and 10B.

6         **MR. BRACKETT:**  No objection.

7         **THE COURT:**  Government's Exhibit 9A, 9B, 10A, and

8  10B admitted without objection.

9         **MR. BENSON:**  If I could retrieve the binder from the

10  witness, Your Honor?

11         **THE COURT:**  Yes, you may.

12         **MR. BENSON:**  I would ask permission to publish these

13  as I ask the witness questions about --

14         **THE COURT:**  You may do that also.

15         Ladies and gentlemen of the jury, at the conclusion

16  of the case, all these exhibits will go back to you.  So you

17  will see them up close and personal.

18  **BY MR. BENSON:**

19  **Q.**   First of all, regarding Government's Exhibit Binder 2 as

20  well as Binder 1, there is an index on the front.  Is that

21  index accurate of the documents contained in the two binders?

22  **A.**   It is.

23  **Q.**   Let's talk, first of all, about Government's Exhibit 9A.

24  For the record, I will be showing that to the witness.

25         Okay.  What is this form?

1   **A.**   It is a Form 433-A.

2   **Q.**   And what's the purpose of this form?

3   **A.**   It's a personal financial statement filed with the Form

4   656.  And in this instance, it was filed because the reason for

5   the offer -- the reason listed for the Offer in Compromise was

6   doubt as to collectability.

7           **MR. BRACKETT:**  Your Honor, I didn't notice this on

8   the form first.  It looks like the Soc. numbers are not

9   redacted here and published.  We need to redact those.

10          **THE COURT:**  Redact those before it goes back to the

11  jury, correct?  It's already out there now.  That's the

12  problem.

13          **MR. BRACKETT:**  Fair enough.  I think we should

14  remedy it before it goes up again at least.

15          **THE COURT:**  Okay.  Next time, when you have a

16  chance -- we're going to take a break in about five minutes --

17  just redact the Social Security numbers.

18          **MR. BENSON:**  Certainly.  I apologize to the Court

19  and counsel for that.

20          **THE COURT:**  Thank you.

21  **BY MR. BENSON:**

22  **Q.**   So the first section -- first of all, the first section,

23  the account is in whose name?

24  **A.**   It's -- well, in this instance here, it lists the -- you

25  know, it's the names of the defendant and his wife, so it's for

 1  their individual income tax liabilities.

 2  **Q.**  So that's how you know it's for their individual, not the

 3  business?

 4  **A.**  Correct.

 5  **Q.**  And in this case, moving on down, we have Section 2, an

 6  employment section.  And what's listed as the defendant's place

 7  of employment?

 8  **A.**  It's listed as First Financial Trust Mortgage.

 9  **Q.**  And that was FFTM that we referenced earlier?

10  **A.**  Correct.

11  **Q.**  Did it make any mention of his employment with GVC?

12  **A.**  No, it does not.

13  **Q.**  Did you come to find that any place on this form?

14  **A.**  No, I did not.

15  **Q.**  Is that where this should have been listed?

16  **A.**  Yes.

17  **Q.**  Talk about other financial information.  That was -- that

18  was left blank by the defendant, correct?

19  **A.**  Correct.

20  **Q.**  And is it fair to say that it appeared that none of that

21  applied to him anyway based upon your investigation?

22  **A.**  Based upon our investigation, it did not.

23  **Q.**  And we have a couple initials down at the bottom of that

24  page?

25  **A.**  Yes.

1   **Q.**  And what are the initials?

2   **A.**  They are the initials of the defendant and his spouse.

3   **Q.**  Let's go to the next page.  We have the section, cash on

4   hand, a couple banks there.  There's that 3208.  What account

5   was that?

6   **A.**  That was the personal account that the defendant and his

7   spouse had at Horizon Bank.

8   **Q.**  And what about the other account?

9   **A.**  The other account was a money market account that the

10  defendant and his spouse had at Centier Bank.

11  **Q.**  And this lists the account balance of $100, correct?

12  **A.**  Correct.

13  **Q.**  That's after that $110,000 went in there, or is that in the

14  middle of all that?

15  **A.**  That was during the course of.

16  **Q.**  Let's take a look at that chart.  I am referring back to

17  Government's Exhibit 7A.  The date of this financial

18  information, the date it says their account balance is as of

19  8/5/09.  What's the date it is actually signed by the

20  defendant?

21  **A.**  The date the 433-A is signed is March 21, 2010.

22  **Q.**  So let's look.  Just the checks to SRC Properties in that

23  month and a half preceding it.  How many are there?

24  **A.**  There is six checks.  Six checks that precede the March 21,

25  2010 date.

1    **Q.**  And let's take a look at Government's Exhibit 6A.

2    Transfers from FFTM's account to Snyder's bank account in the

3    year preceding that totaled what?

4    **A.**  111,000.  The net was $107,523.

5    **Q.**  And it says the balance on 8/5/09 was $100 in that account?

6    **A.**  Yes.

7              **THE COURT:**  Mr. Benson, is this a point in time I

8    can take a break?

9              **MR. BENSON:**  Can I have one more question to finish

10   with this document?

11             **THE COURT:**  You can have one more question.

12   **BY MR. BENSON:**

13   **Q.**  8/3/09, two days before that, how much money was deposited?

14   **A.**  $2,000.

15   **Q.**  And 8/10, the day after?

16   **A.**  1500.

17             **THE COURT:**  Okay.  We are going to take our

18   afternoon break today.  Remember the cautionary instruction I

19   gave you before and I'll give you each time we take these

20   breaks.  Do not discuss this case among your others, yourselves

21   rather.  Do not let anybody else contact you and talk to you

22   about the case.  If that happens, report that to me.  About

23   15 minutes.

24        (Jury out at 3:15 p.m.)

25             **THE COURT:**  Mr. Hatagan, you can step down.

 1   15 minutes.

 2        (Recess at 3:15 p.m.)

 3        (The following proceedings resumed in open court commencing

 4         at 3:35 p.m., reported as follows:)

 5             **THE COURT:**  You can all be seated.  Mr. Hatagan,

 6   remember you are under oath.

 7             **THE WITNESS:**  Yes, Your Honor.

 8             **THE COURT:**  With regard to the schedule, we'll wrap

 9   up between 4:30 and 5:00, so at 4:30 start thinking where you

10   can stop in between that and 5:00 o'clock.

11             **MR. BENSON:**  Okay.  Thank you, Your Honor.

12             **THE COURT:**  Government ready for the jury to be

13   brought in?

14             **MR. BENSON:**  Yes, Your Honor.

15             **THE COURT:**  Defendant ready for the jury to be

16   brought in?

17             **MR. BENNETT:**  Yes, Your Honor.

18             **THE COURT:**  Bring the jury back in.

19        (Jury in at 3:37 p.m.)

20             **THE COURT:**  You can be seated.

21             Mr. Benson.

22             **MR. BENSON:**  Thank you, Your Honor.

23   **BY MR. BENSON:**

24   **Q.**  Agent Hatagan, directing your attention to what has been

25   admitted as Government's Exhibit 9A, the second page, let's

1    take a look at that.  And, once again, this was what form we're

2    looking at?

3    **A.**   This is the Form 433-A, the individual financial statement.

4    **Q.**   This would have been submitted in a request for an Offer in

5    Compromise for what taxes, personal or business?

6    **A.**   It would have been submitted for the personal Offer in

7    Compromise for the years 2005, '06, and '07.

8    **Q.**   And you talked about these bank accounts.  Let's look at

9    the second section where it says, "investment."  Once again,

10   can you read what that says?

11   **A.**   Yes.  It says:  "Investments, include stocks, bonds, mutual

12   funds, stock options, certificates of deposit and retirement

13   assets such as IRAs, Keogh, and 401(k) plans.  Include all

14   corporations, partnerships, limited liability companies, or

15   other business entities in which the individual is an officer,

16   director, owner, member, or otherwise has a financial

17   interest."

18   **Q.**   You stated previously on the first page of Government's

19   Exhibit 9A where it says, "employment," you said you were aware

20   of other employment that should have been listed.  Was that

21   correct?

22   **A.**   That is correct.

23   **Q.**   And with whom was that with?

24   **A.**   The other employment that should have been listed in

25   Section 2 of this form would have been the employment that the

1  defendant had with GVC Mortgage.

2  **Q.** And in this section, the investments, did you come across

3  any documents that showed that the individual was an officer,

4  director, owner, member, or otherwise had a financial interest

5  in any other companies?

6  **A.** I did.

7  **Q.** What companies?

8  **A.** I looked at records from the Indiana Secretary of State

9  that showed that the defendant had an interest in SRC

10 Marketing, LLC. He was also a member.

11 **Q.** And is that the section where that should have appeared?

12 **A.** Yes.

13 **Q.** Looking down a little bit, there is another section, "total

14 equity." And it says, "See attached detail," and we'll talk

15 about that later. And then life insurance was checked no; is

16 that correct?

17 **A.** That is correct.

18 **Q.** And are there some initials at the bottom of the page,

19 again?

20 **A.** Yes. It is the defendant and his spouse's initials at the

21 bottom of the page.

22 **Q.** I'd like to move forward to the signature page of that

23 document. And if the taxpayer is self-employed -- and then

24 this is actually just a -- that's for the next following

25 section.

1          But this one, the wages and expense, there is

2    nothing in the wage box; is that correct?

3    **A.**   That is correct.

4    **Q.**   Did you discover documents that show actually the defendant

5    had wages in that time period?

6    **A.**   Yes.

7    **Q.**   From where?

8    **A.**   Records that were provided to us by GVC Mortgage.

9    **Q.**   And moving down to where it says, "wages, salaries,

10   pension," can you read what that instruction says about what

11   you're supposed to enter in that box?

12   **A.**   It says:  "Enter gross monthly wages and/or salaries.  Do

13   not deduct withholding or allotments taken out of pay such as

14   insurance payments, credit union deductions, car payments, et

15   cetera, to calculate the gross monthly wages and/or salaries"

16   and then it gives and example as to how you should calculate it

17   if you're paid weekly, biweekly, or semimonthly.

18   **Q.**   Let's move on down.  There was a certification.  Can you

19   read that to the jury?

20   **A.**   Yes.  It says:  "Under penalties of perjury, I declare that

21   to the best of my knowledge and belief, the statement of

22   assets, liabilities, and other information is true, correct,

23   and complete."

24   **Q.**   And was that signed under the penalties of perjury?

25   **A.**   It was.

1    **Q.**  By who?

2    **A.**  It was signed by the defendant and it was signed by his

3    spouse on March 21, 2010.

4    **Q.**  And what was the date?

5    **A.**  March 21, 2010.

6    **Q.**  And this section here, attachments, it says:  "Copies of

7    the following items for the last three months should be

8    submitted."  And actually one of boxes is checked, right?

9    **A.**  Correct.

10   **Q.**  What does it say he is submitting as verification for his

11   three months of income prior to the signing of this document?

12   **A.**  The box checked for income states:  "Earning statements,

13   pay stubs, et cetera, from each employer; pension; Social

14   Security; other income; self-employment income."  And in

15   parenthesis, it says:  "Commissions, invoices, sales records,

16   et cetera."

17   **Q.**  What documents would you have expected to see in there that

18   weren't part of this?

19   **A.**  I would have expected to see the pay stubs that the

20   defendant received from GVC Mortgage.

21   **Q.**  Moving forward a couple pages to an attachment, this is the

22   next-to-last page of this document where it lists other income.

23   Can you read what that says?

24   **A.**  It says:  "The taxpayers currently have no taxable

25   income -- "

1   **Q.**  Stop right there.  Was that an accurate statement based

2   upon the documents you reviewed?

3   **A.**  No, it was not.

4   **Q.**  What's missing?

5   **A.**  What's missing is any reference to the wages that the

6   defendant was then earning from GVC Mortgage and had been

7   earning for the six weeks prior to signing the statement and

8   also the monies that were being paid to SRC Marketing and SRC

9   Properties.

10  **Q.**  Okay.

11  **A.**  And then it continues where it says:  "Deborah Snyder is no

12  longer employed.  She has three children who she is raising.

13  James Snyder is currently the sole member of First Financial

14  Trust Mortgage, LL -- "

15  **Q.**  Stop right there.  So he mentioned First Financial Trust.

16  Is there anything in this paragraph that mentions about the

17  payments, the bills that are being paid for FFTM by GVC to SRC,

18  his other company?

19  **A.**  There is not.

20  **Q.**  Go ahead.

21  **A.**  And it goes on to state:  "This limited liability company

22  was formed in 2006.  Due to the business being a startup, it

23  originally lost money.  Then, as a result of the terrible

24  financial climate in our country, the business has taken a

25  drastic downturn.  Home sales and the related mortgage business

1  have been two of the most devastated industries.  Due to the

2  economic turmoil, James Snyder has had to loan First Financial

3  Trust Mortgage, LLC over $138,000."

4  **Q.**  Okay.  Go ahead and read the rest.

5  **A.**  "Due to the economic downturn, James Snyder is not able to

6  take a regular wage out of the corporation.  In order to pay

7  his personal bills, James Snyder attempts to receive loan

8  repayments out of First Financial Trust Mortgage, LLC.  While

9  this is not a guaranteed amount that can be relied on, it is

10  his only source of obtaining funds to pay his personal bills."

11  **Q.**  Let's take that statement, that in order to pay his

12  personal bills, James Snyder attempts to receive loan payments

13  out of First Financial Trust Mortgage.

14       Referring you back to what was admitted as 6A, it

15  goes on to further say:  "While this is not a guaranteed amount

16  that can be relied upon, it is his only source of obtaining

17  funds."

18       Let's look at 6A.  What's going on when he says that

19  for the year before?  Once again, what does this represent?

20  **A.**  Funds that were transferred to the defendant's personal

21  bank account from the First Financial Trust Mortgage bank

22  account.

23  **Q.**  And how many of them are there?

24  **A.**  There was 56 transfers, let's say, excluding the two that

25  went from the defendant back to the company; so there was a net

1    of 54 transfers made either in the form of a check or a

2    computer transfer from the account, First Financial Trust

3    Mortgage, to the personal account of the defendant and his

4    spouse.

5    **Q.**   So if you take out those two, about one a week, right?

6    **A.**   Correct.

7    **Q.**   And you can see the dates on here.  Yet, the defendant is

8    saying that these aren't -- while this amount is not a

9    guaranteed amount that can be relied upon as the only source

10   for obtaining funds for his personal payment.

11            He had 54 or 52 payments that year, did he not?

12   **A.**   He did.

13   **Q.**   Now, you said submitted with this 433-A was another

14   document.  What is that document?

15   **A.**   The 656.

16   **Q.**   And let's take a look at that.  For the record, I am

17   displaying 9B to the witness, the first page of 9B.  And what

18   is this calculation?  The first one contains financial

19   information.  What is the offer?  What is this document that

20   we're looking at, the 656?

21   **A.**   The offer is a representation that's made to the IRS by the

22   taxpayer stating that they have a tax liability -- and in this

23   case it was for the 2005, '06, and '07 tax years -- that they

24   are unable to pay.

25            And in section three of this document, they indicate

1  the reason why they believe they are unable to pay that

2  liability at that point in time.  And it also lists --

3  **Q.**  What does it say?

4  **A.**  In this case, they checked the box in section three that

5  says, "Doubt as to collectability.  I have insufficient assets

6  and income to pay the full amount."  And that's where the

7  Form 656 --

8  **Q.**  Stop.  Read the next line.

9  **A.**  It says:  "You must include a complete collection

10  information statement, Form 433-A, and/or Form 433-B."

11  **Q.**  Based upon the documents you reviewed, was the 433-A a

12  complete collection of information?

13  **A.**  It was not.

14  **Q.**  So let's move down here.  What happens next in Section 4?

15  **A.**  Section 4 is -- part of it is based on a computation that

16  needs to be done on the representations made.  They have to

17  come up with a minimum offer amount or the offer won't be

18  accepted.  So there is a formula contained within the booklet

19  that this Form 656 is in.  It's an instruction booklet, and it

20  kind of guides you through, based on the assets that you have,

21  what your minimum offer should be for the IRS to accept it.

22  **Q.**  And in this case, what was the offer?

23  **A.**  The offer was they offered to pay $1,000 towards the

24  outstanding liability that they had for the years 2005, 2006,

25  and 2007.

1   **Q.**  Moving to the second page, once again, that's some

2   instructions or guidance that goes along with this form,

3   correct?

4   **A.**  That's correct.

5   **Q.**  And Section 4 says:  "By submitting this offer, I/we have

6   read and understand and agree to the following," correct?

7   **A.**  Correct.

8   **Q.**  Going to the third page, there is an explanation of

9   circumstances.  Can you read what it says?

10  **A.**  Yes.  It says:  "We are not able to pay the balance due on

11  the 2005, '06, and 2007 income tax years.  The balance due is

12  the result of an audit of the 2005 and 2006 tax years by the

13  Internal Revenue Service.

14          "As the result of the balance due and the drastic

15  downturn in the business climate, specifically the mortgage

16  business which is the line of work we engage in, we are not

17  able to pay the balance due at this time.  In addition, the

18  prospects do not appear great for the future payment of the

19  balance due."

20  **Q.**  Moving down to the last section, where does it say they are

21  going to get the money to pay this thousand dollars?

22  **A.**  They represent to the IRS that:  "We will have to borrow

23  funds from family and/or friends in order to satisfy the

24  offer."

25  **Q.**  Does it mention anything about getting the payment from

1   GVC?

2   **A.**   It did not.

3   **Q.**   Let's move on to the last page of that form.  There is a

4   signature line.  What does it say above the signature line?

5   **A.**   It says:  "If I/we submit this offer on a substitute form,

6   I/we affirm that this form is a verbatim duplicate of the

7   official Form 656, and I/we agree to be bound by all the terms

8   and conditions set forth in the official Form 656."

9            Below that it states:  "Under penalties of perjury,

10  I declare that I have examined this offer, including

11  accompanying schedules and statements, and to the best of my

12  knowledge and belief it is true, correct, and complete."

13  **Q.**   And what is this, "official use only," something about

14  accepting the waiver of the statutory period?  What's going on

15  there?

16  **A.**   There -- it extents the statute of limitations that the IRS

17  has to collect the money.  So when the Offer in Compromise is

18  submitted, there is a period that's added to the normal statute

19  that the IRS has to collect the money to take -- to give them

20  time to consider this Offer in Compromise.

21  **Q.**   Now, you also said they submitted a similar document, Offer

22  in Compromise, and financial information for the business that

23  they might have; is that correct?

24  **A.**   That is.

25  **Q.**   And what would that form be called?

1  **A.**  The 656 was the same form used for the business.

2  **Q.**  And what about the additional form, the 433?

3  **A.**  As the 656 tendered for First Financial Trust Mortgage was

4  tendered on a doubt as to collectability reason, the

5  requirement was that they also submitted -- or they were also

6  required to submit a Form 433-B, which is the equivalent of the

7  433-A.  It's a financial statement for a business instead of a

8  433-A, which is a financial statement for an individual.

9  **Q.**  Let's take a look at what has been admitted as 10A.  Could

10  you tell us what this is?

11  **A.**  It is a financial statement that was submitted for First

12  Financial Trust Mortgage in conjunction with the 656 Offer in

13  Compromise that was submitted for First Financial Trust

14  Mortgage.

15  **Q.**  And this should list what in the business section?

16  **A.**  In the business section, it's going to list the name of the

17  business, the location of the business, the business phone

18  number, the type of business that it was in, the business form

19  under which the entity is organized, the business tax

20  identification number, the date that the business was

21  incorporated or established.

22  **Q.**  And this is in reference to the business entity that is

23  seeking to get the taxes reduced, right?

24  **A.**  That is correct.

25  **Q.**  And then the second portion at the bottom lists the

1    individuals who are partners, officers, or members.  Who is the

2    only one listed?

3    **A.**  On this form it was listed as James Snyder, managing

4    member, and the address that was given is his personal

5    residence address.  He's listed as the 100 percent shareholder.

6    **Q.**  And going back to that form, is there anyone else listed as

7    a partner, officer, member, or major shareholder?

8    **A.**  There was not.

9    **Q.**  Once again, moving on to the next-to-last page of that

10   document, that's signed under the same penalty of perjury as

11   the previous one?

12   **A.**  It is.

13   **Q.**  And what is the title that Mr. Snyder puts for himself?

14   **A.**  He lists his title as managing member.

15   **Q.**  Now, in conjunction with this financial statement, was

16   there also a 656 submitted?

17   **A.**  There was.

18   **Q.**  Let's take a look at what has been admitted as Government's

19   Exhibit 10B.  Can you tell us what this is?

20   **A.**  It is an Offer in Compromise that was submitted for First

21   Financial Trust Mortgage, and it was submitted for payroll

22   taxes for the period December 31, 2006, through December 31,

23   2009.  The reason for the offer listed was doubt as to

24   collectability.  The amount of the offer was for $5,000.

25   **Q.**  One again, moving on to the third page of that document,

1    can you read what it says in the explanation of circumstances?

2    **A.**   It says:  "We are not able to pay the Form 941 payroll

3    taxes for the quarters beginning with the quarter ending

4    December 31, 2006, and ending with the quarter ended

5    December 31, 2009.

6              "The business that this corporation operates within

7    is the mortgage business.  With the difficulty in people

8    obtaining financing and with the economy and turmoil, it does

9    not appear that conditions with [verbatim] improve

10   significantly."

11   **Q.**   And what's the date of this again?

12   **A.**   This was received by the IRS in April, 2010.  I want to say

13   it was signed in March, 2010.

14   **Q.**   And at that point in time, did anything on this business

15   form disclose the payments that were being made by GVC to SRC

16   for FFTM's liabilities?

17   **A.**   It did not.

18   **Q.**   Let's take a look at what was admitted as Government's

19   Exhibit 7A.  This Form 656 was submitted on what date?

20   **A.**   It was submitted -- it was received by the IRS in

21   April 2010.  It was signed in March 2010.

22   **Q.**   March 21?

23   **A.**   Correct.

24   **Q.**   And at this time, what was going on with those payments for

25   FFTM's bills?

1   **A.**   There was six payments made by GVC Mortgage to SRC

2   Properties.

3   **Q.**   On behalf of who?

4   **A.**   On behalf of First Financial Trust Mortgage.

5           **MR. BRACKETT:**   Objection.  Assumes facts not in

6   evidence.

7           **THE COURT:**   Just a second.

8           Mr. Benson.

9           **MR. BENSON:**   He said that these payments were made

10  for FFTM's bills.  Those invoices are in evidence, Judge, as

11  7B.

12          **THE COURT:**   Objection overruled.

13  **BY MR. BENSON:**

14  **Q.**   Is that something you would expect to see in the

15  explanation of circumstances?

16  **A.**   Yes.

17  **Q.**   Once again, the last page after this statement, it's signed

18  under the penalties of perjury by the defendant, isn't it?

19  **A.**   It is.

20  **Q.**   And what's the date?

21  **A.**   Signed on March 21, 2010.

22  **Q.**   Now, after the 21st -- the 10th, I'd like to show you

23  what's been admitted as Government's Exhibit 11.  Can you tell

24  us what's going on here?

25  **A.**   It's an acknowledgment letter.  This was sent to the

1   defendant's power of attorney, who was Dan Pickart.

2           **MR. BRACKETT:**  Your Honor, I just want to check the

3   record.  I'm not sure 11 has been admitted.

4           **MR. BENSON:**  I think counsel is correct.  Let me lay

5   some foundation.  Thank you.

6   **BY MR. BENSON:**

7   **Q.**  Let's talk about Government's Exhibit 11.  Without going

8   into contents, can you tell us generally what it is?

9   **A.**  Exhibit 11 is an acknowledgment letter that's sent by the

10  IRS.  When a taxpayer tenders an Offer in Compromise, it's an

11  acknowledgment letter that says:  We received your Offer in

12  Compromise.

13  **Q.**  And how long is this either before or after this Offer in

14  Compromise is submitted?

15  **A.**  This would have been done within three weeks of the IRS

16  receiving the offer.

17  **Q.**  Moving on to Government's Exhibit 12.  Can you tell us

18  generally what it is without describing it in detail?

19  **A.**  This is a letter from the IRS directed to the taxpayers

20  regarding their individual Offer in Compromise.

21  **Q.**  The one that we just -- was in evidence that we talked

22  about, right?

23  **A.**  That is correct.

24  **Q.**  Moving on to Government's Exhibit 13A, take a look at that.

25  First of all, are you familiar with that?

1   **A.**  I am.

2   **Q.**  Let me show you 13B too, another multipage document.  Are

3   you familiar with that document?

4   **A.**  Yes.

5   **Q.**  Can you tell us what 13A is and 13B is without going into

6   detail of its contents?

7   **A.**  13A are notes that are contained within the Offer in

8   Compromise file.  The person that is looking at the offers and

9   evaluating them, they often keep a note sheet in the file for

10  various activities taken related to the offer.  And 13B was the

11  second one.  It's correspondence indicating the acceptance or

12  the rejection of the offer.

13          **MR. BENSON:**  At this time I would move to admitted

14  Government's Exhibit 11, 12, 13A, and 13B into evidence,

15  please.

16          **THE COURT:**  Any objection?

17          **MR. BRACKETT:**  No objection.

18          **THE COURT:**  Government's Exhibit 11, Government 12,

19  Government 13A, and Government 13B are all admitted without

20  objection.

21          **MR. BENSON:**  Thank you.  I apologize for that

22  oversight earlier, Judge and counsel.

23  **BY MR. BENSON:**

24  **Q.**  Let's talk about Government's Exhibit 11.  This is

25  addressed to who?

1    **A.**  It's addressed to -- it would have been the representative

2    Daniel Pickart.  It was sent to him for his client, First

3    Federal Trust Mortgage.

4    **Q.**  And what is it basically talking about?

5    **A.**  It's an acknowledgment of the receipt of the Offer in

6    Compromise.

7    **Q.**  And that would have been the one you previously discussed,

8    correct?

9    **A.**  Correct, the 656.

10   **Q.**  It says:  "Attached is a copy of the correspondence we sent

11   your client."  I would like to show you the attachment.  The

12   first page of that attachment, what is this document generally?

13   **A.**  It's kind of like a guideline as to what needs to be done

14   for the IRS to consider the Offer in Compromise.  And it spells

15   it out, like in here they are calling out the fact that you

16   have not filed the following required returns.

17   **Q.**  So tell me -- tell the jury, why does that matter?

18   **A.**  If the IRS was to accept an Offer in Compromise without

19   exercising some degree of due diligence in looking for other

20   outstanding liabilities that the individual or the entity

21   seeking the Offer in Compromise may have, it would cause the

22   offer to fail because one of the requirements to filing an

23   Offer in Compromise is that the individual or the entity has to

24   have all required tax returns filed with the IRS.  I guess for

25   a better choice of terms, it would be a nonstarter.

1  **Q.**  So let's back up.  This Offer in Compromise is sent out.

2  Do I have to -- it wouldn't make any sense --I wouldn't have to

3  have paid all my back taxes, but I must have filed at least the

4  paperwork saying what I owe?

5  **A.**  So the IRS can get a clear and complete picture of what the

6  entity of individual's true tax liability is as of the date

7  that they're seeking the Offer in Compromise.

8  **Q.**  And why are they saying they can't accept this Offer in

9  Compromise?

10  **A.**  Well, this gets into the process with the Offer in

11  Compromise that what the offer specialist will do upon receipt

12  of the Offer in Compromise, what they will --

13  **Q.**  Let me rephrase my question.  They are saying that we

14  received your Offer in Compromise, but we can't evaluate it.

15  Why can't they evaluate it yet?

16  **A.**  Their research would reveal that this entity had unfiled

17  tax returns.

18  **Q.**  So they haven't really declared what they owe yet, so you

19  can't compromise on something you don't know what it is?

20  **A.**  Right.

21  **Q.**  Okay.  And in this case, what did they have to file that

22  they hadn't yet?

23  **A.**  In this correspondence, they indicated that First Financial

24  Trust Mortgage had yet to file a Form 940 for the calendar year

25  ending December 31, 2009.  Also, they had indicated that they

1   had failed to file quarterly payroll tax returns for the

2   quarters ending March 31, 2009; September 30, 2007;

3   September 30, 2009; and December 31, 2009.

4            And their research also revealed that First

5   Financial Trust had failed to file corporate tax return

6   Form 1120-S for the calendar years 2006, 2007, and 2008.  And

7   all of this was as of April 2010 when the offer was submitted.

8   **Q.**  So that letter goes out in April of 2010.  Let's move

9   forward to Government's Exhibit 12, a letter dated 7/22/10.

10  Can you tell us what's going on here?

11           First of all, who is this from?

12  **A.**  This letter is also coming from the offer specialist who is

13  evaluating the Offer in Compromise.

14  **Q.**  To who?

15  **A.**  It is sent to the defendant and his wife, and it's in

16  regard to the individual Offer in Compromise tendered for their

17  individual income tax liabilities for the years 2005, 2006, and

18  2007.

19  **Q.**  What is it saying they have to do before it can be

20  considered?

21  **A.**  They are saying that in order for their individual offer to

22  be considered, they need to address the deficiencies with the

23  entity that is related to the defendant.

24  **Q.**  What entity is that?

25  **A.**  First Financial Trust Mortgage.

1   **Q.** So simply they are telling them: Hey, you got to file the

2   FFTM payroll returns before we can do anything?

3   **A.** Yes, they are indicating at the current time there is a

4   $74,000 balance owed to the IRS. And they also call out that

5   in the first paragraph, they indicate that Mr. Snyder is the

6   primary responsible party for a related entity that is not in

7   compliance with its filing and paying requirements, and that

8   related entity would be First Federal Trust Mortgage, LLC.

9   **Q.** And is it correct to say that because that isn't current,

10  they can't entertain that Offer in Compromise that we discussed

11  earlier from March of 2010?

12  **A.** That is correct.

13  **Q.** Let's move forward to September of 2010. I would like to

14  show you Government's Exhibit 13A. Can you tell us what's

15  going on here?

16  **A.** These are the internal notes that are contained within the

17  Offer in Compromise file. And it talks about, you know, what

18  the outstanding individual income tax liabilities were. It

19  talks about where Notice of Federal Tax Liens had been filed.

20  It talks about the recommendation on the offer, and in this it

21  says they're making the recommendation that the Offer in

22  Compromise be rejected.

23  **Q.** Let's stop for a second. There is a couple things in this

24  section, the tax liability. What's that for?

25  **A.** That basically indicates that as of September 8, 2010,

1    James and Deborah Snyder owed the IRS $12,009 for the calendar

2    year 2005; $26,501 for the calendar year 2006; and $2,341 for

3    the year 2007, all of which were their individual income tax

4    liabilities.

5    **Q.**  And that's of September 8, 2010?

6    **A.**  That is correct.

7    **Q.**  And how does that compare to the time frame in which he was

8    getting GVC payments?

9    **A.**  At this date, he had been an employee of GVC Mortgage now.

10   Considering his employment started in January 2010, he had been

11   an employee of GVC Mortgage for eight months.

12   **Q.**  And is that the same time frame in which these payments of

13   FFTM's debt are being paid to SRC by GVC?

14   **A.**  Correct.

15   **Q.**  And what does it say here in the handwritten section?

16   **A.**  This was basically --

17   **Q.**  What does it say?

18   **A.**  It says -- it says that they reviewed it, and they

19   concurred with the decision to reject the Offer in Compromise.

20   "It is determined that acceptance of this offer would not be in

21   the best interest of the government."

22   **Q.**  And Government's Exhibit 13B, a letter dated September 8th,

23   let's go ahead and take a look at that.  What is this?

24   **A.**  It is the formal rejection letter for the individual Offer

25   in Compromise.  And within the letter, they state the reason.

1   "We are rejecting the offer for the following reason:  We have

2   determined that acceptance of your offer would not be in the

3   best interest of the government."

4   **Q.**  And then it goes on to tell them how they can appeal this,

5   right?

6   **A.**  Correct.

7   **Q.**  Now, Agent Hatagan, you indicated earlier that you had

8   uncovered information that at the time the defendant entered

9   into this Offer in Compromise, failing to disclose his

10  employment with GVC, that you had documents showing that he was

11  employed, correct?

12  **A.**  That's correct.

13  **Q.**  The following items have not been admitted into evidence.

14  I'd like to have you take a look at what's been marked for

15  identification as Government's Exhibit 14A, 14B, and 14C.

16          14A, generally what is that without going into the

17  contents?

18  **A.**  It's an Employment Agreement for GVC Mortgage.

19  **Q.**  And the time frame of that is shortly before the Offer in

20  Compromise was submitted, correct?

21  **A.**  Yes.

22  **Q.**  And Government's Exhibit 14B?

23  **A.**  Is W-4 Form.

24  **Q.**  For who?

25  **A.**  It's for the defendant, James E. Snyder.

1  **Q.**  For what company?

2  **A.**  It was for GVC Mortgage.

3  **Q.**  And then Government's Exhibit 14C, can you tell us what

4  that is?

5  **A.**  It is a W-2 Form issued by GVC Mortgage for the calendar

6  year 2010 to the defendant James Snyder.

7  **Q.**  I'd like to show you a group exhibit, 15A through 15D.

8  Let's take a look, first of all, at 15A.  Generally, what is

9  this document?

10  **A.**  15A is a summary of wages that were paid to the defendant,

11  James Snyder, in the period of February 12 up to March 9th.

12  **Q.**  From what company?

13  **A.**  Wages that were paid to James Snyder by GVC Mortgage.

14  **Q.**  And 15B, what is that?

15  **A.**  15B is a signature card provided by Horizon Bank.  It's for

16  the bank account number ending in 84 -- I apologize -- it is

17  for the defendant's personal bank account No. 3208.

18  **Q.**  And then the multipage Exhibit 15C, what is that?

19  **A.**  They are bank statements for James and Deborah Snyder from

20  Horizon Bank for account number ending in 3208, and they're

21  going to be from the period 2/4/10 till April 2010.

22  **Q.**  And lastly, Government's Exhibit 15D, can you tell me what

23  this group exhibit is?

24  **A.**  They are deposits -- deposit items for Horizon Bank account

25  No. 8163208 held in the name of James and Deborah Snyder.

1    **Q.**  I'd like to have you take a look at government's exhibit

2    16A through C.  16A is what?

3    **A.**  16A is a Horizon Bank signature card for Horizon Bank

4    No. 8578437 held in the name of SRC Properties, LLC.

5    **Q.**  And Government's Exhibit 16B?

6    **A.**  They are Horizon Bank statements for the account for SRC

7    Properties, LLC, account number ending in 8437, and they are

8    going to cover the period of February 2010 through April 2010.

9    **Q.**  And then 16C, what is this group of exhibits?

10   **A.**  They are the checks that were issued by GVC Mortgage to SRC

11   Properties during the period February 4, 2010 through March 19,

12   2010.  They were deposited into the Horizon Bank account in the

13   name of SRC Properties ending in 8437.

14   **Q.**  And lastly Government's Exhibit 17A and B -- the second

15   page of Government's Exhibit 17A, can you tell us what this is?

16   **A.**  These are the records from the Indiana Secretary of State

17   that are for the formation of SRC Properties, LLC.

18   **Q.**  And lastly, Government's Exhibit 17B, what is this?

19   **A.**  They're documents related to the assumption of the business

20   name for SRC Properties.  It's for SRC Marketing and SRC

21   Properties, and it was filed on July 2, 2010.  It's basically

22   changing the name from SRC Properties to SRC Marketing.

23          **MR. BENSON:**  At this time I would move to admit

24   Government Exhibit 14A, 14B, 14C, 15A, 15B, 15C, 15D, 16A, 16B,

25   16C, 17A, and 17B, please.

1          **THE COURT:**  Any objection?

2          **MR. BRACKETT:**  Yes, Judge, just with Exhibit 15A,

3    authenticity.  It is the same issue we discussed at sidebar

4    earlier.

5          **MR. BENSON:**  I can ask a few more questions if that

6    will satisfy counsel and the Court.

7          **MR. BRACKETT:**  Maybe.

8          **THE COURT:**  Okay.

9    **BY MR. BENSON:**

10   **Q.**  Please take a look at 15A.  You said this is what?

11   **A.**  It's a summary of wages paid by GVC Mortgage to

12   James Snyder during the period February 2010 -- I'm sorry,

13   February 12, 2010 through March 19, 2010.

14   **Q.**  And does that come -- is that a summary of the contents of

15   15D, the checks?

16   **A.**  Yes.

17   **Q.**  And did you compare that summary with 15D to make sure it

18   is a true and accurate summary of the actual copies of the

19   checks that you have there?

20   **A.**  I have done the comparison and they are in agreement.

21          **MR. BENSON:**  I would now reoffer 15A, please.

22          **MR. BRACKETT:**  No objection to 15A, B, C, D; 16A, B,

23   C; or 17A and B.

24          **THE COURT:**  Okay.  Government's Exhibit 14A, 14B,

25   14C, 15A, 15B, 15C, 15D, 16A, 16B, 16C, 17A, and 17B are

1  admitted without objection.

2        **MR. BENSON:**  I'll be working with the exhibits that

3  have been admitted.  Can you please display to the jury.

4  **BY MR. BENSON:**

5  **Q.**  You mentioned earlier that the defendant had omitted

6  employment information on the Form 433-A, correct?

7  **A.**  That is correct.

8  **Q.**  Let's take a look at Government's Exhibit 14A.  Well, first

9  of all, let me back up here.  Let's take a look at 9A where it

10 says, "employment."  This is the Form 433-A.

11       The initials are on the bottom, correct?

12 **A.**  Correct.

13 **Q.**  And the date of signature is what?

14 **A.**  3/21/2010.

15 **Q.**  And the employment section lists what?

16 **A.**  It says for the taxpayer, which would be James Snyder, the

17 employment listed is First Financial Trust Mortgage, Inc.

18 **Q.**  I'd like to show you 14A.  Can you tell me what this is?

19 **A.**  It's an Employment Agreement entered into by James Snyder

20 with GVC Mortgage.  He entered into that Employment Agreement

21 on January 27, 2010.

22 **Q.**  And it's between GVC and the defendant?

23 **A.**  It is.

24 **Q.**  And what does it say?

25 **A.**  It says he's going to manage a branch office located at

1   5955 Central Avenue in Indiana.

2   **Q.**  And that address you were familiar with.  Were there any

3   other entities that Mr. Snyder was associated that also worked

4   out of that address?

5   **A.**  SRC Properties, SRC Marketing, Citizens for Snyder, First

6   Financial Trust Mortgage.

7   **Q.**  And this Employment Agreement with GVC, is it signed and

8   dated?

9   **A.**  It was.  It was signed by the defendant.

10  **Q.**  What does he list as his position?

11  **A.**  His position listed on this Employment Agreement is

12  president, and it was signed January 27, 2010.

13  **Q.**  The same date that's at the top, right?

14  **A.**  Correct.

15  **Q.**  And how long is that before he signs the Offer in

16  Compromise and fails to list GVC as employment?

17  **A.**  It was just a few days shy of two months prior to him

18  signing the 433-A.  The 433-A was signed on the 21st.  This was

19  signed on the 27th.

20  **Q.**  14B, what is that document?

21  **A.**  That's a W-4 Form tendered by the defendant Mr. Snyder to

22  GVC Mortgage.  It was signed and dated on February the 8th,

23  2010.  The employer's name listed on there was GVC Mortgage.

24  **Q.**  And lastly 14C, can you tell me what this is?

25  **A.**  W-2 Form issued to the defendant by GVC Mortgage for wages

1   earned in the calendar year 2010.

2   **Q.**  How much is the amount?

3   **A.**  In the calendar year 2010, the defendant received gross

4   wages in the amount of $141,891.27.

5   **Q.**  And none of that was disclosed -- any financial information

6   of GVC was disclosed on the Offer in Compromise, correct?

7   **A.**  It was not.

8           **THE COURT:**  Mr. Benson, would you start winding

9   down.  I want to quit for sure by 5:00.

10          **MR. BENSON:**  Yeah, if I could just get through two

11  more exhibits, that --

12          **THE COURT:**  That's fine.  Just start your winding

13  down.

14          **MR. BENSON:**  I will make sure I finish, Judge.

15  Thank you for the reminder.

16  **BY MR. BENSON:**

17  **Q.**  Now, regarding these GVCs, let's talk a little more about

18  Government's Exhibit 15A.  What does this represent?

19  **A.**  It represents paychecks that the defendant received from

20  GVC Mortgage.  The first one was dated February 2, 2010,

21  through March 19, 2010.

22  **Q.**  The March 19th check, how much was that for?

23  **A.**  The gross amount of that check was $2,274.24.

24  **Q.**  And going back to the signature line from Page 9A, what

25  happened just two days after defendant got a check from GVC for

1    $2,274?

2    **A.**   He signed the Form 433-A, and he signed the Form 656 in

3    which he represented he had no wages.

4    **Q.**   On both of those forms, there is no disclosure of GVC, is

5    there?

6    **A.**   No, there is not.

7    **Q.**   Now, in reviewing these records, were you able to determine

8    the checks from GVC and where they went that were written as

9    part of this summary?

10   **A.**   Yes.

11   **Q.**   What did you determine?

12   **A.**   They were deposited into his personal bank account at

13   Horizon Bank.  It was the account in his and his wife's name

14   ending in 3208.

15   **Q.**   Let's take a look at Government's Exhibit 15B, the

16   signature card from that.  Where is the account number you just

17   talked about?

18   **A.**   It's listed in the upper, left-hand -- we'll call it the

19   upper, left-hand corner.  It is in the center of the page,

20   left-hand side, at the top.  8163208 is the Horizon Bank

21   account number.

22   **Q.**   So that tells you that that's James Snyder and his wife's

23   personal account, right?

24   **A.**   Correct.

25   **Q.**   Now, you mentioned on that summary chart several checks the

1  defendant received right before he filled out the form for the

2  IRS.  Let's take a look at 15D.

3           Can you tell us what this is, the first page?

4  **A.**  Payroll check dated February 12, 2010.

5  **Q.**  From where?

6  **A.**  From GVC Mortgage.

7  **Q.**  To whom?

8  **A.**  Made payable to the order of James Snyder.

9  **Q.**  For how much?

10 **A.**  The met amount of that payroll check was $2,800.08.

11 **Q.**  Let's take a look at the second page of that exhibit,

12 another check.  First of all, there's something up top.  What

13 is that thing up top?

14 **A.**  That is what's referenced as a deposit ticket for Horizon

15 Bank account No. 8163208.

16 **Q.**  So that's the deposit ticket that the check went into the

17 defendant's account, right?

18 **A.**  That is correct.

19 **Q.**  And, once again, where is the check from?

20 **A.**  The check was issued by GVC Mortgage.

21 **Q.**  To who?

22 **A.**  Payable to the order of James Snyder.

23 **Q.**  What date?

24 **A.**  The date was February 19, 2010.

25 **Q.**  For how much?

1    **A.**   The net amount of the check was $3,384.28.

2    **Q.**   Take a look at the third page of that exhibit.  Can you

3    tell us what's going on here?

4           **MR. BRACKETT:**  Your Honor, this is an improper use

5    of a summary exhibit.  We've already went through 15A, which

6    summaries all this.  He can't go through both of them, present

7    the same evidence twice.

8           **THE COURT:**  Well, they're are both in evidence.  He

9    can --

10          **MR. BRACKETT:**  15A is a summary of 15B and C.

11          **THE COURT:**  Yeah, but he can't describe what's on

12   there?

13          **MR. BRACKETT:**  It is described on 15A, Your Honor,

14   so this is duplicative.

15          **THE COURT:**  What exhibit am I looking at?

16          **MR. BENSON:**  They're both in evidence.  I can talk

17   about anything in evidence, Judge.

18          **THE COURT:**  That's what I'm saying; they're in

19   evidence, correct?

20          **MR. BRACKETT:**  They have already been gone through,

21   yes, Judge.  This is duplicate testimony.  He has already asked

22   him about these checks.

23          **THE COURT:**  Okay.  Overruled.

24   **BY MR. BENSON:**

25   **Q.**   So what's going on here on the third page of Government's

1    Exhibit 15D?

2    **A.**   We have a check being deposited into Horizon Bank account

3    8163208 of which there is $200 cash back received from that

4    deposit.

5    **Q.**   And this check is from who?

6    **A.**   GVC Mortgage.

7    **Q.**   To whom?

8    **A.**   Made payable to James Snyder.

9    **Q.**   What's the date?

10   **A.**   The date of the check is February 26, 2010.

11   **Q.**   For how much?

12   **A.**   The net payroll check here is $3,583.63.

13   **Q.**   Let's move forward to the next page of that exhibit,

14   another check.  Where is this from?

15   **A.**   This check is from GVC Mortgage.

16   **Q.**   To who?

17   **A.**   It is made payable to James Snyder.

18   **Q.**   What's the date?

19   **A.**   The date of the check is March 12, 2010.

20   **Q.**   And how much is the amount for?

21   **A.**   The net payroll check is in the amount of $2,049.51.

22   **Q.**   And how many days is this before he signs the Offer in

23   Compromise?

24   **A.**   This would be nine days prior to the date the Offer in

25   Compromise was signed.

1    **Q.**  Let's move forward to the next page of that exhibit.  What

2    is this?

3    **A.**  It's a payroll check from GVC Mortgage.

4    **Q.**  For how much?

5    **A.**  The amount is $1,925.33.

6    **Q.**  Payable to who?

7    **A.**  It was made payable to James Snyder.

8    **Q.**  What's the date?

9    **A.**  The check was dated March 19, 2010.  It was also deposited

10   the same date, March 19, 2010.

11   **Q.**  And did the payment of these checks from GVC continue even

12   after the Offer in Compromise was filed?

13   **A.**  Yes.

14   **Q.**  Let's take a look at, for example, the last page of this

15   exhibit.  Who is this check from?

16   **A.**  It's a check from GVC Mortgage.

17   **Q.**  To who?

18   **A.**  Payable to James Snyder.

19   **Q.**  What's the date?

20   **A.**  The date of the check is March 26, 2010.

21   **Q.**  And for how much money?

22   **A.**  For $538.93.

23   **Q.**  And based upon your review of the records, is it fair to

24   say these payments continued on through the entire year?

25   **A.**  They did.

1   **Q.**  You also mentioned that on Government's Exhibit 9A -- for

2   the record, I'm showing the witness the second page of that

3   exhibit; this is the Offer in Compromise -- there was a section

4   entitled, "investments."  What, if anything, did you discover

5   should have been listed there that wasn't?

6   **A.**  The entity that's known as SRC, LLC, which was set up by

7   the defendant in September, 2009.

8   **Q.**  Did you discover any documents related to that that showed

9   the defendant's interest in SRC?

10  **A.**  The documents that would show the interest that the

11  defendant had in SRC came from the Indiana Secretary of State.

12  **Q.**  Did you also obtain bank records?

13  **A.**  We did.

14  **Q.**  And did those bank records and those documents in the State

15  show that he was an officer, director, owner, member, or

16  otherwise had a financial interest in SRC?

17  **A.**  They did.

18  **Q.**  Let's take a look at what has been admitted as 16A.  Can

19  you tell me what this is?

20  **A.**  It's a Horizon Bank signature card for Horizon Bank,

21  checking account 8578437, held in the name of SRC Properties,

22  LLC.

23  **Q.**  And they list it as what here?

24  **A.**  They list it as a limited liability company.  The business

25  is a mortgage company.  And it was -- the account was opened on

1  February 5, 2010.

2  **Q.**  2010, how does that relate -- 2010, how does this date

3  relate to the date it was left off the Offer in Compromise?

4  **A.**  This was a little bit more than -- it's about six weeks

5  prior to the signing of the Offer in Compromise.

6  **Q.**  And who was listed as the signatory on that account for

7  SRC, Properties?

8  **A.**  The account had one signatory listed.  It was James Snyder.

9  **Q.**  What's the address listed there for SRC Properties?

10  **A.**  The address given for SRC Properties, LLC was 5955 Central

11  Avenue, Portage, Indiana.

12  **Q.**  And that was for what other businesses associated with the

13  defendant?

14  **A.**  Other entities that were at 5955 Central Avenue were First

15  Financial Trust Mortgage, it was the Citizens for Snyder

16  campaign, and SRC.

17  **Q.**  I'd like to show you what has been admitted as 16B, a

18  couple bank statements.  Let's look at the first page.  What is

19  this?

20  **A.**  It is a bank statement from Horizon Bank for account

21  No. 8578437.  It's a checking account, and it is held in the

22  name of SRC Properties, LLC.  It starts with the date 2/5/2010,

23  which was the date the account was opened.

24  **Q.**  So that's a month before the Offer in Compromise?

25  **A.**  Yes.

1   **Q.**  And this is the bank statements that go along with that

2   signature card we saw for James Snyder, correct?

3   **A.**  Correct.

4   **Q.**  And there's some web transfers.  Can you tell us what's

5   going on there?

6   **A.**  There's web transfers being made to the Horizon Bank

7   account, which would be the first one listed for 2/9.  That

8   would be account No. 8360768 is the account that was held at

9   Horizon Bank for First Financial Trust Mortgage.  The second

10  one listed for February the 9th, which would be account

11  No. 8163208, are funds being transferred to the personal bank

12  account of James and Deborah Snyder held at Horizon Bank.

13  **Q.**  And this is for the month before the Offer in Compromise is

14  signed, correct?

15  **A.**  Yes.

16  **Q.**  I'd like to show you the second page of 16B.  What is this?

17  **A.**  That is a bank statement for SRC Properties, LLC, Horizon

18  Bank account No. 8578437.

19  **Q.**  Same account, right?

20  **A.**  Same account.

21  **Q.**  For what date?  For what period?

22  **A.**  It covers the period 2/28/10, through 3/31 -- think it's at

23  the top right.  I can't see it on that.  It's through 3/31/10.

24  **Q.**  And what does it show going on in this account in this

25  month, the month that the Offer in Compromise is signed?

1  **A.**   In the first section it shows a series of monies being

2  transferred either to the account of First Financial Trust

3  Mortgage or to the personal account of James and Deborah

4  Snyder.

5  **Q.**   And we've got a bunch of web transfers.  They look like

6  there's a 0768 and 3268.  What is 0768 account again?

7  **A.**   0768 is the Horizon Bank account that was held by First

8  Financial Trust Mortgage.

9  **Q.**   So this is money going from --

10  **A.**   It's going from SRC to First Financial Trust Mortgage.

11  **Q.**   And the 3208?

12  **A.**   That would be the defendant's personal Horizon Bank

13  account, so it would be money going from SRC to the personal

14  bank account held by the defendant and his wife at Horizon

15  Bank.

16  **Q.**   And as a matter of fact, there's a web transfer two days

17  before the Offer in Compromise, correct?

18  **A.**   That is correct, on March 19th.

19  **Q.**   And what does that depict?  What is that web transfer?

20  What's going on?

21  **A.**   It is a transfer of $1,950 from SRC to First Financial

22  Trust Mortgage.

23  **Q.**   And lastly, I will show you what has been admitted as

24  Government's Exhibit 16C.  Can you tell us what these are?

25  **A.**   These are checks issued by GVC Mortgage to SRC Properties.

1    It would be during the period February 4, 2010, through March

2    19, 2010.

3    **Q.**  And this is for the month, or two months actually,

4    preceding the Offer in Compromise, correct?

5    **A.**  That is correct.

6    **Q.**  And was SRC, the company that the defendant owned,

7    disclosed anywhere on that first Offer in Compromise from March

8    21st, 2010?

9    **A.**  It was not.

10   **Q.**  Let's take a look at some of these checks.  What's the date

11   and the amount?

12   **A.**  First check we have here is dated February 4, 2010, and

13   it's in the amount of $5,000.

14   **Q.**  And what is the second page here?

15   **A.**  That's the deposit ticket for the SRC Horizon Bank account

16   ending in 8437.

17   **Q.**  What's the next document?

18   **A.**  This is a transfer coming from the -- it's going into the

19   SRC Properties account, which is $3,500 coming from the First

20   Financial Trust Mortgage account ending 0768 and $1,000 coming

21   from the defendant's personal bank account ending in 3208.

22   **Q.**  So next one?

23   **A.**  It's a deposit of a check from GVC Mortgage made payable to

24   SRC Properties.  It's check No. 1002, and it was in the amount

25   of $5,118.66.

1    **Q.**  Let's take a look at another check from that exhibit.

2    What's the date and what's the amount?

3    **A.**  Check No. 1003.  It's dated February 18, 2010.  It's from

4    GVC Mortgage made payable to SRC Properties.  It's in the

5    amount of $13,904.07.

6    **Q.**  Another check from about a month before the Offer in

7    Compromise, what's the date and the amount?

8    **A.**  It's check No. 1004 issued by GVC Mortgage.  The check is

9    dated February 25th, 2010, made payable to SRC Properties in

10   the amount of $16,765.78.

11   **Q.**  Moving on to March, the month of the Offer in Compromise,

12   what's the date and the amount of this check?

13   **A.**  Check No. 1005 dated March 5th, 2010, from GVC Mortgage to

14   SRC Properties.  The amount of the check is $3,910.03.

15   **Q.**  The next item in that exhibit, what is the date and amount

16   of that check?

17   **A.**  It is check No. 1008 dated March 18th, 2010, from GVC

18   Mortgage to SRC Properties.  The amount of the check is

19   $1,588.40.

20   **Q.**  And I believe you said these payments continued even after

21   -- well after the Offer in Compromise, correct?

22   **A.**  They continued up and to a point to SRC Properties, and

23   then they started being made payable to SRC Marketing.

24   **Q.**  And what's the date of this one?

25   **A.**  This is check No. 1009 dated March 25th, 2010, from GVC

1    Mortgage to SRC Properties, and it's in the amount of

2    $5,397.95.

3    **Q.**  In addition to the bank account signature card showing that

4    Mr. Snyder controlled SRC, you said you obtained documents from

5    the State of Indiana; is that correct?

6    **A.**  That is correct.

7    **Q.**  Let's take a look at what has been admitted as 17A.  Can

8    you tell us what this is?

9    **A.**  It's a Certificate of Organization for SRC Properties, and

10   it was dated September 14, 2009.

11   **Q.**  Going to the second page of that document, what does this

12   document tell us about SRC?

13   **A.**  It tells us that the principal office for SRC Properties is

14   5955 Central Avenue in Portage, Indiana.  It lists the

15   registered office and agent as James Snyder with an address of

16   5955 Central Avenue, Portage, Indiana.  It says that this is

17   effective 9/4/09.

18   **Q.**  Stop right there.  The effective date, is that before or

19   after the IRS had issued levies for FFTM?

20   **A.**  It was two months subsequent to the IRS levy notice.

21   **Q.**  So FFTM gets levied, and two months later SRC Properties is

22   created, correct?

23   **A.**  That is correct.

24   **Q.**  And who does it say it would be managed by, or who will the

25   entity be managed by?

1    **A.**  It says it will be managed by the members, and it contains

2    the electronic signature of James Snyder.

3    **Q.**  And then Government's Exhibit 17B, some more documents from

4    the Secretary of the State of Indiana, can you tell us what

5    this is?

6    **A.**  It's as of -- and this -- as of July 2, 2010, it says that

7    they are going to change the name from SRC Properties, LLC to

8    SRC Marketing, LLC.

9    **Q.**  And the second page of that document is what?

10   **A.**  It's a certificate of the assumed business name.  And it

11   says, "SRC Properties," and it's going -- they're assuming the

12   name of SRC Marketing, LLC.

13   **Q.**  And that request is made when?

14   **A.**  That is made --

15   **Q.**  Let me show you the first page.

16   **A.**  -- July 2, 2010.

17              **THE COURT:**  Mr. Benson, can we stop for the day?

18              **MR. BENSON:**  Yes, Your Honor.  That's fine.

19              **THE COURT:**  Mr. Hatagan, you can step down if you

20   want to.

21              Ladies and gentlemen of the jury, I'm going to read

22   the recess instruction for the evening.  During this recess and

23   all other recess, you must not discuss this case with anyone.

24   This includes your family, other jurors, and anyone else

25   involved in the trial.  Do not watch or listen to any news

1    reports concerning this trial on television or on the radio,

2    and do not read any news accounts of this trial in the

3    newspaper or on the internet, if any.  Do not conduct any

4    independent research about this case, the matters in the case,

5    and the individuals involved in the case.

6          In other words, you should not consult dictionaries

7    or reference materials, search the internet, websites, blogs,

8    or use any other electronic tools to obtain information about

9    this case or help you decide the case.  Please do not try to

10   find out information from any source outside the confines of

11   this courtroom.

12          You are required to keep an open mind until you have

13   heard all the evidence in this case, the closing arguments of

14   counsel, and the final instructions of law by the Court.

15          Leave your notebooks on your chairs when you leave.

16   Leave them on the chairs here.  They will be out there for you

17   tomorrow morning.  Have a good evening.  It's 9:00 o'clock

18   tomorrow.  Hopefully I'll make it.

19     (Jury out at 4:53 p.m.)

20     **THE COURT:**  Let me ask one question of the

21   attorneys.  Was there any attempt to try to stipulate to

22   admissibility of these documents?  I mean, the objections have

23   been to a couple documents appear to be different than what you

24   have, and those were explained.  We spent a lot of time on

25   documents that there was no objection at the end of the day to

 1   their admissibility.  I'm just asking was there any attempt to

 2   try --

 3        **MR. BENSON:**  We provided certified copies -- Judge,

 4   with all due respect, if they're objecting, it's not really the

 5   authentication that takes long.  We've got to go through

 6   them --

 7        **THE COURT:**  No, I understand that.  We spent time --

 8   if they'd have already been stipulated into evidence, we would

 9   have saved the time of that part of it.  He would then go into

10   talking about it.

11        **MR. BENSON:**  We're still trying to get a stipulation

12   as to the interstate nexus, which we haven't had a response to,

13   Judge, so we can only offer.

14        **MR. HADLEY:**  We did stipulate to that, Your Honor --

15        **MR. BENSON:**  To the interstate nexus?

16        **THE COURT:**  Wait.  You've got to go one at a time.

17   It's late in the day.  She's having trouble hearing.  You have

18   to be in front of a microphone too.

19        **MR. HADLEY:**  Was that about the City of Portage

20   receiving a certain number --

21        **MS. KOSTER:**  Right.  I thought you said you were

22   going to get back to you --

23        **THE COURT REPORTER:**  Mr. Hadley, I need you to

24   please use a microphone.

25        **MR. HADLEY:**  I'm sorry.  I don't think this is on.

1    We stimulated to that months ago.

2         **MR. BENSON:**  Did we receive a signed stipulate with

3    your and your client's signature.  If we did, we apologize for

4    misplacing it.  Was that sent over.

5         **MS. CACIOPPO:**  It was never sent to us.  It was a

6    request.  We said yes.  And during preparation for trial, we

7    did not receive any request for stipulation, but if it's fair,

8    we would have been very willing to --

9         **MS. KOSTER:**  Well, that's good news.

10         **THE COURT:**  Wait a minute.  Anyway, I've made my

11    point.  If you don't want to, you don't have to.  It would be

12    nice if you would.  I will see you tomorrow morning at

13    9:00 o'clock.

14    (Proceedings adjourned at 4:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

*CERTIFICATION*

2

3       I, ASHLEY N. STOKES, Federal Court Reporter, certify
that the foregoing is a correct transcript from the record of
4   proceedings in the above-entitled matter.

5

6

7       S:/Ashley N. Stokes_____ January 30, 2019
        Certified Realtime Reporter
8       United States District Court
        Northern District of Indiana
9       Hammond Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,000** [3] - 17:24, 184:23, 214:20
**$1,500** - 156:24
**$1,588.40** [1] - 215:19
**$1,925.33** [1] - 209:5
**$1,950** [1] - 213:21
**$1.125** [4] - 13:6, 22:21, 52:8, 52:10
**$10,000** [2] - 32:8, 70:17
**$100** [2] - 174:11, 175:5
**$100,000** [2] - 39:10, 63:11
**$107,000** [1] - 156:11
**$107,523** [2] - 158:10, 175:4
**$11,000** [1] - 151:25
**$11,176** [1] - 151:19
**$110,000** [2] - 15:1, 174:13
**$111,526** [1] - 156:6
**$112** [3] - 19:24, 40:17
**$12,000** [4] - 13:13, 13:17, 30:16, 34:22
**$12,009** [1] - 197:1
**$13,000** [12] - 13:8, 13:17, 23:5, 23:14, 23:22, 29:22, 35:1, 62:3, 63:10, 64:2, 154:10, 154:11
**$13,904.07** [1] - 215:5
**$138,000** [1] - 182:3
**$14,704.74** [1] - 151:22
**$140** [1] - 42:7
**$141,891.27** [1] - 204:4
**$150** [1] - 39:16
**$150,000** [1] - 28:3
**$16,765.78** [1] - 215:10
**$2,000** [8] - 67:3, 67:10, 67:13, 67:15, 70:11, 70:12, 151:24, 175:14
**$2,049.51** [1] - 208:21
**$2,100** [1] - 151:24
**$2,250** [1] - 166:6
**$2,274** [1] - 205:1
**$2,274.24** [1] - 204:23
**$2,341** [1] - 197:2
**$2,800.08** [1] - 266:10
**$200** [1] - 208:3
**$200,000** [2] - 22:6, 26:6
**$21,000** [1] - 149:15
**$21,315.76** [1] - 149:7

**$21,751** [1] - 151:17
**$21,751.33** [1] - 151:21
**$250,000** [1] - 22:6
**$26,501** [1] - 197:2
**$3,000** [1] - 166:1
**$3,384.28** [1] - 207:1
**$3,500** [1] - 214:19
**$3,583.63** [1] - 208:12
**$3,910.03** [1] - 215:14
**$30,000** [1] - 63:10
**$31,369** [1] - 17:18
**$326,000** [1] - 20:13
**$35,000** [3] - 52:14, 52:21, 62:4
**$40,000** [2] - 17:22, 17:24
**$400,000** [1] - 20:14
**$5,000** [3] - 17:14, 188:24, 214:13
**$5,118.66** [1] - 214:25
**$5,397.95** [1] - 216:2
**$50,000** [1] - 60:21
**$538.93** [1] - 209:22
**$6,000** [2] - 30:16, 30:19
**$60,000** [1] - 28:22
**$7,000** [2] - 151:23
**$74,000** [1] - 196:4
**$750** [1] - 166:7
**$83,101.02** [1] - 153:14
**$85,000** [1] - 39:11
**$97,000** [6] - 14:25, 15:21, 17:5, 17:13, 154:25, 155:1
**$97,429.18** [1] - 154:7

**'**

**'06** [3] - 177:7, 183:23, 185:11
**'07** [2] - 177:7, 183:23
**'94** [1] - 128:10

**0**

**0768** [5] - 157:16, 213:6, 213:7, 214:20

**1**

**1** [14] - 3:14, 34:21, 81:8, 81:12, 81:18, 82:20, 82:21, 83:2, 83:20, 90:10, 97:12, 98:7, 129:14, 171:20
**1/7** [1] - 156:24
**10** [4] - 33:2, 95:1, 128:6, 158:18

**100** [2] - 42:20, 188:5
**1002** [1] - 214:24
**1003** [1] - 215:3
**1004** [1] - 215:8
**1005** [1] - 215:13
**1006** [2] - 131:8, 132:10
**1008** [1] - 215:17
**1009** [1] - 215:25
**102** [1] - 3:8
**1040** [3] - 91:19, 97:6, 98:16
**1065** [1] - 97:6
**10A** [6] - 3:18, 170:10, 170:11, 171:5, 171:7, 187:9
**10A-B** [1] - 3:18
**10B** [5] - 170:15, 170:16, 171:5, 171:8, 188:19
**10th** [1] - 190:22
**11** [13] - 2:3, 3:19, 86:1, 90:10, 95:2, 171:2, 190:23, 191:3, 191:7, 191:9, 192:14, 192:18, 192:24
**11/30/09** [1] - 154:2
**111,000** [2] - 158:9, 175:4
**112** [1] - 40:19
**1120** [2] - 97:6, 98:16
**1120-F** [1] - 97:6
**1120-S** [1] - 195:6
**117** [1] - 3:8
**11:16** [2] - 73:22, 73:25
**11:35** [1] - 74:2
**11:37** [1] - 74:11
**12** [10] - 3:3, 3:19, 191:17, 192:14, 192:18, 195:9, 199:11, 201:13, 206:4, 208:19
**12/31/08** [2] - 148:7, 148:9
**122** [1] - 3:9
**124** [1] - 3:10
**12:30** [2] - 73:12, 73:15
**12:41** [2] - 118:19, 118:23
**12:45** [1] - 118:21
**13** [5] - 14:20, 86:14, 128:8, 146:1, 159:17
**138** [1] - 3:15
**139** [1] - 3:16
**13A** [7] - 3:20, 191:24, 192:5, 192:7, 192:14, 192:19,

**196**:14
**13A-B** [1] - 3:20
**13B** [6] - 192:2, 192:5, 192:10, 192:14, 192:19, 197:22
**13th** [1] - 14:20
**14** [3] - 87:23, 87:25, 216:10
**142** [1] - 3:16
**143** [1] - 3:17
**144** [1] - 3:17
**14A** [8] - 3:20, 88:1, 198:15, 198:16, 200:24, 201:24, 202:8, 202:18
**14A-C** [1] - 3:20
**14B** [5] - 198:15, 198:22, 200:24, 201:24, 203:20
**14C** [5] - 198:15, 199:3, 200:24, 201:25, 203:24
**15** [11] - 1:5, 31:6, 48:11, 73:14, 73:21, 73:24, 88:7, 95:8, 124:20, 175:23, 176:1
**150** [4] - 29:12, 60:6, 60:12, 60:19
**150-day** [2] - 29:8, 60:13
**1500** [2] - 1:14, 175:16
**15A** [14] - 3:21, 199:7, 199:8, 199:10, 200:24, 201:2, 201:10, 201:21, 201:22, 201:25, 204:18, 207:5, 207:10, 207:13
**15A-D** [1] - 3:21
**15B** [6] - 199:14, 199:15, 200:24, 201:25, 205:15, 207:10
**15C** [3] - 199:18, 200:24, 201:25
**15D** [8] - 199:7, 199:22, 200:24, 201:15, 201:17, 201:25, 206:2, 208:11
**16** [2] - 88:12, 95:8
**1605** [1] - 2:7
**16A** [8] - 3:21, 200:2, 200:3, 200:24, 201:22, 201:25, 210:18
**16A-C** [1] - 3:21
**16B** [5] - 200:5, 200:24, 201:25, 211:17, 212:16

**16C** [4] - 200:9, 200:25, 201:25, 213:24
**17** [1] - 89:4
**171** [2] - 3:18, 3:18
**17A** [7] - 3:22, 200:14, 200:15, 200:25, 201:23, 201:25, 216:7
**17A-B** [1] - 3:22
**17B** [5] - 168:23, 200:18, 200:25, 201:25, 217:3
**18** [2] - 89:8, 215:3
**18th** [1] - 215:17
**19** [7] - 200:11, 201:13, 204:21, 206:24, 209:9, 209:10, 214:2
**192** [3] - 3:19, 3:19, 3:20
**19th** [2] - 204:22, 213:18
**1:45** [1] - 118:21
**1:46** [1] - 118:25
**1:49** [1] - 120:3
**1A** [1] - 94:20

**2**

**2** [16] - 1:8, 20:2, 83:25, 94:16, 98:11, 149:14, 167:7, 168:24, 169:3, 171:19, 173:5, 177:25, 200:21, 204:20, 217:6, 217:16
**2.5** [1] - 17:24
**2/28/10** [1] - 212:22
**2/4/10** [1] - 199:21
**2/5/2010** [1] - 211:22
**2/9** [1] - 212:7
**20** [2] - 89:17, 153:24
**2000** [1] - 45:8
**2004** [1] - 128:10
**2005** [11] - 17:16, 144:5, 166:22, 170:8, 177:7, 183:23, 184:24, 185:11, 185:12, 195:17, 197:2
**2006** [18] - 17:17, 128:7, 128:8, 144:5, 151:10, 152:25, 153:3, 153:5, 166:22, 170:9, 181:22, 184:24, 185:12, 188:22, 189:4, 195:6,

195:17, 197:2
**2007** [19] - 14:17,
17:17, 41:5, 46:5,
46:11, 46:14, 46:20,
57:22, 137:6, 144:5,
151:16, 166:23,
170:9, 184:25,
185:11, 195:2,
195:6, 195:18, 197:3
**2008** [8] - 14:17, 41:5,
46:20, 82:5, 84:22,
109:11, 148:9, 195:6
**2009** [41] - 14:17,
14:20, 14:24, 14:25,
17:16, 17:18, 41:5,
109:11, 139:1,
139:17, 140:25,
146:1, 148:17,
150:16, 151:24,
152:9, 153:10,
153:23, 154:4,
154:9, 154:25,
155:6, 156:1, 156:2,
158:12, 158:22,
159:9, 159:14,
159:17, 168:5,
168:6, 188:23,
189:5, 194:25,
195:2, 195:3, 210:7,
216:10
**201** [4] - 3:20, 3:21,
3:21, 3:22
**2010** [71] - 13:3, 15:24,
16:13, 17:20, 18:10,
20:7, 142:13,
158:18, 158:19,
167:21, 167:25,
168:6, 168:12,
169:9, 169:23,
170:1, 170:20,
174:21, 174:25,
180:3, 180:5,
189:12, 189:13,
189:21, 190:21,
195:7, 195:8,
196:11, 196:13,
196:25, 197:5,
197:10, 199:6,
199:21, 200:8,
200:11, 200:12,
200:21, 201:12,
201:13, 202:21,
203:12, 203:23,
204:1, 204:3,
204:20, 204:21,
206:4, 206:24,
208:10, 208:19,
209:9, 209:10,
209:20, 211:1,
211:2, 214:1, 214:2,
214:8, 214:12,

215:3, 215:9,
215:13, 215:17,
215:25, 217:6,
217:16
**2011** [6] - 19:9, 20:7,
26:19, 49:6, 49:8,
137:6
**2012** [12] - 20:7, 21:24,
22:9, 26:18, 26:19,
49:10, 67:15, 70:12,
82:7, 84:24, 93:2,
142:13
**2013** [6] - 13:3, 20:2,
20:7, 21:25, 22:9,
26:21
**2014** [4] - 23:21,
26:25, 126:7, 128:21
**2015** [1] - 66:10
**2016** [5] - 13:9, 30:4,
33:2, 42:9, 66:18
**2019** [2] - 1:5, 221:7
**20s** [4] - 45:11, 46:5,
50:4, 50:6
**21** [10] - 23:21, 150:16,
167:20, 167:25,
174:21, 174:24,
180:3, 180:5,
189:22, 190:21
**215** [1] - 60:11
**219** [3] - 1:15, 2:8,
152:5
**21st** [3] - 190:22,
203:18, 214:8
**236-1313** [1] - 2:4
**24** [4] - 139:1, 151:24,
152:9, 153:10
**25** [4] - 75:25, 76:9,
103:18, 114:1
**25633** [1] - 130:1
**25th** [2] - 215:9,
215:25
**26** [3] - 115:4, 208:10,
209:20
**27** [4] - 15:24, 46:9,
202:21, 203:12
**27th** [1] - 203:19
**29** [1] - 17:18
**2:16-cr-160** [1] - 1:3
**2A** [12] - 3:15, 81:12,
81:25, 82:2, 82:20,
82:21, 83:2, 83:13,
83:14, 83:20, 85:23,
88:11
**2A-B** [1] - 3:15
**2B** [13] - 81:12, 81:25,
82:2, 82:20, 82:22,
82:23, 83:2, 83:13,
84:24, 93:1, 93:20,
94:22, 96:3

## 3

**3** [6] - 34:25, 82:8,
82:20, 82:24, 93:12,
99:12
**3/21/2010** [1] - 202:14
**3/31** [1] - 212:22
**3/31/10** [1] - 212:23
**30** [13] - 14:24, 57:20,
113:17, 115:12,
116:16, 116:21,
139:17, 153:5,
154:4, 154:25,
195:2, 195:3, 221:7
**30-plus** [1] - 77:4
**30-year** [1] - 114:21
**31** [12] - 75:21, 151:9,
151:16, 152:25,
156:2, 188:22,
189:4, 189:5,
194:25, 195:2, 195:3
**317** [2] - 1:20, 2:4
**31st** [2] - 148:17,
148:18
**32** [3] - 58:15, 124:16,
124:17
**3208** [9] - 155:15,
157:16, 157:23,
174:4, 199:17,
199:20, 205:14,
213:11, 214:21
**3268** [1] - 213:6
**32nd** [1] - 124:13
**34** [1] - 3:4
**3500** [1] - 1:19
**38,000** [1] - 53:23
**3:15** [2] - 175:24,
176:2
**3:35** [1] - 176:4
**3:37** [1] - 176:19

## 4

**4** [21] - 3:15, 35:10,
37:15, 85:24, 92:21,
129:19, 135:10,
137:20, 138:13,
138:16, 145:3,
145:17, 149:12,
150:3, 159:16,
184:14, 184:15,
185:5, 200:11,
214:1, 214:12
**4,000** [2] - 156:7,
158:9
**40,000** [1] - 60:21
**401(k** [3] - 28:4, 86:18,
177:13
**433** [1] - 187:2
**433-A** [57] - 19:9,

19:12, 20:4, 78:18,
78:20, 79:8, 79:17,
80:14, 80:16, 80:21,
80:23, 81:2, 82:2,
82:4, 82:6, 94:24,
96:6, 97:16, 99:22,
99:23, 104:20,
105:5, 105:22,
106:5, 106:13,
106:21, 106:23,
108:8, 109:1,
109:21, 110:3,
111:6, 111:11,
111:23, 112:3,
112:23, 113:6,
115:14, 116:8,
116:17, 117:2,
169:18, 170:24,
172:1, 174:21,
177:3, 183:13,
184:10, 184:11,
187:7, 187:8, 202:6,
202:10, 203:18,
205:2
**433-As** [3] - 84:17,
107:6, 107:9
**433-B** [10] - 78:19,
79:20, 82:12, 91:21,
93:6, 93:7, 93:13,
99:22, 184:10, 187:6
**45** [1] - 89:17
**46204** [2] - 1:20, 2:3
**46320** [1] - 1:14
**46368** [1] - 2:7
**4:30** [2] - 176:9
**4:53** [1] - 218:19
**4:55** [1] - 220:14
**4A** [1] - 89:17

## 5

**5** [6] - 3:2, 91:10,
129:14, 158:18,
168:12, 211:1
**5.15** [1] - 17:14
**50** [3] - 44:21, 163:23,
163:25
**52** [1] - 183:11
**54** [2] - 183:1, 183:11
**5400** [1] - 1:14
**56** [1] - 182:24
**5955** [10] - 14:5, 15:8,
162:19, 163:3,
163:16, 203:1,
211:10, 211:14,
216:14, 216:16
**5:00** [3] - 176:9,
176:10, 204:9
**5A** [7] - 3:16, 138:20,
139:9, 139:11,

150:11, 152:12,
154:9
**5B** [7] - 139:14,
139:15, 139:16,
140:15, 154:3,
154:9, 154:13
**5th** [1] - 215:13

## 6

**6** [4] - 91:10, 92:22,
140:18, 141:1
**60** [1] - 44:21
**610** [2] - 54:19, 54:23
**6331(b** [1] - 146:16
**656** [27] - 80:14, 80:18,
81:2, 81:24, 97:8,
97:10, 97:12,
100:19, 101:3,
101:13, 101:18,
101:19, 170:21,
172:4, 183:15,
183:20, 184:7,
184:19, 186:7,
186:8, 187:1, 187:3,
187:12, 188:16,
189:19, 193:9, 205:2
**6A** [14] - 3:16, 129:24,
130:17, 131:11,
140:19, 141:16,
142:6, 155:3,
156:23, 156:24,
158:5, 175:1,
182:14, 182:18
**6A-C** [1] - 3:16
**6B** [12] - 132:11,
141:1, 141:10,
141:13, 142:6,
156:15, 156:16,
156:17, 156:23,
157:6, 157:24
**6C** [6] - 132:11, 141:1,
141:10, 141:13,
142:6, 157:18

## 7

**7** [3] - 101:8, 142:19,
156:1
**7/13/09** [1] - 148:15
**7/22/10** [1] - 195:9
**7/24/09** [1] - 154:1
**7/24/2009** [1] - 152:19
**700** [1] - 166:12
**713-3500** [1] - 1:20
**7212** [1] - 115:4
**75** [1] - 3:7
**764-0100** [1] - 2:8
**7801** [1] - 102:5
**7840** [1] - 150:4
**7A** [14] - 3:17, 142:9,

143:8, 143:9, 143:11, 143:13, 158:14, 158:16, 161:6, 161:9, 161:22, 168:10, 174:17, 189:19
**7A-C** [1] - 3:17
**7B** [12] - 142:19, 142:20, 142:22, 143:8, 143:9, 143:13, 144:6, 144:7, 161:1, 162:9, 165:19, 190:11
**7C** [8] - 142:20, 143:4, 143:13, 161:1, 162:9, 162:15, 165:13

## 8

**8** [5] - 129:14, 129:19, 135:10, 196:25, 197:5
**8/10** [1] - 175:15
**8/3/09** [1] - 175:13
**8/5/09** [2] - 174:19, 175:5
**80** [4] - 39:10, 39:11, 153:23, 155:10
**8163208** [6] - 156:19, 199:25, 205:20, 206:15, 208:3, 212:11
**83** [2] - 3:14, 3:15
**83,000** [1] - 152:6
**8360768** [1] - 212:8
**84** [1] - 199:16
**8437** [3] - 200:7, 200:13, 214:16
**8578437** [4] - 200:4, 210:21, 211:21, 212:18
**8A** [8] - 3:17, 143:21, 144:13, 144:16, 144:19, 144:21, 166:16, 167:5
**8A-B** [1] - 3:17
**8B** [9] - 144:8, 144:11, 144:16, 144:17, 144:21, 167:1, 167:2, 167:6, 167:8
**8th** [2] - 197:22, 203:22

## 9

**9** [4] - 85:15, 95:1, 124:17, 128:6
**9/4/09** [1] - 216:17
**937-5500** [1] - 1:15
**940** [2] - 98:23, 194:24

**941** [6] - 98:19, 147:9, 147:11, 147:14, 150:20, 189:2
**941s** [1] - 151:5
**97,000** [1] - 155:22
**990** [1] - 97:6
**9:00** [2] - 218:17, 220:13
**9:07** [1] - 4:2
**9:23** [1] - 5:10
**9A** [11] - 3:18, 168:23, 169:11, 171:4, 171:7, 171:23, 176:25, 177:19, 202:9, 204:24, 210:1
**9A-B** [1] - 3:18
**9B** [6] - 170:5, 170:7, 171:5, 171:7, 183:17
**9th** [2] - 199:11, 212:10

## A

**a.m** [6] - 4:2, 5:10, 73:22, 73:25, 74:2, 74:11
**abandon** [2] - 107:15, 108:9
**abated** [1] - 149:24
**ability** [7] - 34:15, 42:8, 66:13, 87:19, 102:15, 103:10, 165:8
**able** [12] - 48:13, 50:11, 60:15, 72:17, 89:13, 94:5, 136:1, 182:5, 185:10, 185:17, 189:2, 205:7
**above-entitled** [1] - 221:4
**absolute** [1] - 37:19
**absolutely** [5] - 55:18, 57:1, 115:12, 115:24, 116:6
**abysmal** [1] - 47:8
**accept** [13] - 7:9, 17:12, 19:19, 40:11, 97:21, 100:13, 100:18, 102:8, 113:11, 121:21, 184:21, 193:18, 194:8
**acceptance** [4] - 85:19, 192:11, 197:20, 198:2
**accepted** [7] - 27:8, 35:1, 95:23, 97:14, 112:16, 122:21, 184:18
**accepting** [1] - 186:14

**accepts** [1] - 94:10
**access** [1] - 92:13
**accident** [1] - 65:9
**accommodate** [1] - 131:22
**accompanying** [2] - 101:21, 186:11
**according** [2] - 52:25, 53:24
**account** [117] - 15:6, 18:18, 18:23, 19:16, 23:16, 28:4, 38:1, 38:4, 38:7, 38:10, 38:21, 38:22, 38:24, 39:4, 39:6, 39:11, 39:15, 39:19, 39:22, 40:4, 42:7, 60:14, 86:9, 86:10, 92:12, 93:17, 139:25, 140:2, 145:15, 146:4, 147:5, 152:16, 154:15, 154:16, 154:21, 154:23, 155:14, 155:15, 155:16, 155:17, 155:18, 155:23, 156:4, 156:10, 156:12, 156:18, 156:22, 156:25, 157:21, 157:22, 158:1, 158:11, 158:25, 159:18, 164:16, 164:19, 165:6, 165:7, 165:12, 172:23, 174:4, 174:6, 174:8, 174:9, 174:11, 174:18, 175:2, 175:5, 182:21, 182:22, 183:2, 183:3, 199:16, 199:17, 199:20, 199:24, 200:6, 200:7, 200:12, 205:12, 205:13, 205:16, 205:21, 205:23, 206:15, 206:17, 208:2, 210:21, 210:25, 211:6, 211:8, 211:20, 211:21, 211:23, 212:7, 212:8, 212:10, 212:12, 212:18, 212:19, 212:20, 212:24, 213:2, 213:3, 213:6, 213:7, 213:13, 213:14, 214:15, 214:19, 214:20, 214:21, 216:3

**accountant** [3] - 37:25, 39:25, 104:22
**accountant's** [1] - 96:23
**accounting** [2] - 124:10, 128:16
**Accounts** [1] - 52:7
**accounts** [27] - 19:10, 19:22, 39:8, 86:2, 86:5, 86:6, 86:25, 92:4, 92:14, 95:9, 95:10, 95:11, 95:13, 95:14, 96:20, 129:6, 157:15, 159:7, 159:11, 165:9, 165:10, 177:8, 218:2
**accurate** [9] - 82:13, 116:8, 133:2, 139:6, 141:12, 142:3, 171:21, 181:1, 201:18
**accurately** [3] - 97:16, 97:17, 139:7
**accused** [2] - 34:15, 34:16
**accusing** [2] - 130:8, 130:10
**acknowledge** [1] - 17:8
**acknowledging** [1] - 166:18
**acknowledgment** [4] - 190:25, 191:9, 191:11, 193:5
**acronyms** [2] - 18:19, 24:18
**Act** [3] - 63:1, 63:3, 102:2
**act** [1] - 37:1
**action** [2] - 145:14, 146:21
**actions** [3] - 19:18, 110:7, 110:12
**activities** [3] - 42:8, 45:4, 192:10
**activity** [2] - 76:25, 140:1
**actual** [9] - 52:13, 52:18, 80:18, 88:17, 100:6, 122:15, 149:2, 152:22, 201:18
**add** [5] - 39:17, 84:17, 161:25, 162:4, 162:6
**added** [4] - 39:5, 154:11, 167:5, 186:18
**addition** [6] - 51:25, 144:17, 146:18, 169:15, 185:17,

216:3
**additional** [9] - 10:5, 11:7, 93:17, 106:2, 106:10, 146:11, 150:5, 153:15, 187:2
**address** [28] - 12:18, 14:6, 15:8, 83:22, 84:3, 93:20, 98:9, 145:20, 145:23, 150:8, 162:18, 162:19, 162:21, 162:24, 162:25, 163:1, 163:4, 163:6, 163:11, 188:4, 188:5, 195:22, 203:2, 203:4, 211:9, 211:10, 216:15
**addressed** [3] - 163:19, 192:25, 193:1
**adjourned** [1] - 220:14
**adjustments** [1] - 167:2
**Adler** [1] - 2:7
**administered** [2] - 74:18, 123:17
**administration** [4] - 58:9, 75:7, 99:17, 100:2
**administrations** [1] - 65:4
**administratively** [1] - 50:11
**administrators** [1] - 64:20
**admissibility** [2] - 218:22, 219:1
**admit** [5] - 82:19, 143:10, 144:18, 171:3, 200:23
**admitted** [39] - 83:3, 83:8, 93:12, 97:11, 137:21, 137:23, 137:24, 138:12, 138:16, 139:8, 139:11, 142:6, 142:9, 143:16, 143:20, 144:22, 150:10, 158:14, 165:19, 166:17, 168:10, 171:4, 171:8, 176:25, 182:14, 187:9, 188:18, 189:18, 190:23, 191:3, 192:13, 192:19, 198:13, 202:1, 202:3, 210:18, 211:17, 213:23, 216:7

**advance** [1] - 68:1
**advice** [3] - 37:18, 63:5, 63:6
**advise** [1] - 119:10
**advising** [1] - 101:9
**advisor** [2] - 76:23, 110:20
**advisor/revenue** [1] - 76:1
**advocated** [1] - 50:9
**affect** [6] - 78:25, 84:21, 85:19, 88:5, 102:16, 165:7
**affecting** [1] - 20:5
**affiliated** [3] - 38:11, 48:23, 66:5
**affiliation** [1] - 49:8
**affirm** [2] - 101:17, 186:6
**afford** [1] - 16:11
**Affordable** [2] - 62:25, 63:3
**afloat** [1] - 48:17
**African** [1] - 45:2
**afternoon** [2] - 102:24, 175:18
**afterwards** [1] - 29:22
**age** [2] - 41:7, 46:9
**agencies** [4] - 51:15, 57:10, 125:5, 127:19
**Agent** [5] - 141:5, 141:6, 168:19, 176:24, 198:7
**agent** [23] - 57:20, 81:3, 108:3, 120:20, 121:19, 121:20, 122:18, 122:19, 123:10, 124:5, 124:7, 124:16, 126:11, 126:14, 126:15, 126:24, 126:25, 127:7, 127:17, 133:9, 216:15
**agent's** [2] - 130:18, 132:24
**agents** [7] - 23:24, 122:15, 122:17, 125:7, 125:11, 126:25, 127:18
**aggregate** [1] - 52:21
**aging** [1] - 42:4
**ago** [2] - 53:24, 220:1
**agree** [15] - 5:25, 6:6, 15:21, 15:22, 17:10, 19:5, 47:22, 55:24, 101:18, 104:12, 112:23, 113:6, 144:1, 185:6, 186:7
**agreed** [4] - 16:8,
34:18, 62:20, 120:12
**agreeing** [2] - 15:25, 34:10
**Agreement** [19] - 15:23, 16:1, 18:8, 18:10, 19:13, 19:20, 19:23, 20:2, 77:23, 94:14, 146:23, 147:2, 160:1, 160:3, 198:18, 202:19, 202:20, 203:7, 203:11
**agreement** [6] - 15:23, 78:6, 95:17, 166:19, 166:21, 201:20
**agreements** [2] - 66:18, 77:6
**ahead** [8] - 74:21, 107:23, 121:8, 134:16, 160:23, 181:20, 182:4, 197:23
**aided** [1] - 1:25
**aids** [1] - 9:4
**ailments** [1] - 49:24
**alcohol** [1] - 43:25
**alert** [1] - 67:25
**alive** [1] - 48:9
**allegation** [5] - 34:24, 35:13, 53:13, 60:16, 68:18
**allegations** [13] - 34:19, 35:9, 35:14, 35:16, 35:20, 36:5, 37:15, 39:18, 53:14, 53:16, 62:2, 64:4, 64:5
**allege** [1] - 35:8
**alleged** [4] - 36:25, 37:11, 42:25, 63:18
**allegedly** [1] - 52:12
**alleges** [2] - 34:21, 34:25
**allotments** [1] - 179:13
**allow** [6] - 10:22, 10:25, 43:19, 105:17, 107:11, 129:9
**allowed** [5] - 19:24, 20:1, 47:11, 48:24, 111:17
**allows** [1] - 97:19
**almost** [4] - 28:22, 69:21, 109:21, 128:6
**alone** [4] - 5:22, 15:1, 35:19, 75:3
**altered** [3] - 130:3, 130:12, 131:20
**AMERICA** [1] - 1:3
**American** [1] - 45:2
**AmeriPlex** [2] - 145:22, 163:1
**amount** [47] - 38:19, 40:6, 41:22, 42:21, 52:17, 63:17, 99:21, 99:25, 103:3, 103:5, 140:4, 146:12, 146:14, 147:14, 147:16, 148:23, 149:3, 156:10, 167:4, 167:6, 182:9, 182:15, 183:8, 183:9, 184:6, 184:17, 188:24, 204:2, 204:4, 204:23, 206:10, 207:1, 208:20, 208:21, 209:5, 214:11, 214:13, 214:24, 215:2, 215:5, 215:7, 215:10, 215:12, 215:14, 215:15, 215:18, 216:1
**amounts** [3] - 95:3, 160:24, 167:4
**analyses** [2] - 127:10, 127:11
**analysis** [2] - 63:2, 136:10
**analyze** [1] - 128:3
**analyzing** [1] - 127:9
**angst** [1] - 68:5
**animals** [1] - 28:9
**annual** [3] - 67:10, 70:11, 70:12
**anonymous** [1] - 59:2
**answer** [20] - 6:15, 6:18, 10:19, 10:23, 10:25, 11:1, 11:2, 23:20, 113:9, 116:2, 116:4, 121:3, 121:11, 121:12, 121:15, 135:1, 135:2
**answered** [2] - 108:3, 153:19
**anticipated** [1] - 85:7
**anticipating** [1] - 85:13
**antiquated** [1] - 49:13
**antiques** [1] - 89:10
**anyway** [4] - 117:23, 161:3, 173:21, 220:10
**apologize** [10] - 4:5, 5:15, 10:9, 73:4, 133:23, 144:9, 172:18, 192:21, 199:16, 220:3
**appeal** [1] - 198:4
**appear** [3] - 185:18, 189:9, 218:23
**APPEARANCES** [2] - 1:11, 2:1
**appeared** [2] - 173:20, 178:11
**apples** [1] - 27:3
**applicable** [3] - 12:17, 75:1, 93:15
**application** [1] - 112:3
**applications** [1] - 45:14
**applied** [3] - 42:5, 55:9, 173:21
**applies** [1] - 95:6
**apply** [4] - 5:23, 13:1, 33:20, 75:2
**appointed** [3] - 25:8, 25:20, 57:23
**appointees** [1] - 58:8
**appoints** [1] - 22:19
**appreciate** [1] - 34:14
**approach** [7] - 54:8, 58:17, 59:13, 67:19, 81:5, 129:15, 168:20
**appropriate** [3] - 52:5, 121:11, 133:22
**approved** [1] - 64:10
**approves** [1] - 22:14
**approximate** [1] - 161:22
**April** [7] - 20:2, 189:12, 189:21, 195:7, 195:8, 199:21, 200:8
**area** [18] - 28:8, 37:6, 44:22, 50:19, 50:20, 50:21, 51:4, 65:20, 76:6, 111:13, 112:11, 112:14, 113:22, 125:1, 128:5, 128:7, 128:9, 135:23
**areas** [1] - 54:25
**argue** [4] - 12:2, 25:2, 39:13, 61:13
**argued** [1] - 68:4
**arguing** [2] - 55:14, 68:10
**argument** [3] - 12:8, 68:9, 69:5
**argumentative** [5] - 41:1, 42:17, 55:15, 55:23, 69:16
**arguments** [6] - 6:9, 11:16, 12:18, 58:22, 75:5, 218:13
**arm** [2] - 21:2, 26:14
**arms** [5] - 35:5, 49:17,
49:18, 50:13, 51:2
**arranged** [3] - 13:11, 146:23, 147:1
**arrangement** [1] - 16:10
**arrive** [1] - 167:3
**articulated** [1] - 35:5
**artwork** [1] - 89:9
**ASHLEY** [1] - 221:3
**aspect** [2] - 84:9, 103:16
**assess** [2] - 64:15, 79:23
**assessed** [3] - 40:5, 41:22, 146:25
**assessment** [3] - 79:7, 79:10, 99:2
**asset** [2] - 85:25, 88:18
**assets** [26] - 13:4, 19:21, 79:13, 86:17, 88:13, 88:16, 89:3, 89:8, 89:11, 90:17, 92:16, 92:17, 92:18, 95:21, 96:2, 96:11, 96:21, 96:22, 99:20, 99:25, 146:10, 146:19, 177:13, 179:22, 184:5, 184:20
**assign** [1] - 126:11
**assist** [3] - 124:8, 126:6, 127:11
**assistance** [4] - 37:18, 37:25, 51:9, 126:23
**ASSISTANT** [1] - 1:13
**assistant** [3] - 25:8, 25:14, 25:20
**assisting** [1] - 124:10
**associated** [4] - 136:17, 137:1, 203:3, 211:12
**assume** [6] - 4:25, 36:2, 103:20, 109:4, 114:1, 114:14
**assumed** [1] - 217:10
**assumes** [1] - 190:5
**assuming** [1] - 217:11
**assumption** [1] - 200:19
**attach** [1] - 92:11
**attached** [8] - 90:24, 91:19, 96:16, 139:18, 140:9, 157:6, 178:14, 193:10
**attachment** [3] - 180:21, 193:11, 193:12
**attachments** [4] -

90:20, 93:17, 96:13, 180:6
**attack** [1] - 46:8
**attempt** [2] - 218:21, 219:1
**attempted** [1] - 167:14
**attempts** [2] - 182:7, 182:12
**attending** [1] - 45:1
**attention** [9] - 8:15, 10:8, 11:23, 62:12, 73:5, 73:20, 118:4, 176:24
**attestation** [1] - 101:14
**attitudes** [1] - 56:10
**ATTORNEY** [1] - 1:13
**attorney** [4] - 51:18, 104:22, 105:2, 191:1
**Attorney's** [1] - 125:4
**ATTORNEY'S** [1] - 1:13
**attorneys** [5] - 5:14, 12:2, 75:4, 120:10, 218:21
**attributable** [1] - 154:8
**audit** [4] - 17:16, 144:1, 144:3, 185:12
**audits** [1] - 124:19
**August** [1] - 66:10
**authenticate** [2] - 132:6, 133:4
**authentication** [2] - 81:9, 219:5
**authenticity** [1] - 201:3
**authorities** [3] - 57:14, 59:22, 72:9
**authority** [1] - 102:5
**authorized** [6] - 34:23, 36:9, 63:18, 64:17, 65:13, 65:14
**Auto** [1] - 31:11
**automate** [7] - 20:25, 21:1, 21:7, 21:12, 21:19, 49:13, 49:15
**automated** [5] - 21:1, 21:14, 21:16, 21:17, 50:3
**automating** [1] - 50:7
**available** [11] - 8:25, 11:20, 38:7, 38:14, 51:2, 76:15, 87:23, 88:2, 88:3, 93:14, 119:4
**Avenue** [10] - 14:5, 15:9, 162:19, 163:3, 163:16, 203:1, 211:11, 211:14,

216:14, 216:16
**average** [2] - 91:5, 106:19
**avoid** [1] - 146:11
**avoiding** [1] - 164:9
**award** [1] - 62:3
**awarded** [5] - 22:11, 52:7, 59:18, 62:8, 62:9
**awarding** [1] - 64:7
**awards** [3] - 22:20, 35:2, 36:12
**aware** [6] - 107:20, 117:1, 135:19, 137:11, 165:11, 177:19

## B

**back-and-forth** [1] - 108:24
**backbreaking** [1] - 21:4
**backer** [3] - 65:18, 66:5, 66:12
**backers** [1] - 66:15
**background** [8] - 12:6, 44:3, 44:23, 44:24, 47:24, 65:16, 66:20, 98:8
**backgrounds** [1] - 72:14
**backordered** [1] - 29:5
**bad** [1] - 66:16
**badge** [1] - 126:25
**badly** [1] - 48:4
**balance** [30] - 78:7, 104:4, 104:8, 108:18, 108:20, 112:3, 129:10, 146:22, 146:25, 148:22, 149:1, 149:6, 149:7, 151:12, 151:19, 151:22, 151:25, 153:14, 154:21, 154:22, 154:23, 174:11, 174:18, 175:5, 185:10, 185:11, 185:14, 185:17, 185:19, 196:4
**balances** [5] - 76:14, 88:4, 96:22, 98:21, 129:7
**balloon** [4] - 27:16, 27:17, 27:20, 27:25
**bank** [68] - 15:6, 18:17, 18:23, 19:10, 19:16, 19:22, 23:16,

32:13, 38:1, 38:4, 38:7, 38:21, 38:22, 39:15, 39:19, 39:22, 42:7, 65:7, 79:17, 86:2, 86:5, 88:2, 92:12, 92:13, 95:8, 95:9, 95:11, 95:13, 128:2, 128:11, 129:6, 129:10, 137:3, 145:14, 155:14, 156:18, 156:22, 157:8, 157:13, 157:14, 157:20, 157:22, 158:11, 164:16, 164:19, 165:9, 165:10, 165:12, 175:2, 177:8, 182:21, 199:16, 199:17, 199:19, 205:12, 210:12, 210:14, 211:18, 211:20, 212:1, 212:11, 212:17, 213:14, 214:21, 216:3
**Bank** [28] - 23:17, 155:15, 156:18, 157:23, 174:7, 174:10, 199:15, 199:20, 199:24, 200:3, 200:6, 200:12, 205:13, 205:20, 206:15, 208:2, 210:20, 211:20, 212:6, 212:9, 212:12, 212:18, 213:7, 213:12, 213:15, 214:15
**bankruptcies** [1] - 85:7
**bankruptcy** [3] - 95:2, 104:12, 111:12
**banks** [4] - 40:24, 47:2, 96:19, 174:4
**Baptist** [1] - 43:18
**BARNES** [1] - 2:2
**based** [16] - 103:15, 129:10, 135:24, 139:4, 139:21, 141:4, 145:22, 148:12, 154:24, 173:21, 173:22, 181:1, 184:11, 184:15, 184:20, 209:23
**basis** [7] - 11:19, 49:7, 64:16, 64:23, 70:11, 109:5, 109:21
**bates** [1] - 130:1

**Bates** [7] - 130:17, 131:11, 133:6, 133:17, 133:18, 134:4, 134:5
**bear** [2] - 35:24, 35:25
**bearing** [1] - 85:17
**bears** [1] - 35:19
**became** [13] - 13:5, 20:22, 31:18, 42:2, 44:19, 45:11, 45:16, 46:3, 46:18, 57:22, 126:5, 128:18, 135:18
**Becker** [7] - 57:19, 57:20, 57:24, 58:11, 68:5, 68:7, 68:10
**become** [6] - 9:3, 64:9, 114:22, 125:13, 127:7, 137:11
**becomes** [5] - 14:6, 16:24, 22:10, 27:21, 120:8
**bed** [1] - 66:11
**BEFORE** [1] - 1:9
**began** [4] - 31:18, 44:24, 45:13, 49:5
**begin** [2] - 8:11, 146:18
**beginning** [4] - 16:13, 49:10, 86:14, 189:3
**behalf** [11] - 14:24, 16:20, 16:25, 17:2, 17:13, 24:23, 35:16, 50:14, 164:7, 190:3, 190:4
**behaving** [1] - 66:7
**behind** [3] - 139:18, 140:15
**belief** [5] - 90:17, 96:11, 101:22, 179:21, 186:12
**beliefs** [3] - 54:19, 54:20, 55:14
**below** [1] - 146:24
**Below** [1] - 186:9
**Bench** [4] - 54:10, 67:21, 121:1, 130:13
**bench** [4] - 56:7, 70:6, 121:9, 135:7
**beneficiary** [2] - 85:9, 85:15
**benefit** [3] - 86:7, 95:15, 97:17
**benefitted** [1] - 50:6
**BENNETT** [32] - 1:17, 4:19, 33:25, 34:2, 41:3, 41:14, 42:19, 43:17, 46:3, 47:23, 56:5, 56:8, 57:4,

58:7, 58:18, 58:24, 59:15, 59:17, 61:21, 68:18, 69:2, 69:9, 69:12, 69:18, 69:21, 69:23, 70:1, 70:5, 70:7, 74:7, 119:10, 176:17
**Bennett** [7] - 3:8, 34:3, 47:21, 57:3, 59:14, 61:20, 73:8
**Benson** [19] - 3:7, 3:9, 3:10, 13:19, 55:5, 74:13, 75:9, 83:16, 110:2, 114:8, 117:6, 120:25, 130:17, 133:19, 175:7, 176:21, 190:8, 204:8, 217:17
**benson** [1] - 130:7
**BENSON** [141] - 1:12, 4:13, 4:20, 5:2, 54:8, 54:11, 54:22, 55:1, 55:8, 55:12, 55:22, 56:1, 58:20, 74:5, 74:14, 75:10, 75:14, 81:5, 81:7, 81:10, 82:19, 82:22, 82:24, 83:4, 83:6, 83:11, 83:18, 102:19, 107:17, 107:22, 107:24, 109:22, 112:25, 113:8, 114:10, 114:23, 115:15, 115:17, 115:23, 117:8, 117:12, 117:19, 118:14, 118:18, 119:3, 119:7, 119:19, 121:3, 121:6, 122:12, 122:14, 122:22, 123:4, 123:9, 124:3, 125:25, 126:3, 129:15, 130:1, 130:5, 130:8, 130:12, 130:21, 131:3, 131:13, 131:21, 131:25, 132:6, 132:13, 132:20, 132:23, 133:20, 133:23, 134:16, 134:24, 135:4, 135:6, 135:8, 135:14, 135:17, 138:2, 138:12, 138:18, 139:8, 139:13, 141:15, 142:2, 142:7, 143:10, 143:15, 143:18, 144:9,

144:10, 144:18, 144:23, 145:2, 153:21, 159:4, 165:3, 165:5, 167:9, 167:12, 168:20, 168:22, 169:1, 171:3, 171:9, 171:12, 171:18, 172:18, 172:21, 175:9, 175:12, 176:11, 176:14, 176:22, 176:23, 190:9, 190:13, 191:4, 191:6, 192:13, 192:21, 192:23, 200:23, 201:5, 201:9, 201:21, 202:2, 202:4, 204:10, 204:14, 204:16, 207:16, 207:24, 217:18, 219:3, 219:11, 219:15, 220:2

**berm** [1] - 64:1

**best** [19] - 29:17, 43:18, 47:18, 51:3, 51:4, 57:2, 78:17, 80:11, 90:16, 96:10, 97:20, 101:22, 102:7, 104:4, 123:23, 179:21, 186:11, 197:21, 198:3

**better** [4] - 4:7, 5:15, 10:24, 193:25

**between** [14] - 13:3, 32:11, 97:15, 117:8, 140:24, 142:13, 144:16, 155:7, 157:15, 168:9, 168:11, 176:9, 176:10, 202:22

**beyond** [7] - 7:19, 12:13, 13:22, 33:22, 35:20, 69:15, 69:17

**bid** [22] - 25:10, 25:16, 25:17, 25:19, 25:25, 26:2, 26:8, 26:24, 27:7, 28:21, 28:23, 28:24, 29:5, 29:20, 36:16, 53:16, 58:25, 59:18, 59:21, 60:18

**bidder** [1] - 52:5

**bidders** [2] - 60:7, 60:9

**bidding** [2] - 37:3, 59:18

**bids** [5] - 28:21, 28:22, 51:16, 51:18, 53:8

**big** [7] - 50:8, 50:19, 54:2, 63:3, 65:19, 109:11, 162:14

**bigger** [2] - 48:20, 132:21

**biggest** [2] - 47:2, 66:15

**bill** [2] - 163:15, 164:1

**Bill** [1] - 166:4

**billed** [2] - 165:15, 166:3, 166:6

**billing** [2] - 16:23, 16:25

**billion** [1] - 52:1

**bills** [11] - 38:15, 38:23, 39:9, 39:12, 96:25, 181:17, 182:7, 182:10, 182:12, 189:25, 190:10

**Binder** [6] - 81:8, 129:14, 168:24, 169:3, 171:19, 171:20

**binder** [6] - 81:12, 83:4, 135:10, 135:14, 168:23, 171:9

**binders** [1] - 171:21

**bipartisan** [1] - 49:7

**birth** [1] - 83:23

**bit** [20] - 26:10, 43:9, 44:6, 74:22, 75:22, 77:8, 77:9, 78:10, 85:3, 88:7, 90:13, 92:2, 121:2, 128:1, 129:3, 148:7, 160:10, 162:17, 178:13, 211:4

**bits** [1] - 115:10

**biweekly** [1] - 179:17

**Blackhawks'** [1] - 67:8

**blame** [2] - 4:16, 4:17

**blank** [4] - 81:2, 81:21, 115:8, 173:18

**blanking** [1] - 15:15

**blogs** [2] - 8:2, 218:7

**blood** [2] - 17:11, 18:2

**blue** [1] - 125:22

**Board** [7] - 22:12, 22:13, 22:15, 22:18, 22:19, 28:12, 52:6

**boat** [1] - 67:8

**Bob** [3] - 21:22, 22:10, 22:25

**Body** [1] - 31:11

**body** [3] - 26:12, 30:9, 65:19

**body's** [1] - 35:6

**bogus** [1] - 37:17

**BOKKELEN** [1] - 1:9

**bolster** [1] - 39:17

**bonds** [3] - 86:16, 96:21, 177:11

**book** [1] - 115:11

**booklet** [2] - 184:18, 184:19

**books** [2] - 92:17, 128:3

**borrow** [4] - 67:16, 67:17, 70:17, 185:22

**bottom** [9] - 84:19, 93:4, 96:8, 149:8, 173:23, 178:18, 178:21, 187:25, 202:11

**bought** [1] - 25:16

**bound** [2] - 101:18, 186:7

**box** [4] - 179:2, 179:11, 180:12, 184:4

**boxes** [3] - 86:7, 95:16, 180:8

**Brackett** [1] - 34:6

**BRACKETT** [45] - 2:2, 129:23, 130:3, 130:16, 130:24, 131:1, 131:5, 131:8, 132:1, 132:10, 132:21, 133:6, 133:13, 133:16, 134:1, 134:11, 134:14, 134:20, 134:23, 135:3, 138:15, 139:10, 141:17, 141:19, 141:22, 141:24, 143:12, 144:8, 144:20, 153:18, 159:1, 164:22, 171:6, 172:7, 172:13, 190:5, 191:2, 192:17, 201:2, 201:7, 201:22, 207:4, 207:10, 207:13, 207:20

**Brad** [1] - 159:25

**branch** [4] - 16:1, 16:3, 20:8, 202:25

**break** [9] - 73:11, 73:12, 73:14, 73:15, 134:17, 148:21, 172:16, 175:8, 175:18

**breaks** [2] - 66:16, 175:20

**bribe** [16] - 13:12, 13:16, 13:17, 20:19, 30:5, 30:13, 30:14, 30:15, 30:16, 30:17, 30:18, 31:24, 32:1, 62:6, 62:20, 63:16

**bribery** [1] - 29:25

**bribes** [5] - 31:20, 33:6, 33:7, 34:22, 35:1

**brief** [2] - 11:25, 114:6

**briefly** [3] - 76:11, 77:9, 129:18

**bring** [11] - 4:24, 5:6, 8:15, 10:13, 13:21, 71:8, 73:20, 74:10, 76:15, 118:4, 176:18

**Bring** [2] - 5:9, 119:15

**broad** [1] - 114:23

**broke** [1] - 71:3

**broker** [1] - 166:10

**brokerage** [1] - 96:20

**brokers** [1] - 159:24

**brother** [2] - 30:23, 44:20

**brothers** [1] - 21:22

**brought** [7] - 58:10, 66:17, 73:10, 119:2, 119:9, 176:13, 176:16

**brutal** [1] - 28:8

**budget** [1] - 64:2

**Buha** [4] - 21:22, 22:25, 28:2

**Buha's** [2] - 22:11

**build** [4] - 28:9, 36:17, 52:16, 52:20

**building** [5] - 16:4, 43:6, 71:16, 71:25, 72:3

**built** [2] - 26:19, 59:1

**bulk** [1] - 125:10

**bunch** [3] - 139:18, 151:2, 213:5

**burden** [6] - 13:21, 13:24, 35:19, 35:25, 36:2

**business** [123] - 4:21, 13:2, 13:7, 13:12, 14:2, 14:4, 14:5, 14:9, 15:13, 15:18, 16:4, 16:7, 21:11, 21:24, 21:25, 22:11, 31:12, 32:4, 32:6, 35:3, 36:13, 38:22, 38:23, 40:21, 44:19, 45:12, 46:15, 48:10, 48:13, 48:17, 48:19, 48:22, 48:25, 49:1, 53:2, 63:24, 64:10, 65:14, 67:4, 76:18, 78:17, 78:19, 79:21,

79:23, 85:8, 86:19, 89:24, 89:25, 90:2, 91:7, 91:9, 91:12, 91:20, 91:23, 91:24, 92:3, 92:16, 92:17, 92:18, 92:21, 92:24, 92:25, 93:7, 93:8, 93:19, 93:20, 94:1, 94:10, 94:17, 94:19, 94:23, 95:1, 95:2, 95:3, 95:11, 96:1, 96:5, 98:16, 99:3, 128:14, 136:5, 136:17, 136:18, 147:13, 148:2, 153:16, 155:9, 155:16, 155:18, 156:10, 158:21, 166:9, 170:11, 173:3, 177:5, 177:15, 181:22, 181:24, 181:25, 185:15, 185:16, 186:22, 187:1, 187:7, 187:15, 187:16, 187:17, 187:18, 187:19, 187:20, 187:22, 189:6, 189:7, 189:14, 200:19, 210:24, 217:10

**business's** [1] - 79:23

**businesses** [11] - 37:11, 41:19, 47:3, 48:6, 48:8, 53:6, 63:25, 85:2, 87:1, 91:22, 211:12

**businessmen** [2] - 30:4, 30:7

**button** [1] - 72:10

**buy** [3] - 28:12, 28:17, 47:6

**buying** [2] - 21:20, 50:18

**BY** [42] - 75:14, 81:10, 83:11, 83:18, 102:23, 108:7, 113:4, 114:13, 115:3, 116:7, 116:15, 116:22, 116:24, 117:12, 122:14, 124:3, 126:3, 135:8, 135:17, 138:2, 138:18, 139:13, 142:7, 143:18, 144:10, 145:2, 153:21, 159:4, 165:5, 167:12, 169:1, 171:18, 172:21, 175:12,

176:23, 190:13,
191:6, 192:23,
201:9, 202:4,
204:16, 207:24
*bypassing* [1] -
111:13

# C

*cab* [1] - 26:11
*Cacioppo* [5] - 3:8,
34:5, 114:3, 120:25,
122:23
*CACIOPPO* [26] -
1:18, 83:1, 102:21,
102:23, 108:7,
113:3, 113:4, 114:6,
114:12, 114:13,
115:2, 115:3,
115:16, 115:19,
115:24, 116:6,
116:15, 116:19,
116:21, 116:24,
117:4, 117:21,
121:5, 122:24,
123:7, 220:5
*calculate* [2] - 179:15,
179:16
*calculation* [1] -
183:18
*calendar* [12] - 140:25,
155:6, 156:1, 158:5,
158:11, 194:24,
195:6, 197:1, 197:2,
199:5, 204:1, 204:3
*camera* [1] - 72:10
*campaign* [13] - 23:4,
46:7, 49:12, 67:5,
70:14, 70:15, 71:8,
71:9, 137:4, 163:5,
163:11, 211:16
*canceled* [3] - 160:12,
160:16, 161:10
*candid* [1] - 43:11
*candidate* [2] - 49:3,
49:5
*cannot* [5] - 8:12,
9:15, 10:23, 10:25,
115:11
*capable* [1] - 20:5
*capacity* [1] - 124:6
*car* [4] - 40:19, 64:13,
65:1, 179:14
*card* [7] - 97:4,
199:15, 200:3,
205:16, 210:20,
212:2, 216:3
*cards* [9] - 86:6, 86:7,
88:2, 88:3, 94:10,
95:14, 95:15

*care* [6] - 24:12, 45:18,
85:13, 94:13,
120:11, 120:13
*Care* [2] - 63:1, 63:3
*career* [3] - 47:25,
103:20, 115:20
*careful* [1] - 9:2
*carefully* [2] - 9:14,
33:16
*Carlos* [2] - 8:19,
18:11
*Carolyn* [1] - 38:6
*carry* [2] - 102:4,
127:4
*cars* [2] - 65:5, 65:25
*case* [101] - 5:16, 6:24,
7:5, 7:11, 7:21, 7:24,
7:25, 8:4, 8:8, 8:11,
8:13, 8:14, 8:15,
9:21, 10:17, 11:13,
11:15, 12:3, 12:6,
12:20, 13:20, 14:1,
19:20, 26:11, 35:22,
36:1, 44:15, 53:22,
54:14, 54:16, 56:21,
57:18, 58:5, 60:10,
68:10, 68:21, 69:3,
70:7, 70:8, 73:18,
73:19, 73:20, 76:16,
77:3, 77:14, 78:18,
80:4, 80:12, 80:24,
84:11, 95:22, 103:8,
107:25, 108:11,
110:21, 111:25,
113:12, 118:2,
118:4, 119:4,
120:11, 121:7,
121:16, 121:20,
121:21, 122:5,
122:7, 126:12,
127:12, 127:14,
127:16, 127:20,
138:10, 145:13,
145:23, 148:5,
148:19, 148:23,
153:16, 161:11,
165:13, 171:16,
173:5, 175:20,
175:22, 183:23,
184:4, 184:22,
194:21, 217:23,
218:4, 218:5, 218:9,
218:13
*cases* [6] - 61:24,
76:14, 76:24, 77:7,
107:20, 107:25,
122:10, 125:2
*cash* [2] - 30:19,
62:15, 70:19, 70:21,
86:3, 88:10, 92:3,

174:3, 208:3
*cashes* [1] - 32:13
*cashier's* [1] - 70:22
*cashiers'* [1] - 30:17
*caused* [1] - 16:10
*cautionary* [1] -
175:18
*caveat* [1] - 46:2
*cell* [2] - 19:25, 97:2
*center* [1] - 205:19
*Centier* [1] - 174:10
*Central* [10] - 14:5,
15:8, 162:19, 163:3,
163:16, 203:1,
211:10, 211:14,
216:14, 216:16
*central* [1] - 48:21
*certain* [10] - 6:7,
37:23, 54:17, 70:15,
78:12, 78:13, 103:3,
103:5, 146:10,
219:20
*certainly* [3] - 34:11,
43:25, 172:18
*Certificate* [1] - 216:9
*certificate* [1] - 217:10
*certificates* [3] -
86:17, 96:20, 177:12
*certification* [4] -
90:14, 96:9, 98:3,
179:18
*CERTIFICATION* [1] -
221:1
*certified* [1] - 219:3
*Certified* [1] - 221:7
*certify* [1] - 221:3
*cetera* [10] - 56:11,
86:7, 89:10, 94:18,
95:15, 97:5, 97:7,
179:15, 180:13,
180:16
*chairs* [2] - 218:15,
218:16
*challenging* [1] -
130:23
*chance* [5] - 131:9,
135:9, 145:10,
169:2, 172:16
*change* [8] - 108:23,
109:20, 134:4,
136:13, 136:23,
151:17, 217:7
*changed* [8] - 26:21,
42:2, 109:25,
133:11, 134:2,
134:8, 134:15,
136:23
*changes* [2] - 20:11,
109:1
*changing* [1] - 200:22

*charge* [9] - 14:1,
22:16, 22:18, 25:15,
28:19, 29:25, 60:20,
72:18, 149:19
*charged* [7] - 13:14,
13:24, 19:1, 35:10,
115:5, 116:17, 117:1
*charges* [12] - 7:12,
7:14, 7:15, 36:4,
42:10, 42:24, 47:12,
56:21, 58:5
*chart* [16] - 60:7,
139:2, 139:4, 143:1,
153:1, 153:7, 154:4,
157:25, 160:11,
161:6, 161:15,
162:8, 162:12,
174:16, 205:25
*chasing* [1] - 59:4
*chassis* [1] - 29:8
*chassises* [2] - 26:11,
29:2
*check* [79] - 22:22,
22:24, 23:5, 23:7,
32:9, 32:10, 32:12,
70:13, 70:18, 70:19,
70:21, 90:24, 96:16,
98:14, 99:16,
134:16, 134:17,
134:18, 134:19,
142:22, 142:24,
147:20, 148:1,
156:21, 157:2,
157:7, 157:10,
157:12, 160:12,
160:16, 160:19,
160:20, 161:11,
165:20, 165:23,
166:11, 183:1,
191:2, 204:22,
204:23, 204:25,
206:4, 206:10,
206:12, 206:16,
206:19, 206:20,
207:1, 208:2, 208:5,
208:10, 208:12,
208:14, 208:15,
208:19, 208:21,
209:3, 209:9,
209:15, 209:16,
209:20, 214:12,
214:23, 214:24,
215:1, 215:6, 215:8,
215:12, 215:13,
215:14, 215:16,
215:17, 215:18,
215:25
*Check* [1] - 215:3
*checked* [4] - 178:15,
180:8, 180:12, 184:4

*checking* [8] - 39:8,
86:5, 86:10, 95:14,
96:20, 155:15,
210:21, 211:21
*checks* [30] - 30:17,
30:21, 32:8, 70:22,
142:17, 156:12,
156:16, 157:5,
157:24, 158:17,
160:14, 160:17,
160:21, 161:8,
161:10, 161:13,
161:15, 174:22,
174:24, 200:10,
201:15, 201:19,
205:8, 205:25,
207:22, 209:11,
213:25, 214:10
*chew* [1] - 28:10
*Chicago* [2] - 58:13,
64:12
*Chief* [1] - 57:22
*chief* [4] - 58:2, 58:4,
58:10, 58:12
*children* [4] - 38:5,
44:25, 45:2, 181:12
*choice* [1] - 193:25
*choose* [2] - 102:9,
133:15
*chose* [2] - 13:3, 55:1
*Christmas* [4] - 30:25,
31:2, 31:24, 32:1
*CHS* [2] - 31:23, 32:21
*church* [4] - 43:14,
43:17, 45:3, 61:3
*CI* [1] - 122:19
*Circle* [1] - 2:7
*circumstance* [2] -
41:14, 100:4
*circumstances* [8] -
63:16, 101:5, 103:6,
106:9, 109:25,
185:9, 189:1, 190:15
*circumstantial* [3] -
7:1, 7:2, 7:7
*cities* [8] - 50:19,
50:20, 51:11, 54:4,
64:17, 65:4
*Citizens* [3] - 163:4,
203:5, 211:15
*City* [15] - 21:15,
21:18, 22:3, 22:4,
22:12, 24:16, 26:6,
30:2, 34:24, 36:9,
45:2, 53:18, 54:6,
63:2, 219:19
*city* [43] - 13:7, 13:12,
21:4, 21:13, 22:13,
25:20, 26:2, 26:8,
26:24, 27:24, 29:9,

29:17, 31:18, 31:19, 33:6, 33:8, 33:9, 36:15, 37:2, 37:8, 50:3, 50:12, 50:14, 51:16, 51:18, 52:1, 53:7, 53:8, 53:9, 53:20, 53:22, 53:25, 54:1, 56:9, 57:10, 59:2, 60:21, 63:25, 64:20, 65:6, 67:11, 72:22

**city's** [4] - 21:7, 21:12, 36:13, 49:13

**civil** [16] - 76:3, 76:7, 77:3, 122:5, 122:9, 124:19, 125:6, 125:10, 135:25, 143:23, 143:24, 144:1, 144:3, 146:25, 166:21, 167:2

**claim** [3] - 40:7, 44:1, 68:9

**claimed** [3] - 25:4, 28:17, 84:3

**claiming** [2] - 24:24, 42:20

**claims** [4] - 29:23, 37:15, 50:15

**clarify** [1] - 10:14

**classic** [1] - 68:22

**clear** [5] - 17:21, 110:1, 120:19, 130:22, 194:5

**clearly** [2] - 131:11, 132:21

**CLERK** [1] - 4:23

**client** [4] - 34:5, 68:4, 193:2, 193:11

**client's** [1] - 220:3

**clients** [1] - 6:11

**climate** [2] - 181:24, 185:15

**climb** [1] - 28:9

**close** [9] - 4:21, 11:23, 45:5, 46:6, 46:12, 60:11, 69:23, 158:25, 171:17

**closely** [1] - 33:1

**closing** [3] - 11:16, 75:4, 218:13

**Club** [2] - 67:4, 67:5

**co** [1] - 13:19

**co-counsel** [1] - 13:19

**code** [5] - 92:19, 115:4, 115:6, 115:9, 148:8

**Code** [1] - 102:6

**coins** [1] - 89:10

**colleagues** [1] - 34:5

**collect** [15] - 9:8, 14:22, 35:13, 37:16, 104:1, 104:4, 108:18, 108:19, 112:2, 112:19, 113:19, 129:4, 165:8, 186:17, 186:19

**collectability** [9] - 18:2, 99:16, 99:18, 100:6, 105:18, 172:6, 184:5, 187:4, 188:24

**collected** [3] - 113:24, 117:14, 117:16

**collecting** [5] - 15:4, 20:17, 91:4, 104:7, 164:10

**collection** [27] - 13:15, 19:2, 19:15, 20:25, 21:7, 29:4, 42:8, 49:16, 50:7, 77:12, 77:17, 80:24, 84:10, 85:18, 92:6, 92:11, 94:7, 95:22, 99:21, 113:21, 113:25, 115:10, 117:15, 145:10, 146:21, 184:9, 184:12

**collections** [1] - 89:10

**collects** [2] - 112:22, 113:5

**college** [2] - 45:1, 45:8

**column** [7] - 90:6, 150:17, 150:21, 150:25, 152:1, 152:2, 160:16

**combined** [1] - 157:24

**comfortable** [2] - 74:16, 123:12

**coming** [10] - 14:21, 14:22, 38:18, 42:22, 101:10, 105:14, 195:12, 214:18, 214:19, 214:20

**commence** [1] - 9:12

**commencing** [4] - 4:2, 74:1, 118:24, 176:3

**comment** [1] - 131:18

**commercial** [1] - 92:19

**commissions** [2] - 16:14, 180:15

**committed** [1] - 42:25

**committee** [2] - 70:14, 70:15

**committing** [1] - 7:16

**common** [3] - 57:4, 58:9, 64:8

**commonly** [1] -

169:17

**communicate** [1] - 8:8

**communication** [2] - 8:9, 8:12, 108:24

**communications** [3] - 8:10, 24:7, 44:14

**community** [1] - 47:3

**comp** [1] - 50:15

**companies** [21] - 24:17, 24:18, 26:14, 27:2, 30:2, 30:4, 34:23, 36:8, 62:13, 64:9, 64:16, 64:21, 65:13, 66:20, 86:19, 87:18, 87:19, 137:1, 177:14, 178:5, 178:7

**company** [68] - 15:6, 15:7, 15:10, 15:11, 15:12, 15:15, 15:16, 15:18, 16:22, 16:23, 16:25, 18:15, 18:16, 20:10, 23:9, 23:12, 23:17, 24:24, 24:25, 27:4, 27:5, 29:4, 31:17, 34:22, 38:10, 45:10, 48:20, 48:23, 52:20, 62:5, 62:22, 63:11, 65:10, 65:21, 66:17, 87:3, 87:6, 87:9, 87:15, 135:23, 136:9, 136:15, 136:19, 136:21, 136:22, 137:9, 137:12, 137:15, 137:18, 140:24, 145:24, 155:7, 159:22, 159:23, 161:3, 161:4, 161:23, 181:18, 181:21, 182:25, 199:1, 199:12, 210:24, 210:25, 214:6

**compare** [3] - 80:6, 197:7, 201:17

**compared** [1] - 141:10

**comparing** [2] - 27:3, 55:14

**comparison** [1] - 201:20

**compete** [1] - 27:4

**competent** [1] - 37:18

**competitive** [1] - 53:9

**complaints** [1] - 65:23

**complete** [19] - 78:23, 79:6, 79:14, 90:19, 93:14, 93:15, 96:12, 98:1, 98:5, 99:21, 101:23, 105:9, 106:5, 121:22,

179:23, 184:9, 184:12, 186:12, 194:5

**completed** [2] - 12:16, 91:10

**completely** [2] - 37:17, 93:18

**compliance** [1] - 196:7

**complicated** [2] - 20:15, 28:19

**component** [1] - 53:4

**components** [1] - 41:16

**comport** [1] - 61:17

**comported** [1] - 51:19

**composed** [1] - 76:3

**Compromise** [110] - 17:6, 17:7, 17:20, 17:23, 17:25, 19:3, 39:23, 40:5, 77:10, 77:11, 77:18, 77:20, 78:3, 78:12, 79:1, 79:11, 80:15, 81:19, 81:20, 84:7, 85:20, 87:21, 88:5, 88:9, 94:14, 95:5, 97:10, 97:18, 99:10, 99:14, 100:7, 102:8, 102:9, 102:17, 104:15, 110:14, 110:16, 110:25, 111:15, 111:21, 112:7, 112:9, 112:13, 114:17, 116:1, 136:7, 167:18, 167:22, 167:23, 168:7, 168:13, 168:16, 169:8, 169:15, 169:16, 169:20, 170:2, 170:7, 170:13, 170:16, 172:5, 177:5, 177:7, 186:17, 186:20, 186:22, 187:13, 188:20, 191:10, 191:12, 191:14, 191:20, 192:8, 193:6, 193:14, 193:18, 193:21, 193:23, 194:1, 194:7, 194:9, 194:11, 194:12, 194:14, 195:13, 195:16, 196:10, 196:17, 196:22, 197:19, 197:25, 198:9, 198:20, 203:16, 204:6,

179:23, 184:9, 184:12, 186:12, 194:5

208:23, 208:25, 209:12, 210:3, 211:3, 211:5, 211:24, 212:13, 212:25, 213:17, 214:4, 214:7, 215:7, 215:11, 215:21

**compromise** [7] - 40:11, 77:13, 78:8, 97:18, 98:14, 98:15, 194:19

**Compromises** [7] - 77:5, 99:7, 112:10, 114:15, 136:2, 170:21, 170:22

**compromises** [1] - 78:6

**computation** [1] - 184:15

**computer** [5] - 1:25, 105:3, 119:24, 157:8, 183:2

**computer-aided** [1] - 1:25

**concerned** [1] - 135:23

**concerning** [3] - 9:20, 47:17, 218:1

**conclude** [1] - 7:3

**concluded** [1] - 17:16

**conclusion** [4] - 11:2, 113:1, 143:24, 171:15

**concocted** [3] - 16:19, 17:5, 28:16

**concurred** [1] - 197:19

**conditions** [6] - 51:5, 100:24, 101:4, 101:19, 186:8, 189:9

**conduct** [5] - 7:20, 7:23, 43:4, 127:21, 218:3

**conducted** [2] - 67:1, 144:3

**conducting** [2] - 124:9, 127:12

**conference** [8] - 54:10, 56:7, 67:21, 70:6, 121:1, 121:9, 130:13, 135:7

**confidential** [1] - 31:23

**confines** [2] - 8:5, 218:10

**conjunction** [2] - 187:12, 188:15

**conservative** [1] - 44:24

**consider** [4] - 7:6, 111:6, 186:20,

*193*:14
**consideration** *[3]* - 38:17, 62:6, 62:7
**considerations** *[1]* - 63:4
**considered** *[5]* - 6:7, 6:21, 86:23, 195:20, 195:22
**considering** *[1]* - 197:10
**consist** *[1]* - 6:4
**constant** *[1]* - 49:25
**constraints** *[1]* - 54:16
**construction** *[1]* - 35:9
**consult** *[2]* - 8:1, 218:6
**consultant** *[1]* - 24:13
**consultants** *[2]* - 24:11, 24:20
**consultation** *[1]* - 39:25
**Consulting** *[5]* - 23:6, 23:7, 23:8, 23:25, 137:10
**consulting** *[17]* - 16:24, 23:18, 23:25, 24:4, 24:5, 24:6, 24:7, 24:9, 24:14, 24:15, 24:19, 24:21, 24:22, 24:24, 29:24, 62:14, 63:14
**consuming** *[2]* - 11:21, 34:12
**contact** *[6]* - 84:2, 98:9, 129:1, 157:8, 157:13, 175:21
**contacts** *[2]* - 58:15, 94:17
**contained** *[8]* - 7:12, 129:14, 144:12, 167:5, 171:21, 184:18, 192:7, 196:16
**container** *[1]* - 21:3
**containers** *[1]* - 35:7
**contains** *[5]* - 26:13, 166:19, 167:2, 183:18, 217:1
**contents** *[15]* - 81:17, 86:8, 95:16, 138:5, 138:21, 140:22, 141:10, 141:12, 142:21, 169:2, 169:12, 191:8, 192:6, 198:17, 201:14
**continuation** *[2]* - 101:4, 154:4
**continue** *[8]* - 16:6,

46:2, 48:24, 66:25, 78:1, 91:6, 106:2, 209:11
**continued** *[6]* - 20:21, 42:15, 46:23, 209:24, 215:20, 215:22
**Continued** *[1]* - 2:1
**continues** *[2]* - 110:11, 181:11
**contract** *[5]* - 24:5, 53:15, 60:3, 87:9, 87:11
**contracts** *[1]* - 13:7, 22:12, 22:20, 25:5, 25:23, 31:19, 35:2, 62:8, 62:9, 88:21, 88:23
**contradict** *[2]* - 70:9, 70:10
**contrary** *[1]* - 43:2
**contribute** *[1]* - 30:16
**contribution** *[1]* - 67:15
**controlled** *[1]* - 216:4
**controls** *[1]* - 165:7
**convenience** *[1]* - 65:15
**conveniently** *[1]* - 22:15
**conversation** *[4]* - 31:8, 32:3, 32:25, 72:1
**convict** *[1]* - 42:16
**convinced** *[1]* - 15:17
**convinces** *[1]* - 13:22
**cooperating** *[2]* - 122:17, 122:19
**Copies** *[1]* - 96:15
**copies** *[8]* - 8:19, 82:13, 90:23, 96:23, 160:14, 180:6, 201:18, 219:3
**copy** *[2]* - 97:5, 193:10
**corner** *[5]* - 63:23, 63:24, 93:4, 152:17, 205:19
**corporate** *[2]* - 167:20, 195:5
**corporation** *[5]* - 91:12, 91:21, 93:23, 182:6, 189:6
**corporations** *[2]* - 86:18, 177:14
**Correct** *[2]* - 162:13, 174:12
**correct** *[160]* - 61:11, 76:4, 81:21, 84:24, 90:4, 90:8, 90:18, 91:2, 93:2, 94:20,

94:24, 95:6, 96:12, 98:3, 99:10, 101:22, 103:4, 103:13, 104:1, 104:15, 104:18, 105:9, 105:22, 106:10, 106:19, 108:21, 111:24, 125:8, 126:16, 126:17, 127:1, 129:19, 132:8, 140:14, 140:16, 140:17, 140:20, 141:6, 141:7, 143:1, 143:14, 145:5, 147:3, 147:4, 147:21, 148:3, 148:4, 148:15, 148:16, 149:11, 149:18, 150:6, 151:15, 151:17, 151:18, 152:4, 152:6, 152:7, 152:13, 153:7, 153:8, 153:17, 155:2, 155:11, 155:12, 155:24, 157:1, 157:4, 157:19, 158:3, 158:4, 159:20, 160:6, 160:8, 160:9, 160:22, 161:5, 161:14, 161:16, 161:17, 163:7, 163:8, 163:10, 163:13, 164:2, 164:8, 164:20, 164:21, 165:17, 166:2, 166:15, 166:25, 168:2, 168:3, 168:8, 169:6, 169:7, 169:9, 169:10, 170:22, 170:23, 170:25, 171:1, 172:11, 173:4, 173:10, 173:18, 173:19, 174:11, 177:21, 177:22, 178:16, 178:17, 179:2, 179:3, 179:22, 180:9, 183:6, 185:3, 185:4, 185:6, 185:7, 186:12, 186:23, 187:24, 189:23, 191:4, 191:23, 193:8, 193:9, 196:9, 196:12, 197:6, 197:14, 198:6, 198:11, 198:12, 198:20, 202:6,

202:7, 202:11, 202:12, 203:14, 204:6, 205:24, 206:18, 207:19, 212:2, 212:3, 212:14, 213:17, 213:18, 214:4, 214:5, 215:21, 216:5, 216:6, 216:22, 216:23, 221:3
**correctly** *[1]* - 36:14
**correspondence** *[3]* - 192:11, 193:10, 194:23
**corrupt** *[8]* - 36:21, 37:1, 51:22, 52:12, 52:22, 66:14, 70:20
**corruption** *[1]* - 39:18
**corruptly** *[2]* - 13:16, 13:17
**Cortina** *[28]* - 30:7, 30:8, 30:15, 30:18, 30:24, 30:25, 31:7, 31:13, 31:23, 32:1, 32:4, 32:5, 32:6, 32:12, 32:17, 32:19, 32:23, 33:3, 33:7, 33:13, 43:7, 65:17, 66:19, 67:2, 67:13, 70:23, 70:24, 71:14
**Cortina's** *[3]* - 31:11, 33:3, 71:13
**cost** *[2]* - 22:5, 64:2
**costs** *[1]* - 50:16
**counsel** *[15]* - 11:17, 13:19, 34:2, 37:18, 54:11, 62:23, 67:25, 70:9, 113:14, 117:13, 172:19, 191:4, 192:22, 201:6, 218:14
**Count** *[4]* - 34:21, 34:25, 35:10, 37:15
**count** *[5]* - 39:17, 39:21, 42:16, 72:17, 163:24
**counting** *[1]* - 110:11
**country** *[4]* - 54:5, 56:12, 115:18, 181:24
**counts** *[2]* - 35:15, 66:22
**County** *[5]* - 45:14, 45:17, 45:19, 46:4
**couple** *[17]* - 46:12, 49:11, 50:2, 53:24, 54:11, 66:22, 68:19, 73:4, 85:1, 92:2, 159:18, 173:23,

174:4, 180:21, 196:23, 211:18, 218:23
**coupon** *[1]* - 149:9
**course** *[9]* - 10:25, 27:7, 44:17, 103:20, 108:23, 117:23, 128:2, 169:5, 174:15
**COURT** *[193]* - 1:1, 4:4, 4:14, 4:22, 4:24, 5:4, 5:9, 5:11, 8:21, 12:23, 33:23, 41:2, 41:10, 42:18, 43:16, 45:22, 47:13, 54:9, 54:21, 54:23, 55:2, 55:11, 55:16, 55:24, 56:3, 56:6, 56:22, 58:6, 58:23, 59:12, 59:14, 59:16, 61:5, 61:7, 61:10, 61:14, 67:20, 68:6, 68:15, 68:23, 69:3, 69:11, 69:13, 69:16, 69:19, 69:22, 69:25, 70:3, 73:8, 73:23, 74:3, 74:6, 74:8, 74:10, 74:12, 74:16, 74:20, 75:11, 81:6, 82:21, 82:23, 82:25, 83:2, 83:5, 83:9, 83:15, 102:20, 107:19, 107:23, 108:2, 109:23, 113:2, 113:9, 114:3, 114:7, 114:11, 114:25, 115:21, 116:2, 116:18, 116:20, 116:7, 117:10, 117:20, 117:22, 118:7, 118:15, 118:20, 119:1, 119:5, 119:8, 119:11, 119:13, 119:15, 119:21, 120:4, 121:2, 121:7, 121:10, 121:23, 122:2, 122:11, 122:23, 122:25, 123:2, 123:6, 123:8, 123:11, 123:15, 123:19, 126:2, 129:17, 129:25, 130:2, 130:4, 130:7, 130:10, 130:14, 131:3, 131:7, 131:18, 131:23, 132:8, 132:15, 132:19, 133:5, 133:9, 133:14, 133:19, 133:22, 133:25, 134:3,

134:13, 134:19,
134:22, 134:25,
135:5, 135:16,
137:22, 138:14,
138:16, 139:11,
141:18, 141:20,
141:23, 142:5,
143:13, 143:16,
144:21, 145:1,
153:19, 159:3,
164:23, 165:4,
167:11, 168:21,
171:7, 171:11,
171:14, 172:10,
172:15, 172:20,
175:7, 175:11,
175:17, 175:25,
176:5, 176:8,
176:12, 176:15,
176:18, 176:20,
190:7, 190:12,
192:16, 192:18,
201:1, 201:8,
201:24, 204:8,
204:12, 207:8,
207:11, 207:15,
207:18, 207:23,
217:17, 217:19,
218:20, 219:7,
219:16, 219:23,
220:10
**court** [16] - 4:1, 9:9,
10:6, 10:8, 10:12,
10:15, 11:22, 34:16,
73:23, 74:1, 97:2,
118:22, 118:24,
120:7, 120:14, 176:3
**Court** [16] - 4:3, 34:2,
35:18, 58:21, 68:1,
68:12, 68:14, 75:16,
105:4, 132:16,
169:13, 172:18,
201:6, 218:14,
221:3, 221:8
**Court's** [5] - 3:2,
59:11, 68:3, 68:12,
83:6
**courtroom** [12] - 5:13,
6:23, 6:25, 7:22, 8:6,
9:7, 35:23, 58:16,
74:17, 123:15,
125:18, 218:11
**cover** [1] - 200:8
**coverage** [1] - 64:8
**covered** [3] - 61:9,
68:11, 155:25
**covering** [1] - 87:15
**covers** [3] - 148:18,
158:5, 212:22
**CPA** [1] - 37:19

**create** [2] - 141:19,
141:20
**created** [7] - 59:19,
66:7, 140:1, 141:24,
159:8, 159:19,
216:22
**creating** [1] - 63:23
**credibility** [1] - 7:10
**credit** [11] - 48:16,
87:23, 88:2, 88:3,
88:4, 94:10, 97:4,
156:24, 179:14
**crime** [1] - 48:18
**crimes** [5] - 13:14,
13:23, 20:20, 30:1,
42:25
**criminal** [23] - 35:20,
66:21, 76:4, 77:2,
114:18, 116:12,
121:17, 121:24,
122:3, 122:6,
122:16, 124:6,
124:8, 124:9,
124:10, 125:2,
125:6, 126:9,
126:15, 126:18,
127:6, 127:23
**criminally** [2] -
116:17, 117:1
**critical** [1] - 44:2
**criticize** [1] - 44:3
**critters** [1] - 28:9
**cross** [4] - 102:20,
114:4, 133:12,
134:20
**Cross** [1] - 3:8
**CROSS** [1] - 102:22
**Cross-examination**
[1] - 3:8
**cross-examination** [1]
- 102:20
**CROSS-
EXAMINATION** [1] -
102:22
**crossed** [1] - 32:14
**Crown** [1] - 65:7
**Cubs** [1] - 67:7
**cultural** [1] - 72:14
**Cummins** [3] - 59:20,
59:24, 59:25
**current** [12] - 26:3,
26:7, 78:1, 93:14,
103:16, 146:21,
146:25, 148:21,
149:6, 149:7, 196:3,
196:9
**cut** [2] - 44:21, 152:18
**cutting** [1] - 63:23,
66:12

# D

**d/b/a** [1] - 15:13
**daily** [1] - 44:7
**damaged** [1] - 49:23
**Dan** [1] - 191:1
**danger** [1] - 20:3
**dangerous** [2] - 63:19,
63:22
**Daniel** [1] - 193:2
**dark** [2] - 125:22,
125:24
**data** [5] - 93:14, 106:1,
130:22, 166:7,
170:24
**date** [70] - 83:23,
90:24, 91:3, 93:24,
96:16, 130:19,
139:1, 140:4,
145:25, 146:12,
148:16, 150:12,
152:8, 152:9,
152:16, 152:19,
152:20, 152:21,
152:22, 153:9,
153:10, 153:12,
153:13, 154:17,
154:22, 156:24,
159:13, 159:16,
160:24, 167:22,
167:24, 167:25,
168:10, 174:17,
174:18, 174:19,
174:21, 174:25,
180:4, 187:20,
189:11, 189:19,
190:20, 194:6,
197:9, 202:13,
203:13, 206:23,
206:24, 208:9,
208:10, 208:18,
208:19, 208:24,
209:8, 209:10,
209:19, 209:20,
211:2, 211:3,
211:22, 211:23,
212:21, 214:10,
215:2, 215:7,
215:12, 215:15,
215:24, 216:18
**dated** [17] - 15:24,
18:10, 146:1, 195:9,
197:22, 203:8,
203:22, 204:20,
206:4, 209:9,
214:12, 215:3,
215:9, 215:13,
215:17, 215:25,
216:10
**dates** [4] - 151:2,

151:3, 151:4, 183:7
**David** [1] - 46:7
**days** [17] - 22:21,
29:12, 42:22, 50:15,
53:24, 60:6, 60:11,
60:12, 60:19,
120:14, 146:12,
175:13, 203:17,
204:25, 208:22,
208:24, 213:16
**deadline** [1] - 29:9
**deadlines** [2] -
110:10, 110:11
**deal** [4] - 50:8, 53:15,
78:3, 108:13
**dealer** [1] - 27:19
**dealership** [2] - 22:1,
27:11
**dealings** [4] - 43:4,
43:5, 77:5, 129:1
**debit** [1] - 88:4
**Deborah** [7] - 144:4,
181:11, 197:1,
199:19, 199:25,
212:12, 213:3
**debt** [41] - 16:7, 17:13,
17:15, 17:21, 20:17,
37:21, 38:15, 39:13,
40:2, 40:6, 40:8,
40:17, 41:25, 42:4,
42:5, 42:12, 89:14,
102:25, 104:18,
105:19, 107:16,
109:14, 111:24,
112:20, 112:22,
113:6, 113:19,
113:23, 117:13,
136:3, 136:5,
140:13, 152:8,
152:9, 154:6, 154:7,
164:10, 167:15,
197:13
**debts** [1] - 80:1
**deceased** [1] - 49:4
**deceived** [2] - 18:24,
19:20
**December** [9] - 82:7,
151:16, 156:2,
188:22, 189:4,
189:5, 194:25, 195:3
**decide** [7] - 6:24, 7:7,
7:21, 8:4, 9:2,
100:23, 218:9
**decided** [1] - 36:16
**deciding** [1] - 11:14
**decision** [8] - 11:19,
18:25, 20:5, 36:18,
53:1, 78:25, 97:22,
197:19
**declare** [5] - 90:16,

96:10, 101:20,
179:20, 186:10
**declared** [1] - 194:18
**decrease** [1] - 85:14
**decreases** [1] - 85:7
**deduct** [1] - 179:13
**deductions** [1] -
179:14
**defeated** [1] - 57:24
**defendant** [80] -
12:25, 13:23, 14:2,
21:10, 23:12, 33:24,
35:21, 67:23, 68:2,
119:8, 125:14,
126:1, 128:23,
136:3, 136:8,
136:11, 136:17,
137:1, 137:4, 137:5,
137:11, 138:11,
140:24, 145:23,
153:24, 154:25,
155:7, 155:10,
155:14, 155:21,
157:8, 158:21,
160:1, 161:3,
162:22, 165:7,
166:18, 167:14,
167:19, 169:19,
170:8, 172:25,
173:18, 174:2,
174:6, 174:10,
174:20, 176:15,
178:1, 178:9,
178:20, 179:4,
180:2, 180:20,
181:6, 182:25,
183:3, 183:7,
190:18, 195:15,
195:23, 198:8,
198:25, 199:6,
199:10, 202:5,
202:22, 203:9,
203:21, 203:25,
204:3, 204:19,
204:25, 206:1,
210:7, 210:11,
211:13, 213:14,
214:6
**Defendant** [4] - 1:6,
1:17, 2:2, 3:4
**DEFENDANT** [5] - 5:8,
34:1, 74:9, 119:12,
119:14
**defendant's** [22] -
20:15, 54:18,
125:17, 129:1,
135:22, 136:11,
156:9, 156:18,
156:25, 157:22,
158:1, 158:11,

161:23, 170:11, 173:6, 182:20, 191:1, 199:17, 206:17, 210:9, 213:12, 214:21
**defense** [4] - 4:18, 67:24, 67:25, 74:6
**deference** [1] - 54:24
**deferred** [1] - 100:20
**deficiencies** [1] - 195:22
**definitive** [1] - 59:24
**degree** [1] - 193:19
**delay** [3] - 93:16, 108:12
**delays** [1] - 110:11
**delegated** [2] - 51:6, 51:7
**deliberate** [4] - 8:7, 8:11, 12:20, 75:6
**deliberations** [1] - 9:12
**delinquencies** [1] - 103:10
**delinquency** [1] - 103:7
**delinquent** [4] - 76:13, 103:4, 122:5, 129:4
**deliver** [1] - 28:25
**delivered** [1] - 70:23
**delivery** [1] - 29:5
**demand** [3] - 29:3, 44:20
**democracy** [1] - 73:14
**denial** [1] - 85:19
**denied** [1] - 7:15
**denying** [2] - 36:4, 44:5
**department** [3] - 31:16, 51:6, 51:7
**Department** [3] - 25:9, 25:13, 57:16
**dependents** [1] - 83:22
**depict** [1] - 213:19
**deposit** [12] - 86:7, 95:16, 96:21, 156:17, 156:19, 177:12, 199:24, 206:14, 206:16, 208:4, 214:15, 214:23
**deposited** [7] - 38:8, 39:10, 175:13, 200:12, 205:12, 208:2, 209:9
**deposits** [6] - 32:13, 86:17, 94:1, 94:4, 98:21, 199:24
**depreciate** [1] - 27:18

**depreciation** [2] - 27:23, 96:24
**depression** [1] - 48:5
**deputy** [3] - 9:7, 74:17, 123:16
**DEPUTY** [1] - 4:23
**deriving** [1] - 136:12
**describe** [4] - 54:1, 123:23, 125:20, 207:11
**described** [2] - 43:18, 207:13
**describing** [2] - 31:24, 191:18
**description** [2] - 7:13, 161:12
**designated** [1] - 65:1
**desire** [1] - 21:12
**despite** [2] - 13:9, 14:25
**detail** [6] - 42:23, 81:17, 142:21, 178:14, 191:18, 192:6
**detailed** [2] - 144:12, 167:4
**details** [1] - 167:2
**determination** [6] - 97:19, 98:2, 100:5, 102:16, 105:25, 110:4
**determine** [14] - 78:17, 79:5, 84:6, 84:11, 85:6, 88:22, 99:24, 100:13, 105:18, 105:24, 110:6, 136:1, 205:7, 205:11
**determined** [6] - 29:15, 100:11, 102:7, 116:10, 197:20, 198:2
**determining** [2] - 7:10, 95:22
**devastated** [1] - 182:1
**develop** [2] - 76:24, 77:1
**developed** [2] - 12:7, 116:12
**device** [1] - 72:10
**devised** [1] - 15:3
**devoted** [3] - 59:4, 60:17, 72:5
**dialogue** [1] - 107:1
**dictate** [1] - 90:11
**dictionaries** [2] - 8:1, 218:6
**died** [1] - 46:7
**difference** [1] - 144:16
**differences** [2] -

56:10, 56:11
**different** [32] - 9:23, 22:11, 24:18, 26:14, 28:15, 43:12, 44:11, 44:12, 48:1, 54:7, 56:12, 60:10, 60:20, 64:17, 67:9, 72:14, 76:15, 80:5, 82:2, 82:18, 85:2, 99:7, 105:1, 105:6, 113:20, 122:7, 131:19, 132:14, 133:7, 133:17, 218:23
**differentiated** [1] - 28:23
**differently** [1] - 44:6
**differs** [1] - 77:21
**difficult** [1] - 11:21
**difficulty** [1] - 189:7
**diligence** [1] - 193:19
**dime** [1] - 39:5
**dire** [1] - 34:4
**direct** [5] - 6:25, 7:1, 7:6, 35:15
**Direct** [2] - 3:7, 3:10
**DIRECT** [2] - 75:13, 124:2
**directed** [1] - 191:19
**directing** [1] - 176:24
**direction** [2] - 48:1, 72:9
**directional** [1] - 123:20
**directions** [1] - 149:19
**directly** [5] - 114:18, 123:21, 155:18, 164:14, 165:16
**director** [4] - 86:20, 177:16, 178:4, 210:15
**disappeared** [1] - 23:13
**disclose** [7] - 18:6, 20:4, 39:1, 40:4, 42:6, 189:15, 198:9
**disclosed** [5] - 9:11, 89:3, 204:5, 204:6, 214:7
**disclosing** [1] - 18:22
**disclosure** [1] - 205:4
**discover** [4] - 161:18, 179:4, 210:4, 210:8
**discovered** [1] - 108:8
**discretion** [2] - 64:19, 103:4
**discuss** [5] - 8:8, 8:12, 32:18, 175:20, 217:23
**discussed** [9] - 30:12,

49:2, 110:2, 112:9, 165:25, 170:19, 193:7, 196:10, 201:3
**discussing** [3] - 8:11, 20:7, 33:4
**display** [2] - 83:7, 202:3
**displayed** [1] - 144:25
**displaying** [2] - 161:21, 183:17
**disprove** [2] - 59:23, 60:2
**disregard** [7] - 6:21, 41:13, 46:1, 47:17, 47:20, 57:1, 61:19
**disregarded** [1] - 6:23
**dissolved** [1] - 23:11
**distracted** [1] - 9:3
**District** [2] - 221:8, 221:8
**DISTRICT** [2] - 1:1, 1:1
**ditch** [1] - 72:16
**diverting** [1] - 165:6
**division** [5] - 59:25, 124:8, 125:3, 126:9, 135:25
**DIVISION** [1] - 1:2
**Division** [1] - 221:9
**document** [56] - 91:2, 111:16, 130:19, 131:12, 131:19, 132:2, 132:5, 132:7, 132:12, 132:13, 132:22, 132:25, 133:2, 133:7, 133:18, 134:2, 134:4, 134:7, 134:8, 134:12, 137:23, 138:3, 140:20, 141:8, 141:19, 141:20, 141:22, 142:10, 143:4, 143:23, 143:25, 144:3, 150:7, 166:17, 166:18, 167:1, 175:10, 178:23, 180:11, 180:22, 183:14, 183:19, 183:25, 186:21, 188:10, 188:25, 192:2, 192:3, 193:12, 199:9, 203:20, 214:17, 216:11, 216:12, 217:9
**documentation** [1] - 80:9
**documents** [38] - 6:4, 24:8, 28:2, 131:9,

133:1, 136:25, 139:3, 139:4, 139:5, 139:6, 139:7, 139:18, 140:15, 141:1, 142:19, 144:23, 152:10, 152:13, 161:18, 163:17, 167:14, 170:18, 171:21, 178:3, 179:4, 180:17, 181:2, 184:11, 198:10, 200:19, 210:8, 210:10, 210:14, 216:4, 217:3, 218:22, 218:23, 218:25
**DOGAN** [4] - 2:5, 2:6, 2:6
**dollar** [2] - 38:9, 38:13
**dollars** [8] - 13:2, 19:11, 39:7, 52:1, 52:8, 52:13, 62:4, 185:21
**donate** [1] - 67:3
**donation** [2] - 32:11, 32:14
**donations** [2] - 22:25, 23:3
**done** [19] - 4:25, 36:20, 36:22, 51:5, 51:21, 51:23, 52:24, 52:25, 60:18, 69:21, 100:16, 122:21, 146:20, 147:2, 157:7, 184:16, 191:15, 193:13, 201:20
**doors** [2] - 49:6, 49:7
**doorway** [1] - 120:1
**Doubt** [1] - 184:5
**doubt** [11] - 7:19, 12:14, 13:23, 18:1, 33:22, 35:21, 99:16, 99:18, 172:6, 187:4, 188:23
**down** [38] - 10:6, 27:22, 46:18, 52:14, 55:4, 56:23, 56:24, 58:12, 59:4, 84:18, 87:23, 90:13, 92:2, 94:8, 95:8, 96:8, 98:11, 99:12, 100:24, 101:24, 102:2, 113:20, 117:6, 130:14, 131:4, 147:5, 162:4, 173:5, 173:23, 175:25, 178:13, 179:9, 179:18,

184:14, 185:20, 204:9, 204:13, 217:19
**downturn** [3] - 181:25, 182:5, 185:15
**drama** [1] - 71:13
**drastic** [2] - 181:25, 185:14
**draw** [1] - 11:1
**drawing** [1] - 68:25
**drawn** [1] - 156:21
**drill** [3] - 55:4, 56:23, 56:24
**drink** [1] - 43:24
**driver's** [1] - 83:23
**drivers** [3] - 35:6, 50:3, 60:23
**driving** [6] - 26:12, 35:4, 49:20, 64:11, 64:13, 71:15
**dropped** [1] - 59:24
**drunk** [1] - 64:13
**due** [30] - 27:21, 27:25, 42:5, 43:11, 49:25, 70:12, 76:14, 98:21, 108:19, 140:5, 145:10, 148:16, 148:17, 148:25, 149:4, 149:6, 151:12, 151:19, 151:21, 153:15, 181:22, 182:1, 182:5, 185:10, 185:11, 185:14, 185:17, 185:19, 193:19, 219:4
**duly** [2] - 74:18, 123:17
**dumping** [1] - 49:22
**dumps** [1] - 21:2
**duplicate** [3] - 101:17, 186:6, 207:21
**duplicative** [1] - 207:14
**during** [40] - 6:1, 7:23, 8:18, 8:22, 9:6, 9:22, 9:24, 20:11, 20:13, 21:24, 24:10, 25:6, 26:11, 28:4, 32:3, 33:16, 34:4, 35:12, 37:22, 39:24, 41:4, 42:1, 46:7, 46:20, 46:25, 49:8, 59:6, 73:17, 77:25, 108:23, 128:2, 140:24, 158:11, 158:18, 174:15, 200:11, 201:12, 214:1, 217:22, 220:6

**duties** [4] - 75:6, 76:19, 124:5, 127:4
**duty** [1] - 5:21

### E

**early** [1] - 145:24
**earn** [2] - 25:3, 62:17
**earned** [4] - 14:12, 25:2, 25:4, 204:1
**earners** [1] - 90:21
**earning** [5] - 16:14, 16:15, 180:12, 181:6, 181:7
**earnings** [1] - 66:13
**easily** [1] - 49:9
**East** [2] - 58:13, 64:12
**economic** [6] - 49:2, 50:16, 63:1, 63:4, 182:2, 182:5
**economy** [4] - 41:6, 46:23, 47:8, 189:8
**Edward** [1] - 28:3
**effective** [5] - 84:22, 99:17, 100:2, 216:17, 216:18
**effects** [1] - 89:9
**effort** [1] - 37:16
**efforts** [6] - 13:15, 19:2, 19:15, 35:12, 37:22, 39:20
**eight** [1] - 197:11
**either** [11] - 10:23, 36:8, 63:21, 76:14, 98:16, 99:16, 133:22, 157:7, 183:1, 191:13, 213:2
**elected** [4] - 42:2, 50:10, 50:17, 57:5
**election** [4] - 46:17, 49:8, 66:11, 66:14
**electronic** [6] - 8:3, 8:10, 94:1, 157:9, 217:2, 218:8
**elements** [1] - 28:8
**Elizabeth** [2] - 74:15, 75:17
**ELIZABETH** [3] - 3:7, 75:12, 75:17
**ELMO** [1] - 83:7
**elsewhere** [1] - 38:19
**elucidating** [1] - 132:17
**embellish** [1] - 68:24
**employed** [15] - 18:12, 48:11, 48:13, 53:22, 75:18, 89:20, 89:25, 90:1, 90:3, 90:21, 91:11, 91:15, 178:23, 181:12,

198:11
**employee** [9] - 15:11, 16:22, 18:7, 20:11, 23:13, 87:11, 155:19, 197:9, 197:11
**employee's** [1] - 148:1
**employees** [24] - 14:9, 14:11, 15:20, 16:9, 16:11, 16:12, 16:15, 20:9, 21:4, 29:9, 41:18, 49:1, 53:20, 59:2, 63:2, 66:7, 93:25, 122:9, 147:13, 147:15, 147:24, 148:13, 156:5, 158:2
**employees'** [3] - 14:10, 99:5, 148:19
**employer** [12] - 14:15, 84:2, 84:3, 84:9, 84:12, 84:15, 89:21, 90:4, 93:22, 147:23, 147:24, 180:13
**employer's** [2] - 98:19, 203:23
**employment** [28] - 42:1, 84:2, 87:9, 87:11, 89:22, 94:5, 94:7, 98:20, 98:21, 98:22, 99:4, 147:10, 147:11, 173:6, 173:7, 173:11, 177:19, 177:20, 177:24, 177:25, 180:14, 197:10, 198:10, 202:6, 202:10, 202:15, 202:17, 203:16
**Employment** [11] - 15:23, 16:1, 18:8, 18:10, 160:1, 160:3, 198:18, 202:19, 202:20, 203:7, 203:11
**encounter** [2] - 44:7, 56:9
**encountered** [2] - 56:17, 56:18
**end** [19] - 7:5, 7:11, 8:14, 9:6, 9:7, 11:8, 11:14, 11:18, 39:9, 47:20, 48:18, 48:19, 56:24, 105:8, 106:18, 112:16, 121:9, 148:11, 218:25
**End** [2] - 56:7, 70:6, 135:7
**ended** [3] - 148:8,

151:4, 189:4
**ending** [16] - 152:24, 155:15, 157:15, 157:23, 189:3, 189:4, 194:25, 195:2, 199:16, 199:20, 200:7, 200:13, 205:14, 214:16, 214:20, 214:21
**enemies** [1] - 68:19
**enforced** [2] - 110:7, 110:12
**enforcement** [10] - 23:20, 24:3, 25:2, 57:14, 92:11, 124:7, 124:18, 124:23, 124:24, 126:10
**engage** [5] - 72:20, 78:15, 87:20, 167:14, 185:16
**engaged** [2] - 43:3, 166:8
**engine** [2] - 26:20, 59:20
**engines** [2] - 27:1, 59:22
**enjoy** [1] - 118:4
**enrolled** [1] - 94:1
**enter** [4] - 78:25, 88:9, 179:11, 179:12
**entered** [3] - 198:8, 202:19, 202:20
**entertain** [1] - 196:10
**entire** [7] - 51:23, 58:19, 105:17, 109:18, 112:19, 124:16, 209:24
**entirely** [1] - 47:18
**entities** [10] - 86:20, 124:19, 128:4, 129:7, 136:17, 137:3, 138:9, 177:15, 203:3, 211:14
**entitled** [5] - 146:17, 150:4, 152:15, 210:4, 221:4
**entity** [21] - 22:13, 22:14, 53:12, 93:22, 129:5, 129:11, 138:8, 138:24, 161:19, 187:19, 187:22, 193:20, 193:23, 194:6, 194:16, 195:23, 195:24, 196:6, 196:8, 210:6, 216:25
**entry** [4] - 93:14, 93:15, 157:14, 166:7

**environment** [1] - 48:7
**envision** [1] - 140:8
**EPA** [3] - 26:20, 26:21, 26:25
**equal** [1] - 53:11
**equation** [1] - 60:20
**equipment** [4] - 26:2, 92:18, 96:1
**equity** [2] - 95:19, 178:14
**equivalent** [1] - 187:6
**era** [1] - 41:5
**escapes** [1] - 162:4
**especially** [1] - 47:6
**essentially** [5] - 15:19, 16:2, 16:4, 16:6, 17:7, 38:11, 48:19, 48:20, 104:17
**established** [4] - 15:6, 15:12, 45:4, 187:21
**establishes** [1] - 93:24
**estate** [1] - 88:22
**estimate** [1] - 110:8
**estimated** [1] - 94:6
**et** [10] - 56:11, 86:7, 89:10, 94:18, 95:15, 97:5, 97:7, 179:14, 180:13, 180:16
**ethic** [1] - 44:17
**evaluate** [3] - 94:13, 194:14, 194:15
**evaluating** [2] - 192:9, 195:13
**evasion** [1] - 35:11
**eve** [1] - 66:14
**evening** [2] - 217:22, 218:17
**event** [1] - 64:24
**eventual** [1] - 163:2
**eventually** [5] - 18:20, 21:14, 38:11, 137:11, 162:25
**everywhere** [1] - 62:1
**evidence** [93] - 5:22, 6:3, 6:7, 6:10, 6:11, 6:12, 6:13, 6:19, 6:21, 6:23, 6:24, 6:25, 7:1, 7:2, 7:6, 7:7, 7:14, 7:21, 8:16, 9:15, 9:18, 9:20, 10:14, 10:18, 10:21, 11:16, 11:19, 12:5, 12:7, 12:8, 12:9, 12:10, 12:16, 12:19, 13:22, 14:1, 14:16, 18:5, 20:23, 24:15, 29:25, 32:15, 34:17, 36:2, 41:12, 44:17,

45:24, 45:25, 47:14,
47:15, 47:17, 47:19,
47:20, 53:21, 55:9,
55:11, 56:24, 56:25,
57:8, 60:25, 61:17,
62:2, 67:25, 68:21,
70:7, 70:8, 72:7,
73:6, 74:23, 74:25,
75:1, 75:3, 82:20,
139:9, 141:16,
143:11, 143:16,
144:24, 166:17,
190:6, 190:10,
191:21, 192:14,
198:13, 207:7,
207:8, 207:16,
207:17, 207:19,
218:13, 219:8
**exactly** [5] - 23:23,
31:25, 32:2, 36:11,
57:15
*EXAMINATION* [5] -
75:13, 102:22,
117:11, 122:13,
124:2
*Examination* [4] - 3:7,
3:8, 3:9, 3:10
**examination** [6] - 3:8,
102:20, 135:25,
137:8, 143:24,
166:21
**examine** [3] - 128:22,
136:16, 137:14
**examined** [4] -
101:20, 128:11,
163:17, 186:10
**example** [10] - 36:8,
37:17, 59:17, 60:5,
106:15, 165:18,
165:22, 179:16,
209:14
**examples** [2] - 68:20
**excelling** [1] - 22:1
**except** [1] - 100:13
**exchange** [3] - 34:22,
53:14, 72:19
**exclude** [2] - 6:20,
67:23
**excluding** [1] - 182:24
**excuse** [2] - 18:7,
111:8
**excused** [1] - 118:5
**executed** [1] - 33:5
**exemptions** [1] - 84:3
**exercising** [1] -
193:19
**exhibit** [17] - 130:16,
131:15, 154:24,
167:10, 199:7,
199:23, 200:1,

206:11, 207:2,
207:5, 207:15,
208:13, 209:1,
209:15, 210:3,
215:1, 215:15
*Exhibit* [112] - 3:14,
3:15, 3:15, 3:16,
3:16, 3:17, 3:17,
3:18, 3:18, 3:19,
3:19, 3:20, 3:20,
3:21, 3:21, 3:22,
81:12, 81:18, 81:25,
82:8, 82:20, 83:2,
83:13, 83:14, 83:20,
85:23, 88:11, 89:17,
93:1, 93:12, 96:3,
97:12, 101:13,
129:24, 131:11,
137:20, 138:13,
138:16, 138:20,
139:9, 139:11,
140:18, 141:1,
141:16, 142:9,
142:19, 143:11,
143:13, 143:21,
145:3, 145:17,
149:12, 150:3,
150:11, 152:11,
154:3, 155:3,
156:15, 157:6,
157:18, 158:14,
159:16, 161:22,
165:13, 166:16,
168:10, 168:23,
169:3, 169:11,
170:5, 170:10,
171:2, 171:4, 171:7,
171:19, 171:23,
174:17, 175:1,
176:25, 177:19,
188:19, 189:19,
190:23, 191:7,
191:9, 191:17,
191:24, 192:14,
192:18, 192:24,
195:9, 196:14,
197:22, 198:15,
198:22, 199:3,
199:18, 199:22,
200:5, 200:14,
200:15, 200:18,
200:24, 201:2,
201:24, 202:8,
204:18, 205:15,
208:1, 210:1,
213:24, 217:3
**exhibits** [10] - 6:5,
81:8, 135:9, 142:2,
162:9, 169:6,
171:16, 200:9,
202:2, 204:11

*Exhibits* [3] - 129:14,
129:19, 144:21
*EXHIBITS* [1] - 3:11
**exist** [2] - 7:4, 23:11
**existed** [2] - 26:20,
82:14
**existence** [8] - 18:14,
18:23, 38:1, 39:2,
39:19, 39:22, 40:4,
42:6
**expect** [11] - 12:5,
12:7, 59:5, 77:25,
86:10, 87:3, 87:6,
87:10, 88:23, 91:13,
190:14
**expected** [2] - 180:17,
180:19
**expeditiously** [1] -
5:16
**expended** [1] - 38:8
**expenditure** [2] -
50:25, 52:24
**expenditures** [4] -
22:14, 38:18, 52:3,
53:7
**expense** [2] - 61:22,
179:1
*Expense* [1] - 96:5
**expenses** [14] - 50:14,
52:18, 70:15, 79:14,
80:2, 89:19, 90:7,
91:20, 92:23, 92:25,
96:25, 97:1, 97:3,
105:15
**expensive** [5] - 22:6,
26:16, 36:17, 52:3,
66:23
**experience** [7] - 77:4,
107:21, 109:10,
113:17, 115:12,
115:20, 116:5
**experienced** [1] -
25:17
**expert** [1] - 115:25
**explain** [8] - 59:13,
76:11, 77:9, 77:20,
91:17, 92:9, 124:25,
164:13
**explained** [1] - 218:24
**explains** [1] - 149:15
**explanation** [6] - 39:2,
101:5, 144:12,
185:8, 189:1, 190:15
**explanatory** [1] - 89:5
**explicit** [1] - 70:17,
111:22
**explicitly** [2] - 70:17,
111:22
**exposed** [1] - 28:7
**express** [1] - 11:13
**extensive** [1] - 27:1

**extent** [2] - 116:3
**extents** [1] - 186:16
**extra** [1] - 62:12
**extremely** [1] - 34:12
**eyewitness** [1] - 7:2
**eyewitnesses** [2] -
72:2, 72:6

## F

*face* [3] - 32:7, 74:17,
123:15
**facilitate** [1] - 72:22
**facing** [1] - 109:14
**fact** [9] - 7:1, 11:2,
23:10, 25:19, 28:22,
57:9, 164:18,
193:15, 213:16
**factor** [1] - 44:14
**facts** [11] - 5:22, 5:23,
5:24, 6:3, 6:5, 7:3,
7:4, 55:13, 57:17,
75:3, 190:5
**factual** [1] - 12:6
**fail** [2] - 48:20, 193:22
**failed** [7] - 14:17, 20:4,
40:21, 48:18, 48:19,
195:1, 195:5
**failing** [5] - 21:25,
22:11, 35:11,
149:24, 198:9
**fails** [1] - 203:16
**failure** [5] - 38:23,
40:23, 42:6, 93:15,
102:11
**fair** [39] - 13:4, 47:8,
69:10, 69:11, 78:3,
78:10, 79:7, 79:16,
79:22, 80:19, 89:12,
90:10, 91:14, 97:22,
101:1, 102:13,
102:17, 103:1,
103:11, 104:5,
105:15, 108:24,
109:8, 109:15,
110:9, 117:16,
125:10, 128:11,
140:12, 149:20,
150:8, 154:3,
154:24, 158:24,
165:14, 172:13,
173:20, 209:23,
220:7
**fairly** [2] - 34:20, 49:9
**faith** [2] - 37:19,
107:16
**faithful** [1] - 75:6
**false** [8] - 34:24, 35:9,
35:13, 35:15, 36:5,
59:7, 64:4, 109:2

**falsely** [1] - 34:16
**falsely-accused** [1] -
34:16
**familiar** [15] - 14:14,
24:22, 56:13,
114:21, 114:22,
115:4, 115:6,
135:12, 138:3,
139:22, 145:20,
162:21, 191:25,
192:3, 203:2
**family** [3] - 88:17,
185:23, 217:24
**far** [4] - 82:15, 116:12,
152:2, 160:24
**fashion** [5] - 39:13,
65:24, 70:10, 71:24,
152:18
**fault** [2] - 5:17, 5:18
**favor** [2] - 53:5, 53:8
**favored** [2] - 53:2,
60:3
**favorite** [1] - 46:19
**favors** [2] - 33:9,
53:10
*FBI* [12] - 13:10, 23:23,
31:15, 31:17, 31:22,
32:3, 32:5, 57:16,
57:20, 58:15, 125:3
**feature** [1] - 57:4
*February* [18] -
158:18, 168:12,
199:11, 200:8,
200:11, 201:12,
201:13, 203:22,
204:20, 206:4,
206:24, 208:10,
211:1, 212:10,
214:1, 214:12,
215:3, 215:9
**federal** [11] - 57:14,
59:8, 59:22, 72:9,
94:1, 125:5, 138:25,
139:17, 147:16,
149:3, 150:15
*Federal* [11] - 1:14,
136:22, 138:10,
145:18, 146:20,
156:22, 156:25,
193:3, 196:8,
196:19, 221:3
**fee** [2] - 65:2, 67:10
**fees** [4] - 40:7, 70:16,
70:18
**fellow** [2] - 8:9, 9:11
**felt** [2] - 47:1, 47:4
**fenced** [1] - 65:20
**few** [13] - 7:20, 18:11,
33:3, 38:1, 48:10,
53:18, 57:17, 66:10,

71:16, 81:8, 102:24, 201:5, 203:17

**FFTM** [42] - 14:3, 14:11, 14:19, 14:25, 15:1, 15:2, 15:19, 16:5, 16:10, 16:12, 16:18, 16:20, 17:2, 17:4, 17:13, 18:7, 20:9, 20:18, 45:12, 46:15, 48:10, 49:1, 148:10, 153:22, 155:1, 155:9, 158:25, 159:6, 159:18, 160:7, 164:1, 164:4, 164:7, 164:15, 165:15, 166:14, 173:9, 181:17, 196:2, 216:19, 216:21

**FFTM's** [10] - 153:16, 159:11, 163:6, 164:19, 165:6, 175:2, 189:16, 189:25, 190:10, 197:13

**FICA** [1] - 14:15

**field** [2] - 112:1, 112:16

**figure** [6] - 21:8, 41:20, 51:1, 70:3, 105:11, 162:5

**figured** [1] - 20:15

**figures** [1] - 144:12

**file** [15] - 37:24, 112:4, 146:15, 146:19, 147:14, 148:13, 149:25, 192:8, 192:9, 194:21, 194:24, 195:1, 195:5, 196:1, 196:17

**filed** [25] - 51:19, 67:22, 85:6, 95:2, 97:6, 111:12, 139:25, 140:4, 140:5, 140:6, 140:8, 144:4, 148:17, 151:5, 151:6, 154:10, 154:17, 172:3, 172:4, 193:16, 193:24, 194:3, 196:19, 200:21, 209:12

**files** [1] - 19:3

**filing** [3] - 154:8, 193:22, 196:7

**filings** [1] - 92:19

**fill** [4] - 90:1, 97:16, 100:12, 102:14

**filled** [4] - 18:4, 101:5, 104:24, 206:1

**filling** [1] - 18:22

**fills** [2] - 100:15, 101:24

**filtering** [1] - 166:6

**final** [3] - 11:17, 12:18, 218:14

**finally** [7] - 6:22, 8:16, 11:10, 13:17, 35:10, 37:14, 66:1

**finance** [1] - 48:15

**Financial** [43] - 14:3, 45:12, 136:24, 138:25, 139:16, 150:15, 153:13, 155:8, 163:2, 163:15, 163:18, 164:15, 166:4, 166:8, 170:12, 170:13, 170:16, 173:8, 181:13, 181:15, 182:2, 182:8, 182:13, 182:21, 183:2, 187:3, 187:12, 187:13, 188:21, 190:4, 194:23, 195:5, 195:25, 202:17, 203:6, 211:15, 212:9, 213:2, 213:8, 213:10, 213:21, 214:20

**financial** [55] - 18:6, 37:23, 48:14, 61:23, 61:24, 77:11, 78:16, 78:18, 78:23, 79:1, 79:24, 80:1, 80:21, 84:18, 85:17, 86:21, 87:1, 87:16, 87:18, 93:7, 98:1, 103:15, 105:12, 106:1, 106:16, 107:2, 108:22, 109:24, 111:22, 127:9, 127:22, 128:23, 130:22, 140:23, 141:3, 155:5, 169:14, 169:21, 170:11, 170:24, 172:3, 173:17, 174:17, 177:3, 177:16, 178:4, 181:24, 183:18, 186:22, 187:7, 187:8, 187:11, 188:15, 204:5, 210:16

**financials** [1] - 80:10

**financing** [4] - 27:11, 48:15, 96:23, 189:8

**findings** [3] - 127:11, 144:1, 166:21

**fine** [6] - 56:1, 83:17, 135:4, 162:6, 204:12, 217:18

**finish** [5] - 61:5, 61:14, 61:20, 175:9, 204:14

**finished** [2] - 10:1, 120:17

**fired** [3] - 66:1, 66:5, 66:16

**firing** [2] - 66:12, 66:15

**firm** [1] - 63:9

**first** [73] - 4:5, 5:5, 5:7, 5:12, 6:9, 11:5, 13:15, 14:1, 24:3, 25:7, 39:14, 49:12, 54:12, 55:16, 74:23, 75:15, 82:4, 83:13, 83:14, 89:20, 89:21, 89:23, 93:12, 123:13, 126:4, 126:5, 128:18, 137:6, 139:2, 145:16, 145:23, 150:17, 150:21, 151:9, 151:16, 156:15, 156:24, 158:15, 158:16, 160:11, 160:21, 161:13, 162:9, 162:10, 166:4, 167:17, 168:1, 171:4, 171:19, 171:23, 172:8, 172:22, 177:18, 183:17, 183:18, 191:25, 193:12, 195:11, 196:5, 199:8, 202:8, 204:20, 206:3, 206:12, 211:18, 212:7, 213:1, 214:7, 214:12, 217:15

**First** [49] - 14:3, 45:12, 136:22, 136:23, 138:10, 138:25, 139:16, 145:18, 150:15, 153:13, 155:7, 156:21, 156:25, 163:1, 163:2, 163:15, 163:18, 164:15, 166:8, 170:12, 170:13, 170:16, 173:8, 181:13, 181:15, 182:2, 182:8, 182:13, 182:21, 183:2,

187:3, 187:11, 187:13, 188:20, 190:4, 193:2, 194:23, 195:4, 195:25, 196:8, 202:17, 203:5, 211:14, 212:9, 213:2, 213:7, 213:10, 213:21, 214:19

**fishy** [1] - 29:21

**fit** [1] - 44:4

**five** [15] - 40:16, 41:23, 45:10, 52:3, 52:9, 52:13, 52:17, 52:20, 60:22, 64:23, 67:6, 114:6, 138:3, 160:21, 172:16

**five-page** [1] - 138:3

**fix** [2] - 29:19, 107:11

**flip** [3] - 81:12, 129:18, 129:21

**floor** [2] - 27:10, 27:13

**flowed** [1] - 19:11

**flowing** [1] - 15:2

**fluctuate** [1] - 29:3

**follow** [13] - 5:25, 6:20, 8:11, 73:18, 102:24, 121:8, 121:16, 122:11, 123:23, 133:1, 133:3, 139:3, 152:10

**follow-up** [3] - 102:24, 121:8, 122:11

**followed** [7] - 32:5, 46:22, 50:23, 50:24, 52:5, 52:6, 63:6

**following** [24] - 4:1, 11:24, 45:8, 46:14, 51:15, 74:1, 90:23, 91:1, 96:15, 100:24, 112:23, 113:6, 118:24, 139:5, 148:18, 149:12, 152:13, 176:3, 178:24, 180:7, 185:6, 193:16, 198:1, 198:13

**follows** [5] - 4:2, 74:2, 118:25, 139:3, 176:4

**FOR** [3] - 1:1, 3:6, 3:13

**forbids** [1] - 54:19

**foregoing** [1] - 221:3

**forensic** [2] - 124:9, 125:1

**forever** [1] - 120:2

**forget** [4] - 10:9, 10:11, 39:6, 128:19

**Form** [48] - 79:20,

80:14, 81:2, 81:24, 82:2, 82:4, 82:6, 84:4, 91:19, 93:6, 94:24, 97:6, 97:12, 99:22, 99:23, 100:19, 101:3, 101:18, 101:19, 104:21, 111:23, 147:9, 150:20, 151:5, 169:18, 172:1, 172:3, 177:3, 184:7, 184:10, 184:19, 186:7, 186:8, 187:6, 189:2, 189:19, 194:24, 195:6, 198:23, 199:5, 202:6, 202:10, 203:21, 203:25, 205:2

**form** [72] - 8:16, 10:20, 16:2, 38:24, 39:2, 39:14, 39:24, 40:2, 40:15, 70:13, 78:21, 79:3, 79:22, 80:13, 80:15, 81:19, 81:23, 84:9, 84:20, 84:21, 84:23, 87:4, 87:7, 87:10, 87:12, 90:24, 91:7, 91:13, 92:15, 95:24, 96:16, 97:8, 97:10, 97:14, 97:16, 97:19, 101:16, 101:17, 102:3, 104:20, 105:17, 106:7, 106:15, 111:6, 112:1, 140:8, 140:10, 140:11, 147:7, 150:23, 167:4, 169:16, 169:17, 171:25, 172:2, 172:8, 173:13, 177:1, 177:25, 183:1, 185:2, 186:3, 186:5, 186:6, 186:25, 187:1, 187:2, 187:18, 188:3, 188:6, 189:15, 206:1

**formal** [1] - 197:24

**formation** [1] - 200:17

**formed** [3] - 16:20, 137:12, 181:22

**former** [1] - 31:15

**forms** [22] - 18:4, 18:11, 18:22, 40:3, 78:13, 78:18, 78:22, 81:15, 82:13, 82:14, 83:7, 98:3, 98:22, 102:15, 104:24, 115:8, 150:20, 154:23, 205:4

**formula** [1] - 184:18
**forth** [8] - 13:22, 74:22, 101:19, 108:14, 108:24, 117:8, 123:22, 186:8
**forward** [18] - 22:4, 31:17, 84:23, 112:10, 119:16, 140:18, 142:8, 143:19, 144:6, 150:10, 154:1, 171:2, 178:22, 180:21, 195:9, 196:13, 208:13, 209:1
**foundation** [3] - 141:17, 141:25, 191:5
**four** [9] - 7:22, 46:13, 46:18, 49:9, 55:4, 57:24, 60:21, 67:6, 170:18
**four-week** [1] - 55:4
**four-year** [2] - 46:13, 49:9
**fourth** [3] - 89:16, 95:17, 148:9
**frame** [6] - 109:17, 124:15, 170:18, 197:7, 197:12, 198:19
**fraud** [6] - 76:1, 76:23, 77:1, 110:19, 116:12, 122:8
**fraudulent** [1] - 76:25
**free** [2] - 67:14, 133:11
**freedom** [1] - 56:15
**frequency** [1] - 93:25
**Friday** [3] - 119:17, 120:7, 120:12
**friend** [9] - 13:6, 13:11, 25:7, 25:10, 30:8, 46:6, 65:18, 66:4, 67:2
**friend's** [1] - 13:11
**friends** [1] - 185:23
**friendships** [1] - 45:5
**front** [11] - 82:1, 83:10, 87:12, 87:13, 89:25, 123:20, 130:15, 135:10, 154:2, 171:20, 219:18
**fronts** [1] - 160:14
**frustrated** [1] - 31:18
**fuck** [1] - 32:24
**fucking** [2] - 32:20, 32:23
**full** [14] - 14:18, 40:6, 78:23, 79:1, 88:14,

99:20, 99:25, 111:7, 111:9, 113:11, 113:23, 117:13, 146:18, 184:6
**function** [3] - 76:13, 112:11, 122:4
**fund** [3] - 99:1, 99:4
**fundamental** [1] - 54:18
**fundamentalist** [1] - 43:18
**fundamentally** [1] - 133:10
**fundraisers** [1] - 67:9
**funds** [14] - 86:16, 92:12, 94:11, 101:10, 155:6, 157:15, 165:10, 177:12, 182:10, 182:17, 182:20, 183:10, 185:23, 212:11
**funny** [1] - 72:13
**furnished** [1] - 26:2
**furniture** [1] - 89:9
**FURTHER** [1] - 122:13
**furthermore** [1] - 68:3
**furtive** [2] - 53:2, 71:24
**furtive-looking** [1] - 71:24
**FUTA** [1] - 98:23
**future** [3] - 85:17, 164:9, 185:18

# G

**gain** [1] - 46:21
**gained** [1] - 46:15
**game** [5] - 50:22, 67:7, 67:8, 69:10, 69:11
**garbage** [18] - 35:5, 36:12, 36:17, 37:3, 49:13, 49:17, 49:20, 49:23, 50:13, 51:2, 52:9, 52:20, 58:25, 59:21, 62:3
**Gary** [1] - 45:2
**gather** [1] - 127:16
**gathered** [2] - 80:8, 89:18
**gathering** [3] - 78:21, 86:22, 91:4
**genally** [1] - 127:6
**general** [5] - 14:8, 25:25, 26:1, 48:22, 124:19
**generally** [25] - 39:21, 45:14, 79:8, 82:1, 94:22, 105:1,

106:20, 107:4, 107:13, 113:21, 127:23, 138:20, 139:15, 139:19, 140:22, 142:10, 142:20, 143:21, 155:3, 169:12, 191:8, 191:18, 193:12, 198:16, 199:8
**generation** [1] - 56:14
**gentleman** [1] - 125:23
**gentlemen** [18] - 18:5, 22:24, 24:2, 34:19, 41:10, 47:14, 61:16, 73:3, 73:9, 76:11, 92:10, 124:4, 124:14, 137:22, 138:6, 169:13, 171:15, 217:21
**Gerald** [1] - 81:3
**GERALD** [3] - 3:10, 123:13, 124:1
**Gerard** [2] - 123:10, 123:13
**given** [11] - 6:16, 8:19, 9:19, 11:17, 38:17, 62:6, 66:15, 109:8, 117:24, 188:4, 211:10
**glasses** [1] - 125:24
**goal** [6] - 105:8, 108:17, 113:23, 113:25, 117:13, 117:14
**God** [1] - 59:23
**golf** [2] - 23:4, 67:7
**Google** [1] - 53:24
**gosh** [1] - 39:10
**Government** [7] - 1:12, 3:3, 144:21, 192:18, 192:19, 200:24
**government** [40] - 7:18, 12:9, 12:13, 12:21, 25:20, 35:14, 35:19, 38:9, 39:5, 39:13, 39:15, 39:16, 40:23, 51:8, 51:16, 53:20, 54:23, 59:3, 60:23, 61:22, 67:11, 68:1, 68:9, 68:13, 69:5, 71:12, 72:21, 74:4, 74:24, 86:7, 95:15, 97:21, 119:2, 122:11, 130:9, 130:10, 133:3, 176:12, 197:21, 198:3

**GOVERNMENT** [3] - 3:6, 3:13, 12:24
**government's** [2] - 60:15, 200:1
**GOVERNMENT'S** [2] - 75:12, 124:1
**Government's** [89] - 81:11, 81:18, 81:25, 82:8, 82:20, 83:2, 83:13, 83:14, 83:19, 85:22, 88:11, 89:16, 93:1, 93:12, 96:3, 97:11, 101:13, 137:20, 138:13, 138:16, 138:20, 139:9, 139:11, 140:18, 141:15, 142:9, 143:11, 143:13, 143:20, 144:19, 145:3, 145:16, 149:12, 150:3, 150:11, 152:11, 154:3, 154:13, 155:3, 156:14, 157:6, 157:17, 158:14, 159:16, 161:21, 165:13, 166:16, 168:9, 168:23, 169:3, 169:11, 170:5, 171:2, 171:4, 171:7, 171:19, 171:23, 174:17, 175:1, 176:25, 177:18, 188:18, 189:18, 190:23, 191:7, 191:17, 191:24, 192:14, 192:18, 192:24, 195:9, 196:14, 197:22, 198:15, 198:22, 199:3, 199:22, 200:5, 200:14, 200:15, 200:18, 201:24, 202:8, 204:18, 205:15, 207:25, 210:1, 213:24, 217:3
**graduation** [1] - 45:8
**grand** [1] - 160:13
**granted** [1] - 19:22
**grapple** [5] - 49:17, 50:13, 50:21, 51:2
**gratuity** [2] - 13:16, 20:20
**greased** [1] - 72:19
**Great** [37] - 21:10, 21:18, 21:23, 22:10, 22:21, 22:22, 22:25, 23:5, 23:14, 23:18,

25:5, 25:24, 26:7, 27:9, 27:23, 28:4, 28:7, 28:20, 28:22, 28:24, 28:25, 29:1, 29:7, 29:20, 35:2, 37:5, 37:10, 37:12, 43:5, 46:25, 52:4, 52:11, 53:12, 59:18, 60:14, 63:20, 64:3
**great** [1] - 185:18
**greater** [2] - 9:19, 42:23
**greatly** [1] - 38:19
**grew** [3] - 43:19, 43:22, 44:9
**gross** [5] - 93:25, 179:12, 179:15, 204:3, 204:23
**group** [4] - 107:20, 199:7, 199:23, 200:9
**growing** [1] - 43:20
**grown** [1] - 17:22
**guaranteed** [3] - 182:9, 182:15, 183:9
**guess** [6] - 23:7, 25:3, 30:21, 107:24, 165:3, 193:24
**guidance** [3] - 7:10, 69:9, 185:2
**guide** [1] - 5:20
**guideline** [1] - 193:13
**guides** [1] - 184:20
**guilt** [2] - 7:19, 12:13
**guilty** [5] - 7:15, 7:17, 13:23, 33:21, 63:16
**gun** [1] - 127:2
**guns** [2] - 89:10, 126:25
**guy** [10] - 5:14, 46:6, 58:14, 66:11, 66:12, 66:16, 71:2, 71:3, 71:13, 72:12
**guys** [5] - 49:21, 72:17, 79:10, 80:2, 126:25
**GVC** [92] - 15:18, 15:20, 15:23, 16:3, 16:16, 16:25, 17:1, 17:2, 18:7, 18:12, 18:19, 20:8, 20:13, 24:25, 48:21, 137:15, 137:17, 137:18, 142:11, 142:17, 143:7, 158:17, 159:21, 159:22, 160:1, 160:4, 160:5, 160:7, 160:13, 160:15, 160:20, 160:21, 161:8, 161:13,

161:23, 162:11, 162:16, 164:6, 164:7, 164:14, 165:15, 165:23, 166:12, 168:11, 173:11, 178:1, 179:8, 180:20, 181:6, 181:17, 186:1, 189:15, 190:1, 197:8, 197:9, 197:11, 197:13, 198:10, 198:18, 199:2, 199:5, 199:13, 200:10, 201:11, 202:20, 202:22, 203:7, 203:16, 203:22, 203:23, 203:25, 204:6, 204:20, 204:25, 205:4, 205:8, 206:6, 206:20, 208:6, 208:15, 209:3, 209:11, 209:16, 213:25, 214:23, 215:4, 215:8, 215:13, 215:17, 215:25
**GVC's** [1] - 160:19
**GVCs** [1] - 204:17

### H

**H-A-T-A-G-A-N** [1] - 123:14
**Hadley** [2] - 34:6, 219:23
**HADLEY** [4] - 1:18, 219:14, 219:19, 219:25
**hair** [1] - 125:24
**half** [2] - 52:1, 174:23
**HAMMOND** [1] - 1:2
**Hammond** [3] - 1:5, 1:14, 221:9
**hand** [12] - 8:23, 10:16, 35:21, 52:12, 86:3, 92:4, 93:4, 152:17, 174:4, 205:18, 205:19, 205:20
**handle** [2] - 38:2, 38:22
**handled** [2] - 36:14, 37:2
**handles** [1] - 110:18
**handling** [1] - 37:24
**handoff** [1] - 71:24
**hands** [1] - 20:11
**handwriting** [1] -

104:25
**handwritten** [1] - 197:15
**hanging** [1] - 122:25
**happy** [1] - 63:12
**hard** [5] - 47:4, 47:6, 48:5, 49:5, 57:15
**hardship** [1] - 145:12
**harm** [1] - 112:24
**harmed** [1] - 113:7
**Hatagan** [8] - 81:3, 123:10, 123:14, 168:19, 175:25, 176:5, 176:24, 198:7, 217:19
**hatagan** [1] - 123:11
**HATAGAN** [2] - 3:10, 124:1
**haul** [1] - 49:22
**Haven** [1] - 44:19
**head** [5] - 22:15, 51:7, 105:7, 161:25, 163:22
**headquarters** [1] - 163:11
**health** [2] - 24:12, 50:15
**healthcare** [8] - 24:1, 24:4, 24:9, 24:10, 24:14, 24:19, 24:21, 29:24
**healthy** [1] - 48:7
**hear** [39] - 15:20, 20:23, 21:23, 22:5, 22:9, 22:15, 24:2, 24:10, 24:13, 26:15, 27:9, 27:17, 28:1, 29:1, 30:8, 32:19, 32:25, 34:6, 34:7, 39:3, 42:22, 44:17, 45:7, 48:12, 50:2, 51:24, 52:14, 53:14, 53:21, 57:8, 57:12, 57:18, 57:19, 60:25, 61:18, 70:8, 71:1, 72:1, 72:8
**heard** [8] - 6:22, 11:16, 34:14, 36:19, 40:10, 52:23, 61:12, 218:13
**hearing** [4] - 42:11, 65:17, 145:10, 219:17
**hearsay** [1] - 130:21
**heart** [1] - 46:8
**heavy** [2] - 35:7, 49:22
**held** [19] - 4:1, 14:12, 39:4, 54:12, 75:23, 75:24, 76:8, 124:15, 129:6, 155:14,

155:19, 199:25, 200:4, 210:21, 211:21, 212:8, 212:12, 213:7, 213:14
**help** [9] - 8:4, 10:14, 13:6, 48:16, 72:23, 76:15, 76:24, 141:18, 218:9
**helped** [2] - 35:8, 169:5
**helpful** [1] - 95:22
**helping** [1] - 14:4
**hide** [1] - 13:3
**hiding** [1] - 19:21
**high** [2] - 63:4, 71:12
**high-level** [1] - 63:4
**Highlands** [2] - 46:7, 46:10
**highlighted** [1] - 28:20
**himself** [9] - 15:1, 16:2, 20:9, 21:11, 24:20, 36:21, 51:23, 161:4, 188:13
**hire** [3] - 15:19, 24:19, 44:20
**hired** [1] - 24:20
**hiring** [1] - 58:14
**history** [1] - 140:11
**hit** [2] - 47:6, 48:5
**Hobart** [1] - 44:25
**hold** [1] - 54:6
**holding** [2] - 20:9, 92:13
**holiday** [3] - 120:7, 120:8, 120:15
**HOLLISTER** [1] - 1:19
**home** [5] - 9:5, 43:19, 48:15, 65:9, 181:25
**homes** [1] - 43:22
**honest** [2] - 43:4, 162:3
**honestly** [1] - 42:7
**Honor** [50] - 4:13, 4:19, 12:22, 40:25, 42:17, 43:15, 45:20, 47:9, 47:23, 56:5, 56:20, 58:3, 58:17, 58:18, 59:10, 59:15, 61:4, 61:21, 67:18, 69:18, 74:5, 74:7, 75:10, 83:8, 102:19, 108:1, 119:3, 119:7, 119:10, 122:12, 129:16, 129:23, 132:1, 133:16, 135:15, 143:15, 167:9, 168:20, 171:10, 172:7, 176:7, 176:11,

176:14, 176:17, 176:22, 191:2, 207:4, 207:13, 217:18, 219:14
**honor** [1] - 13:19
**HONORABLE** [1] - 1:9
**hopefully** [2] - 18:20, 218:18
**Horizon** [27] - 23:17, 155:15, 156:18, 157:23, 174:7, 199:15, 199:20, 199:24, 200:3, 200:6, 200:12, 205:13, 205:20, 206:14, 208:2, 210:20, 211:20, 212:6, 212:9, 212:12, 212:17, 213:7, 213:12, 213:14, 214:15
**hosting** [1] - 166:6
**hour** [1] - 117:24
**hours** [2] - 48:15, 59:23
**household** [1] - 43:13
**houses** [2] - 47:6
**human** [1] - 31:23
**hump** [1] - 35:7
**hundred** [6] - 39:7, 42:12, 46:13, 112:22, 113:5, 113:19
**hundreds** [3] - 103:21, 114:15, 115:25
**hydraulic** [1] - 49:17

### I

**I/we** [7] - 101:16, 101:17, 101:18, 185:5, 186:5, 186:6, 186:7
**idea** [3] - 20:25, 21:5, 71:2
**identification** [7] - 93:22, 129:14, 142:9, 143:4, 143:20, 187:20, 198:15
**identified** [1] - 126:1
**identifies** [1] - 16:2
**identify** [6] - 19:10, 77:1, 105:8, 131:14, 133:9, 147:7
**identifying** [2] - 98:13, 99:9
**ignore** [2] - 6:15, 119:25
**illegitimate** [1] - 60:25

**imagine** [2] - 103:9, 106:12
**immediately** [2] - 38:14, 146:24
**impact** [2] - 47:1, 103:10
**impede** [1] - 42:7
**impeded** [2] - 20:17, 37:16, 42:20
**impeding** [3] - 13:15, 19:1, 20:21
**implication** [1] - 36:15
**important** [20] - 9:23, 11:3, 14:6, 19:13, 19:14, 32:9, 34:12, 40:15, 60:18, 62:21, 65:3, 65:12, 72:15, 84:5, 84:9, 85:15, 88:8, 88:15, 95:20, 146:23
**importantly** [2] - 22:3, 26:17
**imposed** [1] - 149:21
**imposing** [1] - 51:8
**impound** [4] - 65:5, 65:10, 65:15, 65:20
**impression** [1] - 9:20
**improper** [6] - 6:12, 45:21, 61:8, 62:6, 131:20, 207:4
**improve** [1] - 189:9
**IN** [1] - 1:1
**inability** [1] - 41:4
**Inc** [1] - 202:17
**incentivize** [1] - 27:19
**incentivized** [2] - 27:8, 27:10
**inclined** [1] - 52:22
**include** [20] - 38:1, 86:16, 86:18, 88:21, 89:9, 89:10, 92:17, 92:19, 92:20, 93:17, 95:13, 96:1, 96:23, 99:21, 99:23, 146:25, 148:22, 177:11, 177:13, 184:9
**included** [4] - 26:17, 59:20, 64:4, 157:13
**includes** [3] - 8:9, 73:18, 217:24
**including** [10] - 8:10, 16:23, 45:5, 54:4, 70:15, 86:5, 86:8, 95:16, 101:21, 186:10
**income** [45] - 13:3, 14:13, 18:13, 19:21, 23:14, 39:12, 79:12, 80:2, 84:8, 85:8,

85:14, 86:23, 89:19, 90:7, 91:20, 92:6, 92:23, 92:24, 94:15, 97:6, 98:16, 99:20, 99:25, 102:14, 109:18, 136:12, 136:14, 144:4, 147:16, 149:3, 166:22, 170:8, 173:1, 180:11, 180:12, 180:14, 180:22, 180:25, 184:6, 185:11, 195:17, 196:18, 197:3

**Income** [1] - 96:5

**incomplete** [3] - 106:7, 107:6, 116:8

**inconvenient** [1] - 34:11

**incorporated** [2] - 93:24, 187:21

**incorrect** [6] - 106:23, 111:16, 114:18, 115:13, 116:17, 117:1

**increase** [1] - 85:14

**increased** [3] - 109:14, 154:6, 154:7

**increases** [1] - 85:7

**incredibly** [1] - 55:23

**incumbents** [1] - 57:6

**independent** [2] - 7:23, 218:4

**INDEX** [3] - 3:1, 3:5, 3:11

**index** [2] - 171:20, 171:21

**INDIANA** [1] - 1:1

**Indiana** [37] - 1:5, 1:14, 1:19, 1:20, 2:3, 2:7, 13:5, 14:6, 15:9, 15:14, 20:22, 20:24, 23:9, 23:12, 24:11, 47:7, 48:21, 52:6, 54:6, 57:21, 57:22, 137:18, 145:19, 159:22, 161:18, 163:16, 178:8, 200:16, 203:1, 210:11, 211:11, 216:5, 216:14, 216:16, 217:4, 221:8

**Indianapolis** [2] - 1:20, 2:3

**indicate** [5] - 6:1, 127:10, 146:13, 183:25, 196:5

**indicated** [6] - 67:24, 68:12, 134:7,

194:23, 194:25, 198:7

**indicates** [1] - 196:25

**indicating** [4] - 6:2, 167:14, 192:11, 196:3

**Indicating** [1] - 118:6

**indicating)** [1] - 132:18

**indication** [1] - 166:20

**indications** [1] - 116:12

**indicators** [2] - 77:1, 122:8

**indicted** [3] - 42:10, 115:13, 115:17

**Indictment** [7] - 7:13, 34:20, 34:25, 42:11, 43:1, 64:5

**indictment** [3] - 39:17, 57:11, 115:18

**individual** [33] - 9:14, 76:18, 78:17, 78:19, 78:24, 86:20, 88:14, 107:18, 129:5, 129:12, 144:4, 144:14, 144:15, 153:24, 159:24, 160:17, 166:22, 170:8, 173:1, 173:2, 177:3, 177:15, 178:3, 187:8, 191:20, 193:20, 193:23, 195:16, 195:17, 195:21, 196:18, 197:3, 197:24

**individual's** [2] - 62:9, 194:6

**individually** [1] - 8:25

**individuals** [9] - 7:24, 26:23, 85:25, 90:21, 124:19, 129:7, 138:9, 188:1, 218:5

**industrial** [1] - 37:6

**industries** [1] - 182:1

**industry** [6] - 40:22, 45:9, 47:5, 48:3, 49:24, 109:18

**infer** [1] - 7:3

**inflated** [1] - 38:19

**influence** [2] - 35:1, 87:19

**influenced** [2] - 6:13, 9:16

**inform** [2] - 28:12, 68:20

**information** [93] - 8:3, 8:5, 18:25, 20:4, 34:17, 37:23, 53:14,

57:17, 78:21, 79:2, 79:8, 79:9, 79:16, 79:22, 79:25, 80:1, 80:5, 80:6, 80:7, 80:21, 83:20, 83:24, 83:25, 84:2, 84:3, 84:5, 84:12, 84:16, 84:19, 85:3, 85:16, 85:25, 86:22, 89:18, 90:18, 91:7, 91:9, 91:24, 92:24, 93:21, 94:16, 94:19, 95:5, 95:18, 95:20, 95:25, 96:12, 97:23, 98:5, 98:8, 98:9, 99:21, 102:3, 102:5, 102:7, 102:10, 102:11, 102:14, 102:15, 104:1, 105:5, 105:6, 105:22, 105:25, 106:2, 106:10, 106:16, 106:25, 108:23, 109:20, 111:16, 112:5, 114:18, 115:13, 116:9, 117:17, 127:14, 127:16, 130:21, 133:10, 150:8, 173:17, 174:18, 179:22, 183:19, 184:10, 184:12, 186:22, 198:8, 202:6, 204:5, 218:8, 218:10

**informational** [1] - 93:19

**informs** [1] - 100:25

**initial** [1] - 32:14

**initials** [7] - 38:5, 173:23, 174:1, 174:2, 178:18, 178:20, 202:11

**initiate** [1] - 126:20

**injuries** [4] - 50:1, 50:14, 60:22

**innocence** [1] - 12:15

**innocent** [2] - 7:16, 12:12

**innovation** [1] - 26:17

**inside** [1] - 53:15

**installment** [14] - 19:5, 19:8, 40:9, 42:3, 70:12, 77:5, 77:21, 78:9, 78:13, 84:6, 102:17, 104:10, 112:8

**Installment** [8] - 19:12, 19:19, 19:23, 20:2, 77:23, 94:14, 146:23, 147:2

**installments** [1] - 19:5

**instance** [8] - 106:7, 107:14, 113:18, 147:8, 157:11, 160:18, 172:4, 172:24

**instances** [1] - 10:19

**instead** [7] - 24:16, 27:14, 35:12, 37:1, 40:5, 51:9, 187:7

**institutions** [1] - 40:24

**instruct** [4] - 6:6, 6:18, 35:18, 75:1

**instructed** [1] - 8:17

**instruction** [6] - 6:20, 117:24, 175:18, 179:10, 184:19, 217:22

**Instructions** [1] - 3:2

**instructions** [7] - 5:20, 7:4, 11:17, 12:17, 75:2, 185:2, 218:14

**insufficient** [2] - 99:20, 184:5

**insurance** [11] - 50:15, 62:23, 62:24, 63:13, 85:9, 88:8, 88:10, 97:1, 97:2, 178:15, 179:14

**integrity** [1] - 36:14

**intend** [3] - 39:1, 145:9, 146:10

**intended** [1] - 6:1

**intensive** [1] - 79:19

**Intent** [4] - 14:19, 138:7, 146:16, 168:5

**intentional** [1] - 38:25

**interest** [31] - 40:7, 42:13, 42:21, 48:1, 86:21, 87:2, 87:15, 87:18, 88:22, 97:20, 102:7, 137:1, 140:7, 144:17, 146:11, 148:22, 150:4, 150:5, 151:25, 152:3, 152:5, 155:10, 167:6, 177:17, 178:4, 178:9, 197:21, 198:3, 210:9, 210:10, 210:16

**interesting** [3] - 22:24, 57:17, 71:11

**interestingly** [1] - 23:16

**Internal** [6] - 75:19, 101:9, 102:6, 111:13, 146:16, 185:13

**internal** [3] - 77:4, 102:4, 196:16

**internet** [3] - 8:2, 218:3, 218:7

**interpret** [1] - 12:19

**intersection** [2] - 37:8, 63:19

**interstate** [2] - 219:12, 219:15

**interviewed** [2] - 23:21, 72:4

**interviewing** [1] - 23:24

**interviews** [1] - 127:12

**introduced** [3] - 21:11, 34:4, 74:25

**inventory** [1] - 89:5, 92:18, 96:2

**investigate** [1] - 79:3

**investigating** [1] - 103:6

**investigation** [34] - 13:10, 57:14, 61:2, 66:22, 67:1, 71:20, 72:5, 77:16, 80:8, 100:16, 106:3, 116:10, 124:8, 125:3, 125:14, 126:5, 126:6, 126:9, 126:18, 126:19, 126:20, 126:21, 126:22, 127:6, 127:22, 127:23, 128:3, 128:18, 128:20, 135:18, 167:13, 173:21, 173:22

**investigations** [2] - 124:9, 124:11

**investigators** [3] - 59:3, 59:8, 124:6

**investment** [2] - 86:25, 177:9

**investments** [5] - 86:14, 96:19, 177:11, 178:2, 210:4

**invitation** [2] - 25:25, 72:25

**invitations** [1] - 73:1

**invited** [2] - 51:10, 60:7

**invoice** [6] - 142:23, 143:9, 162:19, 163:14, 165:19, 166:3

**Invoice** [1] - 166:12

**invoices** [20] - 16:19, 17:1, 24:23, 143:5, 143:6, 160:25,

161:1, 161:11, 162:10, 163:18, 163:21, 163:25, 164:3, 164:5, 165:14, 165:24, 168:9, 180:15, 190:10

*involve* [2] - 76:17, 103:6

*involved* [27] - 7:25, 9:3, 36:13, 36:14, 36:20, 45:16, 46:3, 48:2, 51:24, 85:2, 85:5, 87:1, 103:21, 113:15, 120:10, 120:11, 125:2, 125:13, 126:5, 127:7, 128:18, 135:18, 155:6, 156:20, 217:25, 218:5

*involvement* [1] - 52:25

*involves* [1] - 33:2

*involving* [2] - 38:2, 51:15

*IRAs* [2] - 86:17, 177:13

*irrelevant* [1] - 131:21

*IRS* [153] - 13:3, 13:4, 13:10, 14:10, 14:16, 14:18, 14:19, 14:21, 14:25, 15:3, 15:4, 15:21, 16:8, 16:12, 16:18, 17:5, 17:7, 17:8, 17:10, 17:16, 17:20, 17:23, 18:1, 18:5, 18:12, 18:24, 19:4, 19:14, 19:15, 19:18, 19:20, 19:22, 20:5, 20:12, 20:15, 20:17, 20:21, 23:23, 35:12, 37:16, 37:20, 37:24, 38:25, 39:23, 40:4, 41:15, 41:24, 43:4, 75:23, 76:3, 78:25, 79:25, 84:5, 85:3, 85:13, 85:16, 87:20, 88:9, 89:14, 94:13, 95:20, 97:16, 98:4, 99:7, 100:11, 101:24, 102:7, 104:18, 107:20, 108:20, 109:10, 112:14, 112:19, 112:22, 112:24, 113:5, 113:7, 113:18, 114:19, 114:22, 115:12, 115:22, 120:20, 124:8, 124:12,

124:15, 124:20, 126:10, 128:5, 128:25, 129:1, 129:4, 129:6, 129:8, 129:9, 135:24, 135:25, 136:2, 138:7, 139:4, 139:6, 139:20, 139:22, 139:25, 140:3, 140:9, 140:11, 143:23, 145:6, 145:13, 145:14, 147:23, 147:25, 148:3, 148:8, 148:20, 150:5, 152:6, 153:12, 153:14, 154:15, 155:1, 155:22, 158:2, 158:24, 158:25, 164:9, 164:17, 164:18, 165:9, 165:10, 170:1, 183:21, 184:21, 185:22, 186:16, 186:19, 189:12, 189:20, 191:10, 191:15, 191:19, 193:14, 193:18, 193:24, 194:5, 196:4, 197:1, 206:2, 216:19, 216:20

*IRS's* [9] - 13:15, 14:23, 19:2, 42:8, 88:5, 102:16, 144:1, 165:7, 166:21

*issue* [5] - 41:5, 49:12, 63:8, 68:15, 201:3

*issued* [23] - 59:9, 61:2, 77:14, 88:2, 138:7, 138:8, 138:9, 138:10, 142:23, 143:6, 148:14, 148:25, 158:17, 160:14, 161:8, 166:12, 199:5, 200:10, 203:25, 206:20, 213:25, 215:8, 216:19

*issues* [10] - 52:2, 56:22, 62:23, 99:7, 103:14, 103:21, 103:25, 135:19, 142:17

*IT* [7] - 24:1, 24:4, 24:9, 24:15, 24:19, 24:21, 29:24

*Item* [3] - 85:14, 85:15, 86:1

*item* [3] - 6:18, 157:11, 215:15

*items* [11] - 78:20, 90:23, 90:25, 93:19, 96:15, 96:17, 96:18, 156:17, 180:7, 198:13, 199:24

*Items* [2] - 89:17, 90:10

*itself* [1] - 53:19

---

## J

*Jackie* [1] - 34:3

*JACKIE* [1] - 1:17

*James* [136] - 13:1, 13:6, 13:10, 13:14, 14:8, 14:17, 14:20, 14:24, 14:25, 15:1, 15:9, 15:17, 15:22, 15:25, 16:8, 16:11, 16:22, 17:5, 17:12, 17:16, 17:19, 17:22, 18:23, 19:20, 20:7, 20:13, 20:16, 20:20, 20:23, 22:10, 22:15, 22:20, 22:23, 23:1, 23:3, 23:18, 23:21, 23:23, 24:4, 24:12, 24:13, 24:16, 24:23, 25:1, 25:22, 28:11, 28:16, 29:23, 30:1, 30:5, 30:8, 30:13, 30:21, 30:24, 31:1, 31:9, 31:14, 31:25, 32:5, 32:6, 32:12, 32:15, 33:3, 33:7, 33:17, 33:19, 34:5, 34:21, 34:25, 35:14, 35:16, 36:1, 37:15, 37:19, 40:16, 42:23, 42:25, 43:3, 43:10, 44:6, 44:16, 45:8, 46:3, 46:9, 47:25, 49:5, 49:14, 57:13, 57:24, 58:13, 61:23, 65:18, 66:21, 67:2, 67:14, 67:15, 71:1, 71:18, 72:11, 72:15, 125:17, 138:11, 144:4, 145:19, 181:13, 182:2, 182:5, 182:7, 182:12, 188:3, 197:1, 198:25, 199:6, 199:11, 199:13, 199:19, 199:25, 201:12, 202:16, 202:19, 205:22, 206:8, 206:22, 208:8, 208:17, 209:7, 209:18, 211:8,

212:2, 212:12, 213:3, 216:15, 217:2

*JAMES* [1] - 1:5

*January* [16] - 1:5, 15:24, 18:10, 19:9, 49:10, 66:18, 66:20, 71:6, 82:5, 84:22, 148:17, 156:1, 197:10, 202:21, 203:12, 221:7

*jay* [1] - 4:8

*JAYNA* [1] - 1:18

*Jayna* [1] - 34:5

*Jbennett@Taftlaw. Com* [1] - 1:21

*JC* [1] - 30:24

*jcacioppo@taftlaw. com* [1] - 1:21

*Jeff* [1] - 153:25

*jewelry* [1] - 89:9

*Jill* [1] - 13:18

*JILL* [1] - 1:12

*jill.koster@usdoj. gov* [1] - 1:16

*job* [12] - 9:22, 13:21, 14:23, 25:22, 33:9, 58:12, 62:12, 62:17, 65:23, 66:16, 72:22, 136:11

*jobs* [3] - 48:25, 57:7, 62:11

*Joe* [4] - 132:11, 132:13, 141:6

*John* [14] - 30:7, 30:8, 30:15, 30:18, 30:24, 31:11, 32:19, 33:3, 43:7, 66:19, 67:13, 67:16, 71:13, 71:14

*joined* [1] - 30:5

*Jon* [1] - 44:20

*Jones* [1] - 28:3

*Joseph* [2] - 132:1, 132:4

*JOSEPH* [1] - 1:9

*JR* [1] - 1:17

*JS* [2] - 30:23, 32:14

*judge* [7] - 4:20, 54:8, 67:22, 68:8, 81:5, 115:15, 119:19

*Judge* [10] - 54:13, 55:8, 117:9, 130:12, 133:21, 133:23, 135:4, 142:4, 144:24, 190:10, 192:22, 201:2, 204:14, 207:17, 207:21, 219:3, 219:13

*judges* [1] - 5:23

*judgment* [1] - 60:24

*juice* [3] - 32:22, 32:23, 32:24

*July* [16] - 14:19, 14:20, 23:21, 139:1, 146:1, 150:15, 151:24, 152:9, 153:10, 159:14, 159:17, 168:5, 168:6, 200:21, 217:6, 217:16

*jumping* [1] - 74:22

*June* [6] - 126:7, 128:20, 151:9, 153:5, 158:18

*Jurgensen* [12] - 30:11, 30:15, 30:19, 31:14, 31:15, 32:2, 32:9, 32:17, 32:21, 70:24, 72:8, 73:1

*juror* [6] - 9:11, 9:15, 9:17, 9:18, 9:20, 11:7

*jurors* [11] - 7:20, 7:21, 8:9, 8:12, 9:10, 11:10, 34:10, 55:5, 73:18, 120:18, 217:24

*jury* [48] - 4:6, 4:7, 4:16, 5:6, 5:9, 5:19, 9:25, 10:4, 34:3, 34:10, 45:22, 73:10, 74:10, 75:5, 76:12, 77:9, 81:25, 83:8, 92:10, 100:8, 105:4, 119:2, 119:4, 119:8, 119:13, 119:15, 119:16, 121:10, 124:4, 124:14, 124:25, 137:22, 138:6, 144:25, 146:3, 154:14, 160:13, 161:21, 169:13, 171:15, 172:11, 176:12, 176:15, 176:18, 179:19, 193:17, 202:3, 217:21

*JURY* [1] - 1:9

*Jury* [8] - 5:10, 73:22, 74:11, 118:19, 120:3, 175:24, 176:19, 218:19

*justice* [3] - 34:13, 34:15, 75:7

*Justice* [1] - 57:16

---

## K

*keep* [14] - 7:5, 11:3, 11:15, 20:2, 28:4, 48:9, 48:13, 48:17,

48:25, 57:25, 58:8, 73:6, 192:9, 218:12
**keeping** [1] - 44:23
**keeps** [1] - 148:2
**Keogh** [1] - 177:13
**Keoghs** [1] - 86:18
**kept** [2] - 41:17, 158:2
**kind** [21] - 36:16, 50:13, 60:8, 66:1, 69:10, 72:18, 77:14, 79:8, 79:9, 83:25, 86:22, 95:25, 96:18, 127:21, 127:23, 128:9, 135:19, 149:8, 165:22, 184:20, 193:13
**kinds** [7] - 6:25, 7:6, 8:9, 49:24, 51:1, 71:1, 89:12
**kitschy** [1] - 56:15
**Kiwanis** [1] - 67:5
**knee** [2] - 50:1, 50:5
**knocked** [1] - 49:7
**knocking** [1] - 49:6
**knowing** [1] - 13:9
**knowledge** [7] - 77:15, 90:17, 96:11, 101:22, 115:9, 179:21, 186:12
**known** - 35:2, 92:21, 116:16, 137:12, 145:21, 167:18, 169:17, 169:18, 210:6
**knows** [11] - 14:21, 31:25, 59:23, 109:23, 113:9, 115:18, 115:21, 116:20, 121:4, 165:9
**KOSTER** [28] - 1:12, 4:12, 12:22, 12:25, 40:25, 41:9, 42:17, 43:15, 45:20, 47:9, 56:20, 58:3, 58:17, 58:21, 59:10, 59:13, 61:4, 61:6, 61:8, 61:12, 67:18, 67:22, 68:8, 68:17, 68:22, 69:15, 219:21, 220:9
**Koster** [6] - 13:18, 33:23, 54:24, 55:17, 60:6, 69:23
**Kustom** [1] - 31:11

### L

**Ladies** [1] - 217:21
**ladies** [17] - 18:4, 22:24, 24:2, 34:19, 41:10, 47:14, 61:16,

73:3, 73:9, 76:11, 92:9, 124:4, 124:14, 137:22, 138:6, 169:13, 171:15
**lady** [1] - 72:16
**laid** [1] - 141:25
**Lake** [1] - 44:25
**Lakes** [36] - 21:10, 21:18, 21:23, 22:10, 22:21, 22:22, 22:25, 23:5, 23:14, 23:18, 25:5, 25:24, 26:8, 27:9, 27:24, 28:4, 28:7, 28:20, 28:22, 28:24, 28:25, 29:1, 29:7, 29:20, 35:3, 37:5, 37:10, 37:12, 43:6, 52:4, 52:11, 53:12, 59:18, 60:15, 63:20, 64:3
**land** [2] - 88:21, 88:23
**language** [2] - 32:19, 32:20
**large** [7] - 29:4, 40:24, 50:14, 50:24, 54:4, 88:4, 115:11
**larger** [5] - 23:2, 32:8, 50:20, 83:15, 83:16
**last** [26] - 26:16, 50:19, 61:17, 64:6, 75:15, 76:1, 76:21, 85:11, 90:23, 91:3, 92:15, 96:3, 96:15, 97:5, 101:13, 106:15, 123:14, 128:6, 150:7, 180:7, 180:22, 185:20, 186:3, 188:9, 190:17, 209:14
**lastly** [7] - 100:7, 143:19, 199:22, 200:14, 200:18, 203:24, 213:23
**late** [6] - 4:5, 4:15, 50:4, 50:6, 50:22, 219:17
**laugh** [1] - 40:17
**law** [19] - 5:24, 5:25, 8:17, 10:24, 11:17, 12:17, 23:20, 24:3, 25:1, 51:19, 52:6, 57:14, 63:9, 64:19, 75:1, 75:2, 146:14, 218:14
**lawful** [3] - 43:3, 51:15, 70:14
**lawn** [1] - 44:18
**lawns** [1] - 44:21
**laws** [3] - 102:4, 114:22, 114:24

**lawsuit** [1] - 95:1
**lawsuits** [1] - 85:6
**lawyer** [6] - 66:23, 66:24, 67:16, 71:4
**lawyers** [9] - 6:5, 6:10, 6:11, 9:8, 10:1, 10:3, 10:17, 12:18, 36:1
**lay** [1] - 191:4
**leading** [1] - 153:18
**learn** [5] - 26:10, 37:17, 42:24, 43:2, 70:14
**learning** [1] - 39:18
**leased** [3] - 89:4, 92:20, 95:19
**least** [12] - 43:23, 44:6, 44:11, 48:25, 50:20, 53:23, 134:7, 148:10, 153:16, 163:25, 172:14, 194:3
**leave** [4] - 9:6, 218:15, 218:16
**leaves** [1] - 31:9
**leaving** [1] - 71:14
**Lebanon** [2] - 137:18, 159:22
**led** [2] - 40:23, 63:2
**left** [12] - 8:24, 31:16, 32:4, 93:19, 116:9, 151:22, 152:1, 173:18, 205:18, 205:19, 205:20, 211:3
**left-hand** [3] - 205:18, 205:19, 205:20
**legal** [4] - 70:15, 70:16, 70:18, 112:25
**legitimate** [1] - 43:4
**lender** [1] - 27:14
**lenders** [3] - 14:5, 15:17, 96:21
**lending** [2] - 40:24, 48:7
**length** [2] - 49:2, 73:4
**lenses** [2] - 71:18, 71:23
**less** [13] - 17:12, 22:22, 27:6, 27:7, 29:2, 40:11, 60:20, 69:8, 88:14, 88:17, 120:8, 147:20
**letter** [10] - 190:25, 191:9, 191:11, 191:19, 195:8, 195:9, 195:12, 197:22, 197:24, 197:25
**letterhead** [1] - 16:19
**level** [1] - 63:4

**levied** [6] - 158:24, 159:7, 159:18, 160:8, 164:16, 216:21
**levies** [3] - 15:3, 164:9, 216:19
**levy** [22] - 19:16, 92:7, 92:8, 92:11, 92:14, 129:3, 129:4, 129:5, 145:4, 145:6, 145:9, 145:11, 145:14, 146:10, 146:19, 159:10, 159:13, 165:9, 165:11, 168:1, 216:20
**Levy** [4] - 14:19, 138:7, 146:16, 168:5
**levying** [1] - 158:25
**liabilities** [20] - 77:25, 90:18, 96:11, 103:12, 103:14, 122:5, 135:22, 138:23, 138:24, 144:15, 167:3, 167:19, 167:20, 173:1, 179:22, 189:16, 193:20, 195:17, 196:18, 197:4
**liability** [21] - 15:10, 78:7, 86:19, 93:24, 97:18, 140:9, 147:8, 147:17, 149:2, 150:22, 150:24, 151:11, 154:11, 177:14, 181:21, 183:22, 184:2, 184:24, 194:6, 196:24, 210:24
**license** [2] - 63:13, 83:23
**licensed** [3] - 24:5, 24:11, 24:12
**lied** [1] - 23:23
**Lien** [1] - 146:20
**Liens** [1] - 196:19
**lies** [2] - 29:23, 35:16
**life** [6] - 54:7, 56:17, 85:9, 88:8, 88:10, 178:15
**lifetimes** [1] - 49:19
**light** [3] - 29:24, 60:22, 106:1
**limine** [2] - 58:20, 68:6
**limit** [1] - 55:12
**limitations** [1] - 186:16
**limited** [10] - 6:19, 12:4, 15:10, 86:19, 93:23, 116:4,

116:18, 177:14, 181:21, 210:24
**limits** [1] - 65:6
**Line** [2] - 89:4, 89:8
**line** [12] - 28:20, 32:11, 90:14, 153:1, 154:20, 154:21, 156:24, 184:8, 185:16, 186:4, 204:24
**lines** [1] - 73:2
**list** [30] - 6:8, 30:2, 30:6, 34:23, 36:9, 38:24, 43:8, 59:5, 64:21, 65:13, 66:2, 71:5, 72:12, 72:20, 72:24, 86:7, 88:2, 89:22, 90:11, 95:5, 95:16, 102:15, 132:4, 161:13, 187:15, 187:16, 203:10, 203:16, 210:23, 210:24
**listed** [28] - 96:18, 148:7, 150:20, 154:16, 160:5, 160:17, 168:17, 172:5, 173:6, 173:8, 173:15, 177:20, 177:24, 188:2, 188:3, 188:5, 188:6, 188:23, 202:17, 203:11, 203:23, 205:18, 210:5, 211:6, 211:8, 211:9, 212:7, 212:10
**listen** [5] - 9:14, 33:1, 33:16, 73:6, 217:25
**lists** [11] - 23:17, 31:19, 138:11, 172:24, 174:11, 180:22, 184:2, 187:25, 188:14, 202:15, 216:14
**live** [3] - 54:5, 56:9, 65:6
**lives** [1] - 44:7
**living** [1] - 90:7
**LL** [1] - 181:14
**LLC** [21] - 94:18, 136:24, 138:10, 142:18, 143:6, 145:18, 178:10, 182:3, 182:8, 196:8, 200:4, 200:7, 200:17, 210:6, 210:22, 211:10, 211:22, 212:17, 217:7, 217:8, 217:12
**LLP** [2] - 1:19, 2:2

**loan** [11] - 27:12, 27:23, 32:14, 32:18, 71:25, 79:13, 97:5, 182:2, 182:7, 182:12
**loaned** [1] - 79:18
**loans** [7] - 14:4, 16:15, 32:20, 32:21, 33:6, 96:22, 159:24
**local** [9] - 13:7, 35:2, 36:17, 38:12, 43:5, 46:9, 53:5, 53:8, 53:12
**locally** [1] - 53:11
**located** [4] - 14:5, 137:18, 159:22, 202:25
**location** [5] - 65:1, 86:8, 95:16, 163:4, 187:17
**locations** [1] - 33:5
**longtime** [2] - 21:23, 65:18
**look** [72] - 16:10, 41:20, 47:18, 61:23, 67:3, 76:14, 77:11, 77:23, 79:3, 80:5, 80:9, 80:10, 81:8, 81:11, 83:13, 84:10, 85:23, 86:1, 100:13, 127:24, 128:1, 130:25, 131:10, 134:1, 135:9, 135:20, 135:21, 136:18, 137:4, 138:19, 143:21, 149:13, 150:11, 150:17, 152:10, 152:15, 152:17, 156:14, 156:23, 157:17, 158:14, 159:15, 169:11, 174:16, 174:22, 175:1, 177:1, 177:8, 182:18, 183:16, 187:9, 188:18, 189:18, 191:24, 197:23, 198:14, 199:8, 200:1, 201:10, 202:8, 202:9, 205:15, 206:2, 206:11, 207:2, 209:14, 210:18, 211:18, 213:5, 214:10, 215:1, 216:7
**Look** [1] - 17:2
**looked** [7] - 59:8, 62:1, 104:20, 110:1, 137:3, 137:6, 178:8
**looking** [25] - 29:16, 39:16, 71:24, 78:16, 79:12, 79:13, 79:16, 84:8, 85:5, 85:6, 85:8, 88:15, 89:13, 91:1, 92:5, 93:21, 106:18, 127:24, 177:2, 178:13, 183:20, 192:8, 193:19, 207:15
**looks** [5] - 62:11, 105:12, 107:3, 170:1, 172:8
**lose** [1] - 57:6
**losing** [1] - 21:25
**loss** [1] - 97:4
**losses** [1] - 48:14
**lost** [6] - 46:11, 46:14, 49:3, 50:16, 109:18, 181:23
**low** [5] - 27:7, 28:23, 40:19, 52:4, 53:15
**lower** [4] - 28:21, 28:22, 60:10
**lucrative** [1] - 13:12
**lump** [1] - 78:5
**lunch** [7] - 73:9, 73:16, 114:5, 117:24, 118:5, 118:12, 118:13
**lying** [1] - 134:17

## M

**M-C-Q-U-E-N** [1] - 75:17
**Ma'am** [1] - 122:15
**ma'am** [1] - 116:25
**machinery** [2] - 92:17, 96:1
**Mack** [2] - 21:14, 21:16
**main** [4] - 49:12, 122:4, 136:11, 136:14
**maintain** [2] - 29:19, 58:15
**maintained** [1] - 128:4
**maintains** [1] - 30:2
**major** [3] - 52:24, 94:18, 188:7
**majority** [1] - 45:19
**man** [2] - 18:15, 30:11
**manage** [2] - 126:20, 202:25
**managed** [4] - 119:24, 216:24, 216:25, 217:1
**manager** [7] - 14:8, 16:2, 16:3, 20:8, 38:12, 48:22, 126:11
**managing** [3] - 48:24, 188:3, 188:14
**manner** [1] - 44:4
**manufacture** [1] - 35:4
**manufactured** [2] - 26:19, 51:12
**manufacturer** [7] - 27:6, 27:12, 27:14, 27:15, 27:18, 29:8, 36:12
**manufacturer's** [2] - 26:3, 26:7
**manufacturers** [2] - 28:24, 37:7
**march** [2] - 180:5, 189:22
**March** [34] - 17:18, 17:19, 152:25, 167:20, 167:25, 168:6, 169:9, 169:23, 169:24, 170:1, 174:21, 174:24, 180:3, 189:13, 189:21, 190:21, 195:2, 196:11, 199:11, 200:11, 201:13, 204:21, 204:22, 208:19, 209:9, 209:10, 209:20, 213:18, 214:1, 214:7, 215:11, 215:13, 215:17, 215:25
**March/April** [1] - 170:20
**Margaret** [1] - 33:3
**margin** [2] - 52:13, 52:19
**marital** [1] - 83:24
**Mark** [4] - 57:19, 58:11, 68:5, 68:10
**mark** [2] - 57:20, 57:24
**marked** [6] - 129:13, 142:8, 143:3, 143:20, 168:24, 198:14
**market** [4] - 86:5, 95:13, 96:19, 174:9
**marketing** [3] - 158:23, 161:9, 165:24
**Marketing** [26] - 15:16, 18:15, 23:7, 23:10, 137:9, 137:12, 142:18, 143:6, 161:1, 161:16, 161:19, 162:17, 163:9, 165:15, 165:16, 166:13,

168:11, 168:16, 178:10, 181:8, 200:20, 200:22, 203:5, 215:23, 217:8, 217:12
**married** [1] - 45:11
**marshal** [1] - 126:22
**marvelous** [2] - 40:23, 67:10
**matches** [1] - 152:19
**materials** [2] - 8:2, 218:7
**matter** [13] - 34:10, 35:20, 37:2, 51:21, 54:5, 56:8, 56:9, 120:12, 120:13, 169:5, 193:17, 213:16, 221:4
**matters** [6] - 7:5, 7:24, 24:1, 125:6, 218:4
**MATTHEW** [1] - 2:6
**Mayor** [2] - 49:14, 51:21
**mayor** [19] - 13:5, 20:22, 20:24, 22:10, 36:16, 42:2, 42:3, 46:6, 46:10, 49:5, 52:12, 53:1, 53:5, 56:17, 62:10, 62:12, 62:25, 63:18, 65:3
**mayor's** [4] - 46:11, 49:9, 49:12, 57:23
**Mcquen** [6] - 3:7, 74:15, 75:12, 75:17, 120:5, 120:24
**mean** [6] - 91:18, 92:8, 149:2, 150:23, 151:10, 218:22
**meaning** [3] - 18:2, 127:25, 162:25
**means** [9] - 7:22, 32:1, 91:17, 92:9, 111:23, 123:21, 148:8, 151:11, 151:13
**meant** [2] - 132:25, 146:6
**mechanical** [1] - 26:13
**mechanics** [4] - 29:9, 29:14, 29:15, 29:19
**Medicare** [1] - 14:13
**medium** [1] - 53:25
**medium-size** [1] - 53:25
**meet** [7] - 13:24, 25:25, 26:20, 26:22, 26:25, 29:8, 78:7
**meeting** [1] - 81:1
**member** [13] - 15:10, 86:21, 88:17,

138:11, 145:19, 177:16, 178:4, 178:10, 181:13, 188:4, 188:7, 188:14, 210:15
**members** [9] - 5:19, 9:25, 22:19, 28:12, 34:3, 61:3, 94:18, 188:1, 217:1
**memo** [1] - 32:11
**memory** [2] - 9:5, 60:11
**memos** [1] - 24:7
**men** [2] - 30:20, 50:4
**mention** [4] - 44:13, 72:4, 173:11, 185:25
**mentioned** [7] - 60:6, 110:13, 136:6, 181:15, 202:5, 205:25, 210:1
**mentions** [1] - 181:16
**merchandise** [1] - 96:2
**mere** [3] - 17:14, 17:23, 19:24
**merely** [3] - 41:11, 45:23, 47:23
**merged** [2] - 38:11, 48:20
**merger** [1] - 48:24
**Meridian** [1] - 2:3
**Merrillville** [3] - 31:16, 64:11, 65:8
**met** [2] - 60:13, 206:10
**metal** [1] - 120:17
**Miami** [1] - 44:10
**Michigan** [1] - 45:2
**microphone** [2] - 123:20, 130:15, 219:18, 219:24
**mid** [3] - 45:11, 46:5, 50:6
**middle** [3] - 146:2, 154:20, 174:14
**might** [18] - 5:5, 11:2, 21:8, 29:3, 44:11, 64:14, 67:7, 67:8, 79:11, 79:17, 88:4, 89:6, 89:13, 94:5, 95:21, 132:17, 186:23
**million** [8] - 13:6, 22:21, 52:8, 52:10, 52:13, 52:17, 62:4
**mind** [7] - 7:6, 11:3, 11:15, 61:19, 73:6, 115:1, 218:12
**minded** [1] - 11:11
**minds** [1] - 57:1
**mine** [1] - 32:20

**minimum** [2] - 184:17, 184:21

**minute** [5] - 14:7, 16:21, 73:14, 118:7, 220:10

**minutes** [9] - 31:6, 69:25, 71:16, 73:21, 73:24, 114:6, 172:16, 175:23, 176:1

**mirage** [1] - 5:3

**misplacing** [1] - 220:4

**misrepresentation** [2] - 133:18, 133:21

**miss** [1] - 110:11

**missed** [2] - 41:25, 42:4

**missing** [5] - 116:10, 131:12, 134:10, 181:4, 181:5

**mistake** [2] - 30:14, 108:8

**mistakes** [3] - 106:12, 107:9, 107:12

**mitigate** [1] - 48:13

**mixed** [2] - 76:18, 76:20

**mock** [1] - 40:17

**model** [7] - 26:4, 26:7, 26:15, 26:18, 26:19, 26:25, 27:3

**modest** [2] - 52:19, 63:17

**modify** [1] - 10:20

**mom** [1] - 47:3

**mom-and-pop** [1] - 47:3

**moment** [7] - 34:9, 39:19, 43:9, 81:11, 81:12, 143:21, 167:9

**Monday** [3] - 119:18, 120:7, 120:15

**money** [72] - 13:2, 14:21, 14:22, 15:2, 15:4, 15:21, 15:22, 16:17, 17:8, 17:9, 18:3, 18:18, 19:6, 19:7, 19:17, 20:11, 20:12, 20:16, 21:25, 22:7, 22:23, 23:24, 25:3, 32:22, 32:24, 38:13, 38:18, 38:20, 39:4, 47:5, 48:6, 53:11, 62:10, 62:11, 62:16, 62:17, 66:24, 66:25, 67:16, 70:16, 71:3, 71:7, 72:18, 73:1, 79:18, 86:5, 88:24, 88:25, 95:13, 96:19, 113:22,

129:6, 129:11, 147:25, 148:1, 149:3, 155:22, 156:3, 156:9, 164:18, 174:9, 175:13, 181:23, 185:21, 186:17, 186:19, 209:21, 213:9, 213:13

**money's** [1] - 151:13

**moneys** [1] - 38:8

**monies** [6] - 38:8, 155:18, 155:19, 155:20, 181:8, 213:1

**monitoring** [1] - 127:13

**monitors** [1] - 83:10

**month** [3] - 19:24, 19:25, 40:17, 78:10, 148:18, 174:23, 211:24, 212:13, 212:25, 214:3, 215:6, 215:11

**monthly** [13] - 27:15, 40:16, 41:25, 89:19, 92:24, 92:25, 93:25, 96:22, 96:25, 109:21, 179:12, 179:15

**Monthly** [1] - 96:5

**months** [29] - 18:11, 42:10, 42:11, 60:22, 66:10, 85:11, 90:23, 91:1, 91:3, 91:4, 96:15, 106:16, 106:19, 106:20, 106:22, 124:20, 134:12, 148:14, 159:10, 159:13, 159:18, 180:7, 180:11, 197:11, 203:17, 214:3, 216:20, 216:21, 220:1

**moreover** [1] - 29:13

**morning** [3] - 13:18, 218:17, 220:12

**morphed** [1] - 62:19

**Mortgage** [85] - 14:3, 15:19, 15:23, 16:3, 18:12, 20:10, 45:13, 136:24, 138:10, 142:11, 142:17, 145:18, 155:8, 156:22, 158:17, 160:13, 161:8, 162:16, 163:16, 163:18, 164:6, 164:7, 164:15, 165:23, 166:4,

166:13, 170:12, 170:14, 170:17, 173:8, 178:1, 179:8, 180:20, 181:6, 181:14, 182:3, 182:8, 182:13, 182:21, 183:3, 187:3, 187:12, 187:14, 188:21, 190:1, 190:4, 193:3, 194:24, 195:25, 196:8, 197:9, 197:11, 198:18, 199:2, 199:5, 199:13, 200:10, 201:11, 202:17, 202:20, 203:6, 203:22, 203:23, 203:25, 204:20, 206:6, 206:20, 208:6, 208:15, 209:3, 209:16, 211:15, 212:9, 213:3, 213:8, 213:10, 213:22, 213:25, 214:20, 214:23, 215:4, 215:8, 215:13, 215:18, 216:1

**mortgage** [39] - 14:4, 23:17, 23:18, 31:5, 31:10, 38:10, 38:23, 40:22, 45:9, 45:12, 45:14, 46:15, 47:5, 48:3, 48:9, 71:9, 71:10, 89:2, 109:18, 135:23, 136:9, 136:15, 136:18, 136:20, 136:22, 137:18, 140:24, 145:24, 155:7, 155:9, 159:22, 159:23, 159:24, 166:10, 181:25, 185:15, 189:7, 210:25

**mortgages** [3] - 14:4, 79:19, 137:19

**most** [13] - 33:8, 43:12, 43:21, 43:22, 43:23, 44:7, 45:1, 46:24, 55:6, 80:24, 122:9, 122:20, 182:1

**mostly** [2] - 103:15, 132:13

**motion** [4] - 58:20, 67:22, 67:23, 68:6

**mouth** [1] - 123:23

**move** [47] - 5:16, 55:25, 56:3, 56:4, 57:3, 58:18, 58:19,

58:23, 59:14, 61:14, 82:19, 84:18, 84:19, 85:22, 87:23, 98:11, 100:19, 102:2, 122:8, 138:12, 139:8, 139:14, 140:18, 141:15, 142:8, 143:10, 143:19, 144:6, 144:18, 147:5, 150:10, 150:24, 155:3, 166:16, 171:2, 171:3, 171:4, 178:22, 179:18, 184:14, 186:3, 192:13, 195:8, 196:13, 200:23, 208:13, 209:1

**moved** [1] - 84:23

**movies** [2] - 43:20, 43:23

**moving** [25] - 83:25, 88:11, 89:16, 90:13, 92:2, 92:15, 94:16, 94:22, 95:17, 96:8, 99:12, 101:3, 154:1, 170:5, 170:10, 173:5, 179:9, 180:21, 185:1, 185:20, 188:9, 188:25, 191:17, 191:24, 215:11

**mowing** [1] - 44:19

**MR** [218] - 4:13, 4:19, 4:20, 5:2, 33:25, 34:2, 41:3, 41:14, 42:19, 43:17, 46:3, 47:23, 54:8, 54:11, 54:22, 55:1, 55:8, 55:12, 55:22, 56:1, 56:5, 56:8, 57:4, 58:7, 58:18, 58:20, 58:24, 59:15, 59:17, 61:21, 68:18, 69:2, 69:9, 69:12, 69:18, 69:21, 69:23, 70:1, 70:5, 70:7, 74:5, 74:7, 74:14, 75:10, 75:14, 81:5, 81:7, 81:10, 82:19, 82:22, 82:24, 83:4, 83:6, 83:11, 83:18, 102:19, 107:17, 107:22, 107:24, 109:22, 112:25, 113:8, 114:10, 114:23, 115:15, 115:17, 115:23, 117:8, 117:12, 117:19, 118:14, 118:18, 119:3,

119:7, 119:10, 119:19, 121:3, 121:6, 122:12, 122:14, 122:22, 123:4, 123:9, 124:3, 125:25, 126:3, 129:15, 129:23, 130:1, 130:3, 130:5, 130:8, 130:12, 130:16, 130:21, 130:24, 130:25, 131:1, 131:2, 131:5, 131:8, 131:13, 131:21, 131:25, 132:1, 132:6, 132:10, 132:16, 132:20, 132:21, 132:23, 133:6, 133:13, 133:16, 133:20, 133:23, 134:1, 134:11, 134:14, 134:16, 134:20, 134:23, 134:24, 135:3, 135:4, 135:6, 135:8, 135:14, 135:17, 138:2, 138:12, 138:15, 138:18, 139:8, 139:10, 139:13, 141:15, 141:17, 141:19, 141:22, 141:24, 142:2, 142:7, 143:10, 143:12, 143:15, 143:18, 144:8, 144:9, 144:10, 144:18, 144:20, 144:23, 145:2, 153:18, 153:21, 159:1, 159:4, 164:22, 165:3, 165:5, 167:9, 167:12, 168:20, 168:22, 169:1, 171:3, 171:6, 171:9, 171:12, 171:18, 172:7, 172:13, 172:18, 172:21, 175:9, 175:12, 176:11, 176:14, 176:17, 176:22, 176:23, 190:5, 190:9, 190:13, 191:2, 191:4, 191:6, 192:13, 192:17, 192:21, 192:23, 200:23, 201:2, 201:5, 201:7, 201:9, 201:21, 201:22, 202:2, 202:4, 204:10, 204:14,

204:16, 207:4, 207:10, 207:13, 207:16, 207:20, 207:24, 217:18, 219:3, 219:11, 219:14, 219:15, 219:19, 219:25, 220:2

**MS** [52] - 4:12, 12:22, 12:25, 40:25, 41:9, 42:17, 43:15, 45:20, 47:9, 56:20, 58:3, 58:17, 58:21, 59:10, 59:13, 61:4, 61:6, 61:8, 61:12, 67:18, 67:22, 68:8, 68:17, 68:22, 69:15, 83:1, 102:21, 102:23, 108:7, 113:3, 113:4, 114:6, 114:12, 114:13, 115:2, 115:3, 115:16, 115:19, 115:24, 116:6, 116:15, 116:19, 116:21, 116:24, 117:4, 117:21, 121:5, 122:24, 123:7, 219:21, 220:5, 220:9

**mud** [1] - 63:24

**multipage** [3] - 143:4, 192:2, 199:18

**municipal** [1] - 64:10

**municipalities** [2] - 54:3, 64:9

**municipality** [1] - 50:24

**must** [23] - 5:24, 6:7, 6:19, 6:21, 6:23, 7:21, 7:23, 9:6, 9:17, 9:19, 11:5, 11:15, 12:13, 24:11, 26:2, 60:16, 91:10, 99:21, 99:23, 102:10, 184:9, 194:3, 217:23

**mutual** [2] - 86:16, 177:11

## N

**N/A** [1] - 93:15

**name** [46] - 13:18, 15:18, 23:9, 30:11, 34:3, 38:4, 46:16, 57:18, 57:19, 75:15, 83:22, 91:23, 93:20, 98:9, 123:12, 123:13, 123:14, 125:16, 125:17, 130:18, 132:1, 132:14, 132:15,

134:9, 136:20, 136:23, 137:12, 150:12, 153:25, 158:17, 159:25, 161:8, 172:23, 187:16, 199:25, 200:4, 200:13, 200:20, 200:22, 203:23, 205:13, 210:21, 211:22, 217:7, 217:10, 217:12

**named** [3] - 38:5, 46:7, 46:12

**names** [3] - 34:8, 136:20, 172:25

**narrative** [1] - 140:12

**narrow** [1] - 37:8

**narrowed** [1] - 108:3

**narrowly** [1] - 49:3

**nation** [1] - 46:23

**national** [2] - 41:6, 47:8

**NEAL** [1] - 2:2

**Neal** [1] - 34:6

**Neal.Brackett@ btlaw.com** [1] - 2:4

**near** [3] - 63:20, 65:8, 65:9

**nearly** [1] - 17:22

**necessarily** [2] - 111:25, 150:23

**need** [26] - 4:16, 5:5, 28:18, 30:3, 33:18, 53:19, 68:23, 69:7, 70:17, 70:18, 73:12, 79:6, 83:15, 97:23, 100:25, 106:2, 118:8, 129:24, 130:5, 130:14, 132:5, 133:17, 142:3, 172:9, 195:22, 219:23

**needed** [5] - 24:18, 51:14, 67:15, 70:16, 93:18

**needing** [1] - 28:17

**needs** [10] - 18:25, 61:6, 71:3, 118:15, 118:16, 120:13, 133:3, 184:16, 193:13

**neglect** [1] - 37:25

**negotiate** [2] - 37:20, 100:17

**negotiation** [3] - 78:15, 107:15, 167:15

**negotiations** [2] - 41:15, 108:9

**neighborhood** [2] - 37:5, 49:20

**neighbors** [1] - 44:22

**net** [7] - 156:10, 158:10, 175:4, 182:25, 207:1, 208:12, 208:21

**neutral** [2] - 11:10, 11:12

**never** [13] - 24:12, 25:19, 25:21, 39:4, 41:25, 42:4, 43:24, 44:13, 72:3, 97:22, 164:19, 220:5

**New** [7] - 54:6, 54:12, 54:15, 55:14, 55:19, 55:20, 55:22

**new** [13] - 26:3, 26:25, 40:19, 50:12, 57:5, 58:9, 58:10, 58:25, 66:17, 66:18, 112:13, 133:14

**newer** [1] - 27:4

**news** [4] - 64:8, 217:25, 218:2, 220:9

**newspaper** [1] - 218:3

**next** [29] - 12:8, 13:16, 15:17, 18:9, 20:19, 40:16, 41:23, 46:17, 86:13, 91:6, 94:8, 95:24, 98:25, 113:12, 123:3, 125:23, 161:6, 172:15, 174:3, 178:24, 180:22, 184:8, 184:14, 188:9, 208:13, 209:1, 214:17, 214:22, 215:15

**next-to-last** [2] - 180:22, 188:9

**nexus** [2] - 219:12, 219:15

**nice** [1] - 220:12

**nine** [1] - 208:24

**nobody** [5] - 5:17, 52:6, 60:13, 71:22, 120:8

**nominee** [1] - 46:5

**none** [8] - 9:8, 42:25, 43:1, 51:20, 53:16, 147:2, 173:20, 204:5

**nonstarter** [1] - 193:25

**noon** [3] - 117:22, 117:23

**normal** [1] - 186:18

**normally** [1] - 4:14, 80:13

**Normam** [1] - 56:13

**NORTHERN** [1] - 1:1

**Northern** [1] - 221:8

**Northwest** [2] - 47:7, 57:21

**northwest** [1] - 47:7

**not-for-profit** [1] - 124:20

**notate** [2] - 89:24, 89:25

**note** [7] - 9:3, 12:1, 15:8, 93:13, 119:23, 119:24, 192:9

**notebooks** [2] - 8:19, 218:15

**noted** [2] - 69:2, 93:4

**notepads** [1] - 8:25

**notes** [19] - 8:18, 8:22, 8:24, 9:2, 9:4, 9:5, 9:8, 9:10, 9:13, 9:16, 9:18, 9:24, 10:10, 55:7, 92:4, 119:25, 192:7, 196:16

**noteworthy** [2] - 39:21, 49:11

**nothing** [13] - 5:25, 24:9, 36:19, 37:2, 44:2, 54:14, 58:5, 64:3, 68:7, 72:25, 102:19, 142:3, 179:2

**nothing's** [1] - 134:15

**Notice** [5] - 14:19, 138:7, 146:20, 168:5, 196:19

**notice** [8] - 145:25, 146:12, 146:15, 148:14, 148:25, 149:7, 172:7, 216:20

**notification** [2] - 68:16, 145:8

**notify** [1] - 68:13

**notion** [1] - 67:12

**notwithstanding** [1] - 10:11

**November** [6] - 14:24, 33:2, 66:9, 139:17, 154:4, 154:25

**nuisance** [1] - 34:11

**number** [35] - 27:19, 27:22, 34:7, 36:14, 45:6, 81:23, 83:23, 93:13, 93:22, 93:25, 98:10, 102:25, 109:14, 111:2, 130:17, 131:11, 133:6, 133:17, 134:4, 134:5, 146:24, 148:13, 150:4, 160:19, 162:2, 169:17, 187:18, 187:20,

199:16, 199:20, 200:7, 205:16, 205:21, 219:20

**numbers** [8] - 64:17, 83:22, 83:24, 134:21, 153:7, 160:20, 172:8, 172:17

**numerous** [3] - 36:19, 128:23, 128:25

## O

**o'clock** [3] - 176:10, 218:17, 220:13

**oath** [8] - 74:17, 74:18, 78:14, 98:4, 120:24, 123:16, 123:17, 176:6

**ObamaCare** [1] - 63:1

**object** [5] - 107:17, 112:25, 114:23, 132:3, 141:17

**objected** [1] - 54:25

**objecting** [2] - 55:2, 219:4

**Objection** [2] - 42:17, 58:3

**objection** [53] - 6:14, 6:15, 6:17, 40:25, 41:2, 41:9, 43:15, 45:20, 47:9, 55:16, 56:20, 58:17, 59:10, 61:4, 61:7, 67:18, 82:25, 83:1, 83:3, 107:24, 109:22, 113:8, 123:6, 123:7, 129:23, 138:14, 138:15, 138:17, 139:10, 139:12, 141:18, 142:5, 142:6, 143:12, 143:17, 144:20, 144:22, 153:18, 159:1, 164:22, 164:23, 171:6, 171:8, 190:5, 190:12, 192:16, 192:17, 192:20, 201:1, 201:22, 202:1, 218:25

**objectionable** [1] - 131:21

**objections** [5] - 6:10, 6:12, 68:25, 70:4, 218:22

**obligation** [4] - 6:11, 35:22, 110:2, 110:3

**observe** [1] - 31:18

**obstruct** [1] - 15:4

**obstructed** [2] -

20:16, 39:20
**obstructing** [4] -
13:15, 19:1, 20:21,
35:12
**obtain** [8] - 8:3, 35:8,
48:15, 128:25,
156:12, 167:13,
210:12, 218:8
**obtained** [4] - 15:13,
30:18, 156:17, 216:4
**obtaining** [4] - 182:10,
182:16, 183:10,
189:8
**obtains** [1] - 27:11
**obviously** [1] - 74:23
**occasion** [1] - 125:13
**occasionally** [1] -
43:23
**occasions** [1] - 10:22
**occurred** [3] - 65:9,
103:14, 167:17
**occurring** [1] - 127:14
**OF** [5] - 1:1, 1:3, 1:9,
3:5, 3:11
**offenses** [1] - 7:16
**Offer** [112] - 17:6,
17:7, 17:20, 17:23,
39:23, 40:5, 77:5,
77:10, 77:11, 77:18,
77:20, 78:3, 78:12,
79:1, 79:10, 80:15,
81:19, 81:20, 84:7,
85:20, 87:20, 88:5,
88:9, 94:14, 95:4,
97:10, 97:18, 99:6,
99:10, 99:14, 100:7,
102:8, 102:9,
102:16, 104:15,
110:13, 110:16,
110:24, 111:15,
111:21, 112:7,
112:8, 112:10,
112:12, 114:15,
114:17, 136:2,
167:18, 167:22,
168:6, 168:13,
168:16, 169:8,
169:15, 169:19,
170:2, 170:7,
170:13, 170:16,
170:21, 172:5,
177:4, 177:6,
186:17, 186:20,
186:21, 187:12,
188:20, 191:10,
191:11, 191:13,
191:20, 192:7,
193:5, 193:14,
193:18, 193:21,
193:23, 194:1,

194:7, 194:8,
194:10, 194:12,
194:14, 195:13,
195:16, 196:10,
196:17, 196:21,
197:19, 197:24,
198:9, 198:19,
203:15, 204:6,
208:22, 208:24,
209:12, 210:3,
211:3, 211:5,
211:24, 212:13,
212:25, 213:17,
214:4, 214:7, 215:6,
215:11, 215:21
**offer** [59] - 27:7, 77:17,
80:18, 84:6, 95:23,
97:19, 97:21, 98:1,
100:4, 100:10,
100:15, 100:20,
100:22, 100:23,
101:10, 101:11,
101:16, 101:21,
102:1, 110:18,
110:23, 110:24,
111:12, 111:17,
112:15, 112:18,
113:15, 131:1,
131:5, 133:16,
172:5, 183:19,
183:21, 184:17,
184:21, 184:22,
184:23, 185:5,
185:24, 186:5,
186:10, 188:23,
188:24, 191:16,
192:10, 192:12,
193:22, 194:11,
195:7, 195:12,
195:21, 196:20,
197:20, 198:1,
198:2, 219:13
**offered** [4] - 6:12,
67:23, 74:24, 184:23
**offering** [1] - 17:12
**offers** [3] - 17:23,
170:20, 192:8
**Offers** [5] - 17:25,
19:3, 116:1, 136:7,
170:21
**OFFICE** [1] - 1:13
**office** [16] - 31:5,
31:10, 37:24, 38:12,
46:13, 46:16, 49:10,
50:9, 71:8, 71:9,
71:10, 71:14, 137:6,
202:25, 216:13,
216:15
**Office** [1] - 125:4
**OFFICER** [2] - 8:20,
118:6

**officer** [45] - 10:6,
10:12, 10:15, 31:16,
64:14, 75:24, 75:25,
76:1, 76:10, 76:13,
77:15, 77:18, 80:4,
86:20, 87:8, 103:3,
103:18, 104:3,
105:18, 105:21,
105:24, 106:9,
107:15, 108:8,
108:18, 108:24,
110:19, 110:21,
111:5, 111:10,
111:14, 112:1,
112:6, 112:9,
113:11, 114:2,
114:14, 121:16,
121:19, 121:22,
122:20, 177:15,
178:3, 188:7, 210:15
**officer's** [3] - 121:24,
122:2, 122:19
**officers** [9] - 64:22,
72:21, 76:24, 94:18,
109:5, 110:10,
112:10, 122:20,
188:1
**offices** [3] - 45:13,
63:20, 71:9
**official** [6] - 101:18,
101:19, 101:24,
186:7, 186:8, 186:13
**officials** [1] - 46:10
**often** [4] - 84:4, 105:2,
125:3, 192:9
**old** [5] - 26:9, 28:6,
28:13, 72:16, 110:5
**older** [2] - 27:3, 27:5
**Olga** [2] - 46:12, 57:23
**omitted** [1] - 202:5
**once** [24] - 17:19,
19:21, 77:13, 77:17,
95:8, 96:8, 96:13,
97:14, 98:7, 101:5,
101:14, 121:17,
122:21, 127:6,
139:14, 153:9,
154:13, 177:1,
177:9, 182:19,
185:1, 188:9,
190:17, 206:19
**oncoming** [1] - 63:22
**One** [3] - 1:19, 131:3,
131:4
**one** [84] - 15:11,
15:17, 16:13, 18:15,
25:1, 25:23, 27:2,
27:19, 30:7, 32:25,
34:8, 40:3, 48:4,
48:8, 49:21, 50:18,

56:15, 57:7, 57:18,
60:5, 60:10, 62:13,
63:8, 64:22, 66:4,
66:15, 68:23, 72:6,
72:8, 74:21, 77:8,
78:3, 80:24, 81:21,
84:15, 90:6, 98:25,
106:21, 114:10,
117:6, 117:8,
120:10, 120:20,
120:23, 122:12,
127:4, 131:10,
131:23, 142:25,
151:9, 151:16,
152:11, 152:15,
154:22, 158:5,
162:10, 164:3,
165:4, 165:24,
166:1, 167:9,
169:22, 175:9,
175:11, 179:1,
180:8, 183:5,
183:18, 188:2,
188:11, 188:25,
191:21, 192:11,
193:7, 193:22,
204:20, 211:8,
212:7, 212:10,
214:22, 215:24,
218:20, 219:16
**one-man** [1] - 18:15
**one-shot** [1] - 78:3
**ones** [5] - 23:2, 29:18,
82:16, 83:8, 162:15
**ongoing** [4] - 9:4,
107:1, 108:11,
111:23
**online** [4] - 80:7, 86:5,
94:4, 95:13
**open** [10] - 4:1, 11:11,
11:15, 46:1, 56:25,
73:6, 74:1, 118:24,
176:3, 218:12
**open-minded** [1] -
11:11
**opened** [2] - 210:25,
211:23
**opening** [21] - 4:10,
12:1, 12:4, 12:21,
41:10, 45:23, 46:1,
47:12, 47:16, 47:21,
54:16, 54:17, 55:6,
55:13, 55:18, 56:23,
61:15, 61:18, 66:7,
68:2, 69:19
**OPENING** [2] - 12:24,
34:1
**Opening** [2] - 3:3, 3:4
**openings** [1] - 12:7
**operate** [1] - 29:18

**operated** [3] - 37:6,
159:24, 163:2
**operates** [1] - 189:6
**operating** [3] - 16:4,
28:4, 29:10
**operations** [2] - 49:14,
124:23
**operator** [1] - 64:7
**operators** [3] - 36:9,
64:18, 72:23
**opinion** [2] - 8:16,
11:13
**opinions** [1] - 54:7
**opponent** [1] - 58:1
**opponents** [2] - 56:19,
57:9
**opportunity** [7] -
11:25, 22:2, 81:2,
107:11, 137:14,
145:13, 165:11
**opposed** [4] - 57:10,
125:6, 126:15, 157:9
**opposition** [1] - 56:18
**option** [5] - 79:6,
80:11, 100:22,
104:12, 121:20
**options** [7] - 76:15,
77:3, 80:17, 86:16,
104:7, 150:1, 177:12
**oranges** [1] - 27:3
**Order** [1] - 4:3
**order** [27] - 11:25,
29:5, 31:12, 51:20,
52:20, 58:22, 59:11,
59:12, 61:9, 61:10,
63:13, 64:24, 68:3,
68:12, 77:24, 78:14,
78:17, 79:5, 84:10,
103:4, 103:25,
182:6, 182:11,
185:23, 195:21,
206:8, 206:22
**orders** [1] - 97:3
**Organization** [1] -
216:9
**organized** [1] - 187:19
**origin** [1] - 132:3
**original** [2] - 109:1,
151:21
**originally** [3] - 141:5,
154:18, 181:23
**otherwise** [5] - 86:21,
110:4, 177:16,
178:4, 210:16
**ourselves** [1] - 33:14
**outdated** [1] - 28:11
**outing** [2] - 23:4, 67:7
**outline** [1] - 12:6
**outlooks** [1] - 54:7
**outside** [6] - 6:23, 8:5,

71:12, 85:10, 112:7, 218:10

**outstanding** [26] - 95:3, 104:4, 104:8, 108:18, 108:20, 111:24, 112:3, 112:20, 113:5, 113:23, 129:7, 135:22, 138:23, 138:24, 147:8, 150:14, 150:24, 151:12, 151:22, 151:25, 153:13, 154:22, 167:20, 184:24, 193:20, 196:18

**overhead** [1] - 38:16

**overly** [1] - 114:23

**overnight** [1] - 109:18

**overrule** [2] - 6:17, 142:5

**overruled** [5] - 42:18, 43:16, 58:6, 190:12, 207:23

**oversee** [1] - 25:10

**oversight** [1] - 192:22

**owe** [8] - 14:21, 17:8, 17:17, 40:11, 146:12, 146:14, 194:4, 194:18

**owed** [37] - 13:2, 14:25, 15:4, 15:20, 17:5, 17:14, 20:17, 20:18, 35:11, 40:6, 41:16, 42:14, 66:24, 92:12, 95:3, 129:8, 129:11, 148:22, 150:5, 150:15, 151:17, 151:23, 152:2, 152:5, 152:6, 152:9, 153:12, 153:14, 154:25, 155:1, 165:8, 166:24, 167:6, 167:15, 196:4, 197:1

**owes** [1] - 17:24

**owing** [2] - 149:6, 155:22

**own** [20] - 9:14, 9:17, 16:25, 24:24, 28:3, 30:9, 30:10, 30:12, 39:7, 45:12, 51:21, 53:2, 53:10, 58:2, 89:6, 91:24, 93:9, 153:16, 154:23

**owned** [13] - 24:17, 30:8, 30:12, 38:3, 65:19, 87:3, 91:13, 92:20, 153:22, 153:23, 214:6

**owner** [5] - 86:21, 160:8, 177:16, 178:4, 210:15

**owners** [3] - 21:11, 21:23, 62:5

**ownership** [1] - 155:10

**owns** [1] - 161:4

## P

**p.m** [10] - 118:19, 118:23, 118:25, 120:3, 175:24, 176:2, 176:4, 176:19, 218:19, 220:14

**Paccar** [3] - 59:22, 59:23, 59:25

**package** [1] - 116:13

**Page** [3] - 149:14, 167:7, 204:24

**page** [73] - 83:14, 85:22, 88:11, 89:16, 89:18, 89:21, 89:23, 91:6, 92:15, 93:12, 94:22, 95:17, 95:24, 96:3, 100:19, 101:3, 101:13, 138:3, 139:2, 142:10, 142:14, 145:16, 150:3, 150:7, 152:12, 154:2, 154:16, 154:20, 156:15, 158:15, 158:16, 160:11, 160:13, 160:17, 161:6, 161:9, 161:10, 161:21, 165:20, 173:24, 174:3, 176:25, 177:18, 178:18, 178:21, 178:22, 180:22, 183:17, 185:1, 185:8, 186:3, 188:9, 188:25, 190:17, 193:12, 200:15, 205:19, 206:3, 206:11, 207:2, 207:25, 208:13, 209:1, 209:14, 210:2, 211:18, 212:16, 214:14, 216:11, 217:9, 217:15

**PAGE** [2] - 3:6, 3:13

**pages** [4] - 133:3, 142:13, 149:12, 180:21

**paid** [43] - 13:12, 14:16, 15:1, 20:8,

27:6, 27:25, 28:1, 37:12, 38:14, 39:8, 39:9, 39:20, 41:18, 41:21, 42:12, 59:1, 63:10, 84:4, 99:3, 111:9, 120:9, 140:5, 146:13, 146:22, 147:15, 147:17, 148:10, 151:6, 151:14, 151:22, 152:3, 154:10, 155:19, 163:18, 165:15, 179:17, 181:8, 181:17, 194:3, 197:13, 199:10, 199:13, 201:11

**paint** [1] - 65:19

**painted** [1] - 56:14

**painter** [1] - 56:14

**paintings** [1] - 56:15

**paired** [1] - 65:21

**palm** [1] - 72:19

**paperwork** [1] - 194:4

**paragraph** [2] - 181:16, 196:5

**pardon** [1] - 32:19

**parenthesis** [1] - 180:15

**parents** [2] - 43:19, 44:4

**part** [45] - 26:13, 26:14, 36:25, 37:1, 37:12, 37:22, 57:7, 57:8, 58:19, 68:24, 89:14, 93:9, 95:24, 97:25, 116:11, 116:13, 116:23, 117:3, 122:9, 122:15, 122:21, 127:4, 127:9, 128:22, 132:19, 132:21, 135:25, 136:16, 137:8, 142:19, 145:21, 146:2, 146:6, 147:19, 149:1, 152:18, 161:1, 164:25, 167:13, 169:15, 180:18, 184:15, 205:9, 219:9

**participate** [1] - 128:20

**participating** [1] - 26:23

**participation** [1] - 5:21

**particular** [8] - 11:8, 29:7, 38:21, 103:9, 105:9, 107:18,

107:19, 140:13

**particularly** [3] - 47:4, 107:21, 122:18

**parties** [4] - 5:14, 9:8, 95:2, 99:3

**partner** [6] - 13:11, 30:10, 65:22, 66:6, 66:13, 188:7

**partners** [2] - 94:17, 188:1

**partnership** [2] - 91:21, 93:23

**partnerships** [2] - 86:19, 177:14

**party** [11] - 46:4, 46:10, 46:17, 49:4, 49:7, 56:19, 57:5, 57:6, 71:2, 95:1, 196:6

**pass** [1] - 38:22

**passed** [1] - 148:24

**past** [5] - 25:14, 29:14, 65:21, 88:13, 114:15

**pastor** [1] - 61:25

**pastor's** [2] - 61:25

**pay** [63] - 11:23, 13:4, 14:11, 15:21, 15:22, 16:6, 16:8, 16:9, 16:11, 16:17, 17:9, 17:11, 17:13, 17:23, 19:5, 19:6, 19:7, 19:14, 19:24, 19:25, 20:1, 24:25, 27:13, 27:15, 27:22, 30:5, 30:13, 35:11, 38:15, 40:1, 40:8, 41:4, 41:18, 67:10, 67:16, 70:15, 73:1, 89:13, 99:20, 99:25, 100:10, 100:23, 111:7, 146:11, 146:14, 146:21, 146:22, 148:19, 149:24, 179:13, 180:13, 180:19, 182:6, 182:10, 182:11, 183:24, 184:1, 184:6, 184:23, 185:10, 185:17, 185:21, 189:2

**payable** [12] - 142:18, 206:8, 206:22, 208:8, 208:17, 209:6, 209:7, 209:18, 214:23, 215:4, 215:9, 215:23

**paychecks** [3] - 14:10, 99:5, 204:19

**paying** [10] - 14:9,

14:10, 37:20, 60:21, 88:25, 89:2, 89:21, 156:4, 158:1, 196:7

**payment** [36] - 13:8, 27:17, 27:20, 27:25, 29:22, 29:23, 31:20, 31:24, 40:12, 40:19, 40:20, 41:24, 42:4, 62:3, 67:13, 78:2, 78:5, 78:6, 94:2, 94:8, 94:11, 100:20, 112:8, 113:11, 142:23, 146:18, 149:10, 156:20, 157:25, 164:3, 166:12, 183:10, 185:18, 185:25, 209:11

**payments** [43] - 14:18, 16:12, 27:16, 28:1, 40:16, 41:25, 42:1, 42:3, 42:15, 77:24, 94:6, 96:22, 97:3, 104:10, 142:11, 142:25, 143:7, 143:9, 150:25, 151:11, 154:19, 161:2, 161:12, 161:23, 162:11, 164:5, 164:14, 168:10, 168:12, 179:14, 181:17, 182:12, 183:11, 189:15, 189:24, 190:1, 190:9, 197:8, 197:12, 209:24, 215:20

**payoffs** [2] - 96:22, 97:5

**payroll** [28] - 38:15, 41:17, 42:14, 86:6, 93:25, 95:15, 135:21, 135:22, 139:1, 139:17, 147:22, 148:10, 148:12, 148:17, 150:15, 153:15, 156:4, 158:2, 164:10, 188:21, 189:2, 195:1, 196:2, 206:4, 206:10, 208:12, 208:21, 209:3

**pays** [1] - 65:2

**pedal** [1] - 120:16

**penalties** [20] - 40:7, 42:13, 42:21, 90:16, 96:10, 101:20, 140:7, 144:16, 144:17, 148:22, 149:16, 151:24,

152:3, 152:6, 166:24, 167:7, 179:20, 179:24, 186:9, 190:18
**penalty** [8] - 99:1, 99:2, 146:11, 146:25, 149:21, 149:23, 167:4, 188:10
**pencils** [1] - 8:25
**pension** [2] - 179:10, 180:13
**people** [41] - 13:20, 14:4, 19:25, 21:9, 24:19, 29:9, 30:10, 35:23, 36:15, 36:19, 43:21, 44:7, 45:5, 47:5, 48:11, 48:14, 49:23, 50:6, 51:11, 51:24, 53:1, 53:22, 54:6, 56:10, 56:11, 57:6, 58:9, 58:16, 63:5, 65:15, 65:24, 70:20, 71:12, 72:14, 88:16, 91:16, 91:17, 107:8, 109:17, 189:7
**per** [1] - 44:21
**percent** [11] - 17:14, 17:24, 42:12, 42:20, 112:22, 113:5, 113:19, 153:23, 153:24, 155:10, 188:5
**perfectly** [1] - 51:15
**perform** [3] - 24:14, 24:15, 24:20
**performance** [1] - 75:6
**performed** [3] - 16:24, 24:24, 25:15
**performing** [1] - 23:18
**perhaps** [1] - 22:3
**period** [30] - 20:6, 20:12, 20:14, 39:6, 39:24, 46:20, 46:25, 70:25, 136:14, 142:12, 142:13, 148:5, 148:7, 152:22, 152:24, 155:25, 158:18, 158:22, 179:5, 186:14, 186:18, 188:22, 199:11, 199:21, 200:8, 200:11, 201:12, 212:21, 212:22, 214:1
**periodic** [3] - 27:15, 27:16, 100:20
**periods** [3] - 85:11,

144:15, 150:21
**perjury** [8] - 90:16, 96:10, 101:20, 179:20, 179:24, 186:9, 188:10, 190:18
**permission** [2] - 83:6, 171:12
**permit** [1] - 118:3
**permitted** [3] - 9:25, 10:17, 12:2
**person** [8] - 15:11, 26:12, 34:15, 34:16, 43:10, 94:7, 120:23, 192:8
**person's** [2] - 105:12, 107:2
**personal** [50] - 17:15, 17:17, 17:21, 41:16, 42:12, 85:8, 85:25, 86:2, 89:1, 89:4, 89:8, 89:9, 92:3, 94:24, 96:6, 98:17, 120:12, 136:5, 155:14, 155:17, 155:23, 156:3, 156:9, 156:18, 157:22, 158:1, 158:11, 167:19, 169:14, 169:21, 171:17, 172:3, 174:6, 177:5, 177:6, 182:7, 182:10, 182:12, 182:20, 183:3, 183:10, 188:4, 199:17, 205:12, 205:23, 212:11, 213:3, 213:12, 213:13, 214:21
**personally** [4] - 17:24, 20:18, 136:8, 155:21
**personnel** [2] - 9:9, 94:17
**persuaded** [1] - 62:24
**pertain** [2] - 107:18, 115:10
**Peterbilt** [31] - 21:10, 21:19, 21:23, 22:10, 22:21, 22:22, 23:1, 23:5, 23:15, 23:19, 25:5, 25:24, 26:8, 27:9, 27:24, 28:4, 28:25, 29:1, 29:7, 29:20, 35:3, 37:5, 37:10, 37:13, 43:6, 52:4, 52:11, 53:12, 59:19, 60:15, 64:3
**Peterbilt's** [5] - 28:7, 28:20, 28:23, 28:24,

63:20
**Phil** [1] - 13:19
**PHILIP** [1] - 1:12
**philip.Benson@ usdoj.gov** [1] - 1:15
**phone** [9] - 20:1, 30:22, 32:7, 64:16, 71:19, 71:20, 83:22, 97:2, 187:17
**photograph** [1] - 49:16
**photographs** [3] - 71:11, 71:17, 71:24
**phrase** [2] - 11:12, 69:1
**phrasing** [2] - 10:20, 69:4
**physical** [2] - 49:24, 65:4
**pick** [1] - 118:21
**Pickart** [2] - 191:1, 193:2
**picked** [1] - 46:9
**picks** [1] - 21:2
**pickup** [2] - 49:14, 52:2
**picture** [9] - 56:16, 78:23, 79:1, 79:7, 79:14, 98:1, 105:9, 111:23, 194:5
**pieces** [1] - 115:10
**pile** [1] - 162:14
**place** [14] - 10:10, 32:9, 33:2, 54:2, 64:12, 74:17, 122:7, 123:16, 140:2, 140:11, 140:23, 155:5, 173:6, 173:13
**placed** [1] - 165:10
**placing** [1] - 34:22
**plain** [1] - 10:11
**plan** [13] - 17:19, 19:6, 19:8, 27:11, 27:13, 30:12, 77:21, 78:2, 78:9, 84:6, 102:17, 112:8
**plans** [2] - 86:18, 177:13
**platform** [2] - 20:24, 21:6
**play** [1] - 34:19
**Plaza** [1] - 1:14
**pled** [1] - 7:15
**pledge** [1] - 35:23
**plenty** [1] - 66:16
**plus** [6] - 40:7, 42:13, 151:24, 152:3
**Point** [1] - 65:7
**point** [34] - 4:11, 4:24, 14:20, 21:13, 21:17,

23:11, 40:22, 41:1, 41:6, 41:23, 46:5, 47:25, 56:8, 57:13, 59:5, 68:24, 105:17, 106:21, 109:3, 109:9, 110:5, 110:24, 112:2, 112:18, 120:16, 131:23, 136:12, 162:2, 162:3, 175:7, 184:2, 189:14, 215:22, 220:11
**points** [2] - 68:23, 80:25
**police** [10] - 30:3, 31:16, 58:2, 58:4, 58:10, 58:13, 64:14, 64:22, 72:21
**Police** [1] - 57:22
**policies** [3] - 40:23, 57:11, 88:10
**policy** [1] - 85:10
**political** [17] - 45:6, 45:18, 46:21, 46:22, 54:7, 54:12, 55:14, 56:11, 56:18, 57:5, 57:9, 58:8, 65:18, 66:4, 66:12, 67:5, 68:19
**politically** [1] - 57:5
**politician** [3] - 49:4, 68:19, 70:20
**politicians** [1] - 67:9
**politics** [5] - 45:16, 45:17, 46:4, 48:2, 48:3
**poor** [1] - 65:23
**pop** [1] - 47:3
**popular** [1] - 50:10
**population** [2] - 53:23, 54:2
**Portage** [54] - 2:7, 13:5, 14:6, 15:9, 20:22, 20:24, 21:15, 21:18, 22:3, 22:4, 22:12, 24:16, 25:9, 26:6, 30:2, 34:24, 36:10, 43:7, 45:13, 46:4, 46:6, 46:11, 46:16, 49:14, 50:18, 50:22, 51:4, 52:12, 53:19, 53:23, 54:5, 55:15, 55:21, 56:11, 56:17, 56:18, 57:22, 62:25, 63:2, 64:7, 64:18, 65:3, 65:6, 65:15, 65:22, 145:19, 145:21, 162:20, 163:3, 163:16, 211:11,

216:14, 216:16, 219:19
**Porter** [5] - 45:14, 45:17, 45:19, 46:4
**portion** [10] - 14:11, 14:12, 26:11, 85:23, 99:4, 100:15, 129:11, 149:15, 154:7, 187:25
**portions** [1] - 124:17
**portrayed** [1] - 73:7
**portrays** [1] - 139:7
**position** [13] - 10:25, 49:14, 53:5, 57:25, 58:1, 58:11, 66:8, 75:25, 76:8, 76:12, 88:5, 203:10, 203:11
**positioned** [1] - 63:5
**positions** [2] - 75:23, 124:15
**possibility** [1] - 149:23
**possible** [5] - 53:6, 53:10, 79:13, 108:22, 111:14
**possibly** [1] - 128:4
**potential** [8] - 76:25, 79:12, 85:18, 92:7, 104:12, 106:1, 149:22
**potentially** [1] - 164:16
**power** [3] - 104:22, 105:2, 191:1
**practice** [3] - 64:8, 64:20, 65:12
**precede** [1] - 174:24
**preceding** [2] - 174:23, 175:3, 214:4
**predecessor** [1] - 57:23
**predecessor's** [1] - 58:8
**predict** [1] - 109:7
**preferred** [1] - 59:20
**preliminary** [1] - 5:20
**Preliminary** [1] - 3:2
**premiums** [1] - 97:2
**preparation** [1] - 220:6
**prepared** [6] - 25:19, 26:1, 132:2, 138:22, 139:1, 141:5
**prepares** [1] - 106:21
**presence** [1] - 67:11
**present** [8] - 12:9, 12:10, 34:17, 128:8, 145:11, 145:13, 149:22, 207:6
**presentation** [1] -

12:16

**presented** [6] - 6:24, 7:21, 11:24, 47:17, 47:19, 59:24

**presenting** [2] - 81:7, 168:22

**president** [8] - 16:3, 18:9, 22:17, 87:6, 160:5, 160:7, 161:4, 203:12

**presumed** [2] - 7:16, 12:12

**pretend** [2] - 38:9, 38:13

**pretends** [1] - 39:18

**pretrial** [2] - 67:22, 68:3

**pretty** [2] - 43:12, 126:22

**prevent** [2] - 102:11, 146:21

**prevented** [1] - 18:24

**previous** [7] - 22:25, 23:3, 143:1, 154:1, 154:12, 168:9, 188:11

**previously** [12] - 68:3, 117:25, 129:22, 138:19, 140:19, 152:12, 162:1, 165:18, 165:25, 169:8, 177:18, 193:7

**price** [1] - 60:10

**pricing** [1] - 60:10

**primarily** [1] - 125:5

**primary** [2] - 38:21, 196:6

**principal** [3] - 27:22, 40:6, 216:13

**Privacy** [1] - 102:2

**problem** [15] - 15:2, 16:13, 17:3, 17:4, 17:18, 52:7, 55:20, 64:15, 68:25, 121:4, 132:9, 133:5, 134:6, 164:25, 172:12

**problems** [4] - 54:3, 55:20, 55:22, 56:10

**procedural** [1] - 5:5

**procedures** [1] - 52:5

**proceed** [6] - 11:24, 41:13, 74:4, 74:6, 75:9, 110:12

**proceedings** [8] - 1:24, 4:1, 9:4, 74:1, 118:24, 143:24, 176:3, 221:4

**Proceedings** [1] - 220:14

**process** [36] - 25:10,

25:16, 25:17, 26:2, 29:20, 34:4, 34:19, 36:13, 36:20, 49:16, 49:18, 49:22, 50:7, 50:18, 50:23, 51:15, 51:23, 59:18, 60:24, 77:9, 77:10, 77:25, 78:12, 78:13, 78:15, 92:9, 104:15, 108:14, 109:8, 112:13, 112:15, 121:24, 122:3, 127:8, 145:10, 194:10

**processed** [1] - 105:2

**processing** [1] - 102:12

**processor** [3] - 94:9, 94:11, 94:12

**produce** [1] - 60:9

**produced** [4] - 1:24, 130:18, 131:10, 132:12

**product** [1] - 24:6

**production** [2] - 26:4, 26:7

**products** [1] - 51:11

**professional** [1] - 65:25

**profit** [4] - 52:11, 62:4, 97:4, 124:20

**program** [9] - 21:7, 21:12, 78:1, 114:11, 124:7, 124:18, 124:19, 124:24, 126:11

**prohibitive** [1] - 46:19

**project** [4] - 35:9, 36:25, 43:7, 64:2

**prominence** [1] - 45:6

**prominent** [1] - 66:23

**promise** [2] - 35:24, 49:15

**promptly** [1] - 8:15

**proof** [8] - 7:1, 7:3, 13:21, 13:24, 35:19, 35:25, 39:1, 59:24

**prop** [1] - 92:23

**proper** [1] - 10:20

**properly** [2] - 97:22, 102:14

**Properties** [51] - 15:7, 15:12, 18:15, 23:6, 23:10, 137:9, 137:13, 142:12, 142:18, 158:18, 158:20, 159:5, 160:15, 160:21, 161:14, 161:19, 163:9, 168:11,

168:16, 174:22, 181:9, 190:2, 200:4, 200:7, 200:11, 200:13, 200:17, 200:20, 200:21, 200:22, 203:5, 210:21, 211:7, 211:9, 211:10, 211:22, 212:17, 213:25, 214:19, 214:24, 215:4, 215:9, 215:14, 215:18, 215:22, 216:1, 216:9, 216:13, 216:21, 217:7, 217:11

**properties** [1] - 89:1

**Property** [1] - 160:25

**property** [9] - 38:3, 63:8, 88:19, 88:21, 92:20, 95:18, 97:1, 145:6

**proprietorship** [1] - 92:24

**prosecuted** [1] - 68:4

**prosecution** [3] - 68:8, 68:11, 68:22

**prosecutors** [1] - 127:18

**prospects** [1] - 185:18

**prospered** [1] - 63:7

**prove** [11] - 12:13, 12:14, 33:21, 35:17, 35:20, 35:22, 36:5, 36:11, 36:24, 37:14

**proved** [1] - 59:7

**proven** [1] - 7:18

**provide** [9] - 37:23, 79:10, 102:10, 102:11, 106:4, 124:9, 127:16, 127:17, 153:6

**provided** [10] - 79:2, 80:6, 84:8, 122:8, 143:9, 153:11, 160:14, 179:8, 199:15, 219:3

**provides** [1] - 91:19

**proving** [2] - 35:25, 36:7

**public** [3] - 35:2, 127:13, 137:5

**publish** [1] - 171:12

**published** [1] - 172:9

**pull** [5] - 65:7, 72:17, 123:21, 123:22, 140:9

**pulled** [2] - 64:13, 152:21

**purchase** [3] - 50:12,

51:16, 89:4

**purchased** [5] - 25:24, 26:5, 29:13, 51:12, 95:19

**purporting** [1] - 16:19

**purpose** [5] - 38:4, 52:22, 101:8, 102:6, 172:2

**purposes** [1] - 163:6

**pursuant** [2] - 6:19, 60:9

**put** [20] - 26:8, 32:14, 36:8, 40:9, 40:12, 41:24, 47:10, 51:13, 57:2, 58:9, 63:2, 80:10, 119:25, 132:11, 133:14, 137:20, 142:20, 156:15, 162:10, 169:5

**puts** [2] - 106:22, 188:13

## Q

**qualification** [1] - 44:5

**qualified** [3] - 24:14, 24:15, 24:20

**qualify** [1] - 60:1

**quarter** [13] - 118:20, 147:15, 147:18, 148:8, 148:9, 148:11, 148:18, 152:24, 153:15, 154:8, 154:10, 189:3, 189:4

**quarterly** [4] - 98:19, 147:14, 148:13, 195:1

**quarters** [5] - 151:4, 151:7, 154:16, 189:3, 195:2

**questioning** [1] - 10:2

**questionnaire** [1] - 4:7

**questions** [37] - 6:9, 6:10, 10:1, 10:4, 10:5, 10:10, 10:16, 10:23, 11:4, 11:5, 11:7, 11:12, 25:12, 67:11, 80:8, 80:9, 85:1, 88:8, 92:3, 94:23, 102:24, 118:10, 118:11, 118:17, 119:4, 120:18, 120:19, 120:20, 120:22, 121:10, 121:19, 122:24, 158:13, 171:13, 201:5

**quick** [2] - 73:15, 129:25

**quicker** [1] - 68:24

**quickly** [2] - 28:25, 58:12

**quit** [1] - 204:9

**quite** [3] - 79:19, 105:2, 128:1

## R

**race** [4] - 46:12, 46:14, 49:6, 49:9

**radio** [1] - 218:1

**radius** [3] - 37:8, 63:19, 64:1

**raised** [5] - 25:12, 43:13, 44:3, 44:4, 44:16

**raising** [1] - 181:12

**ran** [6] - 20:23, 20:24, 46:11, 49:13, 49:14, 53:5

**Randy** [5] - 25:7, 25:10, 25:18, 26:1, 28:16

**range** [1] - 60:8

**rather** [2] - 13:4, 175:21

**reach** [1] - 49:21

**read** [33] - 10:18, 11:21, 11:22, 61:10, 86:1, 86:14, 87:24, 88:12, 88:19, 89:8, 90:15, 90:21, 91:8, 92:16, 93:13, 95:9, 96:9, 99:18, 101:14, 115:7, 146:2, 146:9, 177:10, 179:10, 179:19, 180:23, 182:4, 184:8, 185:6, 185:9, 189:1, 217:21, 218:2

**ready** [8] - 12:21, 74:4, 74:6, 119:2, 119:8, 119:13, 176:12, 176:15

**Reagan** [1] - 38:6

**real** [7] - 56:16, 88:19, 88:21, 88:22, 92:20, 95:18, 129:25

**realizing** [1] - 15:2

**really** [14] - 32:18, 36:7, 39:4, 40:18, 56:16, 66:5, 105:11, 106:18, 121:18, 127:15, 132:15, 161:1, 194:18, 219:4

**Realtime** [1] - 221:7

**reason** [15] - 11:15,

29:1, 29:12, 48:2, 65:5, 99:14, 114:4, 147:19, 172:4, 172:5, 184:1, 187:4, 188:23, 197:25, 198:1
**reasonable** [7] - 7:19, 12:14, 13:22, 33:22, 35:21, 149:23, 149:24
**reasons** [7] - 103:9, 103:12, 110:16, 111:2, 111:4, 111:5, 111:10
**rebuttal** [1] - 74:25
**recalled** [1] - 11:6
**receipt** [2] - 193:5, 194:11
**receipts** [1] - 63:12
**receivable** [2] - 92:4, 92:14
**receive** [6] - 142:23, 146:18, 182:7, 182:12, 220:2, 220:7
**received** [17] - 6:5, 6:19, 9:20, 30:19, 34:21, 52:11, 114:15, 126:6, 180:20, 189:12, 189:20, 191:11, 194:14, 204:3, 204:19, 206:1, 208:3
**receiving** [2] - 191:16, 219:20
**recess** [9] - 73:17, 73:21, 73:23, 117:22, 118:1, 118:22, 217:22, 217:23
**Recess** [3] - 73:25, 118:23, 176:2
**recessed** [1] - 120:14
**recesses** [1] - 73:17
**Recession** [1] - 47:1
**recession** [2] - 48:5, 109:11
**recitation** [1] - 12:5
**recite** [1] - 115:11
**recognition** [1] - 46:16
**recognize** [1] - 81:15
**recollection** [2] - 9:17, 9:19
**recommendation** [2] - 196:20, 196:21
**record** [20] - 6:5, 61:23, 81:7, 83:12, 83:19, 84:19, 93:11, 123:12, 125:20, 125:25, 126:2,

127:13, 128:1, 144:8, 168:22, 171:24, 183:16, 191:3, 210:2, 221:3
**recording** [2] - 71:13, 72:10
**records** [41] - 24:3, 41:20, 61:24, 62:1, 127:10, 127:21, 127:23, 128:2, 128:3, 128:12, 128:14, 128:16, 128:23, 128:25, 132:11, 135:24, 136:1, 136:10, 136:16, 136:18, 137:3, 137:5, 137:7, 137:8, 137:14, 139:20, 141:3, 145:22, 146:13, 159:8, 162:21, 162:24, 178:8, 179:8, 180:15, 200:16, 205:7, 209:23, 210:12, 210:14
**recover** [1] - 129:10
**recovery** [2] - 99:1
**recurring** [1] - 97:1
**red** [2] - 52:1, 125:23
**redact** [3] - 172:9, 172:10, 172:17
**redacted** [1] - 172:9
**redirect** [1] - 114:8
**Redirect** [2] - 3:8, 3:9
**REDIRECT** [1] - 117:11, 122:13
**reduced** [1] - 187:23
**reduction** [1] - 167:15
**Reeder** [5] - 25:8, 25:10, 25:18, 26:1, 28:16
**refer** [6] - 77:2, 77:18, 110:21, 121:24, 122:3, 122:6
**reference** [8] - 8:2, 131:15, 160:12, 160:15, 161:9, 181:5, 187:22, 218:7
**referenced** [8] - 82:14, 97:12, 140:16, 142:25, 157:5, 169:22, 173:9, 206:14
**references** [2] - 72:14, 132:23
**referral** [4] - 116:11, 116:13, 121:21, 122:21
**referred** [5] - 63:9,

97:8, 114:17, 121:17, 127:22
**referring** [3] - 144:24, 174:16, 182:14
**refers** [1] - 21:1
**refinance** [2] - 45:14, 47:6
**reflect** [3] - 27:23, 125:25, 126:2
**reflected** [2] - 142:24, 143:8
**reflects** [1] - 140:1
**refunds** [2] - 42:5, 146:17
**regard** [6] - 39:22, 49:7, 56:12, 68:6, 176:8, 195:16
**regarded** [1] - 37:19
**regarding** [8] - 36:2, 43:5, 43:6, 43:7, 58:21, 171:19, 191:20, 204:17
**region** [1] - 45:5
**regions** [1] - 64:10
**registered** [4] - 15:14, 23:9, 62:24, 216:15
**registration** [1] - 45:18
**regret** [1] - 58:14
**regular** [5] - 42:2, 77:24, 86:10, 109:5, 182:6
**regularity** [2] - 107:5, 107:8
**reimburses** [1] - 17:3
**reject** [4] - 7:9, 111:15, 111:17, 197:19
**rejected** [10] - 19:4, 39:23, 110:14, 110:17, 110:25, 111:2, 111:4, 111:21, 112:13, 196:22
**rejecting** [1] - 198:1
**rejection** [5] - 93:16, 112:23, 113:6, 192:12, 197:24
**rejects** [1] - 40:5
**relate** [2] - 211:2, 211:3
**related** [23] - 52:2, 95:2, 127:12, 127:14, 128:4, 135:22, 136:8, 136:15, 140:24, 144:2, 144:3, 147:8, 155:7, 156:12, 167:20, 169:19, 181:25, 192:10,

195:23, 196:6, 196:8, 200:19, 210:8
**relating** [2] - 128:23, 128:25
**relation** [1] - 141:2
**relationship** [3] - 70:24, 83:22, 159:6
**released** [3] - 51:16, 123:4, 123:8
**relevance** [7] - 43:15, 47:9, 56:21, 58:4, 61:8, 127:19, 131:15
**relevancy** [1] - 107:24
**relevant** [7] - 16:24, 47:10, 47:12, 54:13, 54:15, 115:23, 115:24
**relied** [4] - 48:7, 182:9, 182:16, 183:9
**religious** [5] - 43:13, 44:23, 44:24, 54:18, 54:20
**rely** [2] - 9:17, 72:12
**remain** [3] - 11:10, 48:2, 78:1
**remaining** [3] - 16:13, 17:4, 98:21
**remedy** [1] - 172:14
**remember** [11] - 9:13, 9:22, 11:14, 11:19, 18:8, 41:7, 55:6, 117:24, 120:24, 175:18, 176:6
**remind** [4] - 10:10, 12:12, 24:23, 120:1
**reminder** [1] - 204:15
**remote** [1] - 65:11
**remove** [1] - 129:6
**removed** [3] - 130:18, 130:19, 131:22
**render** [1] - 109:1
**rent** [1] - 97:1
**rental** [3] - 38:2, 38:3, 89:1
**rentals** [1] - 88:24
**rented** [1] - 92:20
**reoffer** [1] - 201:21
**repair** [2] - 48:16, 65:19
**reparative** [1] - 142:22
**repayments** [1] - 182:8
**repeat** [1] - 159:3
**rephrase** [4] - 121:2, 165:3, 165:4, 194:13
**replace** [1] - 46:10
**replaced** [1] - 49:18
**report** [4] - 126:21, 131:16, 131:17, 175:22

**reported** [5] - 1:24, 4:2, 74:2, 118:25, 176:4
**reporter** [1] - 11:22
**REPORTER** [1] - 219:23
**Reporter** [2] - 221:3, 221:7
**reports** [2] - 127:10, 218:1
**represent** [9] - 66:25, 133:17, 150:21, 151:3, 151:4, 161:7, 182:19, 185:22, 204:18
**representation** [2] - 18:3, 183:21
**representations** [1] - 184:16
**representative** [2] - 79:5, 193:1
**represented** [3] - 160:24, 167:1, 205:3
**representing** [2] - 13:19, 157:13
**represents** [5] - 150:19, 158:16, 166:11, 166:12, 204:19
**Republic** [1] - 29:4
**republican** [3] - 46:4, 46:5, 46:17
**request** [19] - 37:9, 77:13, 80:22, 81:20, 93:16, 95:18, 102:5, 102:12, 109:3, 109:24, 122:19, 126:6, 126:8, 152:22, 177:4, 217:13, 220:6, 220:7
**requested** [2] - 79:19, 102:10, 153:11
**requesting** [2] - 95:4, 102:6
**require** [2] - 31:20, 64:14
**required** [18] - 8:23, 12:11, 26:1, 37:23, 38:24, 50:12, 60:10, 90:20, 96:13, 97:25, 102:8, 146:15, 147:25, 148:12, 187:6, 193:16, 193:24, 218:12
**requirement** [5] - 12:14, 58:8, 59:20, 97:3, 187:5
**requirements** [2] - 193:22, 196:7
**requires** [3] - 50:25,

106:15, 146:14
**research** [8] - 7:23,
50:25, 51:5, 53:24,
136:7, 194:16,
195:4, 218:4
**resided** [1] - 85:10
**residence** [2] - 89:1,
188:5
**residents** [2] - 45:15,
72:22
**resigned** [1] - 58:12
**resolution** [7] - 76:16,
84:11, 93:17,
103:11, 103:15,
111:24, 112:4
**resolve** [13] - 76:13,
77:3, 77:7, 77:24,
78:18, 80:12, 95:22,
102:25, 103:4,
103:25, 107:16,
122:4, 122:10
**resolving** [1] - 103:21
**resources** [3] - 59:4,
60:17, 72:4
**respect** [4] - 43:11,
44:4, 45:24, 219:4
**respond** [2] - 93:18,
146:11
**response** [6] - 6:16,
41:24, 72:25,
160:13, 165:24,
219:12
**responses** [1] - 42:23
**responsibilities** [1] -
124:5
**responsibility** [3] -
9:14, 9:15, 128:22
**responsible** [2] - 14:9,
99:2, 196:6
**rest** [5] - 36:24, 116:9,
120:6, 154:13, 182:4
**restate** [2] - 113:2,
164:23
**result** [5] - 11:11,
93:16, 181:23,
185:12, 185:14
**resumed** [3] - 74:1,
118:24, 176:3
**retire** [4] - 8:7, 8:10,
12:20, 75:5
**retired** [1] - 57:21
**retirement** [4] - 28:3,
86:17, 86:25, 177:12
**retrieve** [4] - 83:4,
135:14, 167:10,
171:9
**return** [14] - 139:25,
140:4, 140:5, 140:6,
140:13, 146:15,
147:10, 148:16,

148:17, 148:24,
154:17, 154:18,
195:5
**returned** [3] - 8:13,
42:12, 46:15
**returns** [9] - 76:14,
97:6, 144:4, 166:22,
193:16, 193:24,
194:17, 195:1, 196:2
**reveal** [2] - 136:10,
194:16
**revealed** [1] - 195:4
**revenue** [60] - 37:24,
75:24, 75:25, 76:10,
76:13, 76:23, 77:4,
77:15, 80:4, 81:3,
102:4, 103:3,
103:17, 104:3,
105:18, 105:21,
105:24, 106:9,
107:14, 108:8,
108:18, 108:24,
109:4, 110:10,
110:19, 110:21,
110:22, 111:5,
111:10, 111:14,
112:1, 112:6, 112:9,
112:10, 113:11,
114:1, 114:14,
121:16, 121:18,
121:22, 121:23,
122:2, 122:15,
122:17, 122:18,
122:19, 122:20,
123:9, 124:5, 124:7,
124:16, 125:7,
125:11, 126:11,
126:14, 126:15,
126:24, 165:6
**Revenue** [6] - 75:19,
101:9, 102:6,
111:13, 146:16,
185:13
**review** [4] - 81:2,
105:21, 169:2,
209:23
**reviewed** [10] - 51:18,
129:22, 133:2,
136:25, 140:19,
141:8, 142:2, 181:2,
184:11, 197:18
**reviewing** [2] - 162:1,
205:7
**revised** [2] - 109:3,
109:24
**revision** [1] - 84:23
**revisions** [2] - 82:3,
82:18
**Rhoda** [1] - 44:9
**ride** [1] - 67:8

**rides** [1] - 45:3
**ridiculous** [1] - 59:3
**right-hand** [2] - 93:4,
152:17
**rights** [1] - 64:7
**risen** [1] - 45:6
**RO** [1] - 108:12
**road** [6] - 35:8, 36:25,
43:6, 46:18, 58:12,
64:12
**rocket** [1] - 21:8
**Rockwell** [1] - 56:13
**role** [11] - 34:18, 66:6,
104:3, 105:21,
114:14, 114:21,
121:24, 122:2,
126:18, 127:7
**room** [5] - 33:4, 43:21,
73:10, 75:5, 84:12
**Rotary** [1] - 67:4
**rotate** [1] - 64:23
**rotating** [2] - 64:16,
64:23
**round** [2] - 28:14,
28:16
**rounds** [1] - 28:15
**roundtable** [1] - 67:4
**route** [2] - 112:8,
113:20
**routine** [1] - 37:1
**row** [1] - 67:14
**Rule** [3] - 54:19,
131:8, 132:10
**rule** [1] - 111:24
**ruled** [1] - 58:21
**rules** [8] - 6:13, 10:18,
10:21, 13:1, 33:20,
52:25, 55:9, 55:11
**ruling** [1] - 6:14
**rumors** [1] - 59:2
**run** [2] - 73:12, 142:13
**running** [7] - 21:6,
31:1, 31:2, 46:16,
48:3, 50:9, 140:12
**runs** [1] - 72:16
**rust** [1] - 28:9

## S

**S:/Ashley** [1] - 221:7
**safe** [1] - 86:7
**safety** [2] - 37:1, 95:16
**salaries** [3] - 179:9,
179:12, 179:15
**salary** [4] - 14:12,
19:17, 42:2, 42:3
**sales** [2] - 180:15,
181:25
**salesman** [1] - 62:24
**salesman's** [1] - 63:13

**sample** [1] - 142:22
**Sanitation** [3] - 25:9,
25:13, 25:21
**SAR** [3] - 131:16,
131:17, 132:24
**satisfy** [2] - 185:23,
201:6
**satisfying** [1] - 37:20
**save** [1] - 35:6
**saved** [2] - 63:9, 219:9
**saves** [1] - 21:3
**saving** [1] - 96:20
**savings** [3] - 86:6,
86:10, 95:14
**saw** [7] - 28:14, 32:10,
44:4, 49:16, 60:7,
96:6, 212:2
**SBSE** [1] - 126:10
**schedule** [10] - 40:9,
40:12, 41:24, 91:16,
91:18, 91:19,
119:16, 120:6,
154:12, 176:8
**scheduled** [1] -
152:20
**schedules** [4] - 96:24,
101:21, 143:8,
186:11
**scheme** [5] - 15:3,
15:4, 17:6, 20:15,
24:22
**scientist** [1] - 21:8
**scope** [1] - 55:12
**Scott** [12] - 30:11,
30:15, 30:19, 31:14,
31:15, 32:1, 32:9,
32:17, 32:21, 70:24,
72:8, 73:1
**screens** [1] - 137:23
**search** [4] - 8:2, 33:4,
146:19, 218:7
**seat** [1] - 46:11
**seated** [4] - 4:4, 5:11,
74:3, 74:12, 74:20,
119:1, 119:22,
120:4, 123:19,
125:18, 125:21,
125:23, 176:5,
176:20
**seats** [1] - 8:21
**second** [32] - 11:6,
29:25, 54:13, 62:12,
81:5, 82:6, 85:22,
94:22, 100:19,
129:25, 142:14,
152:11, 158:15,
160:19, 161:15,
165:19, 176:25,
177:9, 185:1,
187:25, 190:7,

192:11, 196:23,
200:14, 206:11,
210:2, 212:9,
212:16, 214:14,
216:11, 217:9
**secondly** [1] - 121:23
**secret** [4] - 53:2,
53:13, 70:25, 72:10
**secretary** [1] - 159:8
**Secretary** [5] - 15:14,
178:8, 200:16,
210:11, 217:4
**secretly** [1] - 71:13
**section** [44] - 76:17,
76:21, 84:1, 84:18,
85:1, 85:24, 86:13,
88:19, 89:17, 89:21,
90:1, 90:3, 91:13,
92:15, 94:8, 95:25,
100:7, 100:8,
100:12, 122:16,
124:21, 124:22,
172:22, 173:6,
174:3, 177:9, 178:2,
178:11, 178:13,
178:25, 180:6,
183:25, 184:4,
185:20, 187:15,
187:16, 196:24,
197:15, 202:15,
210:3, 213:1
**Section** [24] - 83:20,
83:25, 85:24, 86:14,
87:23, 88:7, 88:12,
91:10, 92:21, 92:22,
94:16, 94:20, 95:8,
98:7, 98:11, 99:12,
101:8, 102:5,
146:16, 173:5,
177:25, 184:14,
184:15, 185:5
**sections** [2] - 89:12,
105:6
**SECURITY** [2] - 8:20,
118:6
**Security** [7] - 14:14,
83:23, 98:10,
147:17, 149:4,
172:17, 180:14
**security** [3] - 10:6,
10:12, 10:15
**security's** [1] - 10:8
**See** [1] - 178:14
**see** [51] - 9:9, 10:4,
14:7, 15:25, 22:2,
25:5, 26:5, 28:2,
28:21, 31:9, 32:4,
32:5, 33:7, 51:12,
53:21, 71:11, 71:14,
71:15, 71:18, 72:1,

72:11, 77:1, 80:11, 84:12, 86:10, 87:3, 87:7, 87:10, 88:23, 91:13, 110:2, 118:21, 125:22, 127:19, 127:24, 132:16, 137:25, 150:12, 150:25, 151:13, 152:17, 160:15, 163:17, 164:3, 171:17, 180:17, 180:19, 183:7, 190:14, 212:23, 220:12

**seeing** [2] - 82:16, 142:12

**seeking** [6] - 85:4, 99:9, 100:10, 187:23, 193:21, 194:7

**seeks** [1] - 105:5

**sees** [1] - 16:12

**selection** [1] - 25:10

**selective** [3] - 68:8, 68:11, 68:22

**selectively** [1] - 68:4

**self** [11] - 89:5, 89:20, 89:22, 89:25, 90:1, 90:3, 90:21, 91:11, 91:15, 178:23, 180:14

**self-employed** [8] - 89:20, 89:25, 90:1, 90:3, 90:21, 91:11, 91:15, 178:23

**self-employment** [2] - 89:22, 180:14

**self-explanatory** [1] - 89:5

**sell** [11] - 21:9, 22:2, 26:8, 26:14, 27:6, 27:12, 27:19, 29:3, 52:16, 52:17, 89:13

**selling** [5] - 22:7, 26:25, 27:2, 27:4, 27:5

**semimonthly** [1] - 179:17

**semis** [2] - 37:7, 63:20

**send** [4] - 36:16, 126:10, 145:7, 149:9

**sending** [2] - 17:1, 24:23

**sense** [2] - 64:21, 194:2

**sent** [12] - 14:19, 145:17, 145:18, 163:14, 190:25, 191:9, 193:2, 193:10, 194:1,

195:15, 220:4, 220:5

**sentence** [1] - 61:5

**sentimental** [1] - 56:16

**separate** [3] - 70:18, 70:19, 76:3

**separating** [1] - 132:22

**September** [10] - 158:22, 159:9, 195:2, 195:3, 196:13, 196:25, 197:5, 197:22, 210:7, 216:10

**series** [4] - 143:4, 155:5, 157:20, 213:1

**serve** [4] - 34:10, 49:4, 64:7, 101:8

**served** [1] - 163:6

**serves** [1] - 60:11

**Service** [5] - 75:19, 101:9, 111:13, 146:16, 185:13

**service** [2] - 22:4, 34:10

**servicing** [1] - 22:8

**serving** [1] - 65:20

**set** [20] - 23:13, 38:1, 38:3, 45:13, 48:10, 77:24, 78:1, 78:5, 78:6, 101:19, 110:10, 158:21, 158:22, 158:24, 159:2, 159:5, 159:6, 159:8, 186:8, 210:6

**sets** [1] - 43:23

**settle** [3] - 17:13, 104:17, 136:2

**settlement** [1] - 106:1

**seven** [1] - 55:9

**several** [5] - 11:3, 34:5, 67:14, 108:15, 205:25

**share** [5] - 10:16, 13:4, 47:8, 57:16, 127:19

**shareholder** [3] - 94:18, 188:5, 188:7

**sheet** [1] - 192:9

**sheets** [1] - 84:17

**shell** [4] - 15:6, 15:7, 18:15, 23:12

**shirt** [1] - 125:23

**shop** [4] - 30:9, 65:19

**short** [2] - 73:11, 78:6

**short-term** [1] - 78:6

**shortly** [2] - 45:11, 198:19

**shot** [1] - 78:3

**shoulder** [1] - 50:5

**show** [52] - 12:5, 12:6, 13:25, 14:2, 14:16, 16:19, 18:5, 18:16, 24:8, 24:15, 28:2, 28:20, 32:15, 36:2, 36:23, 41:12, 41:13, 51:11, 51:13, 70:8, 83:9, 97:11, 129:13, 132:11, 133:15, 140:2, 140:7, 142:14, 143:3, 145:16, 154:2, 157:15, 159:8, 162:24, 165:18, 167:23, 168:1, 179:4, 190:22, 192:2, 193:11, 196:14, 199:7, 202:18, 210:10, 210:15, 211:17, 212:16, 212:24, 213:23, 217:15

**showed** [8] - 18:8, 136:7, 161:19, 162:12, 163:17, 178:3, 178:9, 210:8

**showing** [11] - 24:4, 36:7, 65:24, 83:12, 93:11, 159:15, 167:2, 171:24, 198:10, 210:2, 216:3

**shown** [5] - 137:24, 140:3, 146:24, 150:19

**shows** [8] - 24:6, 51:10, 144:17, 154:17, 154:18, 154:19, 167:6, 213:1

**shy** [1] - 203:17

**side** [22] - 11:25, 20:10, 77:2, 77:3, 77:12, 77:17, 79:5, 92:6, 93:20, 114:18, 116:12, 121:17, 121:25, 122:3, 122:6, 122:9, 123:22, 126:19, 145:11, 205:20

**side's** [1] - 41:11

**sidebar** [5] - 61:12, 129:24, 130:4, 130:5, 201:3

**sides** [2] - 47:19, 76:3

**sign** [2] - 78:14, 143:25

**signatory** [2] - 211:6, 211:8

**signature** [16] - 90:14, 166:19, 166:20, 178:22, 186:4,

199:15, 200:3, 202:13, 204:24, 205:16, 210:20, 212:2, 216:3, 217:2, 220:3

**signed** [27] - 15:22, 18:9, 66:18, 166:18, 169:24, 174:19, 174:21, 179:24, 180:2, 188:10, 189:13, 189:21, 190:17, 190:21, 203:7, 203:9, 203:12, 203:18, 203:19, 203:22, 205:2, 208:25, 212:14, 212:25, 220:2

**significance** [2] - 127:25, 164:11

**significant** [5] - 40:18, 45:19, 93:16, 120:8, 148:23

**significantly** [1] - 189:10

**signing** [5] - 16:1, 180:11, 181:7, 203:18, 211:5

**signs** [2] - 203:15, 208:22

**Silas** [1] - 38:6

**similar** [7] - 79:17, 79:22, 92:2, 94:23, 96:6, 186:21

**simple** [1] - 116:25

**simply** [10] - 7:13, 36:4, 37:3, 38:4, 70:20, 76:18, 125:10, 150:7, 158:5, 196:1

**Simpsons** [1] - 44:10

**sin** [1] - 48:18

**single** [1] - 164:3

**sink** [2] - 16:20, 18:20

**sit** [1] - 162:4

**site** [1] - 65:22

**sits** [3] - 22:16, 22:20, 26:12

**sitting** [3] - 26:9, 28:7, 118:12

**situation** [6] - 18:6, 49:2, 77:12, 78:16, 99:9, 103:16

**six** [13] - 42:10, 42:11, 45:10, 60:22, 76:1, 76:21, 85:11, 148:14, 174:24, 181:7, 190:1, 211:4

**size** [3] - 53:25, 56:9, 148:12

**sized** [1] - 64:17

**sizes** [1] - 54:3

**skills** [1] - 44:12

**slide** [3] - 31:12, 64:12, 130:14

**slightly** [1] - 44:11

**slips** [2] - 157:10, 157:12

**small** [5] - 36:25, 38:2, 44:18, 48:9, 54:1

**smaller** [2] - 50:20, 91:22

**smallest** [1] - 47:2

**smile** [1] - 32:7

**snow** [1] - 65:7

**Snyder** [152] - 5:7, 7:12, 7:14, 7:15, 7:16, 7:17, 12:10, 12:13, 12:14, 13:1, 13:6, 13:10, 13:14, 14:8, 14:17, 14:20, 14:24, 14:25, 15:1, 15:9, 15:17, 15:22, 15:25, 16:8, 16:11, 16:22, 17:5, 17:12, 17:16, 17:19, 17:22, 18:23, 19:20, 20:7, 20:13, 20:16, 20:23, 22:10, 22:15, 22:20, 22:23, 23:1, 23:18, 23:21, 23:23, 24:4, 24:12, 24:13, 24:16, 24:23, 25:1, 25:22, 28:11, 28:16, 30:5, 30:8, 30:13, 30:21, 30:24, 31:5, 31:7, 31:9, 31:14, 31:25, 32:5, 32:6, 32:12, 32:15, 33:3, 33:7, 33:11, 33:17, 33:19, 34:5, 34:21, 35:14, 35:16, 36:1, 37:15, 37:19, 40:16, 42:23, 42:25, 43:3, 43:10, 43:24, 44:6, 44:16, 46:3, 47:25, 51:21, 57:13, 57:24, 58:13, 61:23, 65:18, 66:21, 67:14, 67:15, 71:1, 71:18, 72:11, 72:15, 74:8, 74:25, 115:5, 119:11, 125:17, 138:11, 144:5, 145:19, 163:5, 181:11, 181:13, 182:2, 182:5, 182:7, 182:12, 188:3, 188:13, 196:5, 197:1, 198:25, 199:6, 199:11,

199:13, 199:19, 199:25, 201:12, 202:16, 202:19, 203:3, 203:5, 203:21, 205:22, 206:8, 206:22, 208:8, 208:17, 209:7, 209:18, 211:8, 211:15, 212:2, 212:12, 213:4, 216:4, 216:15, 217:2
**SNYDER** [1] - 1:5
**Snyder's** [9] - 7:18, 12:12, 17:15, 20:20, 23:4, 29:23, 30:1, 44:14, 175:2
**Soc** [1] - 172:8
**soccer** [1] - 61:25
**Social** [7] - 14:14, 83:23, 98:10, 147:17, 149:4, 172:17, 180:13
**socialization** [1] - 44:12
**socialized** [1] - 44:6
**sold** [4] - 22:8, 26:24, 27:24, 38:11
**sole** [3] - 92:23, 92:24, 181:13
**solely** [3] - 6:24, 7:21, 100:11
**solicit** [1] - 13:7
**solicited** [3] - 34:21, 35:1, 143:25
**soliciting** [2] - 13:16, 13:17
**solo** [1] - 53:1
**solved** [1] - 17:3
**someone** [7] - 77:24, 80:18, 84:15, 85:2, 86:9, 112:7, 141:24
**someplace** [1] - 164:18
**sometime** [1] - 32:11
**sometimes** [10] - 4:25, 10:9, 10:11, 17:10, 49:22, 53:14, 106:12, 121:18, 121:21, 125:4
**somewhat** [1] - 131:19
**son** [1] - 61:25
**son's** [1] - 61:25
**soon** [2] - 46:18, 112:17
**sorry** [11] - 15:15, 31:12, 66:10, 75:11, 122:1, 128:19, 133:20, 144:9,

153:3, 201:12, 219:25
**sort** [11] - 46:19, 48:16, 49:13, 51:3, 56:14, 72:13, 78:3, 89:5, 90:10, 127:24, 140:12
**sought** [3] - 84:1, 95:25, 137:5
**sounds** [2] - 24:22, 69:4
**source** [9] - 8:5, 31:23, 49:25, 94:15, 136:14, 182:10, 182:16, 183:9, 218:10
**sources** [3] - 79:12, 92:6, 92:7
**South** [2] - 2:3, 44:19
**space** [1] - 93:17
**spaces** [2] - 93:14, 93:15
**spared** [1] - 61:22
**speaking** [1] - 113:21
**speaks** [1] - 33:17
**spec** [4] - 59:21, 60:1, 60:12, 60:13
**Special** [1] - 141:6
**special** [15] - 100:4, 121:19, 121:20, 122:19, 124:7, 124:18, 124:22, 124:24, 126:10, 126:15, 126:24, 126:25, 127:7, 127:17, 127:18
**specialist** [16] - 77:19, 97:19, 98:1, 100:4, 100:16, 100:22, 102:1, 110:18, 110:19, 110:22, 110:23, 110:24, 111:17, 113:15, 194:11, 195:12
**specialize** [1] - 125:1
**specialized** [1] - 35:4
**specific** [5] - 114:25, 138:21, 148:21, 161:10, 163:24
**specifically** [4] - 27:9, 54:19, 138:5, 185:15
**specifications** [3] - 51:14, 59:19
**specs** [2] - 29:15, 60:9
**spectacularly** [1] - 59:1
**speculate** [1] - 11:2
**speculation** [2] - 107:17, 109:22
**speech** [1] - 56:16

**spell** [1] - 75:15
**spells** [1] - 193:14
**spend** [3] - 45:1, 127:13, 128:1
**spending** [1] - 48:15
**spent** [8] - 57:20, 59:8, 59:22, 124:17, 124:20, 127:9, 218:24, 219:7
**sponsor** [1] - 141:21
**spouse** [6] - 84:13, 174:2, 174:7, 174:10, 180:3, 183:4
**spouse's** [2] - 83:24, 178:20
**spreadsheet** [3] - 138:22, 139:16, 150:14
**spring** [1] - 42:9
**Square** [1] - 1:19
**SRC** [127] - 15:7, 15:12, 15:16, 16:19, 16:22, 17:2, 17:3, 18:15, 18:16, 18:19, 18:23, 19:10, 19:21, 20:10, 20:14, 23:6, 23:7, 23:8, 23:10, 23:13, 23:17, 23:22, 23:24, 24:25, 38:4, 137:9, 137:12, 137:13, 142:11, 142:18, 143:6, 158:17, 158:20, 158:24, 159:5, 159:8, 159:19, 160:8, 160:15, 160:21, 160:25, 161:4, 161:8, 161:13, 161:14, 161:15, 161:19, 161:23, 162:11, 162:17, 163:9, 163:14, 164:1, 164:4, 164:7, 165:15, 165:23, 166:3, 166:13, 166:14, 168:11, 168:16, 174:22, 178:9, 181:8, 181:17, 189:15, 190:1, 197:13, 200:4, 200:6, 200:10, 200:13, 200:17, 200:20, 200:22, 203:5, 210:6, 210:9, 210:11, 210:16, 210:21, 211:7, 211:9, 211:10, 211:16, 211:22,

212:17, 213:10, 213:13, 213:21, 213:25, 214:6, 214:15, 214:19, 214:24, 215:4, 215:9, 215:14, 215:18, 215:22, 215:23, 216:1, 216:4, 216:9, 216:12, 216:13, 216:21, 217:7, 217:8, 217:11, 217:12
**SRC's** [2] - 18:17, 23:16
**stack** [1] - 162:14
**stake** [2] - 87:16, 87:19
**stand** [6] - 11:6, 35:22, 49:3, 119:20, 153:20, 162:7
**stand-in** [1] - 49:3
**standard** [1] - 27:1
**standards** [2] - 26:20, 26:21
**standpoint** [3] - 4:18, 5:5, 84:10
**start** [12] - 4:15, 5:15, 83:12, 83:19, 110:6, 110:11, 118:20, 140:19, 168:12, 176:9, 204:8, 204:12
**started** [2] - 31:17, 44:18, 45:11, 49:6, 54:18, 75:24, 128:7, 131:18, 136:22, 145:24, 197:10, 215:23
**starting** [4] - 46:21, 48:1, 74:23, 80:25
**starts** [3] - 112:13, 130:19, 211:22
**startup** [1] - 181:22
**state** [12] - 23:12, 24:11, 51:19, 52:6, 69:7, 69:10, 75:15, 85:9, 123:12, 146:17, 181:21, 197:25
**State** [11] - 15:14, 23:9, 52:6, 159:8, 161:18, 178:8, 200:16, 210:11, 210:14, 216:5, 217:4
**Statement** [3] - 3:3, 3:4, 96:5
**STATEMENT** [2] - 12:24, 34:1
**statement** [38] - 4:10, 12:1, 12:21, 46:1,

46:2, 47:16, 47:21, 55:6, 56:25, 61:15, 61:18, 69:19, 90:17, 96:11, 99:22, 102:2, 109:25, 157:3, 157:14, 169:14, 169:21, 170:11, 172:3, 177:3, 179:21, 181:1, 181:7, 182:11, 184:10, 187:7, 187:8, 187:11, 188:15, 190:17, 211:20, 212:17
**statements** [28] - 6:9, 12:4, 12:8, 41:11, 45:24, 55:18, 56:23, 67:23, 67:24, 68:2, 96:19, 96:21, 96:23, 96:25, 97:4, 97:5, 101:21, 116:17, 117:1, 157:17, 157:20, 157:24, 180:12, 186:11, 199:19, 200:6, 211:18, 212:1
**states** [2] - 180:12, 186:9
**States** [8] - 13:20, 74:14, 85:11, 102:4, 109:12, 123:9, 125:4, 221:8
**STATES** [4] - 1:1, 1:3, 1:13, 1:13
**stating** [1] - 183:22
**Station** [1] - 44:25
**status** [6] - 79:24, 83:24, 85:17, 93:7, 105:12, 107:3
**statute** [4] - 115:5, 115:6, 186:16, 186:18
**statutory** [1] - 186:14
**stay** [10] - 48:12, 53:11, 58:11, 114:11, 118:8, 118:9, 118:14, 118:15, 118:16, 121:7
**steered** [4] - 13:6, 25:4, 25:23, 60:3
**steering** [1] - 53:2
**stenotype** [1] - 1:24
**step** [4] - 119:25, 120:1, 175:25, 217:19
**steps** [1] - 50:12
**STETTINIUS** [1] - 1:19
**Steve** [4] - 21:22, 22:11, 22:25, 28:2

**still** [21] - 17:5, 20:9,
39:23, 40:4, 42:14,
53:8, 53:9, 57:9,
57:10, 76:23, 77:3,
110:5, 112:9,
113:15, 113:16,
113:21, 117:6,
120:24, 151:23,
152:6, 219:11
**stimulated** [1] - 220:1
**stipulate** [4] - 6:6,
218:21, 219:14,
220:2
**stipulated** [1] - 219:8
**stipulation** [2] -
219:11, 220:7
**stock** [2] - 86:16,
177:12
**stocks** [4] - 86:16,
86:24, 96:21, 177:11
**STOKES** [1] - 221:3
**Stokes** [1] - 221:7
**stolen** [1] - 65:25
**stone** [2] - 61:23,
64:18
**stood** [1] - 14:3
**stop** [14] - 19:16,
19:19, 20:20, 30:1,
107:16, 147:11,
160:19, 176:10,
181:1, 181:15,
184:8, 196:23,
216:18, 217:17
**stops** [1] - 19:15
**stored** [2] - 86:6,
95:14
**story** [2] - 36:24, 57:8
**straightforward** [2] -
34:20
**Street** [1] - 2:3
**street** [5] - 51:6, 51:7,
71:18, 71:22, 93:20
**Streets** [3] - 25:9,
25:13, 25:21
**streets** [1] - 51:9
**strike** [1] - 61:18
**strong** [1] - 44:16
**struggled** [1] - 48:9
**struggling** [2] - 48:12,
49:1
**stub** [2] - 142:22,
142:24
**stubs** [2] - 180:13,
180:19
**stuff** [6] - 89:13,
101:24, 110:5,
116:10, 131:21,
132:23
**stupid** [1] - 33:14
**subject** [2] - 15:3,

58:20
**subject's** [1] - 128:4
**submission** [6] -
39:24, 91:2, 106:24,
109:2, 110:3, 111:6
**submit** [13] - 10:1,
10:13, 10:15, 11:8,
19:12, 38:24, 77:13,
78:14, 98:1, 101:16,
106:23, 186:5, 187:6
**submits** [3] - 17:22,
19:9, 147:25
**submitted** [41] - 11:5,
17:7, 17:20, 18:1,
18:11, 20:3, 39:14,
40:2, 40:3, 40:14,
77:17, 80:13, 80:16,
80:23, 81:19, 90:24,
96:16, 100:18,
101:6, 104:21,
106:1, 111:12,
170:7, 170:13,
177:4, 177:6, 180:8,
183:13, 186:18,
186:21, 187:5,
187:11, 187:13,
188:16, 188:20,
188:21, 189:19,
189:20, 191:14,
195:7, 198:20
**submitting** [5] - 98:14,
99:6, 100:9, 180:10,
185:5
**subpoena** [2] - 123:5,
160:13
**subpoenaed** [1] - 24:3
**subpoenas** [1] - 61:2
**subsequent** [2] -
85:19, 216:20
**substantial** [1] - 149:1
**substitute** [2] -
101:16, 186:5
**success** [1] - 46:21
**successful** [3] -
49:12, 59:1, 103:11
**suffer** [1] - 46:23
**suffered** [2] - 47:7,
48:7
**suffering** [1] - 48:4
**sufficient** [2] - 41:7,
99:25
**sufficiently** [1] - 44:19
**Suit** [1] - 2:7
**suit** [1] - 125:22
**suitable** [1] - 65:20
**Suite** [2] - 1:14, 1:19
**sum** [1] - 78:5
**summaries** [2] -
133:14, 207:6
**summarize** [4] -

12:19, 131:9,
138:22, 149:13
**summarizes** [3] -
139:17, 147:14,
150:14
**summary** [44] - 131:8,
132:10, 132:25,
133:2, 139:2, 139:5,
139:7, 139:16,
139:20, 140:23,
141:2, 141:4, 141:5,
141:12, 141:22,
142:3, 142:11,
142:16, 142:17,
143:1, 146:4, 147:5,
152:13, 152:20,
153:1, 153:7, 153:9,
154:1, 154:16,
157:2, 157:3, 157:5,
157:25, 160:10,
162:8, 199:10,
201:11, 201:14,
201:17, 201:18,
205:9, 205:25,
207:5, 207:10
**superimpose** [1] -
60:24
**superintendent** [6] -
25:8, 25:14, 25:15,
25:17, 25:21, 51:9
**supply** [1] - 48:6
**supplying** [1] - 83:21
**support** [10] - 19:12,
21:9, 21:21, 45:25,
49:8, 50:10, 54:22,
80:9, 127:15, 157:25
**supported** [2] - 46:17,
157:12
**supports** [3] - 29:25,
80:21, 157:2
**supposed** [9] - 16:23,
51:20, 55:13, 66:11,
68:13, 97:25, 148:2,
149:9, 179:11
**supposedly** [1] -
35:12
**surely** [1] - 54:2
**surfaced** [1] - 41:15
**surgeries** [1] - 50:5
**surprisingly** [1] -
21:21
**suspect** [3] - 43:20,
43:22, 71:20
**sustain** [3] - 6:14,
41:2, 164:23
**sustained** [2] - 55:17,
56:2
**swearing** [1] - 98:4
**swing** [1] - 63:21
**sworn** [2] - 4:20, 5:19

**SWORN** [2] - 75:12,
124:1
**system** [6] - 20:25,
34:12, 34:15, 94:2,
94:6, 126:22
**systems** [1] - 80:7

---

# T

**table** [1] - 112:18
**TAFT** [1] - 1:19
**tail** [1] - 71:12
**tailored** [1] - 60:16
**talks** [6] - 21:21,
149:21, 196:17,
196:19, 196:20
**targeted** [1] - 68:9
**task** [1] - 25:15
**tasks** [1] - 127:15
**Tax** [2] - 146:20,
166:19
**tax** [116] - 14:1, 17:13,
17:15, 17:21, 20:17,
35:10, 37:21, 38:15,
39:13, 39:21, 40:2,
40:6, 40:7, 40:8,
42:4, 42:5, 42:24,
63:8, 63:9, 66:22,
76:14, 77:25, 93:25,
94:2, 94:6, 97:6,
97:18, 98:21, 98:22,
99:4, 99:17, 100:2,
103:25, 109:14,
111:24, 112:22,
113:5, 114:22,
114:23, 115:4,
115:6, 115:9,
117:13, 124:19,
127:12, 135:21,
135:22, 138:23,
138:24, 140:4,
140:9, 140:10,
140:13, 143:24,
144:4, 144:15,
144:17, 146:14,
146:17, 147:7,
147:10, 147:11,
147:16, 147:17,
147:22, 148:5,
148:7, 148:17,
149:2, 149:3, 149:4,
149:25, 150:19,
150:22, 150:24,
151:6, 151:10,
151:11, 151:17,
151:21, 151:23,
152:22, 152:24,
154:6, 154:7,
154:10, 154:18,
156:4, 158:2,
164:10, 166:22,

167:3, 167:4,
167:15, 167:19,
167:20, 173:1,
183:22, 183:23,
185:11, 185:12,
187:19, 193:24,
194:6, 194:17,
195:1, 195:5,
195:17, 196:18,
196:24, 197:3
**taxable** [2] - 39:12,
180:24
**taxes** [41] - 14:13,
14:14, 14:15, 16:17,
17:17, 35:11, 35:13,
37:16, 41:5, 41:16,
41:17, 42:14, 43:5,
63:10, 76:18, 94:5,
94:7, 97:2, 98:13,
98:20, 103:4, 129:5,
139:1, 139:17,
140:5, 148:10,
150:15, 152:1,
152:2, 153:15,
165:8, 166:24,
167:7, 170:8, 177:5,
187:23, 188:22,
189:3, 194:3
**taxpayer** [62] - 19:14,
77:12, 78:14, 79:4,
79:9, 80:1, 80:16,
83:21, 89:13, 89:20,
91:10, 92:12, 92:13,
93:9, 95:4, 97:15,
97:24, 98:8, 98:9,
99:6, 99:24, 100:9,
100:11, 100:15,
100:23, 100:25,
101:6, 101:9,
101:14, 102:10,
102:13, 102:25,
103:21, 104:1,
104:17, 105:9,
106:4, 106:10,
106:21, 107:2,
107:11, 107:15,
108:9, 109:7, 109:8,
110:6, 110:10,
111:12, 111:22,
112:19, 116:16,
117:17, 143:25,
145:8, 145:10,
146:4, 146:7,
178:23, 183:22,
191:10, 202:16
**taxpayer's** [8] - 84:12,
90:14, 103:7,
103:16, 104:22,
105:19, 108:22,
112:12
**taxpayers** [4] -

106:12, 109:14,
180:24, 191:19
**team** [1] - 62:1
**teamed** [1] - 30:11
**tear** [1] - 35:6
**technical** [3] - 76:1,
76:23, 110:19
**technology** [1] - 49:18
**teenager** [1] - 44:18
**telephone** [3] - 62:1,
97:2, 146:24
**telephoto** [2] - 71:18,
71:23
**television** [5] - 43:19,
43:22, 44:11, 44:13,
218:1
**tellingly** [1] - 33:11
**ten** [4] - 69:25, 85:12,
88:13, 146:12
**tendered** [12] - 136:2,
136:8, 148:20,
167:18, 169:14,
169:22, 170:12,
170:16, 187:3,
187:4, 195:16,
203:21
**tenders** [1] - 191:10
**tens** [3] - 13:2, 19:11,
128:11
**tenure** [1] - 75:23
**term** [5] - 14:14,
46:13, 49:10, 78:6,
139:22
**terms** [13] - 25:25,
26:1, 37:20, 40:1,
78:7, 100:7, 100:9,
101:18, 104:7,
107:2, 164:9, 186:7,
193:25
**terrible** [1] - 181:23
**testified** [5] - 10:3,
103:17, 104:10,
104:14, 106:15
**testify** [5] - 32:10,
62:5, 132:3, 133:1,
141:25
**testifying** [2] - 68:1,
159:2
**testimony** [14] - 6:4,
6:20, 7:2, 7:9, 9:18,
11:9, 11:22, 11:23,
28:1, 52:15, 54:19,
59:6, 62:18, 207:21
**THE** [215] - 1:1, 1:1,
1:9, 3:6, 3:13, 4:4,
4:14, 4:22, 4:23,
4:24, 5:4, 5:8, 5:9,
5:11, 8:21, 12:23,
33:23, 41:2, 41:10,
42:18, 43:16, 45:22,

47:13, 54:9, 54:21,
54:23, 55:2, 55:11,
55:16, 55:24, 56:3,
56:6, 56:22, 58:6,
58:23, 59:12, 59:14,
59:16, 61:5, 61:7,
61:10, 61:14, 67:20,
68:6, 68:15, 68:23,
69:3, 69:11, 69:13,
69:16, 69:19, 69:22,
69:25, 70:3, 73:8,
73:23, 74:3, 74:6,
74:8, 74:9, 74:10,
74:12, 74:16, 74:19,
74:20, 75:11, 81:6,
82:21, 82:23, 82:25,
83:2, 83:5, 83:9,
83:15, 83:17,
102:20, 107:19,
107:23, 108:2,
108:6, 109:23,
113:2, 113:9, 114:3,
114:7, 114:11,
114:25, 115:21,
116:2, 116:7,
116:18, 116:20,
116:22, 117:5,
117:6, 117:10,
117:20, 117:22,
118:7, 118:15,
118:20, 119:1,
119:5, 119:8,
119:11, 119:12,
119:13, 119:14,
119:15, 119:21,
120:4, 121:2, 121:7,
121:10, 121:18,
121:23, 122:1,
122:2, 122:4,
122:11, 122:23,
122:25, 123:1,
123:2, 123:6, 123:8,
123:11, 123:13,
123:15, 123:18,
123:19, 126:2,
129:17, 129:25,
130:2, 130:4, 130:7,
130:10, 130:14,
131:3, 131:7,
131:18, 131:23,
132:8, 132:15,
132:19, 133:5,
133:9, 133:14,
133:19, 133:22,
133:25, 134:3,
134:13, 134:19,
134:22, 134:25,
135:5, 135:16,
137:22, 138:14,
138:16, 139:11,
141:18, 141:20,

141:23, 142:5,
143:13, 143:16,
144:21, 145:1,
153:19, 159:3,
164:23, 165:4,
167:11, 168:21,
171:7, 171:11,
171:14, 172:10,
172:15, 172:20,
175:7, 175:11,
175:17, 175:25,
176:5, 176:7, 176:8,
176:12, 176:15,
176:18, 176:20,
190:7, 190:12,
192:16, 192:18,
201:1, 201:8,
201:24, 204:8,
204:12, 207:8,
207:11, 207:15,
207:18, 207:23,
217:17, 217:19,
218:20, 219:7,
219:16, 219:23,
220:10
**theirs** [1] - 69:10
**theory** [1] - 21:5
**therefore** [1] - 59:25
**they've** [8] - 37:11,
38:19, 86:24, 86:25,
100:16, 130:19,
132:24, 133:11
**thinking** [2] - 73:2,
176:9
**third** [17] - 39:17, 66:7,
84:18, 85:1, 88:11,
101:3, 142:14,
150:3, 154:8, 154:9,
158:15, 160:16,
161:21, 185:8,
188:25, 207:2,
207:25
**THOMAS** [1] - 2:5
**THORNBURG** [1] - 2:2
**thousand** [2] - 39:7,
185:21
**thousands** [4] - 13:2,
19:11, 103:23,
128:11
**three** [33] - 4:25,
13:14, 30:4, 34:23,
35:15, 38:5, 55:16,
64:18, 64:21, 65:13,
66:3, 66:19, 67:6,
71:21, 82:10, 90:23,
91:1, 91:3, 91:4,
96:15, 106:16,
106:19, 106:20,
106:22, 132:24,
142:10, 163:6,

180:7, 180:11,
181:12, 183:25,
184:4, 191:15
**three-page** [1] -
142:10
**throughout** [4] -
11:11, 18:20, 33:20,
45:5
**Thursday** [3] - 119:17,
120:7, 120:12
**ticket** [4] - 46:10,
206:14, 206:16,
214:15
**tickets** [1] - 156:20
**tie** [1] - 125:23
**tightened** [1] - 48:6
**timely** [3] - 65:24,
117:16, 149:24
**title** [3] - 85:24,
188:13, 188:14
**Title** [1] - 115:4
**today** [10] - 4:5, 5:7,
5:18, 12:25, 33:19,
35:23, 73:10, 81:1,
125:18, 175:18
**together** [7] - 30:5,
30:20, 51:14,
106:22, 132:12,
133:14, 169:5
**tomorrow** [4] - 73:10,
218:17, 218:18,
220:12
**took** [11] - 38:12,
48:19, 49:9, 63:6,
69:23, 117:22,
137:4, 138:19,
140:11, 140:23,
155:5
**tool** [1] - 92:11
**tools** [4] - 8:3, 77:7,
92:17, 218:8
**top** [15] - 83:19, 85:23,
88:12, 89:17, 93:13,
95:24, 132:19,
134:9, 163:15,
163:22, 203:13,
205:20, 206:12,
206:13, 212:23
**total** [15] - 52:21, 90:6,
90:7, 92:24, 95:19,
150:22, 151:10,
151:11, 151:17,
152:5, 156:3, 158:8,
161:22, 162:3,
178:13
**totaled** [1] - 175:3
**totally** [1] - 61:19
**totes** [1] - 49:23
**touches** [1] - 53:22
**tow** [21] - 30:3, 30:6,

30:9, 30:10, 30:12,
31:17, 31:19, 36:9,
64:7, 64:14, 64:16,
64:17, 64:21, 64:25,
65:7, 65:10, 65:22,
72:17, 72:23
**toward** [1] - 38:14
**towards** [2] - 96:8,
184:23
**towed** [2] - 65:5, 66:1
**towing** [9] - 13:12,
31:19, 34:22, 34:23,
36:8, 43:8, 64:9,
66:3, 66:13
**towing's** [1] - 72:15
**town** [2] - 35:4, 71:15
**tows** [1] - 65:22
**track** [3] - 41:17, 70:2,
134:6
**traction** [1] - 46:22
**trade** [2] - 51:10,
92:18
**traffic** [1] - 63:22
**transaction** [2] - 72:2,
156:20
**transactions** [3] -
38:2, 140:23, 155:5
**transcript** [13] - 11:20,
31:8, 139:22,
139:24, 140:1,
140:3, 140:10,
152:16, 152:24,
154:17, 154:20,
221:3
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:24
**transcription** [1] -
1:25
**transcripts** [6] -
140:15, 152:12,
152:20, 153:6,
153:11, 154:15
**transfer** [8] - 155:6,
157:8, 157:9, 183:2,
213:16, 213:19,
213:21, 214:18
**transferred** [9] -
88:13, 88:16, 155:9,
155:20, 156:10,
158:9, 182:20,
212:11, 213:2
**transfers** [6] - 175:2,
182:24, 183:1,
212:4, 212:6, 213:5
**trash** [9] - 20:25, 21:2,
21:3, 21:7, 21:12,
29:4, 49:16, 50:7,
52:2
**treat** [1] - 6:17
**trial** [28] - 5:21, 6:1,

7:23, 8:18, 8:22, 9:6, 9:7, 9:22, 9:24, 11:11, 11:14, 11:18, 11:24, 18:20, 21:24, 24:10, 25:6, 33:1, 33:16, 33:20, 44:18, 47:11, 55:5, 73:3, 217:25, 218:1, 218:2, 220:6

**TRIAL** [1] - 1:9

**trials** [1] - 5:1

**tried** [4] - 37:19, 47:10, 53:8, 131:22

**tries** [3] - 73:20, 104:17, 118:3

**trouble** [1] - 219:17

**truck** [29] - 20:19, 21:3, 22:8, 25:5, 25:24, 26:5, 26:6, 26:8, 26:12, 26:18, 26:22, 26:24, 27:3, 27:4, 27:5, 27:23, 27:24, 28:6, 28:11, 28:13, 43:6, 49:20, 52:16, 59:21, 60:9, 64:14, 72:23

**trucks** [67] - 21:1, 21:2, 21:9, 21:13, 21:14, 21:16, 21:18, 21:20, 22:2, 22:4, 22:5, 25:11, 25:16, 26:10, 26:11, 26:14, 26:16, 26:17, 26:25, 27:1, 27:2, 27:11, 27:12, 27:13, 27:18, 27:19, 28:9, 28:14, 28:15, 28:16, 28:17, 28:25, 29:2, 29:4, 29:10, 29:11, 29:13, 29:16, 29:18, 29:19, 30:9, 30:10, 30:12, 35:5, 36:12, 36:17, 37:3, 49:17, 49:23, 50:13, 50:18, 50:21, 51:2, 51:13, 51:17, 52:3, 52:9, 52:14, 52:17, 52:20, 58:25, 59:22, 62:3, 64:25

**true** [15] - 60:4, 82:13, 90:18, 96:12, 101:22, 106:8, 125:7, 133:2, 139:6, 141:12, 142:3, 179:22, 186:12, 194:6, 201:18

**Trust** [48] - 14:3, 45:12, 136:22, 138:10, 138:25, 139:16, 145:18, 150:15, 153:13, 155:8, 156:22,

163:2, 163:15, 163:18, 164:15, 166:4, 166:8, 170:12, 170:14, 170:17, 173:8, 181:14, 181:15, 182:3, 182:8, 182:13, 182:21, 183:2, 187:3, 187:12, 187:13, 188:21, 190:4, 193:3, 194:24, 195:5, 195:25, 196:8, 202:17, 203:6, 211:15, 212:9, 213:2, 213:8, 213:10, 213:22, 214:20

**trust** [7] - 85:9, 85:15, 99:1, 99:3, 147:24, 155:19

**truth** [1] - 18:6

**truthful** [2] - 34:17, 98:5

**try** [8] - 8:4, 8:14, 61:23, 73:14, 118:21, 218:9, 218:21, 219:2

**trying** [24] - 19:14, 40:1, 47:4, 48:14, 48:16, 55:17, 59:12, 59:15, 59:23, 62:1, 70:3, 78:23, 79:14, 84:5, 89:5, 94:13, 98:14, 104:4, 105:11, 108:19, 112:2, 127:21, 143:6, 219:11

**Tuesday** [1] - 120:16

**turmoil** [2] - 182:2, 189:8

**turn** [4] - 4:7, 10:4, 74:17, 131:4

**turning** [4] - 37:8, 61:22, 63:19, 64:1

**turnip** [2] - 17:11, 18:2

**twice** [1] - 207:7

**two** [50] - 6:25, 21:14, 21:15, 22:11, 22:19, 22:20, 22:22, 23:2, 26:9, 27:2, 27:22, 28:6, 28:7, 28:13, 28:15, 30:4, 30:12, 30:20, 32:8, 39:17, 41:15, 49:21, 50:5, 52:1, 76:3, 91:12, 117:8, 120:14, 141:1, 142:12, 142:19, 149:12, 152:11, 159:12,

165:19, 170:21, 170:24, 171:21, 175:13, 182:1, 182:24, 183:5, 203:17, 204:10, 204:25, 213:16, 214:3, 216:20, 216:21

**two-year-old** [1] - 28:6

**type** [7] - 78:15, 78:20, 83:20, 93:22, 125:2, 166:9, 187:18

**typed** [1] - 105:2

**types** [2] - 78:20, 85:2

**typically** [6] - 30:4, 50:23, 57:17, 104:24, 108:10, 127:16

## U

**UCC** [2] - 92:19, 96:23

**ultimate** [3] - 102:16, 108:17, 117:14

**ultimately** [1] - 29:13

**unable** [3] - 40:8, 183:24, 184:1

**unanimously** [1] - 7:18

**uncovered** [1] - 198:8

**under** [34] - 6:13, 10:17, 10:20, 10:24, 13:10, 40:6, 52:5, 57:11, 57:13, 60:1, 63:3, 63:15, 64:2, 66:21, 74:17, 78:14, 86:2, 90:16, 96:10, 96:13, 98:4, 101:19, 102:2, 115:6, 120:24, 123:16, 146:6, 176:6, 179:20, 179:24, 186:9, 187:19, 188:10, 190:18

**underlying** [4] - 103:7, 139:7, 139:20, 141:3

**underneath** [2] - 90:20, 90:22

**underprivileged** [1] - 44:25

**understood** [1] - 69:9

**undue** [1] - 145:12

**unemployment** [1] - 98:24

**unfiled** [1] - 76:14, 194:16

**unfortunately** [2] - 46:7, 48:8

**uniform** [1] - 92:19

**union** [1] - 179:14

**UNITED** [4] - 1:1, 1:3, 1:13, 1:13

**United** [8] - 13:20, 74:14, 85:11, 102:4, 109:12, 123:9, 125:4, 221:8

**unless** [4] - 7:17, 97:23, 107:17, 111:21

**unlike** [2] - 22:25, 23:3

**unlikely** [1] - 11:20

**unpaid** [1] - 35:13

**unused** [1] - 26:3

**unusual** [1] - 25:12

**up** [92] - 4:9, 4:10, 4:11, 4:24, 5:5, 7:7, 8:24, 17:21, 21:2, 23:13, 28:9, 29:6, 30:11, 30:18, 38:1, 38:3, 39:5, 39:17, 43:19, 43:20, 43:22, 44:9, 45:13, 47:5, 48:6, 48:10, 59:6, 65:21, 65:24, 67:20, 75:8, 77:24, 78:2, 78:5, 78:6, 79:15, 83:9, 83:10, 91:3, 93:13, 94:20, 102:24, 112:16, 118:12, 118:21, 119:21, 120:19, 120:22, 121:7, 121:8, 122:11, 126:21, 130:2, 130:7, 131:16, 134:8, 134:25, 137:21, 137:23, 142:20, 149:2, 149:15, 150:12, 151:2, 151:25, 153:1, 154:4, 154:21, 156:15, 158:21, 158:22, 158:24, 159:2, 159:5, 159:6, 159:9, 161:25, 162:4, 162:6, 162:10, 162:24, 171:17, 172:14, 176:9, 184:17, 194:1, 199:11, 202:9, 206:12, 206:13, 210:6, 215:22

**update** [2] - 110:3, 111:22

**updated** [1] - 106:25

**upper** [3] - 152:17, 205:18, 205:19

**urge** [1] - 11:23

**urgency** [2] - 28:17,

29:11

**urgent** [1] - 146:6

**useful** [1] - 112:5

**uses** [1] - 92:11

**utilities** [1] - 97:1

## V

**Valpo** [2] - 21:15

**valuable** [1] - 63:14

**value** [7] - 63:11, 86:6, 88:10, 88:14, 88:17, 95:14, 95:21

**values** [2] - 33:17, 79:13

**VAN** [1] - 1:9

**variety** [3] - 52:2, 104:7, 127:15

**various** [6] - 33:5, 44:15, 75:22, 103:14, 127:9, 192:10

**varying** [1] - 51:4

**vehicle** [1] - 30:3

**vehicles** [4] - 89:4, 89:6, 92:20, 95:19

**Velazquez** [2] - 46:12, 57:23

**VELEZ** [2] - 8:20, 118:6

**vendor** [6] - 35:2, 36:17, 43:5, 53:3, 53:7, 60:3

**vendors** [3] - 51:12, 53:8, 66:3

**verbatim** [4] - 67:2, 101:17, 186:6, 189:9

**verdict** [2] - 6:2, 8:13

**verification** [1] - 180:10

**version** [2] - 93:2, 133:7

**versus** [2] - 107:25, 126:24

**vhadley@taftlaw. com** [1] - 1:22

**viable** [2] - 79:6, 79:11

**Vice** [1] - 44:10

**view** [2] - 44:12, 51:8

**views** [3] - 54:7, 54:12, 54:14

**Villa** [4] - 132:4, 132:11, 141:6

**Villa's** [2] - 132:1, 132:14

**villa's** [1] - 134:9

**violates** [1] - 59:11

**violating** [1] - 58:22

**violation** [1] - 68:2

**vital** [1] - 75:6

*Vivek* [1] - 34:6
*VIVEK* [1] - 1:18
*voir* [1] - 34:4
*VOLUME* [1] - 1:8
*voluminous* [1] - 131:9
*voted* [1] - 28:12
*votes* [1] - 46:13
*Voyles* [1] - 159:25
*vs* [1] - 1:4

## W

*W-2* [4] - 86:23, 90:4, 199:5, 203:25
*W-4* [3] - 84:4, 198:23, 203:21
*wage* [3] - 90:21, 179:2, 182:6
*wages* [17] - 89:22, 105:14, 147:15, 147:16, 149:5, 179:1, 179:5, 179:9, 179:12, 179:15, 181:5, 199:10, 199:13, 201:11, 203:25, 204:4, 205:3
*wait* [2] - 4:10, 220:10
*Wait* [2] - 118:7, 219:16
*waiting* [1] - 114:5
*waiver* [1] - 186:14
*walk* [1] - 120:19
*walked* [3] - 71:22, 72:3, 105:4
*walls* [1] - 7:22
*wants* [3] - 27:18, 60:24, 134:4
*warning* [1] - 146:7
*warrants* [1] - 33:5
*watch* [1] - 217:25
*watched* [1] - 44:13
*watching* [2] - 32:4, 44:9
*ways* [3] - 25:23, 102:25, 105:1
*wear* [1] - 35:6
*wearing* [4] - 32:2, 72:10, 125:20, 125:22
*weather* [1] - 51:5
*web* [6] - 166:6, 212:4, 212:6, 213:5, 213:16, 213:19
*website* [1] - 91:23
*websites* [2] - 8:2, 218:7
*week* [5] - 44:21, 55:4, 119:16, 120:6, 183:5
*weekends* [1] - 45:1

*weekly* [1] - 179:17
*weeks* [6] - 22:22, 55:9, 73:4, 181:7, 191:15, 211:4
*weight* [1] - 9:19
*welcome* [1] - 117:5
*well-positioned* [1] - 63:5
*well-regarded* [1] - 37:19
*whatsoever* [3] - 37:3, 45:24, 68:7
*whereas* [1] - 60:11
*white* [1] - 125:23
*whole* [9] - 31:8, 47:18, 68:15, 93:2, 107:20, 115:18, 115:21, 116:23, 162:14
*wide* [1] - 60:8
*widely* [2] - 54:7, 54:12
*widen* [2] - 64:1
*widened* [1] - 37:9
*widening* [3] - 36:25, 43:7, 63:19
*wife* [4] - 33:3, 172:25, 195:15, 213:14
*wife's* [3] - 166:20, 205:13, 205:22
*wildly* [1] - 51:4
*willing* [1] - 220:8
*win* [1] - 46:19
*winding* [2] - 204:8, 204:12
*winning* [2] - 53:16, 59:21
*winters* [1] - 28:8
*wipe* [1] - 57:1
*wire* [1] - 32:2
*wires* [1] - 28:10
*withdraw* [1] - 58:19
*withheld* [9] - 14:15, 41:19, 99:4, 147:16, 147:23, 148:1, 148:19, 149:3, 156:4
*withholding* [7] - 14:10, 14:13, 147:19, 147:22, 147:23, 179:13
*withholdings* [1] - 149:4
*withholds* [2] - 102:13, 147:24
*witness* [41] - 10:1, 10:3, 10:13, 10:18, 10:19, 10:22, 10:24, 11:1, 11:6, 11:8, 11:13, 47:10, 59:6, 70:25, 75:8, 83:12,

93:11, 107:19, 118:14, 118:15, 118:16, 119:3, 119:19, 123:3, 123:4, 126:1, 130:16, 132:3, 132:4, 132:14, 133:1, 133:15, 134:25, 137:24, 162:7, 168:23, 171:10, 171:13, 171:24, 183:17, 210:2
*WITNESS* [15] - 74:19, 75:12, 83:17, 108:6, 116:7, 116:22, 117:5, 121:18, 122:1, 122:4, 123:1, 123:13, 123:18, 124:1, 176:7
*witness's* [4] - 7:9, 11:6, 11:9, 54:20
*WITNESSES* [2] - 3:5, 3:6
*witnesses* [9] - 6:4, 7:8, 7:10, 9:9, 10:2, 11:4, 12:9, 12:10, 44:15
*woman* [1] - 46:12
*won* [3] - 46:13, 49:9, 52:4
*word* [4] - 12:1, 32:10, 131:20, 134:14
*words* [7] - 7:20, 8:1, 15:10, 52:12, 52:16, 53:18, 218:6
*workers* [1] - 50:15
*works* [3] - 39:8, 51:3, 51:4
*Works* [6] - 22:12, 22:13, 22:16, 22:18, 22:20, 28:12
*world* [3] - 44:12, 47:2, 56:12
*world's* [1] - 47:2
*worn* [1] - 5:2
*worse* [1] - 55:23
*worth* [4] - 13:7, 22:20, 27:7, 60:21
*wrap* [1] - 176:8
*wreck* [1] - 64:13
*wrecks* [1] - 64:23
*write* [4] - 10:6, 126:21, 127:10, 137:19
*writes* [1] - 22:22
*writing* [4] - 11:5, 16:15, 45:13, 157:10
*written* [6] - 11:20, 64:18, 70:13,

165:23, 205:8
*wrote* [3] - 18:9, 159:23, 160:21

## Y

*yard* [1] - 30:9
*year* [31] - 26:18, 26:19, 28:6, 42:1, 46:13, 49:9, 67:3, 67:6, 82:4, 84:20, 124:13, 128:7, 140:25, 153:23, 155:6, 156:1, 156:11, 158:6, 158:11, 175:3, 182:19, 183:11, 194:24, 197:2, 197:3, 199:6, 204:1, 204:3, 209:24
*year's* [1] - 39:9
*years* [49] - 26:9, 28:7, 28:13, 38:2, 39:6, 39:16, 40:16, 41:23, 45:10, 46:18, 46:22, 48:10, 57:20, 57:24, 58:15, 66:22, 67:14, 71:22, 75:21, 75:25, 76:2, 76:9, 76:22, 77:4, 85:12, 88:13, 103:18, 113:17, 114:1, 115:12, 116:16, 116:21, 124:16, 124:17, 128:6, 128:8, 128:10, 132:24, 144:5, 151:6, 166:22, 170:8, 177:7, 183:23, 184:24, 185:11, 185:12, 195:6, 195:17
*yesterday* [1] - 4:21
*York* [6] - 54:6, 54:12, 54:15, 55:14, 55:19, 55:20
*York's* [1] - 55:22
*young* [1] - 50:4
*younger* [1] - 44:20
*yourself* [1] - 33:1
*yourselves* [1] - 175:20

## Z

*zero* [6] - 151:10, 151:11, 151:12, 154:10
*zeros* [1] - 151:13