UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.  2:16 CR 160 JVB-JEM |
| | ) | |
| JAMES E. SNYDER | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM[1]

Defendant James E. Snyder now stands before this Honorable Court for sentencing following his convictions at trial for: corrupt solicitation of $13,000 in violation of 18 U.S.C. § 666 (Count 2); and corrupt interference with the administration of the Internal Revenue laws in violation of 26 U.S.C. § 7212 (Count 3). Because this Court presided over Snyder's lengthy trial, and because Snyder's Presentence Investigation Report, DE # 305 (hereafter "PSR"), and accompanying Addendum, DE # 306, address Probation's Guideline calculation and the parties' objections and responses thereto, the government will not belabor those issues here.

---

[1] On February 14, 2019, the Court entered an order directing the government to file its sentencing memorandum 21 days prior to Defendant's sentencing. Although the Court subsequently set an evidentiary hearing for December 6, 2019, Defendant's sentencing is scheduled for December 17, 2019. Three weeks prior to December 17th is November 26th and, accordingly, the government planned to file its sentencing memorandum that day. However, earlier today defense counsel contacted the government claiming its memorandum was overdue and should have been filed on November 15th – three weeks prior to December 6th. Although the government disagrees with defense counsel's interpretation of the Court's February order, it nonetheless agreed to file its sentencing memorandum today.

1

Instead, the government will focus herein on addressing why the sentence recommended by Probation – a combined 46 months' incarceration followed by one year of supervised release on Counts 2 and 3 combined – is fair and reasonable based on the nature and seriousness of Snyder's offense conduct and the need to promote just punishment and to seek specific and general deterrence of similar crimes going forward. *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A)-(C). Finally, the government will address why Snyder's history and characteristics support giving a low-end Guideline sentence. *See* 18 U.S.C. § 3553(a)(1).

Regarding Count 2, the trial evidence, as accurately summarized by Probation in Snyder's PSR, clearly supports Probation's Guideline calculation. *See* PSR ¶ 4-63, 113-118. The government incorporates by reference here its briefs summarizing the trial evidence and responding to Snyder's attacks on the legal sufficiency thereof. *See* DE # 273, 290.

Notably these documents did not address the grand jury testimony of Robert and Steven Buha, owners of Great Lakes Peterbilt ("GLPB"). Because the Court has recently expressed concern about the government's decision not to call or immunize the Buhas at trial, the government will briefly summarize herein the key portions of the Buhas' prior testimony and explain why nothing therein, if believed, contradicts the evidence presented at trial or Probation's Guideline calculation as to Count 2 – in fact, the opposite is true.

The Buhas claimed in the grand jury that when they paid the Mayor $13,000 on January 10, 2014, they were not thinking of the fact that, just days earlier, they had been awarded the second of two contracts worth a total of over $1.125M by the City of Portage. *See* Steve Buha Grand Jury Testimony (hereafter "S. Buha"); Robert Buha Grand Jury Testimony (hereafter "R. Buha"). Both Buhas agreed, however, that "in retrospect" it did seem that Snyder felt he was owed the $13,000 because of those truck contracts. S. Buha at 55; R. Buha at 76-77, 84-85, 96-97. Importantly, the Buhas' claimed to be unaware of even the public actions Snyder had taken to ensure they were awarded those contracts. S. Buha at 56-57; R. Buha at 56.

Robert Buha admitted that prior to GLPB submitting its second-round bid, Snyder told him as many as ten different times that he (Snyder) wanted GLPB to receive the contracts. R. Buha at 59-62, 73. Robert Buha was "pretty confident" GLPB was going to win that bid because of its "relationship with the City" which meant its relationship with Snyder. R. Buha at 71. Additionally, when Snyder showed up unannounced at GLPB to allegedly ask for $15,000, he laid his motive bare, explaining he "need[ed] the money" because of "serious tax problems that had to be solved" and due to "Christmas and the holidays [being] here." R. Buha at 37. Although according to the Buhas Snyder claimed he would work for the money, he insisted on getting it up front rather than weekly because, he said, "I need the money now." R.

3

Buha at 42. Snyder made other promises that were not kept according to the Buhas. He said he would get the Buhas a written consulting contract but never did, allegedly despite repeated requests. R. Buha at 58-60. He also promised to file and give them a copy of his filled-out City of Portage conflict of interest form to demonstrate the legitimacy of their arrangement. R. Buha at 82. Snyder insisted that the Buhas make the $13,000 check out to "SRC Consulting" – a company that trial testimony established never existed. R. Buha at 82-83. And both Buhas confirmed that Snyder did not perform health insurance or IT consulting. S. Buha at 54 (deferring to his brother), R. Buha at 78-79 (answering "no" when asked if Snyder ever had meetings at GLPB regarding IT or heath care, or ever provided written work product), 87 (answering "no" and confirming not "anywhere close" when asked if Snyder performed sufficient work to support the $13,000 payment).

Snyder's actions on the day he was interviewed by the FBI, as recounted by Robert Buha, further support the jury's verdict. According to Robert Buha, Snyder called him that July 2014 morning and, rather than talk on the phone, insisted Robert drive to Snyder's house. R. Buha at 28. Once together, Robert Buha could tell Snyder was "very, very, very concerned" about the FBI's questions and warned Robert that the FBI was "going to probably come visit you about" the payment. Robert Buha told the grand jury that his answers in July 2014 about the $13,000 payment to

Snyder were a "defense mechanism"; he was worried he might be in trouble so he made it sound as if GLPB had received value from Snyder in exchange for the money. R. Buha at 85. Robert Buha claimed "naiveté" and "stupidity" as the reasons he did not go to authorities to report Snyder's allegedly extortionate conduct. R. Buha at 102-103.

As already explained, the government chose not to call or immunize the Buhas at trial due to its concerns about their truthfulness.[2] Nonetheless, even if the Court finds them credible, nothing about the Buhas' prior testimony contradicts Probation's findings of fact based on the evidence that was presented at trial or its application of Guideline enhancements to Count 2. Snyder was a public official at the time (PSR ¶113) and held a high-level decision-making or sensitive position (PSR ¶115) by virtue of his position as

---

[2] Right after meeting with Snyder the day he was interviewed, Robert Buha chose not to mention their rendezvous to the FBI and instead falsely (compared to his grand jury testimony) claimed it had been his idea to hire Snyder as a consultant. Steve Buha likewise lied by repeatedly claiming to have a written contract with Snyder. *See* Gov't Ex. 270. In response to a subpoena, the Buhas then directed Brett Searle, GLPB's Comptroller, to produce a document titled "SRC Consultation Benefits 2014" which contained false and dubious assertions of fact deriving from the Buhas. *See* DE # 274 at 6 and n.23. Robert Buha then signed a false business record certification claiming that document was made and kept in the regular course of business at GLPB, which was also not true. And then the Buhas demanded immunity from the Attorney General himself only to paint themselves as victims of an extortion scheme carried out by Snyder. Based on all this, the government concluded it could not call the Buhas to testify at trial or seek further immunity on their behalf.

5

Mayor of Portage. The value of the payment he solicited and accepted from the Buhas was $13,000 (PSR ¶ 114) and the Buhas' prior testimony does not refute Probation's finding based on the trial evidence that Snyder managed Randy Reeder during the truck bid process (PSR ¶ 117). Likewise, nothing the Buhas said to the grand jury contradicts Probation's finding that Defendant obstructed or impeded justice, or attempted to obstruct or impede justice, by telling law enforcement he had "done advisement work" for GLPB "all throughout the, the course of the year" on "health insurance and IT" matters in exchange for the $13,000 (PSR ¶ 118). *See* Gov't Ex. 240 at 3-4. Snyder claimed to law enforcement that "we met with a lot of people" and specifically that he "brought a lot of people to meet with [the Buhas] and talk to them and sat in a lot of meetings and discussed things" with them "at the dealership" (*id.* at 4-5), which Robert Buha flatly refuted. R. Buha at 78-79. Thus, whether one believes the Buhas' accounts or not, Probation's calculation of an Adjusted Offense Level of 21 for Snyder's Count 2 conviction is appropriate and fair.

The seriousness of Snyder's Count 2 offense conduct is difficult to overstate. As their elected mayor, Snyder owed the people of Portage, Indiana his honest services. Instead, Snyder used his public office to make money to

supplement his income[3] by corruptly soliciting and/or accepting $13,000 from two of the very constituents he was elected to serve. Snyder did not care that one of the trucks the citizens of Portage bought from GLPB was outdated and had been sitting outside, exposed to the elements for over two years. All he cared about was the fact that GLPB really wanted to sell it (because, as the evidence at trial demonstrated, they were overdue on a balloon payment of more than $60,000 for that chassis alone) and taking it off their hands could or would benefit him personally.

As the Supreme Court has explained, "a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562 (1961). Similarly, Judge Ruben Castillo of the Northern District of Illinois described the societal harm caused by public corruption offenses this way:

> Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all -- not only to the average citizen, but to all elected and appointed officials.

---

[3] As Defendant explained to law enforcement, when he took office he expected his mortgage company, First Financial Trust Mortgage ("FFTM") to supplement his income by "eighty to a hundred grand a year" but that business "tanked" so he came up with another plan. Gov't Ex. 240 at 6. In Defendant's own words: "I've gotta keep earning a certain amount of income." *Id.*

> . . . .
> It is this Court's opinion that these persons who commit crimes in the halls of government should be subject to the same consequences as those that commit crimes on the streets. Thus, courts must continue their vigilance in our nation's struggle against public corruption. This Court fully agrees with the statements of its esteemed and capable senior colleague Judge John F. Grady, who recently stated: "the matter of official corruption, bribery and shakedowns is an endemic problem. . . . The public needs to know that paying bribes . . . is conduct that will lead to serious punishment."

*United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006) (internal citations omitted).

Defendant's status as a public official should also be considered when it comes to promoting respect for the law, adequately deterring criminal conduct by others, and protecting the public from future crimes by Defendant. As Judge Castillo explained:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.

*Spano*, 411 F. Supp. 2d at 940.

The Seventh Circuit has "endorsed the idea that white-collar criminals act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity," and thus are "prime

8

candidates for general deterrence." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)). Indeed, exploiting a position of public trust by trading government contracts for money is the type of rational and calculated crime that is most susceptible to general deterrence. "As a counterbalance for those without adequate conscience, the resulting punishment must send a message to other public officials that giving in to temptation will indeed lead to prison, and for a significant stretch of time." *United States v. Thorpe*, No. 17-cr-40062-SMY, 2018 U.S. Dist. LEXIS 184829, at *10-11 (S.D. Ill. Oct. 29, 2018). The Seventh Circuit has upheld above-Guideline sentences premised largely upon the need for more general deterrence in public corruption cases. *See, e.g., United States v. Hamilton*, 703 F. App'x 429, 433 (7th Cir. 2017) (affirming "substantially above the guidelines" sentence that was justified appropriately) ("The judge made a good case for the need for more general deterrence: while Hamilton was engaging in his fraud, at least two other defendants were sentenced for public corruption, and yet Hamilton evidently paid no attention. And those two were the tip of the iceberg; the sentencing memorandum identifies over 45 similar prosecutions in the district.").

Examples of sentences handed down in the past decade against other mayors convicted of corruption offenses include: the former mayor of Reading, Pennsylvania who was sentenced earlier this year to eight years in prison for

promising government contracts to companies in exchange for campaign contributions (*see* https://wtop.com/national/2019/04/the-latest-ex-mayor-apologizes-for-corruption-conviction/); the former mayor of Allentown, Pennsylvania who in late 2018 received a 15-year sentence for likewise promising government contracts in exchange for campaign donations (*see* https://www.foxnews.com/politics/allentown-ex-mayor-sentenced-to-prison-on-corruption-charges); the former mayor of Niles, Ohio, who in May 2018 was sentenced to serve ten years in prison for various corruption offenses including having an unlawful interest in a public contract (*see* https://businessjournaldaily.com/former-niles-mayor-infante-sentenced-to-10-years-for-corruption/); the former mayor of New Orleans, Louisiana who in 2014 was sentenced to serve ten years for bribery, money laundering, fraud and tax evasion (*see* http://www.nydailynews.com/news/politics/ex-new-orleans-mayor-10-years-federal-prison-article-1.1860244?barcprox=true); the former mayor of Charlotte, North Carolina who in 2014 was sentenced to serve 44 months in prison after pleading guilty to honest services fraud (*see* https://www.theguardian.com/us-news/2014/oct/14/north-carolina-mayor-sentenced-prison-corruption); the former mayor of Detroit, Michigan who in 2013 was sentenced to serve 28 years for shaking down contractors vying for city work and using income to a non-profit as his personal slush fund (*see* https://detroit.cbslocal.com/2013/10/10/sentencing-underway-for-ex-detroit-mayor-

10

kwame-kilpatrick/); the former mayor of Mandeville, Louisiana who in 2010 was sentenced to serve 64 months in prison after pleading guilty to corruption and income tax evasion charges (*see* https://www.nola.com/news/crime_police/article_51226d1b-7193-54cf-b1d7-50d417b94386.html); and finally the former mayor of Camden, New Jersey who in 2001 was sentenced to serve seven years in prison for various corruption, money laundering and insurance fraud offenses (*see* https://www.nytimes.com/2001/06/16/nyregion/former-mayor-of-camden-is-sentenced-for-corruption.html).

Public corruption offenses like those listed above and this one play an unfortunately recurring and prominent role in northwest Indiana's own history. For all these reasons, the government believes a term of incarceration of 37 months, representing a sentence at the low end of the applicable Guideline range of Level 21, is needed to address the seriousness of Snyder's public corruption offense and to deter him and other elected officials from similarly abusing the public's trust in the future.

For Snyder's conviction on Count 3 of the indictment, Probation's calculated offense level of 18 is likewise appropriate. The government further contends that a guideline a sentence within that recommended range of 27-33 months is proper for this tax crime.

Once again the government incorporates by reference the facts set forth in Snyder's PSR (see ¶¶ 64-106) and in the government's post-trial filings.

Importantly, Snyder's tax-related offense conduct did not involve a single act derived from impulsive or aberrant behavior. Rather, the conduct engaged in by Snyder was an ongoing pattern of sophisticated criminal conduct designed to hide from the IRS for years, Snyder's true financial dealings. Snyder engaged in this long-spanning, sophisticated scheme, to avoid payment of the very same taxes that all individuals and business owners routinely pay to the IRS.

Snyder withheld payroll taxes from the employees at FFTM and failed to pay those taxes to the IRS, not once or twice, but for several years. This occurred at the very same time Snyder was lying to the IRS about his personal income status. As evidenced at trial, Snyder hid the existence of his employment at GVC, as well as his ownership interest in SRC, to shield his personal wealth from the IRS. To further create the illusion that FFTM was broke, Snyder shuttled bogus expenses between SRC and FFTM. Snyder further accomplished his goal by submitting to the IRS a patently false offer and compromise, and three additional form 433-As in which Snyder lied about his true income, his employment with GVC, his ownership interest in SRC, and the true financial state of FFTM. Snyder signed each of these documents under oath, asserting that they were true, accurate and complete. All of Snyder's lies on these forms allowed Snyder to delay for several years the payment of his personal income taxes, and to escape

payment of over $200,000 of the tax due and owing, interest and penalties, for FFTM's payroll taxes.

To further help accomplish his theft and as evidenced by the emails admitted at trial, Snyder enlisted the help of his accountant to file false tax returns hiding his true income from the IRS. The two emails admitted at trial clearly reveal the conspiratorial nature of Snyder's plan and his involvement of others to accomplish his goal.

Based upon Snyder's extensive attempts to hide his income from the IRS, the numerous years over which his conduct occurred, and his position as a public office holder, a guideline sentence is reasonable and necessary to properly reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for his extensive criminal conduct. A guideline sentence is also necessary to further deter others from engaging in similar criminal conduct aimed at obstructing or impeding the IRS.

Simply put, a sentence of between 27-33 months is an appropriate sentence for Snyder's sophisticated, long-running, multi-year scheme of lying and cheating the IRS out of the tax revenue it legitimately tried to promptly collect.

Finally, the government urges the Court to also consider Snyder's history and characteristics. According to the information he provided Probation, Snyder is one of four children (three boys and one girl). Snyder's father worked

as a salesman and his mother was a homemaker. Snyder lived in West Virginia, Pennsylvania, New York and Michigan growing up before moving to Portage, Indiana in 1989. Snyder graduated from Fairhaven Academy in 1996 with a high school diploma and graduated from Fairhaven College in 2000 with a degree in Theology. He is in good health, has no history of chronic illness or mental health problems, and has never had a drug or alcohol problem of any kind. In short, Snyder has enjoyed many of the life advantages that often evade defendants appearing before this Court for sentencing; he came from a stable, supportive and abuse-free middle-class home and was encouraged to and did obtain a college education.

Despite having these many advantages, prior to becoming Mayor of Portage and while operating his mortgage business FFTM, Defendant engaged in rampant mortgage fraud prior to his commission of the offenses for which he was convicted at trial. *See* PSR Addendum, DE # 306 at 1-3. According to the grand jury testimony of Snyder's own long-time friend and former business partner, Steve Dalton, the fraud occurred "regularly" at FFTM and Snyder was the individual responsible. *Id.* at 2. The fraud consisted of Snyder paying his clients kick-backs after closings but not listing those payments on the HUD-1 closing statements as required by law. *Id.* Snyder also helped clients pay off or down their debts in order to make them appear more "credit-worthy" to lenders and failed to disclose those transactions on the HUD-1s as well. *Id.* This fraud,

followed closely by Snyder's many efforts to obstruct and impede the IRS and then his use of his elected public office to corruptly gain $13,000 he did not earn, together provide a clear picture of how Snyder squandered the many advantages he was given in life.

Finally, the government wishes to address Snyder's failure to accept responsibility for his criminal conduct throughout this prosecution. At each stage of this case, including as recently as in his objections to Probation's Presentence Report, Snyder has denied engaging in any criminal conduct whatsoever. As the Seventh Circuit explained in *Blagojevich*, pleading not guilty, denying culpability throughout trial, and contending post-trial that the evidence was insufficient on every count is "the antithesis of accepting responsibility." *United States v. Blagojevich*, 794 F.3d 729, 743 (7th Cir. 2015). While the Guidelines permit defendants who go to trial to preserve legal issues to receive acceptance credit under narrow circumstances, "this was not a situation in which [D]efendant went to trial just to contest questions of law; he contested facts as well" including "his intent to defraud and act corruptly." *United States v. Lupton*, No. 07-CR-219, 2009 U.S. Dist. LEXIS 60975, at *8 (E.D. Wis. June 29, 2009) (denying request for acceptance credit at sentencing). In addition, Probation's application of the obstruction enhancement in Guideline § 3E1.1, if followed by the Court, similarly forecloses acceptance credit. *See id.* at *9.

WHEREFORE based on the factors set forth in 18 U.S.C. § 3553(a), a sentence of 47 months of incarceration followed by one year of supervised release is a just, fair and reasonable sentence for Defendant James Snyder.

DATED this 20th day of November, 2019.

                                      Respectfully submitted.

WILLIAM BARR,
ATTORNEY GENERAL

John R. Lausch, Jr.
UNITED STATES ATTORNEY

/s/ *Jill R. Koster*
Assistant U.S. Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana 46320
(219) 937-5500

/s/ *Phillip C. Benson*
Assistant U.S. Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana 46320
(219) 937-5500

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

By: _/s/ Jill R. Koster_
JILL ROCHELLE KOSTER
Assistant United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana 46320
(219) 937-5500