```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF INDIANA
 2                    HAMMOND DIVISION

 3   UNITED STATES OF AMERICA,     )
                                   )
 4     vs.                         )   Case No.
                                   )   2:16-cr-00160-MFK-2
 5   JAMES E. SNYDER,              )
                                   )
 6         Defendant.              )
     _____)
 7
                    EXCERPT FROM JURY TRIAL
 8          CLOSING ARGUMENT BY THE GOVERNMENT
                       MARCH 18, 2021
 9          BEFORE THE HONORABLE MATTHEW F. KENNELLY
                  UNITED STATES DISTRICT COURT
10

11   APPEARANCES:

12   FOR THE GOVERNMENT:      JILL ROCHELLE KOSTER - AUSA
                              United States Attorney's Office
13                            5400 Federal Plaza, Suite 1500
                              Hammond, Indiana 46320
14                            219-937-5500
                              Fax: 219-852-2770
15                            Email: Jill.Koster@usdoj.gov

16                            ANKUR SRIVASTAVA - AUSA
                              United States Attorney's Office
17                            219 South Dearborn, 5th Floor
                              Chicago, Illinois 60604-2029
18                            312-353-3148
                              Email: Ankur.Srivastava@usdoj.gov
19

20   FOR THE DEFENDANT:       JACKIE M. BENNETT, JUNIOR
                              Taft Stettinius & Hollister LLP
21                            One Indiana Square, Suite 3500
                              Indianapolis, Indiana 46204-2023
22                            317-713-3500
                              Fax: 317-713-3699
23                            Email: jbennett@taftlaw.com

24

25
```

1    APPEARANCES (Continued):

2

3    FOR THE DEFENDANT:        VIVEK R. HADLEY
                               Taft Stettinius & Hollister LLP
4                              One Indiana Square, Suite 3500
                               Indianapolis, Indiana 46204
5                              317-713-3500
                               Fax: 317-713-3699
6                              Email: vhadley@taftlaw.com

7

8    ALSO PRESENT:             Defendant, James E. Snyder

9

10   OFFICIAL REPORTER:        Angela Phipps, RMR, CRR, CSR
                               5400 Federal Plaza
11                             Hammond, Indiana 46320
                               (219) 852-3616
12                             angela_phipps@innd.uscourts.gov

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.

1        (Whereupon, proceedings were had and reported, but not

2         made a part of this record.)

3                            *    *    *

4        (Jury present.)

5                **CLOSING ARGUMENT BY THE GOVERNMENT**

6        **MS. KOSTER:**  Thank you, Judge.  Good afternoon.

7   We're here today because James Snyder violated the public's

8   trust.  He took an oath to serve the people of the City of

9   Portage, Indiana, and he violated that oath by putting his own

10  interests ahead of those of the people of Portage.

11       We have proven James Snyder guilty beyond a reasonable

12  doubt.  At the beginning of this trial, my co-counsel, Ankur

13  Srivastava, told you that the Government embraces its burden of

14  proof.  That is our responsibility to bring you proof beyond a

15  reasonable doubt and we have done that.

16       As Judge Kennelly just instructed you, the Indictment

17  charges Defendant with bribery.  In order for you to find the

18  Defendant guilty of this charge, the Government must prove each

19  of the following five elements beyond a reasonable doubt:

20       First, that the Defendant was an agent of the City of

21  Portage.  I suggest to you, ladies and gentlemen, that's

22  obvious.  He was the mayor.  He was an agent of the City of

23  Portage.  He was also the president of the Board of Works, and

24  you heard testimony about that.

25       Second, that the Defendant solicited, demanded, accepted

1   or agreed to accept a thing of value from another person.  You

2   heard testimony and evidence that $13,000 was provided to the

3   Defendant in the form of a check, that he accepted it, and went

4   into his bank account and the money then was transferred to his

5   personal account.  So there is ample evidence that the

6   Defendant accepted a thing of value from another person.

7        The Defendant acted corruptly, with the intent to be

8   influenced or rewarded in connection with the contracts with

9   the City of Portage -- and I'll come back to that element in

10  just a minute.

11       The contracts involved a thing of value of $5,000 or more.

12  That too, ladies and gentlemen, you have heard plenty of

13  testimony about the contracts in this case totaled

14  $1.125 million.

15       And, finally, that the City of Portage, in one year,

16  received benefits of more than $10,000 under any federal

17  program involving a grant, contract, subsidy, loan, guarantee,

18  insurance or other assistance.

19       On that element you heard testimony directly from Lynn

20  Reed at the clerk treasurer's office in Portage, Indiana, as

21  well as from John Shepherd.  Both of them told you that there's

22  never been a year that the City of Portage has not received at

23  least $10,000 in federal benefits, whether it be Medicare,

24  Medicaid, or grants or public safety, Department of

25  Transportation benefits for the building of roads, highways,

```
 1   maintenance, that sort of thing.
 2        So that brings us back to the one element that I haven't
 3   yet addressed, and that is, the Defendant acted corruptly with
 4   the intent to be influenced or rewarded in connection with
 5   contracts with the City of Portage.
 6        That is the element that I'm going to address for the
 7   remainder of my argument.
 8        First, I want to talk to you about circumstantial versus
 9   direct evidence.
10        In opening statement, Mr. Bennett told you that all of the
11   evidence you're going to hear is circumstantial evidence; you
12   will hear no direct evidence that this actually happened.  Now,
13   ladies and gentlemen, the way that that was worded in opening,
14   I suggest to you, is not in accordance with the law.
15        The law states people sometimes look at a fact and
16   conclude from it that another fact exists.  This is called an
17   inference.  You are allowed to make reasonable inferences, so
18   long as they are based on the evidence.
19        For example, earlier this week, it snowed overnight.  You
20   wake up in the morning, you see snow on the ground.  You didn't
21   see the snow fall on the ground, but it's there.  You can infer
22   from the snow on the ground that it snowed.  That's an
23   inference.
24        You may have heard the terms "direct evidence" and
25   "circumstantial evidence."  Direct evidence is evidence that
```

1  directly proves a fact, such as seeing the snow fall to the

2  ground.  Circumstantial evidence is evidence that indirectly

3  proves a fact, such as waking up and seeing snow on the ground.

4      You are to consider both direct and circumstantial

5  evidence.  The law does not say that one is better than

6  another.  It is up to you to decide how much weight to give any

7  evidence, whether it is direct or circumstantial.

8      I want to talk for a moment about motive to accept or

9  demand a bribe or gratuity.  And, ladies and gentlemen, the

10 evidence we've presented in this case really fits into six

11 different categories.

12     The first category is this one:  Motive to accept or

13 demand a bribe or gratuity.  The other categories are:

14 Evidence of bid rigging, timing of the payment and the sale, no

15 documentation of work allegedly performed, efforts to conceal,

16 and consciousness of guilt.

17     I will address each of those categories of evidence in

18 turn and walk you through the evidence that was presented in

19 the case.

20     Let's start with motive evidence.

21     You heard ample testimony from the beginning of the trial

22 from Special Agent Jerry Hatagan of the IRS that the Defendant,

23 James Snyder, needed money.

24     In March of 2013, the Defendant received notices from the

25 IRS that he owed over $11,000 on his 2006 and 2007 taxes.

1    In April of 2013, the Defendant filled out a form for the
2    IRS under oath and declared he had $11,000 in credit card debt.
3    He was upside down on two home mortgages, for a total of over
4    $66,000, and he was upside down on his Honda Odyssey over
5    $7,000, meaning he owed more on those assets than they were
6    worth.  So if he had sold them, he would actually still owe
7    money to the bank for the assets.
8    You also heard testimony from Special Agent Hatagan that
9    James Snyder received notice in September of 2013 that the IRS
10   was assessing against him what are called trust fund penalties,
11   and those trust fund penalties are for unpaid payroll taxes.
12   He was informed that September that $39,523 in trust fund
13   penalties would be assessed against him personally, meaning he
14   was personally liable for that additional nearly $40,000.
15   You also heard evidence that, in January of 2014, as was
16   the case in many of the prior months, the Defendant was past
17   due on his car payment.  And by January, he was past due over
18   $1600.
19   He also had received several notices of foreclosure from
20   the bank; in this case, Chase Bank.  And this notice, in
21   particular, is relevant because he received it soon -- on or
22   about December 11th, 2013; almost a month to the day before
23   the Defendant accepted the $13,000 check from Great Lakes
24   Peterbilt.
25   And in this notice, he was informed that his rental

1    property was in default, that there was an intent to foreclose

2    on that property, and he owed $2300.

3        (Audio played, Government's Exhibit 190; and 190-A

4         transcript displayed to the jury.)

5        You heard it directly from the Defendant's mouth in that

6    interview.  He needed money.

7        Now let's talk about the evidence of bid rigging.

8        The Defendant inserted himself in the bid process for

9    these two contracts in a number of ways.  The first way was

10   that he took out of the process the man who would normally have

11   been responsible for overseeing it, and that is Steve

12   Charnetzky, the superintendent of Streets and Sanitation.

13       You heard Steve Charnetzky's testimony that he had handled

14   at least 25 different bid processes in his prior years as

15   superintendent of Streets and Sanitation, which he had served

16   in that position by the time he was reappointed by James Snyder

17   for 16 years.

18       Steve Charnetzky had a ton of knowledge and experience

19   about the bid process, but James Snyder didn't want him

20   involved.  Why not?  Why wouldn't you want the most-experienced

21   person involved in a process that is quite complicated?  Ask

22   yourselves.

23       Instead, he put his good friend, Randy Reeder, in charge

24   of that process.  And you've heard testimony directly from

25   Mr. Reeder.  He wasn't qualified to be a small engine mechanic.

```
 1   He was working as a maintenance man, part-time, before he was
 2   hired by the Defendant.  He volunteered for the Defendant's
 3   campaign; helped put up some signs.  The Defendant promised him
 4   a job.  Next thing he knows, he's assistant superintendent of
 5   Streets and Sanitation and responsible for the acquisition of
 6   over $1.125 million of equipment on behalf of the City of
 7   Portage.
 8        And I hope it was clear, ladies and gentlemen, from the
 9   testimony of Mr. Reeder that he is a follower.  He is a
10   follower of James Snyder.  James Snyder tells him to do
11   something, and he does it.  That's why Randy Reeder was put in
12   charge of this process.
13        John Beck took the stand.  He was a mechanic.  And I
14   should mention, ladies and gentlemen, these photographs are not
15   in evidence.  They're just to remind you of the witnesses that
16   the Government called, because it's been -- it's been a while
17   since you've seen some of them.
18        John Beck took the witness stand and testified he was a
19   mechanic for the City of Portage for a very, very long time.  I
20   think somewhere north of 20 years, 24 years.  Before that, he
21   was a semi truck driver and drove Mack trucks.
22        And he told you that he had been asked to provide specs
23   for the trucks that would be best for the Department of
24   Sanitation.  And he contacted Waste Management and Republic,
25   and he arrived at an opinion as to what type of truck the City
```

1    should buy, what type of truck is best for the application of

2    refuse collection.

3          And he expressed those opinions to Randy Reeder.  He told

4    him exactly the type of truck that he preferred and why.  And

5    significantly, perhaps not the brand didn't matter, but things

6    like full-eject mattered.

7          And he gave you the reasons why, because sometimes the

8    trash can freeze overnight in the winter, and it makes it

9    difficult and dangerous for the employees who are trying to

10   empty the trash trucks at the dump or at the -- I think they

11   call it a station -- what is it called -- transfer station.

12   Thank you.

13         At the transfer station, the trash can get stuck in the

14   back of the body of the truck, and it doesn't come out.  And

15   then they have to shove, I think he said, wooden crates into

16   the back to try to shove the trash, get the trash to shove out.

17   And that's dangerous.

18         He expressed his opinions to Randy Reeder.  And Randy

19   Reeder, one of those opinions was, he does prefer a Cummins

20   engine.  And Randy Reeder did put that into the spec.

21         You heard testimony, though, that, in order to make it

22   fair for all bidders, you would normally put something like a

23   Cummins engine and put the horsepower and the torque that you

24   prefer or equivalent.  We don't see that language in this spec.

25         And what was interesting about the testimony that we heard

1    from the witnesses is that Randy Reeder picked and chose which

2    advice from the mechanics he followed; right?  You heard

3    cross-examination of the salesmen who came in and testified by

4    Defendant:  Well, those Mack trucks didn't have a Cummins

5    engine, so they couldn't have been chosen, because that's what

6    the mechanics wanted, Cummins engine.

7        Yeah, but what the mechanics also wanted was full-eject,

8    and that wasn't followed.  So Randy Reeder wants you to believe

9    that Cummins engine is in there because the mechanics preferred

10   it, but it also just happens to be the type of engine that's in

11   Great Lakes Peterbilt's chasses.

12       And they chose not to follow the advice of the mechanics

13   as to other aspects.

14       This is Truck 406.  You heard a lot of testimony about

15   this truck.  Probably learned more about this truck than you

16   care to know.  This is the truck that sat on Great Lakes

17   Peterbilt's lot for two years prior to its sale to the City of

18   Portage.

19       You heard testimony, ladies and gentlemen, that, after the

20   first round, after three truck contracts had been awarded to

21   Great Lakes Peterbilt, the Defendant and Randy Reeder tried to

22   purchase that truck directly from Great Lakes Peterbilt; and

23   they -- Randy Reeder wrote an email to Greg Sobkowski, the City

24   Attorney saying, "Mayor wanted me to ask you if the City was

25   able to order a fourth Peterbilt truck with the same body

1    style.  Do we have to rebid, or can we just order another one

2    like the three we just purchased?"

3        They were looking to do it directly.  They wanted to do it

4    directly.  But Mr. Sobkowski said, "If it costs more than

5    $150,000 you have to have a bid process; that's the law."

6        So what does the Defendant do?  He says, "Well, how much

7    is it?"  Randy Reeder says, "It's 180 to 200."  Randy Reeder

8    says, "He probably called Steve Charnetzky."  His recollection

9    is Charnetzky said, "Yeah, we can't sell it for less than

10    $150,000," so they had to do a bid process.

11        But that didn't stop James Snyder from asking, ask him if

12    they can get it below 150; we can buy it directly without doing

13    a formal bid process.  They were motivated and interested in

14    buying that truck.  And ask yourselves why; why the interest in

15    this two-year-old truck that had been sitting on Great Lakes

16    Peterbilt's lot?

17        Do you think it was the only used truck in this area

18    available for sale that could carry refuse?  Of course it

19    wasn't.  It was the only used truck -- I said the word "used."

20    I didn't mean "used" in the sense that it had been titled and

21    driven; I just meant older.  Used in the sense it was aged.

22    Was it the only aged truck sitting around that could have been

23    sold to the City of Portage?  Of course not, no.  But it was

24    the only aged truck that Great Lakes Peterbilt was desperate to

25    sell.

1          How else was this bid process rigged?  You heard testimony

2     from Lynn Reed.  She's been in the clerk treasurer's office, I

3     think she said, over 30 -- 35 years.  And she told you that

4     addressing the bids to the mayor's office was highly unusual.

5          It hadn't been done in the past.  They were supposed to go

6     to the clerk treasurer's office.  Why are they supposed to go

7     to the clerk treasurer's office?  Because that is the

8     individual and the office that is responsible for securing them

9     and making sure and knowing what's happening with those bids

10    between when they're received and when they're opened at a

11    public meeting.

12         And you've heard some testimony -- We've asked some

13    witnesses about these envelopes that we had.  They're in

14    evidence.  They're Government's Exhibit 53.  And the bottom

15    line, ladies and gentlemen, with regard to these envelopes and

16    with regard to whatever happened after the bids were delivered

17    but before they were opened at a public meeting is this:  We

18    don't know.  We don't know what happened.  And I suggest to you

19    that that was by design.

20         Randy Reeder and James Snyder directed that the bids be

21    delivered to the mayor's office, and that wasn't an accident.

22    It was an unusual thing that hadn't happened before and hasn't

23    happened since.  They've told you that just in the last few

24    days.  You've heard testimony that has been changed.  That was

25    not an accident.  The envelopes were delivered there, and it

1    was highly irregular, and you'll have a chance to look at them

2    yourselves.

3        But one thing we do know:  The handwriting on this

4    envelope does not belong to Scott McIntyre.  He testified under

5    oath that's not his handwriting.  Does not belong to Robert or

6    Steven Buha.  And if you look through the exhibits in this

7    case, you'll see there are some handwriting exhibits with

8    Robert and Steven Buha's handwriting.  Both of them have

9    beautiful penmanship.  Beautiful.  Remarkably beautiful

10   penmanship.  This is not their handwriting.  He wasn't kidding

11   when he said, "I write much neater than that."  He has

12   beautiful penmanship.  Not this.

13       You heard testimony from three men who have worked in the

14   trucking industry for a long time as salesmen.  Their job is to

15   sell trucks.  Their goal is to get companies and municipalities

16   and cities to buy their trucks.  And they each noticed

17   irregularities in this process.

18       Now keep in mind, ladies and gentlemen, these are people

19   who don't know about the $13,000 payment, who don't know about

20   a lot of the other facts that you know about.  All they knew

21   about were the invitations to bid, the specs, and the voting on

22   the bids.  That was the extent of their knowledge.  And based

23   on just those facts, they observed things that were not normal,

24   that were irregular, that seemed to them to be improper.

25       And some of them were so frustrated and dismayed by what

1  they saw, they didn't even bid in the second round.  These are

2  salesmen who make their livelihood selling trucks, and they

3  didn't even try to sell trucks in the second round.  What does

4  that tell you?

5      Another irregularity and other evidence of bid rigging is

6  the communication between only one of the salesmen involved in

7  the process, or one of the companies involved in the process,

8  and James Snyder.

9      And we put into evidence these telephone summaries that

10  show you -- this is the first round of bidding.  We checked

11  every phone number provided by all of these salesmen on the

12  paperwork to the City, and these are the only numbers that were

13  called.

14      In the first round, Steven Buha.  He was the only salesman

15  the Defendant had direct contact with.  Why is the mayor of

16  Portage talking and texting with a man who is in the process of

17  and then submits a bid to the City to sell equipment?  Why

18  would that be happening?  Why has the mayor injected himself

19  into this process?

20      And this is the second round.  Way more communication

21  during the second round between the Defendant and both Robert

22  and Steven Buha.  Again, why?  You heard testimony that there

23  was allegedly a consulting arrangement.  Well, that

24  arrangement, even if you believe it existed, didn't occur until

25  January 10th, 2014.  That's after this process ended.  This

1   is not consulting that's happening here.  What are they talking
2   about?  Why are they talking?  Why are they meeting?
3        We know they met because there's emails; there's Outlook
4   invitations to meetings that were found by the Government's
5   search warrant.  Why are they having lunch the day before the
6   bids are due?
7        Defendant called Bob Buha to testify, and you heard from
8   him yesterday and today, but you didn't hear testimony or
9   questions about that.  Ask yourselves why not.
10       Taking you back to Truck 406, you heard testimony and
11  evidence that the general terms of the specifications issued by
12  the City state, "All equipment furnished shall be new, unused,
13  and the same as the manufacturer's current production model."
14       Defense counsel tried to get up when cross-examining some
15  witness and say, "Well, that's not really where the specs are.
16  The specs are really on the following pages."
17       These are the general terms.  And it says "shall" --
18  "shall be new, unused and the same as the manufacturer's
19  current production model."
20       And you heard witness after witness say that this truck
21  was not the same as the manufacturer's current production
22  model.  It was a model 2012, and it was sold to the City at the
23  same time as a new truck right off the assembly line, which was
24  a model 2015.  They are not the same.
25       You heard testimony and evidence about the EPA changing

1    the emissions standards in between there.

2         You heard testimony and evidence that every year these

3    trucks become more expensive.  Why?  Better and faster computer

4    chips and other things are put into the trucks.  They developed

5    these trucks.  They make improvements.

6         You know, in your mind, if you went to a dealership and

7    said, "I want to buy a new car," and they said, "Here's this

8    perfectly good 2018," would you say, "Oh, yeah, that's probably

9    the same as the 2021"?  Sure.  Of course, it's not.  You

10   wouldn't want it.  Why would the City want it?

11        Government's Exhibit 167 shows that that truck was built

12   in November of 2011.  It was delivered to Great Lakes Peterbilt

13   at that time, and it sat on their lot for two years.  The

14   Cummins engine passed 2010 emissions standards, not 2013

15   emissions standards.

16        Government's Exhibit 87 is a document where Randy Reeder

17   sends out two weeks before the Board of Works votes in the

18   second round, he sends out this chart.  And the chart has and

19   compares every other bid in the first round to Great Lakes

20   Peterbilt's bid.

21        So two weeks before the Board has even voted, has even

22   decided they're going to go with Great Lakes Peterbilt,

23   Randy Reeder has created a chart showing and comparing that

24   particular bid to every other bid.

25        It's obvious from the testimony and evidence, and you can

1   use your common sense, that they chose to prioritize the

2   delivery date over every other spec that was written in the

3   specifications for a reason.  They did it because Great Lakes

4   Peterbilt was one of the only companies that could meet that.

5   Probably, they thought, the only company.  Unbeknownst to them,

6   Best had a Peterbilt 320 that happened to have already been

7   manufactured and could meet that same deadline.

8        You heard testimony from Randy Reeder about the delivery,

9   because both Charnetzky and Mr. Beck, when asked, said there

10  was no rush.  Yeah, it was time to buy some new trucks, and

11  everybody was in favor of the automation.  Government is not

12  arguing automation was bad or trucks shouldn't have been

13  purchased.  Any one of these trucks would have been automated.

14       The point, ladies and gentlemen, is that they favored

15  Great Lakes Peterbilt's trucks, and Randy Reeder told you why.

16  He said the mayor has pressed that this should happen as soon

17  as possible.  The urgency came from the mayor.

18       That was one of the things-- and the mayor's knowledge

19  about that 150 days --that Mr. Reeder got on the stand in a

20  previous hearing and tried to retract from his grand jury

21  testimony.  And why would he do that?  Why would he retract

22  something he already said under oath?  He did it because the

23  Defendant asked him to, just like everything else Randy Reeder

24  does.  Defendant asks him, and he does it.

25       And if you look at the two charts and comparing now

1    Government's Exhibit 34 with Government's Exhibit 38, you can

2    see that a lot of people who bid in the first round, including

3    some of the salesmen that you heard from during the trial,

4    decided not to even bid in the second round.

5        And what's so interesting if you compare the two rounds is

6    that, in the first round, it was all about the delivery date.

7    It was all about speed, how fast can we get it; right?

8        They prioritized delivery over price.  They paid $59,000

9    for a truck because it could be delivered -- $59,000 more for

10   three trucks, excuse me, that could be delivered within

11   150 days, which worked out to about $560 a day for those trucks

12   than they could have paid if price was the most important

13   thing, for other trucks that just would have taken longer to

14   manufacture.

15       And both Charnetzky and Beck told you there was no

16   urgency.  There was never a day that the City of Portage was

17   not able to pick up all of the trash.  They had enough working

18   vehicles.  They had even retrofitted tippers on the back of

19   their rear-loaded refuse vehicles.

20       There was no urgency.  The only urgency came from

21   James Snyder.  And Randy Reeder admitted that in the grand

22   jury.  He had said he never did find out from James Snyder what

23   was the rush.

24       Yet, in the second round, they didn't prioritize delivery

25   date over price, like they had in the first.  In the second

1    round, they prioritized price over delivery date; just the
2    opposite.
3        There was one truck that was available 21 days after being
4    ordered, but they didn't order it.  What happened to the
5    urgency?  All of a sudden, the urgency was gone and now what we
6    care about now is the price.  After paying $60,000 extra in the
7    first round, now we care about price.
8        And you heard that Randy Reeder created this chart and he
9    wrote at the bottom, "All companies meet bid specs and lowest,
10   responsive-bidder goes to lowest cost," but that wasn't true.
11   Not all of the companies met the bid specs.
12       Both Link and Peterbilt were trying to sell a chassis to
13   the City of Portage that was a model 2012.  That didn't meet
14   the specs.  Under Indiana law, it should have been rejected.
15   And it wasn't.  Why wasn't it?
16       The only people who knew about the model 2012,
17   Randy Reeder and the mayor.  The only people at the Board of
18   Works meeting who knew about the model 2012 stayed silent and
19   didn't mention it.
20       Mayor Snyder voted in favor of awarding the contracts in
21   both rounds to Great Lakes Peterbilt, and I suspect you might
22   hear, ladies and gentlemen -- It was under law, he has to be on
23   the Board of Works so that, you know, it was his duty to vote.
24   There's nothing wrong with that.  He could have recused
25   himself.  He could have said, "You know, I had all this contact

1    with this company.  It's probably not appropriate for me to
2    vote on this particular contract."  But he didn't do that.  He
3    voted, and he voted in favor of Great Lakes Peterbilt.
4        So let's talk now about the timing of the  payment and the
5    timing of the City's purchase of that truck.
6        Steve Buha and Bob Buha, the owners of Great Lakes
7    Peterbilt, were in dire straits during this time.  You heard a
8    lot of testimony about, yes, in November of 2014 they sold
9    their business and they got -- we got different numbers, but
10   probably Mr. Buha knows best.  He said around $5 million net.
11   So, yeah, they were sitting pretty in November of 2014.
12       But that was not the case in 2013.
13       You heard testimony, the very first witness who testified
14   at trial, Mr. Peyton Harrell from Peterbilt Motor Company.  And
15   he told you Great Lakes Peterbilt was one of the most
16   underperforming dealer groups in the Peterbilt dealer network,
17   ranking 55 of 61 in 2013 and 53 of 61 in 2014.  The dealership
18   has shown a negative net profit three of the last six years.
19       He told you their credit rating had been lowered from a D
20   to an E, that they had been put in SOT status.  "SOT" means
21   "sales out of trust," meaning they sold trucks; they sold
22   trucks and didn't pay back their financier, PACCAR, despite
23   getting the cash in their account, didn't turn that cash back
24   over to PACCAR.  They were sales out of trust.
25       He also told you that Steve and Bob Buha infused $450,000

1    into the dealership.  And I walked the agent through the bank

2    records to show money comes out of Edward Jones, goes into the

3    operating account, and goes into the payroll account and into

4    the FET account and into the operating account -- Sorry.  I

5    misspoke.  Went out of Edward Jones into Steve Buha's checking

6    account, then went into the payroll account, the FET account

7    and the Great Lakes Peterbilt operating account.

8        I suggest to you, ladies and gentlemen, you don't take

9    money out of your personal retirement account unless your

10   business depends on it, unless you're literally going to lose

11   your business and the only way to make payroll is to get that

12   money out of your personal retirement account and use it to

13   make payroll; and that's what happened.

14       And Brett Searle testified that the second time it

15   happened, which was $150,000 taken out of Steven Buha's

16   retirement account, he didn't get paid back before selling the

17   dealership.  He did get money, though; obviously, they were

18   doing fine after they sold the dealership, shew.  But during

19   this time, they were in trouble.

20       They were past due $76,000 the same month they wrote a

21   check to James Snyder for $13,000.  What sense does that make?

22   What sense?  It makes no sense.  Your business is failing, and

23   you write a $13,000 check for IT and health insurance

24   consulting?  So they claim.  That makes absolutely no sense.

25       They wanted to sell this truck, Truck 406.  They needed to

1   sell this truck.  They had $45,000 invested in this truck.

2   They had $60,000 due on this truck.  It came due on

3   November 24th, 2013, just a month before the Board of Works

4   voted to buy the truck.  So they were overdue by a month on

5   this curtailment, these curtailment payments, by the time they

6   finally sold it.

7       If they didn't make those curtailment payments, PACCAR

8   could have taken back the truck, and they would have lost their

9   $45,000 they had invested in that truck.

10      By selling the truck, they get back their 45,000, plus the

11  additional 30,000 they made a payment on January 3rd, 2014.

12  So they get back their $75,000.  They can use that money in

13  their operating account.  They were cash-poor.  They were

14  non-liquid.  They had cash-flow problems.  They needed that

15  money back.

16      We saw a text exchange between Steve Buha and James Snyder

17  where James Snyder says, "I have a purchase order for you.  You

18  there today?"  And we know that purchase order was delivered,

19  because Randy Reeder testified he wrote it up.  He gave it to

20  James Snyder.  We see James Snyder's signature on it.  The

21  purchase order is dated January 3rd, 2014.  And we know that

22  on that date the Buhas made a $30,000 payment toward the truck.

23      Probably, they were saying, if we weren't going to be able

24  to sell that truck, we might just have said goodbye to that

25  $45,000.  But once they had a purchase order in hand, okay, we

1    can make this $30,000 payment, we'll use the purchase order to

2    get an extension from PACCAR on the remaining $30,000.  That's

3    exactly what happened.

4        You can see here in this memo from January of 2014, "Great

5    Lakes Peterbilt has requested approval to postpone the final

6    payment on one new 2012 Peterbilt vehicle identification number

7    ending in 412, given the pending sale to the City of Portage,

8    PO attached."  Purchase order attached.

9        And you heard from Bob Buha himself today said:  Yeah, it

10   would be helpful to have that, right, because then they know

11   you're good for the money; you're going to get the money from

12   the City of Portage.

13       And what's interesting about this evidence, ladies and

14   gentlemen, is that they did get a curtailment modification, and

15   they were permitted until April 30th to pay for this truck.

16   But as of May 1st, 2014, they still hadn't paid.  They still

17   had, and if you look at the very bottom of the current balance,

18   call them, you'll see they still had a balance as of May 1st

19   of $30,237.

20       Do you remember Bob Buha, what he said today on the stand:

21   Took a while to get paid.  Like, it took longer than we would

22   have liked.  That was a frustration.  I made a lot of phone

23   calls.

24       They needed that money, ladies and gentlemen.  They

25   needed it.

```
 1        And you heard some testimony about political donations
 2   that were made to the Defendant by the Buhas.  This is a
 3   timeline to put those donations into context, okay?  We have
 4   when Snyder takes office, and then we have the two different
 5   rounds of bidding for the truck contracts.
 6        You can see that, in the beginning, in 2012, they gave
 7   $2,000 to Snyder for his roundtable.  They joined the
 8   roundtable.  2013, they gave $2,000 for his trip to Austria.
 9   They donated that money to his PAC.  But even more, they then
10   wrote a check for $5,000 to James Snyder for the golf outing.
11        Now, Brett Searle told you that James Snyder was the only
12   political candidate that the Buhas were giving donations to
13   directly that he can recall.
14        Bob Buha on the stand made it sound like, "Oh, yeah, you
15   know, I make these donations.  I don't know.  I don't keep
16   track of who we give the money to."  They were giving it all to
17   James Snyder, and they were doing that at a time that they were
18   in deep trouble.  Why would they do that?
19        Mr. Searle told you he likes to have backup when he writes
20   a check.  This is a good example.  This is part of Government's
21   Exhibit 20.  This is when they made the check for the Austria
22   trip.  He kept in his file a copy of the Austria letter.  And
23   then you have the printout, which is a copy of the check.  He
24   likes to have backup.
25        And there was something interesting about that $5,000
```

1   payment.  Government is not alleging there was anything illegal
2   about that payment.  However, it is very interesting, they
3   agreed to be gold sponsors of a golf outing, which should get
4   them recognition throughout the day, and a foursome, but then
5   they decide we're not even going to show up.  You can give away
6   our tee spot, but we're going to be gold sponsors.

7       Who sponsors an event and then doesn't show up for the
8   recognition?  If you're sponsoring an event to get recognition
9   in the community to prompt sales, you would think you would
10  want to be there so the other members of the community that are
11  participating in the event could see you there and you would
12  get that recognition.  There's something in it for them, too,
13  when they give a political donation along these lines.  But yet
14  they didn't show up.  They didn't come.

15      Instead, Steve Buha wrote a personal check to James
16  Snyder, which was deposited into his account, and then reported
17  on his campaign account as a $5,000 donation from Steve Buha
18  personally.  But you heard testimony from Mr. Searle that he
19  was reimbursed.  Steve Buha was reimbursed for this donation.
20  And I asked him:  Well, why couldn't Great Lakes Peterbilt have
21  just made the check out directly?  He didn't know.

22      And then finally we saw this $13,000 payment in January of
23  2014.  So to put that in context, and regarding the timing, it
24  is important to note that just two weeks after receiving the
25  second of two contracts worth $1.125 million, the Buhas cut

1    that $13,000 check to James Snyder.

2        Now I want to talk to you about the lack of documentation

3    of work allegedly performed.

4        (Government's Exhibit 188 audio played.)

5        So let's review.  In July of 2014, Steve Buha tells the

6    FBI six different times:  We have a contract.  We have a

7    written contract.  In fact, I think we even ran it past a

8    lawyer.  You can't do that without a written contract; right?

9    He's confident they have a written contract.  That's what he

10   tells the FBI.  And guess what?  There was no contract.  He

11   lied.

12       I submit to you, ladies and gentlemen, that it is not

13   believable for Bob Buha to take that witness stand and tell you

14   he did think we had a contract, but he wasn't sure and, you

15   know, he couldn't remember.  This is the mayor of Portage.  If

16   you entered into a contract with a public official who was the

17   mayor, you would remember it.  It's not something you forget.

18   You either have the document or you don't, especially after the

19   fact when the FBI comes knocking.

20       You heard testimony that there were two subpoenas issued

21   by Government to try to obtain copies of this contract, and any

22   other documentation, any other written documentation showing

23   actual work performed -- letters, summaries, emails even,

24   business cards, anything at all showing actual work performed.

25   And when I say "business cards," I'm talking about with "SRC

1    Consulting" on it.  Because, as you heard, ladies and

2    gentlemen, multiple witnesses were asked, "Did you ever have

3    any letterhead with SRC Consulting?  Anything else?"  No.  Why?

4    It didn't exist.

5        There's no evidence in the record of the existence of SRC

6    Consulting, except for the check for $13,000.  That is the only

7    evidence of its existence.  That is in the record.

8        Now I want to talk to you about efforts to conceal.

9        (Audio of Government's Exhibit 150 played; and 150-A

10        transcript displayed.)

11       That was the full discussion, the full discussion before

12   the second round contract was awarded.  Nobody mentioned.  We

13   know Randy Reeder was present.  We know James Snyder was

14   present.  We can hear their voices.  They didn't mention the

15   age of the model 2012 truck to the other voting members.

16       And on the subject of concealment, I already mentioned

17   about SRC Consulting, that the only place that that company

18   appears on any piece of paper in the record is on this check.

19       We know that SRC Properties was registered with the

20   Indiana Secretary of State.  It was registered as a mortgage

21   company.  And James Snyder was the only signatory on its bank

22   account.  That is the account into which the $13,000 check was

23   deposited.  This is Government's Exhibit 18.

24       And we know from Government's Exhibit 157 that the

25   Secretary of State documentation shows James Snyder registered

1   SRC Properties effective September of 2009, but that it was
2   administratively dissolved on February 14th, 2013; almost a
3   year before he got a check made out to SRC Consulting and
4   deposited that check into SRC Properties' bank account.
5          (Government's Exhibit 190 audio played; and Government's
6           Exhibit 190-A transcript displayed to the jury.)
7          And I'm going to stop it there.  It gives you a long
8   explanation that basically tells you nothing about SRC -- what
9   is it, why is it receiving this check made out to SRC
10  Consulting?
11         That was an effort at concealment, ladies and gentlemen.
12  To the extent that it was not smart to accept a bribe in the
13  form of a check, I would submit to you that it was at least
14  smarter that it wasn't made out to him.  And you notice when
15  you look at the back of the check, he didn't even endorse the
16  check; he didn't sign his name on the check.
17         It was also an effort at concealment in the sense that I
18  will talk about this in a second, that he didn't disclose it to
19  the City of Portage as he was required under the ordinance that
20  was shown to you by Nina Revas, the current clerk treasurer.
21         And the ordinance states that statements of economic
22  interest must be filed for the preceding year no later than
23  February 1st of each year, complete through February 1st of
24  the preceding year, and that it must disclose the name of any
25  person from which the official received any compensation to

1  which, to the best of the filer's knowledge, does business with

2  an agency during his or her term of office or employment with

3  an agency, or is in the process of bidding for a contract with

4  an agency during his or her term of office or employment with

5  the agency.

6      James Snyder should have disclosed that payment to the

7  City of Portage.  And what's really interesting about it, is

8  that he knew he was supposed to, because he says it to the FBI

9  in the interview clips that you heard:  Oh, yeah I'm supposed

10  to do that, but not until next year, February.

11      February comes.  And even though the FBI asked him about

12  the payment, he doesn't disclose it to the City.

13      It's not because he didn't know how to fill out the form,

14  because, here, we have a copy of his 2014 form.  This is

15  Government's Exhibit 163.  He knows about the form.  He knows

16  he's required to fill it out.  He did fill it out for the

17  preceding year, but he didn't fill one out in 2015 for the 2014

18  year.

19      And there's no question that Great Lakes Peterbilt was

20  doing business with the City of Portage at the time.  This is

21  Government's Exhibit 2, was put into evidence by Lynn Reed, and

22  it shows all of the different payments to Great Lakes Peterbilt

23  during 2013 and 2014.  They were doing business with the City

24  of Portage.

25      And that brings me to the final category:  Consciousness

1   of guilt.  "Consciousness of guilt" is a fancy way of saying

2   "behavior that looks and smacks of guilt."  If it looks like a

3   duck and it talks like a duck and walks like a duck, it must be

4   a duck.  "Consciousness of guilt," ladies and gentlemen.

5        You heard that James Snyder told John Shepherd he was

6   doing lobbying work for Great Lakes Peterbilt, lobbying

7   regarding truck matters in Indianapolis.

8        And he told Randy Reeder he was doing phone and payroll

9   consulting -- phone and payroll.  Yet, he told the FBI a

10  different story.

11       (Government's Exhibit 190 audio played; and Government's

12        Exhibit 190-A transcript displayed to the jury.)

13       How do we know that James Snyder was not doing health

14  insurance consulting?  We know because he wasn't licensed to be

15  a health insurance consultant.  And Mr Evans testified and

16  walked you through the definition of a "consultant," a person

17  who, in exchange for money, holds themselves out to the public

18  as being engaged in the business of offering, or for a fee,

19  offers any advice, counsel, opinion, or service with respect to

20  the benefits, advantages, or disadvantages promised under any

21  policy of insurance that could be issued in Indiana.

22       James Snyder had never applied for a license, nor had he

23  ever taken classes that one would need to take in order to

24  become licensed in health insurance consulting.

25       There's also evidence in the record-- this is Government's

1  Exhibit 51 --that shows that, when questions were asked

2  relating to health insurance-- and this is as of November of

3  2014, 10 months after he supposedly was hired by the Buhas to

4  be a health insurance consultant --James Snyder is still

5  referring questions about health insurance to actual health

6  insurance consultants like Mark Miller.

7      And Lynn Reed put into evidence the financial statements

8  from the City showing payments to Mark Miller.  He was hired as

9  a consultant.

10     You also heard testimony from two witnesses who addressed

11  the Defendant's lack of IT knowledge; Josh Pagel and Grant

12  Andres; and they both testified based on their conversations

13  with the Defendant.  And you know, if you're an expert and you

14  know something about a specific area, you can tell by talking

15  to another person who has that same interest exactly how much

16  do they know.  Do they know more than you?  Do they know less?

17     And experts can tell pretty quickly where they're talking

18  to somebody who speaks their language; and both of these men

19  said James Snyder did not have advanced-level knowledge or even

20  greater-than-the-average person's knowledge when it came to IT

21  matters.

22     And, again, we have an exhibit, Government's Exhibit 70

23  that shows that James Snyder himself, his own business, was

24  hiring an IT consultant.  This is in October of 2013, just a

25  few months before, supposedly, he's going to work as an IT

1  consultant for Great Lakes Peterbilt.  He's hiring, meaning

2  paying out of his own pocket, IT consultants.

3      (Government's Exhibit 190 audio played; and Government's

4       Exhibit 190-A transcript displayed.)

5      So why is that answer in a section of argument about

6  consciousness of guilt?  Because it's an obvious lie.  It's an

7  easily proven lie, and we have proven it to be a lie through

8  the testimony and the evidence in this case.

9      Why would James Snyder tell the FBI:  I have nothing to do

10  with the bid process.  Nothing at all.  Nope, completely

11  separate from me.  I stay out of it on purpose?

12      Why would he do that?  Because he knew how it looked.  He

13  got a payment from a company that had just gotten

14  $1.125 million in contracts from those bid processes.  He

15  wanted the FBI to believe he had nothing to do with it.

16      Well, they didn't take him at his word, ladies and

17  gentlemen.  That's their job.  People give them information.

18  They verify it.  Not all the information turns out to be true.

19  And that's true of witnesses.  It's true of everybody; right?

20  But that's their job.  They have to investigate.  And that's

21  what they did.  They investigated, and the investigation showed

22  it wasn't true.

23      Other evidence of consciousness of guilt:  James Snyder

24  directed Steve Charnetzky to fire John Beck because he was seen

25  talking to the FBI at the Streets and Sanitation Department.

1    Why wouldn't he want city employees to talk to the FBI?  If

2    there was nothing wrong with his relationship with the Buhas in

3    accepting that $13,000, so what, let him talk.  Why would you

4    tell somebody to fire another person just because they're

5    talking to the FBI, unless you have something to hide?

6         And who else did he tell what to say or do in this case?

7    He told Randy Reeder to retract his testimony in the grand

8    jury.  Retract.  And you may remember Randy Reeder was on the

9    stand, and we were talking about how in the grand jury he

10   volunteered -- he had like an epiphany:  I was a pawn; he used

11   me like a pawn.

12        And then later Snyder told him retract that, and so

13   he did.

14        Well, the Judge's instructions indicate to you that:  When

15   you hear evidence that before trial a witness made a statement

16   that is inconsistent with their testimony here in court, you

17   may consider the inconsistent statement made before the trial

18   to help you decide how truthful and accurate the witness'

19   testimony was here in court.  If the earlier statement was made

20   under oath, you can also consider the earlier statement as

21   evidence of the truth of whatever the witness said in the

22   earlier statement.

23        Randy Reeder is the definition of a "pawn."  What can get

24   more pawn-like that when you say you're a pawn and the person

25   who is incriminated by that says "Take that back," you take it

1  back?  And that's what he did.  He tried to take it back.  But

2  it's sworn testimony under oath, ladies and gentlemen.

3          **THE COURT:**  I'm just giving you a head's up; you're

4  at about 55 right now.

5          **MS. KOSTER:**  Thank you, Judge.

6      And then we saw the defense's star witness, Bob Buha, take

7  the stand.

8      Bob Buha told you his account is that the consulting

9  arrangement wasn't even conceived of until about a week to two

10 weeks before they wrote the check, the $13,000 check, to James

11 Snyder.

12     And, ladies and gentlemen, I wish I had put the slide back

13 in here, but remember what happened a week before that check

14 was written?  The text message:  I have a purchase order for

15 you.  James Snyder to Steve Buha.

16     Then the handwritten purchase order by Randy Reeder, it

17 gets delivered to Great Lakes Peterbilt just in time for them

18 to seek a curtailment modification.  They needed that purchase

19 order.  They needed it.  He delivered it.  They submitted it to

20 PACCAR to get an extension on that $30,000 payment.

21     James Snyder went to Great Lakes Peterbilt that day with

22 that purchase order.  Bob Buha's account proves he's guilty.

23 He hands them a purchase order for the truck they're desperate

24 to sell and says:  I need money.  I need money.  I have tax

25 problems.  I've got these family things, the holidays.

```
 1   Whatever explanation he gives.
 2       And Bob Buha says:  Well, we're not going to pay you
 3   15,000, but we'll pay you $13,000 up front.  Because somehow
 4   that math makes it seem reasonable to pay a public official
 5   $13,000.
 6       Keep in mind, the government proves its case if the
 7   defendant acted with intent to be influenced or rewarded -- or
 8   rewarded.
 9       And you heard my colleague, Ankur Srivastava, ask Mr. Buha
10   questions about:  Well, why do you think he came to you
11   that day?
12       He went to the company that just won $1.125 million in
13   bids and told them he needed money.  He was asking for a
14   reward.
15       And let's talk about Bob Buha.
16       We know he lied to law enforcement.  He said it was his
17   idea to hire James Snyder.  Well, that's not true.  It wasn't
18   his idea at all.  According to him, James Snyder showed up at
19   his business and said:  I need money.
20       And when he was confronted with that in the grand jury, he
21   said:  Well, that was a defense mechanism.
22       Why, Mr. Buha, did you make it seem -- When you were
23   interviewed by law enforcement in July of 2014, why did you
24   make it seem like that was a legitimate transaction, like you
25   had actually received $13,000 worth of work performed?  Why?
```

1       He said:  "Defense mechanism."  His words, "Defense

2  mechanism."

3       "Because you thought you might be in trouble; right?"

4       "Yes."

5       So James Snyder wasn't the only one with consciousness of

6  guilt.

7       But Bob Buha lied to law enforcement to make it look like

8  the transaction had been legitimate, just like Steve Buha did.

9  We have a contract, six different times.

10      He also then failed to disclose that he had just met with

11  the mayor when the FBI came in to interview him.

12      If you're a victim of a crime, if the mayor has shown up

13  and asked you for money and you only paid him because he's the

14  mayor, wouldn't you want to tell the FBI about that when they

15  came to your business?  Wouldn't you say, "I'm glad you guys

16  are here, because you're never going to believe what's been

17  happening.  James Snyder came to us and asked us for money

18  right after we won these contracts.  We paid him, you know,

19  because he's the mayor."  But they didn't do that.  He didn't

20  do that.

21      What else was unbelievable about Bob Buha's testimony?  He

22  said he was angry.  Do you remember at the beginning of the

23  direct:  I'm angry about the press coverage and the way -- the

24  things people have been saying about what happened.  I'm angry

25  about it.

```
 1        Well, if you're angry about the press coverage and you're
 2   concerned about the press coverage, you would remember the
 3   facts related to the press coverage; right?  You would remember
 4   the days you had meetings, what you talked about.  You would
 5   remember the services rendered.  You would be able to recite.
 6   It's your reputation.
 7        These men are still businessmen in the community.  They've
 8   lived in this community their entire lives.  Their reputation
 9   is at stake.  And he comes in and says:  I can't really
10   remember.  I don't know.  I can't remember if I said that, and
11   if the record says I said it, then I said it.
12        Really?  You're angry and you can't remember anything?
13   Doesn't that strike you as odd, as unbelievable?
14        He says:  Well, no, no.  Not a loan.  But we'll just hand
15   him the money.
16        Explain that to me.  At least with a loan you might get
17   some payment back; right?  Why not a loan?  Why not a loan?  No
18   way.  But, yeah, we'll hand him a check for $13,000 in advance
19   without a contract and with no, you know, really understanding
20   of what work is going to be performed.  That's fine.  But loan,
21   no.  What sense does that make?
22        He admitted Snyder was a man of influence, he called him.
23   A man of influence.  And that is consistent with what Brett
24   Searle told you.  That Bob Buha told him when he was writing
25   the $13,000 check and he asked for backup and none was
```

1    provided, Brett Searle said that Bob Buha said:  He's the

2    mayor.  He's got a lot of contacts.  He's got a lot of

3    contacts, that mayor.  I want the inside track.

4          Man of influence.

5          And, yet, today Bob Buha denied ever saying that.

6          We have met our burden.  We have proven that James Snyder

7    is guilty of accepting a bribe, accepting the $13,000 with

8    intent to be influenced or rewarded in connection with

9    contracts of the City of Portage.  He violated the public's

10   trust.  He took an oath to serve the people of Portage.  And,

11   instead, he put his own financial interests ahead of those

12   people.

13         We have proven James Snyder guilty beyond a reasonable

14   doubt; and for that reason, we ask that you find him guilty.

15         Thank you.

16         (WHEREUPON, further proceedings were had and reported, but

17          not made a part of this record.)

18                        *    *    *

19

20

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2              I, Angela Phipps, RMR, CRR, CSR, certify that the

3    foregoing is a true, complete, and accurate excerpt of

4    transcript of the record of proceedings in the above-entitled

5    matter before the Honorable Matthew F. Kennelly, on March 18,

6    2021.

7

8    Date:  March 24, 2021      S/Angela Phipps, RMR, CRR, CSR
                                Official Court Reporter
9                               for the U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MS. KOSTER: [2]**
3/6 35/5
**THE COURT: [1]**
35/3

**$**

**$1.125 [5]**   4/14
9/6 26/25 33/14
36/12
**$1.125 million**
**[5]**   4/14 9/6
26/25 33/14
36/12
**$10,000 [2]**
4/16 4/23
**$11,000 [2]**
6/25 7/2
**$13,000 [17]**
4/2 7/23 14/19
22/21 22/23
26/22 27/1 28/6
28/22 34/3
35/10 36/3 36/5
36/25 38/18
38/25 39/7
**$150,000 [3]**
12/5 12/10
22/15
**$1600 [1]**   7/18
**$2,000 [2]**   25/7
25/8
**$2300 [1]**   8/2
**$30,000 [4]**
23/22 24/1 24/2
35/20
**$30,237 [1]**

24/19
**$39,523 [1]**
7/12
**$40,000 [1]**
7/14
**$45,000 [3]**
23/1 23/9 23/25
**$450,000 [1]**
21/25
**$5 [1]**   21/10
**$5,000 [4]**   4/11
25/10 25/25
26/17
**$560 [1]**   19/11
**$59,000 [2]**
19/8 19/9
**$60,000 [2]**
20/6 23/2
**$66,000 [1]**   7/4
**$7,000 [1]**   7/5
**$75,000 [1]**
23/12
**$76,000 [1]**
22/20

**-**

**--that [1]**
18/19

**1**

**10 [1]**   32/3
**10th [1]**   15/25
**11th [1]**   7/22
**14th [1]**   29/2
**15,000 [1]**   36/3
**150 [3]**   12/12
18/19 28/9

**150 days [1]**
12/11
**150-A [1]**   28/9
**1500 [1]**   1/13
**157 [1]**   28/24
**16 [1]**   8/17
**163 [1]**   30/15
**167 [1]**   17/11
**18 [3]**   1/8
28/23 40/5
**180 [1]**   12/7
**188 [1]**   27/4
**190 [4]**   8/3
29/5 31/11 33/3
**190-A [4]**   8/3
29/6 31/12 33/4
**1st [4]**   24/16
24/18 29/23
29/23

**2**

**20 [2]**   9/20
25/21
**200 [1]**   12/7
**2006 [1]**   6/25
**2007 [1]**   6/25
**2009 [1]**   29/1
**2010 [1]**   17/14
**2011 [1]**   17/12
**2012 [7]**   16/22
20/13 20/16
20/18 24/6 25/6
28/15
**2013 [12]**   6/24
7/1 7/9 7/22
17/14 21/12
21/17 23/3 25/8

## 2

**2013... [3]**
29/2 30/23
32/24
**2014 [16]** 7/15
15/25 21/8
21/11 21/17
23/11 23/21
24/4 24/16
26/23 27/5
30/14 30/17
30/23 32/3
36/23
**2015 [2]** 16/24
30/17
**2018 [1]** 17/8
**2021 [4]** 1/8
17/9 40/6 40/8
**2023 [1]** 1/21
**2029 [1]** 1/17
**21 [1]** 20/3
**219 [2]** 1/17
2/11
**219-852-2770 [1]**
1/14
**219-937-5500 [1]**
1/14
**24 [2]** 9/20
40/8
**24th [1]** 23/3
**25 [1]** 8/14
**2770 [1]** 1/14
**2:16-cr-00160-MF
K-2 [1]** 1/4

## 3

**30 [1]** 13/3
**30,000 [1]**
23/11
**30th [1]** 24/15
**312-353-3148 [1]**
1/18
**3148 [1]** 1/18
**317-713-3500 [2]**
1/22 2/5
**317-713-3699 [2]**
1/22 2/5
**320 [1]** 18/6
**34 [1]** 19/1
**35 [1]** 13/3
**3500 [4]** 1/21
1/22 2/4 2/5
**3616 [1]** 2/11
**3699 [2]** 1/22
2/5
**38 [1]** 19/1
**3rd [2]** 23/11
23/21

## 4

**406 [3]** 11/14
16/10 22/25
**412 [1]** 24/7
**45,000 [1]**
23/10
**46204 [1]** 2/4
**46204-2023 [1]**
1/21
**46320 [2]** 1/13
2/11

## 5

**51 --that [1]**
32/1
**53 [2]** 13/14
21/17
**5400 [2]** 1/13
2/10
**55 [2]** 21/17
35/4
**5500 [1]** 1/14
**5th [1]** 1/17

## 6

**60604-2029 [1]**
1/17
**61 [2]** 21/17
21/17

## 7

**70 [1]** 32/22

## 8

**852-3616 [1]**
2/11
**87 [1]** 17/16

## A

**able [4]** 11/25
19/17 23/23
38/5
**about [58]**
**above [1]** 40/4
**above-entitled
[1]** 40/4
**absolutely [1]**
22/24
**accept [4]** 4/1
6/8 6/12 29/12

**A**

USDC IN/ND case 2:16-cr-00160-JVB document 512 filed 03/26/21 page 43 of 77

**accepted [4]**
3/25 4/3 4/6
7/23
**accepting [3]**
34/3 39/7 39/7
**accident [2]**
13/21 13/25
**accordance [1]**
5/14
**According [1]**
36/18
**account [22]**
4/4 4/5 21/23
22/3 22/3 22/4
22/4 22/6 22/6
22/6 22/7 22/9
22/12 22/16
23/13 26/16
26/17 28/22
28/22 29/4 35/8
35/22
**accurate [2]**
34/18 40/3
**acquisition [1]**
9/5
**acted [3]** 4/7
5/3 36/7
**actual [3]**
27/23 27/24
32/5
**actually [3]**
5/12 7/6 36/25
**additional [2]**
7/14 23/11
**address [2]** 5/6

6/17
**addressed [2]**
5/3 32/10
**addressing [1]**
13/4
**administratively**
**[1]** 29/2
**admitted [2]**
19/21 38/22
**advance [1]**
38/18
**advanced [1]**
32/19
**advanced-level**
**[1]** 32/19
**advantages [1]**
31/20
**advice [3]** 11/2
11/12 31/19
**after [12]**
11/19 11/20
13/16 15/25
16/20 20/3 20/6
22/18 26/24
27/18 32/3
37/18
**afternoon [1]**
3/6
**again [2]** 15/22
32/22
**against [2]**
7/10 7/13
**age [1]** 28/15
**aged [3]** 12/21
12/22 12/24
**agency [4]** 30/2
30/3 30/4 30/5

**agent [5]** 3/20
3/22 6/22 7/8
22/1
**agreed [2]** 4/1
26/3
**ahead [2]** 3/10
39/11
**aided [1]** 2/25
**all [18]** 5/10
10/22 14/20
15/11 16/12
19/6 19/7 19/17
20/5 20/9 20/11
20/25 25/16
27/24 30/22
33/10 33/18
36/18
**allegedly [3]**
6/15 15/23 27/3
**alleging [1]**
26/1
**allowed [1]**
5/17
**almost [2]** 7/22
29/2
**along [1]** 26/13
**already [3]**
18/6 18/22
28/16
**also [13]** 2/8
3/23 7/8 7/15
7/19 11/7 11/10
21/25 29/17
31/25 32/10
34/20 37/10
**AMERICA [1]** 1/3
**ample [2]** 4/5

# A

**ample... [1]**
6/21
**Andres [1]**
32/12
**angela [4]**   2/10
2/12 40/2 40/8
**angry [5]**   37/22
37/23 37/24
38/1 38/12
**ANKUR [3]**   1/16
3/12 36/9
**Ankur.Srivastava
[1]**   1/18
**another [8]**   4/1
4/6 5/16 6/6
12/1 15/5 32/15
34/4
**answer [1]**   33/5
**any [11]**   4/16
6/6 18/13 27/21
27/22 28/3
28/18 29/24
29/25 31/19
31/20
**anything [4]**
26/1 27/24 28/3
38/12
**APPEARANCES [2]**
1/11 1/25
**appears [1]**
28/18
**application [1]**
10/1
**applied [1]**
31/22

**appropriate [1]**
21/1
**approval [1]**
24/5
**April [2]**   7/1
24/15
**are [26]**   5/17
5/18 6/4 6/13
7/10 7/11 9/14
10/9 13/6 14/7
14/18 15/1
15/12 16/1 16/2
16/2 16/5 16/6
16/15 16/16
16/17 16/24
17/4 26/10
37/16 38/7
**area [2]**   12/17
32/14
**arguing [1]**
18/12
**argument [4]**
1/8 3/5 5/7
33/5
**around [2]**
12/22 21/10
**arrangement [3]**
15/23 15/24
35/9
**arrived [1]**
9/25
**as [32]**   3/16
4/20 4/21 5/18
6/1 6/3 7/15
8/14 9/1 9/25
11/13 14/14
16/13 16/18

16/21 16/23
17/19 18/16
18/17 24/16
24/18 26/17
28/1 28/20
29/19 31/18
32/2 32/8 32/25
34/20 38/13
38/13
**ask [7]**   8/21
11/24 12/11
12/14 16/9 36/9
39/14
**asked [11]**   9/22
13/12 18/9
18/23 26/20
28/2 30/11 32/1
37/13 37/17
38/25
**asking [2]**
12/11 36/13
**asks [1]**   18/24
**aspects [1]**
11/13
**assembly [1]**
16/23
**assessed [1]**
7/13
**assessing [1]**
7/10
**assets [2]**   7/5
7/7
**assistance [1]**
4/18
**assistant [1]**
9/4
**attached [2]**

## A

**attached... [2]**
24/8 24/8
**Attorney [1]**
11/24
**Attorney's [2]**
1/12 1/16
**audio [6]** 8/3
27/4 28/9 29/5
31/11 33/3
**AUSA [2]** 1/12
1/16
**Austria [3]**
25/8 25/21
25/22
**automated [1]**
18/13
**automation [2]**
18/11 18/12
**available [2]**
12/18 20/3
**average [1]**
32/20
**awarded [2]**
11/20 28/12
**awarding [1]**
20/20
**away [1]** 26/5

## B

**back [19]** 4/9
5/2 10/14 10/16
16/10 19/18
21/22 21/23
22/16 23/8
23/10 23/12
23/15 29/15

34/25 35/1 35/1
35/12 36/17
**backup [3]**
25/19 25/24
38/25
**bad [1]** 18/12
**balance [2]**
24/17 24/18
**bank [7]** 4/4
7/7 7/20 7/20
22/1 28/21 29/4
**based [3]** 5/18
14/22 32/12
**basically [1]**
29/8
**be [32]** 4/7
4/23 5/4 7/13
8/25 9/23 11/10
13/20 14/24
15/18 16/12
16/18 19/9
19/10 20/22
23/23 24/10
26/3 26/6 26/10
29/22 31/3
31/14 31/21
32/4 33/7 33/18
36/7 37/3 38/5
38/20 39/8
**beautiful [4]**
14/9 14/9 14/9
14/12
**because [28]**
3/7 7/21 9/16
10/7 11/5 11/9
13/7 16/3 18/3
18/9 18/22 19/9

23/19 24/10
28/21 30/8 30/13
30/14 31/14
33/6 33/12
33/24 34/4 36/3
37/3 37/13
37/16 37/19
**Beck [5]** 9/13
9/18 18/9 19/15
33/24
**become [2]** 17/3
31/24
**been [22]** 4/22
8/11 9/16 9/16
9/22 11/5 11/20
12/15 12/20
12/22 13/2 13/5
13/24 18/6
18/12 18/13
20/14 21/19
21/20 37/8
37/16 37/24
**before [19]** 1/9
7/22 9/1 9/20
13/17 13/22
16/5 17/17
17/21 22/16
23/3 28/11 29/3
32/25 34/15
34/17 35/10
35/13 40/5
**before the [1]**
40/5
**beginning [4]**
3/12 6/21 25/6
37/22
**behalf [1]** 9/6

**B**

USDC IN/ND case 2:16-cr-00160-MFK document 512 filed 03/30/21 page 46 of 77

**behavior [1]**
31/2
**being [2]** 20/3
31/18
**believable [1]**
27/13
**believe [4]**
11/8 15/24
33/15 37/16
**belong [2]** 14/4
14/5
**below [1]** 12/12
**benefits [4]**
4/16 4/23 4/25
31/20
**BENNETT [2]**
1/20 5/10
**best [5]** 9/23
10/1 18/6 21/10
30/1
**better [2]** 6/5
17/3
**between [5]**
13/10 15/6
15/21 17/1
23/16
**beyond [4]** 3/11
3/14 3/19 39/13
**bid [23]** 6/14
8/7 8/8 8/14
8/19 12/5 12/10
12/13 13/1
14/21 15/1 15/5
15/17 17/19
17/20 17/24

17/24 19/2 19/4
20/9 20/11
33/10 33/14
**bidder [1]**
20/10
**bidders [1]**
10/22
**bidding [3]**
15/10 25/5 30/3
**bids [7]** 13/4
13/9 13/16
13/20 14/22
16/6 36/13
**Board [6]** 3/23
17/17 17/21
20/17 20/23
23/3
**Bob [17]** 16/7
21/6 21/25 24/9
24/20 25/14
27/13 35/6 35/8
35/22 36/2
36/15 37/7
37/21 38/24
39/1 39/5
**body [2]** 10/14
11/25
**both [10]** 4/21
6/4 14/8 15/21
18/9 19/15
20/12 20/21
32/12 32/18
**bottom [3]**
13/14 20/9
24/17
**brand [1]** 10/5
**Brett [4]** 22/14

25/11 38/23
39/7
**bribe [4]** 6/9
6/13 29/12 39/7
**bribery [1]**
3/17
**bring [1]** 3/14
**brings [2]** 5/2
30/25
**Buha [29]** 14/6
15/14 15/22
16/7 21/6 21/6
21/10 21/25
23/16 24/9
24/20 25/14
26/15 26/17
26/19 27/5
27/13 35/6 35/8
35/15 36/2 36/9
36/15 36/22
37/7 37/8 38/24
39/1 39/5
**Buha's [5]** 14/8
22/5 22/15
35/22 37/21
**Buhas [6]** 23/22
25/2 25/12
26/25 32/3 34/2
**building [1]**
4/25
**built [1]** 17/11
**burden [2]** 3/13
39/6
**business [13]**
21/9 22/10
22/11 22/22
27/24 27/25

USDC IN/ND case 2:16-cr-00160-MFK document 512 filed 03/26/21 page 47 of 77

**B**

**business... [7]**
  30/1 30/20
  30/23 31/18
  32/23 36/19
  37/15
**businessmen [1]**
  38/7
**buy [6]**   10/1
  12/12 14/16
  17/7 18/10 23/4
**buying [1]**
  12/14

**C**

**call [2]**   10/11
  24/18
**called [8]**   5/16
  7/10 9/16 10/11
  12/8 15/13 16/7
  38/22
**calls [1]**   24/23
**came [9]**   11/3
  18/17 19/20
  23/2 32/20
  36/10 37/11
  37/15 37/17
**campaign [2]**
  9/3 26/17
**can [20]**   5/21
  10/8 10/13 12/1
  12/12 12/12
  17/25 19/1 19/7
  23/12 24/1 24/4
  25/6 25/13 26/5
  28/14 32/14
  32/17 34/20

  34/23
**can't [5]**   12/19
  27/8 38/9 38/10
  38/12
**candidate [1]**
  25/12
**car [2]**   7/17
  17/7
**card [1]**   7/2
**cards [2]**   27/24
  27/25
**care [3]**   11/16
  20/6 20/7
**carry [1]**   12/18
**case [11]**   1/4
  4/13 6/10 6/19
  7/16 7/20 14/7
  21/12 33/8 34/6
  36/6
**cash [4]**   21/23
  21/23 23/13
  23/14
**cash-flow [1]**
  23/14
**cash-poor [1]**
  23/13
**categories [3]**
  6/11 6/13 6/17
**category [2]**
  6/12 30/25
**CERTIFICATE [1]**
  39/19
**certify [1]**
  40/2
**chance [1]**   14/1
**changed [1]**
  13/24

**changing [1]**
  16/25
**charge [3]**   3/18
  8/23 9/12
**charges [1]**
  3/17
**Charnetzky [7]**
  8/12 8/18 12/8
  12/9 18/9 19/15
  33/24
**Charnetzky's [1]**
  8/13
**chart [4]**   17/18
  17/18 17/23
  20/8
**charts [1]**
  18/25
**Chase [1]**   7/20
**Chase Bank [1]**
  7/20
**chasses [1]**
  11/11
**chassis [1]**
  20/12
**check [26]**   4/3
  7/23 22/21
  22/23 25/10
  25/20 25/21
  25/23 26/15
  26/21 27/1 28/6
  28/18 28/22
  29/3 29/4 29/9
  29/13 29/15
  29/16 29/16
  35/10 35/10
  35/13 38/18
  38/25

**C**

USDC IN/ND case 2:16-cr-00160-MFK / JVB document 512 filed 03/26/21 page 48 of 77

**checked [1]**
15/10
**checking [1]**
22/5
**Chicago [1]**
1/17
**chips [1]** 17/4
**chose [3]** 11/1
11/12 18/1
**chosen [1]** 11/5
**circumstantial**
**[6]** 5/8 5/11
5/25 6/2 6/4
6/7
**cities [1]**
14/16
**city [31]** 3/8
3/20 3/22 4/9
4/15 4/22 5/5
9/6 9/19 9/25
11/17 11/23
11/24 12/23
15/12 15/17
16/12 16/22
17/10 19/16
20/13 24/7
24/12 29/19
30/7 30/12
30/20 30/23
32/8 34/1 39/9
**City's [1]** 21/5
**claim [1]** 22/24
**classes [1]**
31/23
**clear [1]** 9/8

**clerk [5]** 4/20
13/3 29/6 29/23
29/20
**clips [1]** 30/9
**CLOSING [2]** 1/8
3/5
**co [1]** 3/12
**co-counsel [1]**
3/12
**colleague [1]**
36/9
**collection [1]**
10/2
**come [3]** 4/9
10/14 26/14
**comes [4]** 22/2
27/19 30/11
38/9
**common [1]** 18/1
**communication**
**[2]** 15/6 15/20
**community [4]**
26/9 26/10 38/7
38/8
**companies [5]**
14/15 15/7 18/4
20/9 20/11
**company [7]**
18/5 21/1 21/14
28/17 28/21
33/13 36/12
**compare [1]**
19/5
**compares [1]**
17/19
**comparing [2]**
17/23 18/25

**compensation [1]**
29/25
**complete [2]**
29/23 40/3
**completely [1]**
33/10
**complicated [1]**
8/21
**computer [2]**
2/25 17/3
**computer-aided**
**[1]** 2/25
**conceal [2]**
6/15 28/8
**concealment [3]**
28/16 29/11
29/17
**conceived [1]**
35/9
**concerned [1]**
38/2
**conclude [1]**
5/16
**confident [1]**
27/9
**confronted [1]**
36/20
**connection [3]**
4/8 5/4 39/8
**consciousness**
**[7]** 6/16 30/25
31/1 31/4 33/6
33/23 37/5
**consider [3]**
6/4 34/17 34/20
**consistent [1]**
38/23

**C**

**consultant [6]**
31/15 31/16
32/4 32/9 32/24
33/1

**consultant
--James [1]**
32/4

**consultants [2]**
32/6 33/2

**consulting [13]**
15/23 16/1
22/24 28/1 28/3
28/6 28/17 29/3
29/10 31/9
31/14 31/24
35/8

**contact [2]**
15/15 20/25

**contacted [1]**
9/24

**contacts [2]**
39/2 39/3

**context [2]**
25/3 26/23

**Continued [1]**
2/1

**contract [14]**
4/17 21/2 27/6
27/7 27/8 27/9
27/10 27/14
27/16 27/21
28/12 30/3 37/9
38/19

**contracts [12]**
4/8 4/11 4/13

5/5 8/9 11/20
20/20 25/5
26/25 33/14
37/18 39/9

**conversations
[1]** 32/12

**copies [1]**
27/21

**copy [3]** 25/22
25/23 30/14

**corruptly [2]**
4/7 5/3

**cost [1]** 20/10

**costs [1]** 12/4

**could [12]**
12/18 12/22
18/4 18/7 19/9
19/10 19/12
20/24 20/25
23/8 26/11
31/21

**couldn't [3]**
11/5 26/20
27/15

**counsel [3]**
3/12 16/14
31/19

**course [3]**
12/18 12/23
17/9

**court [6]** 1/1
1/9 34/16 34/19
40/8 40/9

**coverage [4]**
37/23 38/1 38/2
38/3

**cr [1]** 1/4

**crates [1]**
20/15

**created [2]**
17/23 20/8

**credit [2]** 7/2
21/19

**crime [1]** 37/12

**cross [2]** 11/3
16/14

**cross-examinatio
n [1]** 11/3

**cross-examining
[1]** 16/14

**CRR [3]** 2/10
40/2 40/8

**CSR [3]** 2/10
40/2 40/8

**Cummins [6]**
10/19 10/23
11/4 11/6 11/9
17/14

**current [5]**
16/13 16/19
16/21 24/17
29/20

**curtailment [5]**
23/5 23/5 23/7
24/14 35/18

**cut [1]** 26/25

**D**

**dangerous [2]**
10/9 10/17

**date [6]** 18/2
19/6 19/25 20/1
23/22 40/8

**dated [1]** 23/21

**D**

USDC IN/ND case 2:16-cr-00160-MFK   document 512   filed 03/29/21   page 50 of 77

**day [7]**   7/22
16/5 19/11
19/16 26/4
35/21 36/11
**days [5]**   13/24
18/19 19/11
20/3 38/4
**deadline [1]**
18/7
**dealer [2]**
21/16 21/16
**dealership [5]**
17/6 21/17 22/1
22/17 22/18
**Dearborn [1]**
1/17
**debt [1]**   7/2
**December [1]**
7/22
**decide [3]**   6/6
26/5 34/18
**decided [2]**
17/22 19/4
**declared [1]**
7/2
**deep [1]**   25/18
**default [1]**   8/1
**defendant [31]**
1/6 1/20 2/3
2/8 3/17 3/18
3/20 3/25 4/3
4/6 4/7 5/3
6/22 6/24 7/1
7/16 7/23 8/8
9/2 9/3 11/4

11/21 12/6
15/1 15/21
16/7 18/23
18/24 25/2
32/13 36/7
**Defendant's [3]**
8/5 9/2 32/11
**defense [4]**
16/14 36/21
37/1 37/1
**defense's [1]**
35/6
**definition [2]**
31/16 34/23
**delivered [9]**
13/16 13/21
13/25 17/12
19/9 19/10
23/18 35/17
35/19
**delivery [6]**
18/2 18/8 19/6
19/8 19/24 20/1
**demand [2]**   6/9
6/13
**demanded [1]**
3/25
**denied [1]**   39/5
**Department [3]**
4/24 9/23 33/25
**depends [1]**
22/10
**deposited [3]**
26/16 28/23
29/4
**design [1]**
13/19

**desperate [2]**
12/24 35/23
**despite [1]**
21/22
**developed [1]**
17/4
**did [17]**   10/20
18/3 18/22
19/22 22/17
24/14 27/14
28/2 30/16
32/19 33/21
34/6 34/13 35/1
36/22 36/23
37/8
**didn't [32]**
5/20 8/19 10/5
11/4 12/11
12/20 15/1 15/3
15/24 16/8
19/24 20/4
20/13 20/19
21/2 21/22
21/23 22/16
23/7 26/14
26/14 26/21
28/4 28/14
29/15 29/16
29/18 30/13
30/17 33/16
37/19 37/19
**different [8]**
6/11 8/14 21/9
25/4 27/6 30/22
31/10 37/9
**difficult [1]**
10/9

**D**

**dire [1]** 21/7
**direct [8]** 5/9
5/12 5/24 5/25
6/4 6/7 15/15
37/23
**directed [2]**
13/20 33/24
**directly [10]**
4/19 6/1 8/5
8/24 11/22 12/3
12/4 12/12
25/13 26/21
**disadvantages
[1]** 31/20
**disclose [4]**
29/18 29/24
30/12 37/10
**disclosed [1]**
30/6
**discussion [2]**
28/11 28/11
**dismayed [1]**
14/25
**displayed [5]**
8/4 28/10 29/6
31/12 33/4
**dissolved [1]**
29/2
**DISTRICT [4]**
1/1 1/1 1/9
40/9
**DIVISION [1]**
1/2
**do [26]** 9/10
12/1 12/3 12/3

12/6 12/10
12/12 14/3
18/21 21/2
24/20 25/18
27/8 30/10
31/13 32/16
32/16 32/16
33/9 33/12
33/15 34/6
36/10 37/19
37/20 37/22
**document [2]**
17/16 27/18
**documentation
[5]** 6/15 27/2
27/22 27/22
28/25
**does [12]** 6/5
9/11 10/19 12/6
14/4 14/5 15/3
18/24 18/24
22/21 30/1
38/21
**doesn't [4]**
10/14 26/7
30/12 38/13
**doing [8]** 12/12
22/18 25/17
30/20 30/23
31/6 31/8 31/13
**don't [10]**
10/24 13/18
13/18 14/19
14/19 22/8
25/15 25/15
27/18 38/10
**donated [1]**

25/9
**donation [13]**
26/13 26/17
26/19
**donations [4]**
25/1 25/3 25/12
25/15
**done [2]** 3/15
13/5
**doubt [4]** 3/12
3/15 3/19 39/14
**down [2]** 7/3
7/4
**driven [1]**
12/21
**driver [1]** 9/21
**drove [1]** 9/21
**duck [4]** 31/3
31/3 31/3 31/4
**due [6]** 7/17
7/17 16/6 22/20
23/2 23/2
**dump [1]** 10/10
**during [7]**
15/21 19/3 21/7
22/18 30/2 30/4
30/23
**duty [1]** 20/23

**E**

**each [4]** 3/18
6/17 14/16
29/23
**earlier [4]**
5/19 34/19
34/20 34/22
**easily [1]** 33/7

**E**

USDC IN/ND case 2:16-cr-00160-JVB document 512 filed 03/26/21 page 52 of 77

economic [1]
29/21

Edward [2]   22/2
22/5

effective [1]
29/1

effort [2]
29/11 29/17

efforts [2]
6/15 28/8

either [1]
27/18

eject [2]   10/6
11/7

element [4]   4/9
4/19 5/2 5/6

elements [1]
3/19

else [5]   13/1
18/23 28/3 34/6
37/21

email [5]   1/15
1/18 1/23 2/6
11/23

emails [2]   16/3
27/23

embraces [1]
3/13

emissions [3]
17/1 17/14
17/15

employees [2]
10/9 34/1

employment [2]
30/2 30/4

empty [1]   10/10
ended [1]   15/25
ending [1]   24/7
endorse [1]
29/15

enforcement [3]
36/16 36/23
37/7

engaged [1]
31/18

engine [8]   8/25
10/20 10/23
11/5 11/6 11/9
11/10 17/14

enough [1]
19/17

entered [1]
27/16

entire [1]   38/8

entitled [1]
40/4

envelope [1]
14/4

envelopes [3]
13/13 13/15
13/25

EPA [1]   16/25

epiphany [1]
34/10

equipment [3]
9/6 15/17 16/12

equivalent [1]
10/24

especially [1]
27/18

Evans [1]   31/15

even [15]   15/1

15/3 15/24
19/4 19/18 25/9
26/5 27/7 27/23
29/15 30/11
32/19 35/9

event [3]   26/7
26/8 26/11

ever [3]   28/2
31/23 39/5

every [5]   15/11
17/2 17/19
17/24 18/2

everybody [2]
18/11 33/19

everything [1]
18/23

evidence [40]
4/2 4/5 5/9
5/11 5/11 5/12
5/18 5/24 5/25
5/25 5/25 6/2
6/2 6/5 6/7
6/10 6/14 6/17
6/18 6/20 7/15
8/7 9/15 13/14
15/5 15/9 16/11
16/25 17/2
17/25 24/13
28/5 28/7 30/21
31/25 32/7 33/8
33/23 34/15
34/21

exactly [3]
10/4 24/3 32/15

examination [1]
11/3

**E**

**examining [1]**
16/14

**example [2]**
5/19 25/20

**except [1]**   28/6

**excerpt [2]**   1/7
40/3

**exchange [2]**
23/16 31/17

**excuse [1]**
19/10

**exhibit [22]**
8/3 13/14 17/11
17/16 19/1 19/1
25/21 27/4 28/9
28/23 28/24
29/5 29/6 30/15
30/21 31/11
31/12 32/1
32/22 32/22
33/3 33/4

**exhibits [2]**
14/6 14/7

**exist [1]**   28/4

**existed [1]**
15/24

**existence [2]**
28/5 28/7

**exists [1]**   5/16

**expensive [1]**
17/3

**experience [1]**
8/18

**experienced [1]**
8/20

**expert [1]**
32/19

**experts [1]**
32/17

**Explain [1]**
38/16

**explanation [2]**
29/8 36/1

**expressed [2]**
10/3 10/18

**extension [2]**
24/2 35/20

**extent [2]**
14/22 29/12

**extra [1]**   20/6

---

**F**

**fact [6]**   5/15
5/16 6/1 6/3
27/7 27/19

**facts [3]**   14/20
14/23 38/3

**failed [1]**
37/10

**failing [1]**
22/22

**fair [1]**   10/22

**fall [2]**   5/21
6/1

**family [1]**
35/25

**fancy [1]**   31/1

**fast [1]**   19/7

**faster [1]**   17/3

**favor [3]**   18/11
20/20 21/3

**favored [1]**

18/14

**Fax [1]**   13/14
1/22 2/5

**FBI [13]**   27/6
27/10 27/19
30/8 30/11 31/9
33/9 33/15
33/25 34/1 34/5
37/11 37/14

**February [5]**
29/2 29/23
29/23 30/10
30/11

**federal [4]**
1/13 2/10 4/16
4/23

**fee [1]**   31/18

**FET [2]**   22/4
22/6

**few [2]**   13/23
32/25

**file [1]**   25/22

**filed [1]**   29/22

**filer's [1]**
30/1

**fill [4]**   30/13
30/16 30/16
30/17

**filled [1]**   7/1

**final [2]**   24/5
30/25

**finally [3]**
4/15 23/6 26/22

**financial [2]**
32/7 39/11

**financier [1]**
21/22

## F

**find [3]**   3/17
19/22 39/14
**fine [2]**   22/18
38/20
**fire [2]**   33/24
34/4
**first [13]**   3/20
5/8 6/12 8/9
11/20 15/10
15/14 17/19
19/2 19/6 19/25
20/7 21/13
**fits [1]**   6/10
**five [1]**   3/19
**Floor [1]**   1/17
**flow [1]**   23/14
**follow [1]**
11/12
**followed [2]**
11/2 11/8
**follower [2]**
9/9 9/10
**following [2]**
3/19 16/16
**foreclose [1]**
8/1
**foreclosure [1]**
7/19
**foregoing [1]**
40/3
**forget [1]**
27/17
**form [6]**   4/3
7/1 29/13 30/13
30/14 30/15

**formal [1]**
12/13
**found [1]**   16/4
**foursome [1]**
26/4
**fourth [1]**
11/25
**freeze [1]**   10/8
**friend [1]**   8/23
**front [1]**   36/3
**frustrated [1]**
14/25
**frustration [1]**
24/22
**full [4]**   10/6
11/7 28/11
28/11
**full-eject [2]**
10/6 11/7
**fund [3]**   7/10
7/11 7/12
**furnished [1]**
16/12
**further [1]**
39/16

## G

**gave [4]**   10/7
23/19 25/6 25/8
**general [2]**
16/11 16/17
**gentlemen [21]**
3/21 4/12 5/13
6/9 9/8 9/14
11/19 13/15
14/18 18/14
20/22 22/8

24/14 24/24
27/11 28/12
29/11 31/4
33/17 35/2
35/12
**get [21]**   10/13
10/16 12/12
14/15 16/14
19/7 22/11
22/16 22/17
23/10 23/12
24/2 24/11
24/14 24/21
26/3 26/8 26/12
34/23 35/20
38/16
**gets [1]**   35/17
**getting [1]**
21/23
**give [5]**   6/6
25/16 26/5
26/13 33/17
**given [1]**   24/7
**gives [2]**   29/7
36/1
**giving [3]**
25/12 25/16
35/3
**glad [1]**   37/15
**go [3]**   13/5
13/6 17/22
**goal [1]**   14/15
**goes [3]**   20/10
22/2 22/3
**going [13]**   5/6
5/11 17/22
22/10 23/23

# G

**going... [8]**
24/11 26/5 26/6
29/7 32/25 36/2
37/16 38/20
**gold [2]** 26/3
26/6
**golf [2]** 25/10
26/3
**gone [1]** 20/5
**good [5]** 3/6
8/23 17/8 24/11
25/20
**goodbye [1]**
23/24
**got [8]** 18/19
21/9 21/9 29/3
33/13 35/25
39/2 39/2
**gotten [1]**
33/13
**government [10]**
1/8 1/12 3/5
3/13 3/18 9/16
18/11 26/1
27/21 36/6
**Government's
[22]** 8/3 13/14
16/4 17/11
17/16 19/1 19/1
25/20 27/4 28/9
28/23 28/24
29/5 29/5 30/15
30/21 31/11
31/11 31/25
32/22 33/3 33/3

**grand [5]** 18/20
19/2 34/7 34/9
36/20
**grant [2]** 4/17
32/11
**grants [1]** 4/24
**gratuity [2]**
6/9 6/13
**Great [25]** 7/23
11/11 11/16
11/21 11/22
12/15 12/24
17/12 17/19
17/22 18/3
18/15 20/21
21/3 21/6 21/15
22/7 24/4 26/20
30/19 30/22
31/6 33/1 35/17
35/21
**greater [1]**
32/20
**Greg [1]** 11/23
**ground [5]** 5/20
5/21 5/22 6/2
6/3
**groups [1]**
21/16
**guarantee [1]**
4/17
**guess [1]** 27/10
**guilt [8]** 6/16
31/1 31/1 31/2
31/4 33/6 33/23
37/6
**guilty [6]** 3/11
3/18 35/22 39/7

39/13 39/14
**guys [1]** 37/15

# H

**had [41]**
**HADLEY [1]** 2/3
**hadn't [3]** 13/5
13/22 24/16
**HAMMOND [3]** 1/2
1/13 2/11
**hand [3]** 23/25
38/14 38/18
**handled [1]**
8/13
**hands [1]** 35/23
**handwriting [5]**
14/3 14/5 14/7
14/8 14/10
**handwritten [1]**
35/16
**happen [1]**
18/16
**happened [12]**
5/12 13/16
13/18 13/22
13/23 18/6 20/4
22/13 22/15
24/3 35/13
37/24
**happening [4]**
13/9 15/18 16/1
37/17
**happens [1]**
11/10
**Harrell [1]**
21/14
**has [14]** 4/22

# H

USDC IN/ND case 2:16-cr-00160-MFK document 512 filed 03/30/21 page 56 of 77

**has... [13]**
 13/24 14/11
 15/18 17/18
 17/21 17/21
 17/23 18/16
 20/22 21/18
 24/5 32/15
 37/12
**hasn't [1]**
 13/22
**Hatagan [2]**
 6/22 7/8
**have [55]**
**haven't [1]**  5/2
**having [1]**  16/5
**he [156]**
**he did [1]**
 34/13
**he's [11]**  9/4
 27/9 30/16
 32/25 33/1
 35/22 37/13
 37/19 39/1 39/2
 39/2
**head's [1]**  35/3
**health [8]**
 22/23 31/13
 31/15 31/24
 32/2 32/4 32/5
 32/5
**hear [6]**  5/11
 5/12 16/8 20/22
 28/14 34/15
**heard [40]**  3/24
 4/2 4/12 4/19

5/24 6/21 7/8
7/15 7/21 8/13
8/24 10/21
10/25 11/2
11/14 11/19
13/1 13/12
13/24 14/13
15/22 16/7
16/10 16/20
16/25 17/2 18/8
19/3 20/8 21/7
21/13 24/9 25/1
26/18 27/20
28/1 30/9 31/5
32/10 36/9
**hearing [1]**
 18/20
**help [1]**  34/18
**helped [1]**  9/3
**helpful [1]**
 24/10
**her [2]**  30/2
 30/4
**here [8]**  3/7
 16/1 24/4 30/14
 34/16 34/19
 35/13 37/16
**Here's [1]**  17/7
**hide [1]**  34/5
**highly [2]**  13/4
 14/1
**highways [1]**
 4/25
**him [25]**  7/10
 7/13 8/19 9/3
 9/10 10/4 12/11
 16/8 18/23

18/24 26/20
29/14 30/1
33/16 34/3
34/12 36/18
37/11 37/13
37/18 38/15
38/18 38/22
38/24 39/14
**himself [5]**  8/8
 15/18 20/25
 24/9 32/23
**hire [1]**  36/17
**hired [3]**  9/2
 32/3 32/8
**hiring [2]**
 32/24 33/1
**his [35]**  3/9
 4/4 4/4 6/25
 7/4 7/17 7/25
 8/14 8/23 10/18
 12/8 14/5 18/20
 20/23 25/7 25/8
 25/9 25/22
 26/16 26/17
 29/16 30/2 30/4
 30/14 32/23
 33/2 33/16 34/2
 34/7 35/8 36/16
 36/18 36/19
 37/1 39/11
**holds [1]**  31/17
**holidays [1]**
 35/25
**Hollister [2]**
 1/20 2/3
**home [1]**  7/3
**Honda [1]**  7/4

USDC IN/ND case 2:16-cr-00160-MFK document 127 filed 03/26/21 page 57 of 77

**H**

**HONORABLE [2]**
 1/9 40/5
**hope [1]** 9/8
**horsepower [1]**
 10/23
**how [10]** 6/6
 12/6 13/1 19/7
 30/13 31/13
 32/15 33/12
 34/9 34/18
**However [1]**
 26/2

**I**

**I'll [1]** 4/9
**I'm [8]** 5/6
 27/25 29/7 30/9
 35/3 37/15
 37/23 37/24
**I've [1]** 35/25
**idea [2]** 36/17
 36/18
**identification**
 **[1]** 24/6
**illegal [1]**
 26/1
**Illinois [1]**
 1/17
**important [2]**
 19/12 26/24
**improper [1]**
 14/24
**improvements [1]**
 17/5
**including [1]**
 19/2

**inconsistent [2]**
 34/10 34/17
**incriminated [1]**
 34/25
**INDIANA [12]**
 1/1 1/13 1/21
 1/21 2/4 2/4
 2/11 3/9 4/20
 20/14 28/20
 31/21
**Indianapolis [3]**
 1/21 2/4 31/7
**indicate [1]**
 34/14
**Indictment [1]**
 3/16
**indirectly [1]**
 6/2
**individual [1]**
 13/8
**industry [1]**
 14/14
**infer [1]** 5/21
**inference [2]**
 5/17 5/23
**inferences [1]**
 5/17
**influence [3]**
 38/22 38/23
 39/4
**influenced [4]**
 4/8 5/4 36/7
 39/8
**information [2]**
 33/17 33/18
**informed [2]**
 7/12 7/25

**infused [1]**
 21/25
**injected [1]**
 15/18
**innd.uscourts.go**
**v [1]** 2/12
**inserted [1]**
 8/8
**inside [1]** 39/3
**instead [3]**
 8/23 26/15
 39/11
**instructed [1]**
 3/16
**instructions [1]**
 34/14
**insurance [10]**
 4/18 22/23
 31/14 31/15
 31/21 31/24
 32/2 32/4 32/5
 32/6
**intent [5]** 4/7
 5/4 8/1 36/7
 39/8
**interest [3]**
 12/14 29/22
 32/15
**interested [1]**
 12/13
**interesting [6]**
 10/25 19/5
 24/13 25/25
 26/2 30/7
**interests [2]**
 3/10 39/11
**interview [3]**

USDC IN/ND case 2:16-cr-00160-MFK document 513 filed 08/26/21 page 58 of 77

**I**

**interview... [3]**
8/6 30/9 37/11
**interviewed [1]**
36/23
**invested [2]**
23/1 23/9
**investigate [1]**
33/20
**investigated [1]**
33/21
**investigation
[1]** 33/21
**invitations [2]**
14/21 16/4
**involved [5]**
4/11 8/20 8/21
15/6 15/7
**involving [1]**
4/17
**irregular [2]**
14/1 14/24
**irregularities
[1]** 14/17
**irregularity [1]**
15/5
**IRS [4]** 6/22
6/25 7/2 7/9
**is [83]**
**issued [3]**
16/11 27/20
31/21
**it [131]**
**it's [14]** 5/21
9/16 9/16 12/7
17/9 17/25 21/1

27/17 30/13
33/6 33/6 33/19
35/2 38/6
**its [5]** 3/13
11/17 28/7
28/21 36/6

**J**

**JACKIE [1]** 1/20
**JAMES [46]**
**James Snyder [1]**
19/21
**January [7]**
7/15 7/17 15/25
23/11 23/21
24/4 26/22
**jbennett [1]**
1/23
**Jerry [1]** 6/22
**JILL [1]** 1/12
**Jill.Koster [1]**
1/15
**job [4]** 9/4
14/14 33/17
33/20
**John [5]** 4/21
9/13 9/18 31/5
33/24
**joined [1]** 25/7
**Jones [2]** 22/2
22/5
**Josh [1]** 32/11
**Judge [3]** 3/6
3/16 35/5
**Judge's [1]**
34/14
**July [2]** 27/5

36/23
**JUNIOR [1]** 1/20
**jury [10]** 1/7
3/4 8/4 18/20
19/22 29/6
31/12 34/8 34/9
36/20
**just [25]** 3/16
4/10 9/15 11/10
12/1 12/2 12/21
13/23 14/23
18/23 19/13
20/1 23/3 23/24
26/21 26/24
32/24 33/13
34/4 35/3 35/17
36/12 37/8
37/10 38/14

**K**

**keep [3]** 14/18
25/15 36/6
**KENNELLY [3]**
1/9 3/16 40/5
**kept [1]** 25/22
**kidding [1]**
14/10
**knew [5]** 14/20
20/16 20/18
30/8 33/12
**knocking [1]**
27/19
**know [34]** 11/16
13/18 13/18
14/3 14/19
14/19 14/20
16/3 17/6 20/23

**K**

**know... [24]**
20/25 23/18
23/21 24/10
25/15 25/15
26/21 27/15
28/13 28/13
28/19 28/24
30/13 31/13
31/14 32/13
32/14 32/16
32/16 32/16
36/16 37/18
38/10 38/19
**knowing [1]**
13/9
**knowledge [7]**
8/18 14/22
18/18 30/1
32/11 32/19
32/20
**knows [4]** 9/4
21/10 30/15
30/15
**KOSTER [1]** 1/12

**L**

**lack [2]** 27/2
32/11
**ladies [21]**
3/21 4/12 5/13
6/9 9/8 9/14
11/19 13/15
14/18 18/14
20/22 22/8
24/13 24/24
27/12 28/1

29/11 31/4
33/10 35/2
35/12
**Lakes [25]** 7/23
11/11 11/16
11/21 11/22
12/15 12/24
17/12 17/19
17/22 18/3
18/15 20/21
21/3 21/6 21/15
22/7 24/5 26/20
30/19 30/22
31/6 33/1 35/17
35/21
**language [2]**
10/24 32/18
**last [2]** 13/23
21/18
**later [2]** 29/22
34/12
**law [9]** 5/14
5/15 6/5 12/5
20/14 20/22
36/16 36/23
37/7
**lawyer [1]** 27/8
**learned [1]**
11/15
**least [4]** 4/23
8/14 29/13
38/16
**legitimate [2]**
36/24 37/8
**less [2]** 12/9
32/16
**let [1]** 34/3

**let's [5]** 6/20
8/7 21/4 27/5
36/15
**letter [1]**
25/22
**letterhead [1]**
28/3
**letters [1]**
27/23
**level [1]** 32/19
**liable [1]** 7/14
**license [1]**
31/22
**licensed [2]**
31/14 31/24
**lie [3]** 33/6
33/7 33/7
**lied [3]** 27/11
36/16 37/7
**like [18]** 10/6
10/22 12/2
18/23 19/25
24/21 25/14
31/2 31/3 31/3
32/6 34/10
34/11 34/24
36/24 36/24
37/7 37/8
**liked [1]** 24/22
**likes [2]** 25/19
25/24
**line [2]** 13/15
16/23
**lines [1]** 26/13
**Link [1]** 20/12
**liquid [1]**
23/14

USDC IN/ND case 2:16-cr-00160-MFK / document 512    filed 03/26/21    page 60 of 77

**L**

**literally [1]**
 22/10
**lived [1]**   38/8
**livelihood [1]**
 15/2
**lives [1]**   38/8
**LLP [2]**   1/20
 2/3
**loaded [1]**
 19/19
**loan [6]**   4/17
 38/14 38/16
 38/17 38/17
 38/20
**lobbying [2]**
 31/6 31/6
**long [4]**   5/18
 9/19 14/14 29/7
**longer [2]**
 19/13 24/21
**look [7]**   5/15
 14/1 14/6 18/25
 24/17 29/15
 37/7
**looked [1]**
 33/12
**looking [1]**
 12/3
**looks [2]**   31/2
 31/2
**lose [1]**   22/10
**lost [1]**   23/8
**lot [10]**   11/14
 11/17 12/16
 14/20 17/13

 19/2 21/8 24/22
 39/9 39/12
**lowered [1]**
 21/19
**lowest [2]**   20/9
 20/10
**lunch [1]**   16/5
**Lynn [4]**   4/19
 13/2 30/21 32/7

**M**

**Mack [2]**   9/21
 11/4
**made [15]**   3/2
 23/11 23/22
 24/22 25/2
 25/14 25/21
 26/21 29/3 29/9
 29/14 34/15
 34/17 34/19
 39/17
**maintenance [2]**
 5/1 9/1
**make [14]**   5/17
 10/21 15/2 17/5
 22/11 22/13
 22/21 23/7 24/1
 25/15 36/22
 36/24 37/7
 38/21
**makes [4]**   10/8
 22/22 22/24
 36/4
**making [1]**   13/9
**man [6]**   8/10
 9/1 15/16 38/22
 38/23 39/4

**Management [1]**
 39/24
**manufacture [1]**
 19/14
**manufactured [1]**
 18/7
**manufacturer's**
 **[3]**   16/13
 16/18 16/21
**many [1]**   7/16
**MARCH [4]**   1/8
 6/24 40/5 40/8
**Mark [2]**   32/6
 32/8
**math [1]**   36/4
**matter [2]**   10/5
 40/5
**mattered [1]**
 10/6
**matters [2]**
 31/7 32/21
**MATTHEW [2]**   1/9
 40/5
**may [5]**   5/24
 24/16 24/18
 34/8 34/17
**mayor [16]**   3/22
 11/24 15/15
 15/18 18/16
 18/17 20/17
 20/20 27/15
 27/17 37/11
 37/12 37/14
 37/19 39/2 39/3
**mayor's [3]**
 13/4 13/21
 18/18

# M

USDC IN/ND case 2:16-cr-00160-MFK   document 512   filed 03/26/21   page 61 of 77

**McIntyre [1]**
  14/4
**me [7]**   11/24
  19/10 21/1
  30/25 33/11
  34/11 38/16
**mean [1]**   12/20
**meaning [4]**   7/5
  7/13 21/21 33/1
**means [1]**   21/20
**meant [1]**   12/21
**mechanic [3]**
  8/25 9/13 9/19
**mechanics [5]**
  11/2 11/6 11/7
  11/9 11/12
**mechanism [3]**
  36/21 37/1 37/2
**Medicaid [1]**
  4/24
**Medicare [1]**
  4/23
**meet [4]**   18/4
  18/7 20/9 20/13
**meeting [4]**
  13/11 13/17
  16/2 20/18
**meetings [2]**
  16/4 38/4
**members [2]**
  26/10 28/15
**memo [1]**   24/4
**men [3]**   14/13
  32/18 38/7
**mention [3]**

9/14 20/19
28/11
**mentioned [2]**
  28/12 28/16
**message [1]**
  35/14
**met [4]**   16/3
  20/11 37/10
  39/6
**MFK [1]**   1/4
**might [4]**   20/21
  23/24 37/3
  38/16
**Miller [2]**   32/6
  32/8
**million [6]**
  4/14 9/6 21/10
  26/25 33/14
  36/12
**mind [3]**   14/18
  17/6 36/6
**minute [1]**   4/10
**misspoke [1]**
  22/5
**model [9]**   16/13
  16/19 16/22
  16/22 16/24
  20/13 20/16
  20/18 28/15
**modification [2]**
  24/14 35/18
**moment [1]**   6/8
**money [23]**   4/4
  6/23 7/7 8/6
  22/2 22/9 22/12
  22/17 23/12
  23/15 24/11

24/11 24/24
25/19 25/16
31/17 35/24
35/24 36/13
36/19 37/13
37/17 38/15
**month [4]**   7/22
  22/20 23/3 23/4
**months [3]**   7/16
  32/3 32/25
**more [11]**   4/11
  4/16 7/5 11/15
  12/4 15/20 17/3
  19/9 25/9 32/16
  34/24
**morning [1]**
  5/20
**mortgage [1]**
  28/20
**mortgages [1]**
  7/3
**most [3]**   8/20
  19/12 21/15
**most-experienced
  [1]**   8/20
**motivated [1]**
  12/13
**motive [3]**   6/8
  6/12 6/20
**Motor [1]**   21/14
**mouth [1]**   8/5
**Mr [11]**   9/9
  12/4 18/9 18/19
  21/10 21/14
  25/19 26/18
  31/15 36/9
  36/22

USDC IN/ND case 2:16-cr-00160-MFK   document 112   filed 03/26/21   page 62 of 77

**M**

**Mr Evans [1]**
31/15

**Mr. [2]**   5/10
8/25

**Mr. Bennett [1]**
5/10

**Mr. Reeder [1]**
8/25

**much [4]**   6/6
12/6 14/11
32/15

**multiple [1]**
28/2

**municipalities**
**[1]**   14/15

**must [4]**   3/18
29/22 29/24
31/3

**my [3]**   3/12 5/7
36/9

**N**

**name [2]**   29/16
29/24

**nearly [1]**   7/14

**neater [1]**
14/11

**need [4]**   31/23
35/24 35/24
36/19

**needed [9]**   6/23
8/6 22/25 23/14
24/24 24/25
35/18 35/19
36/13

**needed it [1]**

24/25

**negative [1]**
21/18

**net [2]**   21/10
21/18

**network [1]**
21/16

**never [5]**   4/22
19/16 19/22
31/22 37/16

**new [6]**   16/12
16/18 16/23
17/7 18/10 24/6

**next [2]**   9/4
30/10

**Nina [1]**   29/20

**no [19]**   1/4
5/12 6/14 12/23
18/10 19/15
19/20 22/22
22/24 27/10
28/3 28/5 29/22
30/19 38/14
38/14 38/17
38/19 38/21

**Nobody [1]**
28/12

**non [1]**   23/14

**non-liquid [1]**
23/14

**none [1]**   38/25

**Nope [1]**   33/10

**normal [1]**
14/23

**normally [2]**
8/10 10/22

**north [1]**   9/20

**NORTHERN [1]**
1/1

**not [45]**

**note [1]**   26/24

**nothing [6]**
20/24 29/8 33/9
33/10 33/15
34/2

**notice [4]**   7/9
7/20 7/25 29/14

**noticed [1]**
14/16

**notices [2]**
6/24 7/19

**November [5]**
17/12 21/8
21/11 23/3 32/2

**November 24th**
**[1]**   23/3

**now [12]**   5/12
8/7 14/18 18/25
20/5 20/6 20/7
21/4 25/11 27/2
28/8 35/4

**number [3]**   8/9
15/11 24/6

**numbers [2]**
15/12 21/9

**O**

**oath [8]**   3/8
3/9 7/2 14/5
18/22 34/20
35/2 39/10

**observed [1]**
14/23

**obtain [1]**

# O

**obtain... [1]**
27/21
**obvious [3]**
3/22 17/25 33/6
**obviously [1]**
22/17
**occur [1]** 15/24
**October [1]**
32/24
**odd [1]** 38/13
**Odyssey [1]** 7/4
**off [1]** 16/23
**offering [1]**
31/18
**offers [1]**
31/19
**office [12]**
1/12 1/16 4/20
13/2 13/4 13/6
13/7 13/8 13/21
25/4 30/2 30/4
**official [5]**
2/10 27/16
29/25 36/4 40/8
**Oh [3]** 17/8
25/14 30/9
**okay [2]** 23/25
25/3
**old [1]** 12/15
**older [1]** 12/21
**once [1]** 23/25
**one [20]** 1/21
2/4 4/15 5/2
6/5 6/12 10/19
12/1 14/3 15/6

15/7 18/4 18/13
18/18 20/3
21/15 24/6
30/17 31/23
37/5
**only [19]** 12/17
12/19 12/22
12/24 15/6
15/12 15/14
18/4 18/5 19/20
20/16 20/17
22/11 25/11
28/6 28/17
28/21 37/5
37/13
**opened [2]**
13/10 13/17
**opening [2]**
5/10 5/13
**operating [4]**
22/3 22/4 22/7
23/13
**opinion [2]**
9/25 31/19
**opinions [3]**
10/3 10/18
10/19
**opposite [1]**
20/2
**order [17]** 3/17
10/21 11/25
12/1 20/4 23/17
23/18 23/21
23/25 24/1 24/8
31/23 35/14
35/16 35/19
35/22 35/23

**ordered [1]**
20/4
**ordinance [2]**
29/19 29/21
**other [15]** 4/18
6/13 11/13
14/20 15/5 17/4
17/19 17/24
18/2 19/13
26/10 27/22
27/22 28/15
33/23
**our [3]** 3/14
26/6 39/6
**out [27]** 7/1
8/10 10/14
10/16 17/17
17/18 19/11
19/22 21/21
21/24 22/2 22/5
22/9 22/12
22/15 26/21
29/3 29/9 29/14
30/13 30/16
30/16 30/17
31/17 33/2
33/11 33/18
**outing [2]**
25/10 26/3
**Outlook [1]**
16/3
**over [11]** 6/25
7/3 7/4 7/17
9/6 13/3 18/2
19/8 19/25 20/1
21/24
**overdue [1]**

**O**

**overdue... [1]**
23/4
**overnight [2]**
5/19 10/8
**overseeing [1]**
8/11
**owe [1]** 7/6
**owed [3]** 6/25
7/5 8/2
**own [4]** 3/9
32/23 33/2
39/11
**owners [1]** 21/6

**P**

**PAC [1]** 25/9
**PACCAR [5]**
21/22 21/24
23/7 24/2 35/20
**Pagel [1]** 32/11
**pages [1]** 16/16
**paid [7]** 19/8
19/12 22/16
24/16 24/21
37/13 37/18
**paper [1]** 28/18
**paperwork [1]**
15/12
**part [4]** 3/2
9/1 25/20 39/17
**part-time [1]**
9/1
**participating**
**[1]** 26/11
**particular [3]**
7/21 17/24 21/2

**passed [1]**
1/4
**past [5]** 7/16
7/17 13/5 22/20
27/7
**pawn [5]** 34/10
34/11 34/23
34/24 34/24
**pawn-like [1]**
34/24
**pay [5]** 21/22
24/15 36/2 36/3
36/4
**paying [2]** 20/6
33/2
**payment [16]**
6/14 7/17 14/19
21/4 23/11
23/22 24/1 24/6
26/1 26/2 26/22
30/6 30/12
33/13 35/20
38/17
**payments [4]**
23/5 23/7 30/22
32/8
**payroll [7]**
7/11 22/3 22/6
22/11 22/13
31/8 31/9
**penalties [3]**
7/10 7/11 7/13
**pending [1]**
24/7
**penmanship [3]**
14/9 14/10
14/12

**people [11]** 3/8
3/10 5/15 14/18
19/2 20/16
20/17 33/17
37/24 39/10
39/12
**perfectly [1]**
17/8
**performed [6]**
6/15 27/3 27/23
27/24 36/25
38/20
**perhaps [1]**
10/5
**permitted [1]**
24/15
**person [8]** 4/1
4/6 8/21 29/25
31/16 32/15
34/4 34/24
**person's [1]**
32/20
**personal [4]**
4/5 22/9 22/12
26/15
**personally [3]**
7/13 7/14 26/18
**Peterbilt [26]**
7/24 11/21
11/22 11/25
12/24 17/12
17/22 18/4 18/6
20/12 20/21
21/3 21/7 21/14
21/15 21/16
22/7 24/5 24/6
26/20 30/19

USDC IN/ND case 2:16-cr-00160-JVB-JEM document 512 filed 03/26/21 page 65 of 77

**P**

**Peterbilt... [5]**
30/22 31/6
33/1 35/17
35/21
**Peterbilt's [5]**
11/11 11/17
12/16 17/20
18/15
**Peyton [1]**
21/14
**phipps [4]** 2/10
2/12 40/2 40/8
**phone [4]** 15/11
24/22 31/8 31/9
**photographs [1]**
9/14
**pick [1]** 19/17
**picked [1]** 11/1
**piece [1]** 28/18
**place [1]** 28/17
**played [6]** 8/3
27/4 28/9 29/5
31/11 33/3
**Plaza [2]** 1/13
2/10
**plenty [1]** 4/12
**plus [1]** 23/10
**PO [1]** 24/8
**pocket [1]** 33/2
**point [1]** 18/14
**policy [1]**
31/21
**political [3]**
25/1 25/12
26/13

**poor [1]** 23/13
**Portage [25]**
3/9 3/10 3/21
3/23 4/9 4/15
4/20 4/22 5/5
9/7 9/19 11/18
12/23 15/16
19/16 20/13
24/7 24/12
27/15 29/19
30/7 30/20
30/24 39/9
39/10
**position [1]**
8/16
**possible [1]**
18/17
**postpone [1]**
24/5
**preceding [3]**
29/22 29/24
30/17
**prefer [2]**
10/19 10/24
**preferred [2]**
10/4 11/9
**present [4]** 2/8
3/4 28/13 28/14
**presented [2]**
6/10 6/18
**president [1]**
3/23
**press [4]** 37/23
38/1 38/2 38/3
**pressed [1]**
18/16
**pretty [2]**

21/11 32/17
**previous [1]**
18/20
**price [6]** 19/8
19/12 19/25
20/1 20/6 20/7
**printout [1]**
25/23
**prior [3]** 7/16
8/14 11/17
**prioritize [2]**
18/1 19/24
**prioritized [2]**
19/8 20/1
**probably [7]**
11/15 12/8 17/8
18/5 21/1 21/10
23/23
**problems [2]**
23/14 35/25
**proceedings [4]**
2/24 3/1 39/16
40/4
**process [18]**
8/8 8/10 8/19
8/21 8/24 9/12
12/5 12/10
12/13 13/1
14/17 15/7 15/7
15/16 15/19
15/25 30/3
33/10
**processes [2]**
8/14 33/14
**produced [1]**
2/24
**production [3]**

USDC IN/ND case 2:16-cr-00160-MFK / document 512    filed 03/26/21    page 66 of 77

## P

**production...**
**[3]**   16/13
16/19 16/21
**profit [1]**
21/18
**program [1]**
4/17
**promised [2]**
9/3 31/20
**prompt [1]**   26/9
**proof [2]**   3/14
3/14
**Properties [2]**
28/19 29/1
**Properties' [1]**
29/4
**property [2]**
8/1 8/2
**prove [1]**   3/18
**proven [5]**   3/11
33/7 33/7 39/6
39/13
**proves [4]**   6/1
6/3 35/22 36/6
**provide [1]**
9/22
**provided [3]**
4/2 15/11 39/1
**public [6]**   4/24
13/11 13/17
27/16 31/17
36/4
**public's [2]**
3/7 39/9
**purchase [13]**

11/22 21/5
23/1 23/18
23/21 23/25
24/1 24/8 35/14
35/16 35/18
35/22 35/23
**purchased [2]**
12/2 18/13
**purpose [1]**
33/11
**put [15]**   8/23
9/3 9/11 10/20
10/22 10/23
15/9 17/4 21/20
25/3 26/23
30/21 32/7
35/12 39/11
**putting [1]**   3/9

## Q

**qualified [1]**
8/25
**question [1]**
30/19
**questions [4]**
16/9 32/1 32/5
36/10
**quickly [1]**
32/17
**quite [1]**   8/21

## R

**ran [1]**   27/7
**Randy [28]**   8/23
9/11 10/3 10/18
10/18 10/20
11/1 11/8 11/21

11/23 12/7 12/7
13/7 13/8 15/20
17/23 18/8
18/15 18/23
19/21 20/8
20/17 23/19
28/13 31/8 34/7
34/8 34/23
35/16
**Randy Reeder [2]**
17/23 20/17
**ranking [1]**
21/17
**rating [1]**
21/19
**really [7]**   6/10
16/15 16/16
30/7 38/9 38/12
38/19
**reappointed [1]**
8/16
**rear [1]**   19/19
**rear-loaded [1]**
19/19
**reason [2]**   18/3
39/14
**reasonable [6]**
3/11 3/15 3/19
5/17 36/4 39/13
**reasons [1]**
10/7
**rebid [1]**   12/1
**recall [1]**
25/13
**received [9]**
4/16 4/22 6/24
7/9 7/19 7/21

# R

**received... [3]**
13/10 29/25
36/25
**receiving [2]**
26/24 29/9
**recite [1]**  38/5
**recognition [4]**
26/4 26/8 26/8
26/12
**recollection [1]**
12/8
**record [8]**  3/2
28/5 28/7 28/18
31/25 38/11
39/17 40/4
**records [1]**
22/2
**recused [1]**
20/24
**Reed [4]**  4/20
13/2 30/21 32/7
**Reeder [31]**
8/23 8/25 9/9
9/11 10/3 10/18
10/19 10/20
11/1 11/8 11/21
11/23 12/7 12/7
13/20 17/16
17/23 18/8
18/15 18/19
18/23 19/21
20/8 20/17
23/19 28/13
31/8 34/7 34/8
34/23 35/16

**referring [1]**
32/5
**refuse [3]**  10/2
12/18 19/19
**regard [2]**
13/15 13/16
**regarding [2]**
26/23 31/7
**registered [3]**
28/19 28/20
28/25
**reimbursed [2]**
26/19 26/19
**rejected [1]**
20/14
**related [1]**
38/3
**relating [1]**
32/2
**relationship [1]**
34/2
**relevant [1]**
7/21
**remainder [1]**
5/7
**remaining [1]**
24/2
**Remarkably [1]**
14/9
**remember [12]**
24/20 27/15
27/17 34/8
35/13 37/22
38/2 38/3 38/5
38/10 38/10
38/12
**remind [1]**  9/15

**rendered [1]**
38/15
**rental [1]**  7/25
**reported [4]**
2/24 3/1 26/16
39/16
**REPORTER [3]**
2/10 40/1 40/8
**Republic [1]**
9/24
**reputation [2]**
38/6 38/8
**requested [1]**
24/5
**required [2]**
29/19 30/16
**respect [1]**
31/19
**responsibility
[1]**  3/14
**responsible [3]**
8/11 9/5 13/8
**responsive [1]**
20/10
**responsive-bidde
r [1]**  20/10
**retirement [3]**
22/9 22/12
22/16
**retract [5]**
18/20 18/21
34/7 34/8 34/12
**retrofitted [1]**
19/18
**Revas [1]**  29/20
**review [1]**  27/5
**reward [1]**

**R**

**reward... [1]**
36/14
**rewarded [5]**
4/8 5/4 36/7
36/8 39/8
**rigged [1]** 13/1
**rigging [3]**
6/14 8/7 15/5
**right [11]** 11/2
16/23 19/7
24/10 27/8
33/19 35/4 37/3
37/18 38/3
38/17
**RMR [3]** 2/10
40/2 40/8
**roads [1]** 4/25
**Robert [3]** 14/5
14/8 15/21
**ROCHELLE [1]**
1/12
**round [16]**
11/20 15/1 15/3
15/10 15/14
15/20 15/21
17/18 17/19
19/2 19/4 19/6
19/24 20/1 20/7
28/12
**rounds [3]** 19/5
20/21 25/5
**roundtable [2]**
25/7 25/8
**rush [2]** 18/10
19/23

**S**

**S/Angela [1]**
40/8
**safety [1]** 4/24
**said [29]** 10/15
12/4 12/9 12/19
13/3 14/11 17/7
17/7 18/9 18/16
18/22 19/22
20/25 21/10
23/24 24/9
24/20 32/19
34/21 36/16
36/19 36/21
37/1 37/22
38/10 38/11
38/11 39/1 39/1
**sale [4]** 6/14
11/17 12/18
24/7
**sales [3]** 21/21
21/24 26/9
**salesman [1]**
15/14
**salesmen [6]**
11/3 14/14 15/2
15/6 15/11 19/3
**same [10]** 11/25
16/13 16/18
16/21 16/23
16/24 17/9 18/7
22/20 32/15
**Sanitation [5]**
8/12 8/15 9/5
9/24 33/25
**sat [2]** 11/16

17/13
**saw [4]** 15/1
23/16 26/22
35/6
**say [8]** 6/5
16/15 16/20
17/8 27/25 34/6
34/24 37/15
**saying [5]**
11/24 23/23
31/1 37/24 39/5
**says [12]** 12/6
12/7 12/8 16/17
23/17 30/8
34/25 35/24
36/2 38/9 38/11
38/14
**Scott [1]** 14/4
**search [1]** 16/5
**Searle [6]**
22/14 25/11
25/19 26/18
38/24 39/1
**second [13]**
3/25 15/1 15/3
15/20 15/21
17/18 19/4
19/24 19/25
22/14 26/25
28/12 29/18
**Secretary [2]**
28/20 28/25
**section [1]**
33/5
**securing [1]**
13/8
**see [10]** 5/20

**S**

**see... [9]**   5/21
10/24 14/7 19/2
23/20 24/4
24/18 25/6
26/11
**seeing [2]**   6/1
6/3
**seek [1]**   35/18
**seem [3]**   36/4
36/22 36/24
**seemed [1]**
14/24
**seen [2]**   9/17
33/24
**sell [10]**   12/9
12/25 14/15
15/3 15/17
20/12 22/25
23/1 23/24
35/24
**selling [3]**
15/2 22/16
23/10
**semi [1]**   9/21
**sends [2]**   17/17
17/18
**sense [9]**   12/20
12/21 18/1
22/21 22/22
22/22 22/24
29/17 38/21
**separate [1]**
33/11
**September [3]**
7/9 7/12 29/1

**serve [2]**   3/8
3/9 / 10
**served [1]**   8/15
**service [1]**
31/19
**services [1]**
38/5
**several [1]**
7/19
**shall [3]**   16/12
16/17 16/18
**she [2]**   13/3
13/3
**She's [1]**   13/2
**Shepherd [2]**
4/21 31/5
**shew [1]**   22/18
**should [6]**   9/14
10/1 18/16
20/14 26/3 30/6
**shouldn't [1]**
18/12
**shove [3]**   10/15
10/16 10/16
**show [5]**   15/10
22/2 26/5 26/7
26/14
**showed [2]**
33/21 36/18
**showing [4]**
17/23 27/22
27/24 32/8
**shown [3]**   21/18
29/20 37/12
**shows [5]**   17/11
28/25 30/22
32/1 32/23

**sign [1]**   29/16
**signatory [1]**
28/21
**signature [1]**
23/20
**significantly
[1]**   10/5
**signs [1]**   9/3
**silent [1]**
20/18
**since [2]**   9/17
13/23
**sitting [3]**
12/15 12/22
21/11
**six [4]**   6/10
21/18 27/6 37/9
**slide [1]**   35/12
**smacks [1]**   31/2
**small [1]**   8/25
**smart [1]**   29/12
**smarter [1]**
29/14
**snow [5]**   5/20
5/21 5/22 6/1
6/3
**snowed [2]**   5/19
5/22
**SNYDER [50]**
**Snyder's [1]**
23/20
**so [24]**   4/5 5/2
5/17 7/6 11/5
11/8 12/6 12/10
14/25 17/21
19/5 20/23 21/4
21/11 22/24

# S

USDC IN/ND case 2:16-cr-00160-JTM document 512 filed 03/26/21 page 70 of 77

**so... [9]** 23/4 23/12 26/10 26/23 27/5 33/5 34/3 34/12 37/5

**Sobkowski [2]** 11/23 12/4

**sold [8]** 7/6 12/23 16/22 21/8 21/21 21/21 22/18 23/6

**solicited [1]** 3/25

**some [11]** 9/3 9/17 13/12 13/12 14/7 14/25 16/14 18/10 19/3 25/1 38/17

**somebody [2]** 32/18 34/4

**somehow [1]** 36/3

**something [8]** 9/11 10/22 18/22 25/25 26/12 27/17 32/14 34/5

**sometimes [2]** 5/15 10/7

**somewhere [1]** 9/20

**soon [2]** 7/21 18/16

**Sorry [1]** 22/4

**sort [1]** 5/1

**SOT [2]** 21/20 21/20

**sound [1]** 25/14

**South [1]** 1/17

**speaks [1]** 32/18

**spec [3]** 10/20 10/24 18/2

**Special [2]** 6/22 7/8

**specific [1]** 32/14

**specifications [2]** 16/11 18/3

**specs [7]** 9/22 14/21 16/15 16/16 20/9 20/11 20/14

**speed [1]** 19/7

**sponsoring [1]** 26/8

**sponsors [3]** 26/3 26/6 26/7

**spot [1]** 26/6

**Square [2]** 1/21 2/4

**SRC [10]** 27/25 28/3 28/5 28/17 28/19 29/1 29/3 29/4 29/8 29/9

**SRIVASTAVA [3]** 1/16 3/13 36/9

**stake [1]** 38/9

**stand [8]** 9/13 9/18 18/19 24/20 25/14

**standards [3]** 17/1 17/14 17/15

**star [1]** 35/6

**start [1]** 6/20

**state [3]** 16/12 28/20 28/25

**statement [6]** 5/10 34/15 34/17 34/19 34/20 34/22

**statements [2]** 29/21 32/7

**states [7]** 1/1 1/3 1/9 1/12 1/16 5/15 29/21

**station [3]** 10/11 10/11 10/13

**status [1]** 21/20

**stay [1]** 33/11

**stayed [1]** 20/18

**stenotype [1]** 2/24

**Stettinius [2]** 1/20 2/3

**Steve [15]** 8/11 8/13 8/18 12/8 21/6 21/25 22/5 23/16 26/15 26/17 26/19 27/5 33/24 35/15 37/8

**Steven [5]** 14/6

USDC IN/ND case 2:16-cr-00160-JVB-JEM document 512 filed 03/26/21 page 71 of 77

**S**

**Steven... [4]**
  14/8 15/14
  15/22 22/15
**still [6]**  7/6
  24/16 24/16
  24/18 32/4 38/7
**stop [2]**  12/11
  29/7
**story [1]**  31/10
**straits [1]**
  21/7
**Streets [4]**
  8/12 8/15 9/5
  33/25
**strike [1]**
  38/13
**stuck [1]**  10/13
**style [1]**  12/1
**subject [1]**
  28/16
**submit [2]**
  27/12 29/13
**submits [1]**
  15/17
**submitted [1]**
  35/19
**subpoenas [1]**
  27/20
**subsidy [1]**
  4/17
**such [2]**  6/1
  6/3
**sudden [1]**  20/5
**suggest [4]**
  3/21 5/14 13/18

22/8
**suite [3]**  1/13
  1/21 2/4
**summaries [2]**
  15/9 27/23
**superintendent**
  **[3]**  8/12 8/15
  9/4
**supposed [4]**
  13/5 13/6 30/8
  30/9
**supposedly [2]**
  32/3 32/25
**sure [3]**  13/9
  17/9 27/14
**suspect [1]**
  20/21
**sworn [1]**  35/2

**T**

**Taft [2]**  1/20
  2/3
**taftlaw.com [2]**
  1/23 2/6
**take [8]**  22/8
  27/13 31/23
  33/16 34/25
  34/25 35/1 35/6
**taken [4]**  19/13
  22/15 23/8
  31/23
**takes [1]**  25/4
**Taking [1]**
  16/10
**talk [10]**  5/8
  6/8 8/7 21/4
  27/2 28/8 29/18

34/1 34/3 36/15
**talked [1]**  38/4
**talking [9]**
  15/16 16/1 16/2
  27/25 32/14
  32/17 33/25
  34/5 34/9
**talks [1]**  31/3
**tax [1]**  35/24
**taxes [2]**  6/25
  7/11
**tee [1]**  26/6
**telephone [1]**
  15/9
**tell [8]**  15/4
  27/13 32/14
  32/17 33/9 34/4
  34/6 37/14
**tells [4]**  9/10
  27/5 27/10 29/8
**term [2]**  30/2
  30/4
**terms [3]**  5/24
  16/11 16/17
**testified [8]**
  9/18 11/3 14/4
  21/13 22/14
  23/19 31/15
  32/12
**testify [1]**
  16/7
**testimony [37]**
  3/24 4/2 4/13
  4/19 6/21 7/8
  8/13 8/24 9/9
  10/21 10/25
  11/14 11/19

**T**

USDC IN/ND case 2:16-cr-00160-MFK   document 512   filed 03/26/21   page 72 of 77

**testimony...**

 **[24]**  13/1
13/12 13/24
14/13 15/22
16/8 16/10
16/25 17/2
17/25 18/8
18/21 21/8
21/13 25/1
26/18 27/20
32/10 33/8 34/7
34/16 34/19
35/2 37/21

**text [2]**  23/16
35/14

**texting [1]**
15/16

**than [12]**  4/16
6/5 7/5 11/15
12/4 12/9 14/11
19/12 24/21
29/22 32/16
32/20

**Thank [4]**  3/6
10/12 35/5
39/15

**that [253]**

**that day [1]**
36/11

**that's [22]**
3/21 5/22 9/11
10/17 11/5
11/10 12/5 14/5
15/25 16/1
16/15 17/8

22/13 24/2 27/9
33/14 33/19
33/20 33/20
35/1 36/17
38/20

**their [24]**
14/10 14/14
14/15 14/16
14/22 15/2
17/13 19/19
21/9 21/19
21/22 21/23
23/8 23/10
23/12 23/13
28/14 32/12
32/18 33/17
33/20 34/16
38/8 38/8

**them [16]**  4/21
7/6 9/17 13/8
14/1 14/8 14/24
14/25 18/5
24/18 26/4
26/12 33/17
35/17 35/23
36/13

**themselves [1]**
31/17

**then [17]**  4/4
10/15 15/17
22/6 24/10 25/4
25/9 25/23 26/4
26/7 26/16
26/22 34/12
35/6 35/16
37/10 38/11

**there [22]**  4/5

5/21 8/1 11/9
13/7 15/3 15/17
15/22 17/1 18/9
19/15 19/16
19/20 20/3
23/18 25/25
26/1 26/10
26/11 27/10
27/20 29/7 34/2

**there's [8]**
4/21 16/3 16/3
20/24 26/12
28/5 30/19
31/25

**these [20]**  8/9
9/14 13/13
13/15 14/18
15/1 15/9 15/11
15/12 16/17
17/2 17/5 18/13
23/5 25/15
26/13 32/18
35/25 37/18
38/7

**they [116]**

**they're [9]**
9/15 13/10
13/10 13/13
13/14 17/22
32/17 34/4
35/23

**They've [2]**
13/23 38/7

**thing [8]**  4/1
4/6 4/11 5/1
9/4 13/22 14/3
19/13

**T**

**things [6]** 10/5 14/23 17/4 18/18 35/25 37/24

**think [9]** 9/20 10/10 10/15 12/17 13/3 26/9 27/7 27/14 36/10

**this [72]**

**those [14]** 3/10 6/17 7/5 7/11 10/3 10/19 11/4 13/9 14/23 19/11 23/7 25/3 33/14 39/11

**though [3]** 10/21 22/17 30/11

**thought [2]** 18/5 37/3

**three [5]** 11/20 12/2 14/13 19/10 21/18

**through [6]** 6/18 14/6 22/1 29/23 31/16 33/7

**throughout [1]** 26/4

**time [14]** 8/16 9/1 9/19 14/14 16/23 17/13 18/10 21/7 22/14 22/19

23/5 25/17 30/20 35/17

**timeline [1]** 25/3

**times [2]** 27/6 37/9

**timing [4]** 6/14 21/4 21/5 26/23

**tippers [1]** 19/18

**titled [1]** 12/20

**today [6]** 3/7 16/8 23/18 24/9 24/20 39/5

**told [23]** 3/13 4/21 5/10 9/22 10/3 13/3 13/23 18/15 19/15 21/15 21/19 21/25 25/11 25/19 31/5 31/8 31/9 34/7 34/12 35/8 36/13 38/24 38/24

**ton [1]** 8/18

**too [2]** 4/12 26/12

**took [7]** 3/8 8/10 9/13 9/18 24/21 24/21 39/10

**torque [1]** 10/23

**total [1]** 7/3

**totaled [1]** 4/13

**toward [1]** 25/22

**track [2]** 25/16 39/3

**transaction [2]** 36/24 37/8

**transcript [7]** 2/24 8/4 28/10 29/6 31/12 33/4 40/4

**transcription [1]** 2/25

**transfer [2]** 10/11 10/13

**transferred [1]** 4/4

**Transportation [1]** 4/25

**trash [6]** 10/8 10/10 10/13 10/16 10/16 19/17

**treasurer [1]** 29/20

**treasurer's [4]** 4/20 13/2 13/6 13/7

**trial [7]** 1/7 3/12 6/21 19/3 21/14 34/15 34/17

**tried [4]** 11/21 16/14 18/20 35/1

**trip [2]** 25/8 25/22

**trouble [3]**

**T**

**trouble... [3]**
22/19 25/18
37/3
**truck [41]**
**trucking [1]**
14/14
**trucks [20]**
9/21 9/23 10/10
11/4 14/15
14/16 15/2 15/3
17/3 17/4 17/5
18/10 18/12
18/13 18/15
19/10 19/11
19/13 21/21
21/22
**true [7]**  20/10
33/18 33/19
33/19 33/22
36/17 40/3
**trust [7]**  3/8
7/10 7/11 7/12
21/21 21/24
39/10
**truth [1]**  34/21
**truthful [1]**
34/18
**try [3]**  10/16
15/3 27/21
**trying [2]**  10/9
20/12
**turn [2]**  6/18
21/23
**turns [1]**  33/18
**two [15]**  7/3

8/9 11/17 12/15
17/7 17/11 17/17
17/21 18/25
19/5 25/4 26/24
26/25 27/20
32/10 35/9
**two-year-old [1]**
12/15
**type [4]**  9/25
10/1 10/4 11/10

**U**

**U.S [1]**  40/9
**Unbeknownst [1]**
18/5
**unbelievable [2]**
37/21 38/13
**under [10]**  4/16
7/2 14/4 18/22
20/14 20/22
29/19 31/20
34/20 35/2
**underperforming**
**[1]**  21/16
**understanding**
**[1]**  38/19
**UNITED [5]**  1/1
1/3 1/9 1/12
1/16
**unless [3]**  22/9
22/10 34/5
**unpaid [1]**  7/11
**until [4]**  15/24
24/15 30/10
35/9
**unused [2]**
16/12 16/18

**unusual [2]**
19/14 19/24
**up [14]**  5/20
6/3 6/6 9/3
16/14 19/17
23/19 26/5 26/7
26/14 35/3 36/3
36/18 37/12
**upside [2]**  7/3
7/4
**urgency [6]**
18/17 19/16
19/20 19/20
20/5 20/5
**us [3]**  5/2
37/17 37/17
**usdoj.gov [2]**
1/15 1/18
**use [4]**  18/1
22/12 23/12
24/1
**used [6]**  12/17
12/19 12/19
12/20 12/21
34/10

**V**

**value [3]**  4/1
4/6 4/11
**vehicle [1]**
24/6
**vehicles [2]**
19/18 19/19
**verify [1]**
33/18
**versus [1]**  5/8
**very [5]**  9/19

## V

**very... [4]**
9/19 21/13
24/17 26/2
**vhadley [1]** 2/6
**victim [1]**
37/12
**violated [3]**
3/7 3/9 39/9
**VIVEK [1]** 2/3
**voices [1]**
28/14
**volunteered [2]**
9/2 34/10
**vote [2]** 20/23
21/2
**voted [5]** 17/21
20/20 21/3 21/3
23/4
**votes [1]** 17/17
**voting [2]**
14/21 28/15
**vs [1]** 1/4

## W

**wake [1]** 5/20
**waking [1]** 6/3
**walk [1]** 6/18
**walked [2]** 22/1
31/16
**walks [1]** 31/3
**want [13]** 5/8
6/8 8/19 8/20
17/7 17/10
17/10 26/10
27/2 28/8 34/1
37/14 39/3

**wanted [6]** 11/6
11/7 12/24 12/25
22/25 33/15
**wants [1]** 11/8
**warrant [1]**
16/5
**was [128]**
**wasn't [15]**
8/25 11/8 12/19
13/21 14/10
20/10 20/15
20/15 27/14
29/14 31/14
33/22 35/9
36/17 37/5
**Waste [1]** 9/24
**way [7]** 5/13
8/9 15/20 22/11
31/1 37/23
38/18
**ways [1]** 8/9
**we [56]**
**we'll [4]** 24/1
36/3 38/14
38/18
**we're [4]** 3/7
26/5 26/6 36/2
**we've [2]** 6/10
13/12
**week [3]** 5/19
35/9 35/13
**weeks [4]** 17/17
17/21 26/24
35/10
**weight [1]** 6/6
**well [14]** 4/21
11/4 12/6 15/23

16/15 26/20
33/16 35/16
36/2 36/10
36/17 36/21
38/1 38/14
**went [6]** 4/3
17/6 22/5 22/6
35/21 36/12
**were [38]** 3/1
7/5 12/3 12/13
13/5 13/16
13/17 13/25
14/21 14/23
14/24 14/25
15/12 16/4
20/12 21/7
21/11 21/24
22/17 22/19
22/20 23/4
23/13 23/13
23/23 24/15
25/2 25/12
25/16 25/17
25/17 27/20
28/2 30/23 32/1
34/9 36/22
39/16
**weren't [1]**
23/23
**what [35]** 7/10
9/25 10/1 10/11
10/25 11/5 11/7
12/6 13/18
14/25 15/3 16/1
19/22 20/4 20/5
22/13 22/21
22/22 24/3

# W

**what... [16]**
24/20 27/9
27/10 29/8
33/21 34/3 34/6
34/23 35/1
35/13 37/21
37/24 38/4
38/20 38/21
38/23

**what's [5]**  13/9
19/5 24/13 30/7
37/16

**whatever [3]**
13/16 34/21
36/1

**when [21]**  13/10
13/10 14/11
16/14 18/9 25/4
25/19 25/21
26/13 27/19
27/25 29/14
32/1 32/20
34/14 34/24
36/20 36/22
37/11 37/14
38/24

**where [4]**  16/15
17/16 23/17
32/17

**Whereupon [2]**
3/1 39/16

**whether [2]**
4/23 6/7

**which [11]**  8/15
11/1 16/23

19/11 22/15
25/23 26/3
26/16 28/22
29/25 30/1

**while [2]**  9/16
24/21

**who [21]**  8/10
10/9 11/3 14/13
14/19 14/19
15/2 15/16 19/2
20/16 20/18
21/13 25/16
26/7 27/16
31/17 32/10
32/15 32/18
34/6 34/25

**why [37]**  8/20
8/20 9/11 10/4
10/7 12/14
12/14 13/6
15/15 15/17
15/18 15/22
16/2 16/2 16/5
16/9 17/3 17/10
18/15 18/21
18/21 20/15
25/18 26/20
28/3 29/9 33/5
33/9 33/12 34/1
34/3 36/10
36/22 36/23
36/25 38/17
38/17

**will [3]**  5/12
6/17 29/18

**winter [1]**  10/8

**wish [1]**  35/12

**within [1]**  12/11

**without [3]**
12/12 27/8
38/19

**witness [9]**
9/18 16/15
16/20 16/20
21/13 27/13
34/15 34/21
35/6

**witness' [1]**
34/18

**witnesses [6]**
9/15 11/1 13/13
28/2 32/10
33/19

**won [2]**  36/12
37/18

**wooden [1]**
10/15

**word [2]**  12/19
33/16

**worded [1]**  5/13

**words [1]**  37/1

**work [8]**  6/15
27/3 27/23
27/24 31/6
32/25 36/25
38/20

**worked [2]**
14/13 19/11

**working [2]**  9/1
19/17

**Works [5]**  3/23
17/17 20/18
20/23 23/3

USDC IN/ND case 2:16-cr-00160-MFK document 512 filed 03/26/21 page 77 of 77

# W

**worth [3]** 7/6
26/25 36/25

**would [29]** 7/6
7/13 8/10 9/23
10/22 15/18
17/8 17/10
18/13 18/21
18/21 19/13
23/8 24/10
24/21 25/18
26/9 26/9 26/11
27/17 29/13
31/23 33/9
33/12 34/3 38/2
38/3 38/4 38/5

**wouldn't [5]**
8/20 17/10 34/1
37/14 37/15

**write [2]** 14/11
22/23

**writes [1]**
25/19

**writing [1]**
38/24

**written [6]**
18/2 27/7 27/8
27/9 27/22
35/14

**wrong [2]** 20/24
34/2

**wrote [7]** 11/23
20/9 22/20
23/19 25/10
26/15 35/10

# Y

**yeah [9]** 11/7
12/9 17/8 18/10
21/11 24/9
25/14 30/9
38/18

**year [11]** 4/15
4/22 12/15 17/2
29/3 29/22
29/23 29/24
30/10 30/17
30/18

**years [8]** 8/14
8/17 9/20 9/20
11/17 13/3
17/13 21/18

**yes [2]** 21/8
37/4

**yesterday [1]**
16/8

**yet [5]** 5/3
19/24 26/13
31/9 39/5

**you [178]**

**you'll [3]** 14/1
14/7 24/18

**you're [13]**
5/11 22/10
24/11 24/11
26/8 32/13
34/24 35/3
37/12 37/16
38/1 38/1 38/12

**you've [4]** 8/24
9/17 13/12
13/24

**your [9]** 17/6
18/11 21/9 22/9
22/11 22/12
22/22 37/15
38/6

**yourselves [4]**
8/22 12/14 14/2
16/9