**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

UNITED STATES OF AMERICA

v.                                          CASE NO. 2:16-CR-160-HAB-JEM

JAMES E SNYDER

**OPINION AND ORDER**

After ten years, two trials, two stops at the Seventh Circuit, and a trip to the Supreme Court

of the United States, this case is finally on the eve of sentencing. Yet questions remain despite this

long journey and the ink spilled along the way.

A jury convicted Defendant James Snyder ("Snyder") on Counts 3 and 4 from his decade-

old indictment. Judge Matthew F. Kennelly[1] sentenced him to 21 months imprisonment on each

count, to be served concurrently. Snyder appealed, making no arguments about the applicability

of the Sentencing Guidelines. The Seventh Circuit affirmed. Snyder then appealed only his Count

3 conviction to the Supreme Court, which then granted certiorari, reversed the judgment, and

remanded the case for further proceedings. On remand, the Seventh Circuit held that the

government could pursue a new trial on Count 3.

But the government now plans to dismiss Count 3 and proceed to sentencing on Count 4.

Snyder, in turn, asks this Court to revisit some of Judge Kennelly's sentencing rulings. The

questions are whether this Court can and—only if so—how it should rule.

---

[1] Judge Kennelly, who sits on the United States District Court for the Northern District of Illinois, sat on Snyder's case by designation.

## BACKGROUND

### I.     The Indictment

A grand jury returned an indictment against Snyder in 2016. (ECF 1). It charged him with two counts of federal funds bribery in violation of 18 U.S.C. § 666(a)(1)(B) (Counts 1 and 3 or "bribery counts"), and one count of corruptly obstructing the Internal Revenue Service's ("IRS") administration of the federal revenue laws, in violation of 26 U.S.C. § 7212(a) (Count 4 or "tax count").[2] (*Id.*).

On the tax count, the indictment alleged the following: Snyder failed to pay both his personal taxes and payroll taxes from his business—referred to as FFTM—between 2007 and 2009. (*Id.* at 6). He also was late in submitting his quarterly tax forms multiple times. (*Id.*). His corporate income tax return filings for tax years 2010 and 2011 were not filed until the fourth quarter of 2012. (*Id.*). The IRS first contacted Snyder about FFTM's unpaid taxes in July 2009, notifying him that it intended to levy FFTM's accounts. (*Id.* at 7). At that time, FFTM owed the IRS $83,000. (*Id.*). Updated transcripts later revealed the IRS debt to be $97,000. (*Id.*).

After receiving this notice, Snyder initiated a scheme to hide funds so the IRS could not collect. (*Id.* at 7). First, Snyder transferred more than $111,000 from FFTM to his personal bank account. (*Id.*). Later, in 2010, he took two more actions: (1) he signed an employment agreement with a mortgage company called GVC[3] and (2) he created a new company called SRC. (*Id.* at 7–8). GVC hired FFTM's employees and paid their salaries, even though Snyder and his employees continued to hold themselves out as FFTM. (*Id.*). When FFTM incurred operating expenses,

---

[2] Count 2 charged a co-defendant, John Cortina. (ECF 1). Snyder was tried alone at his two trials, so the counts were re-numbered for simplicity. Here, the Court will refer to the counts by how they were numbered in the indictment.

[3] GVC is called MC in the indictment, but is called GVC elsewhere, including the emails at issue for applying the sentencing enhancement. (Gov. Ex. 25A, 25B).

Snyder had GVC reimburse those costs by remitting payment to SRC. (*Id.* at 8–9). These payments from GVC to SRC totaled $400,000 over three years. All the while, Snyder tried to reach a compromise with the IRS on FFTM's tax debt by claiming FFTM had "insufficient assets and income to pay" the $97,000 owed. (*Id.* at 9).

During this time, Snyder submitted multiple forms to the IRS under penalty of perjury. Three of these were Form 433-As, which were meant to disclose all of Snyder's income, assets, expenses, and debt. (*Id.* at 11). All three—submitted in 2010, 2011, and 2013—failed to disclose sources of income and the existence of assets. (*Id.* at 13–14). The latter two specifically concealed either the existence of SRC, the existence of SRC's bank account, or tens of thousands of dollars that had been deposited into SRC's bank account. (*Id.* at 14–15).

## II.    <u>Procedural History</u>

Two trials followed. The first, held in 2020 before Judge Joseph S. Van Bokkelen, saw the jury acquit Snyder on one bribery count (Count 1), but convict Snyder on the other bribery count (Count 3) and the tax count (Count 4). (ECF 256). Later, Judge Van Bokkelen granted Snyder a new trial on Count 3. (ECF 322, at 17). But in that same order, he denied Snyder's request for a new trial on the tax count. (*Id.* at 14–17). The second trial, held in 2021 before Judge Kennelly, resulted in another conviction on Count 3 ("bribery conviction"). (ECF 508).

At Snyder's sentencing hearing, Judge Kennelly heard argument on objections to the presentence report and made his rulings from the bench. As relevant here, Snyder objected to a two-level increase in his base offense level on the tax count for being a leader/organizer of criminal activity under U.S.S.G. § 3B1.1(c) ("leader/organizer enhancement").

In support of the enhancement, the government pointed to two emails sent to Snyder on October 6, 2012, and October 8, 2012. (Gov. Ex. 25A, 25B). They were sent by Steve Dalton, an

acquaintance who he hired to do some work for FFTM. Both emails feature Dalton describing his efforts to comb through Snyder's financials to hide items that could be considered income from Snyder's accountant Daniel Pickart. (*Id.*).

In the first email, Dalton described his work on Snyder's 2010 finances and what he expects Pickart will consider income. (Gov. Ex. 25A). He then added:

> I could use W-2's and 1099's if you have any for 2010 and 2011. I don't have enough info to know how to best organize the incomes.
>
> *I buried a lot but I don't think we can risk killing more of the incomes* because if it was audited they would find a whole lot more transfers to your personal account than I'm showing here.

(*Id.*) (emphasis added).

Dalton sent the second email to Snyder two days later, detailing his work more precisely. The full October 8, 2012, email details the income numbers he generated and raises concerns that Pickart will find his work product suspicious:

> I need you to look at these.
>
> In essence, FFT had almost no income in 2010 and owed money back to SRC. You also borrowed from SRC personally. But SRC showed a rather large $70k Income.
>
> In 2011, FFT had a small loss and paid back a little bit of the money it borrowed from SRC. You paid back all that you borrowed. And SRC had a rather large $35k loss.
>
> I can send to [Pickart] this afternoon. Let's be frank, he's not going to like them. *He knows we fabricated some of this, and knows we don't have the details.* But since he did the 2009 taxes and your personal taxes, he's really the best one to bang them out.
>
> He's going to start asking questions, like they always do, about loans and cars and such. I don't have anything on cars, mortgages, loans, W2's, 1099's from GVC. I can send these to [Pickart] and then tell him to contact Deb? Or I can send to Dan and then talk to him In the morning and see what else he needs and have him email you and I? Need your input.
>
> Steve.

(*Id.*) (emphasis added).

After hearing argument, Judge Kennelly overruled Snyder's objection. He said the following in support of his ruling:

> Next is the role in the offense enhancement for the 7212 charge. This is based on an individual, Steve Dalton. . . . The e-mails make the case on that. I think they sufficiently show that Mr. Dalton's a participant. There's a Seventh Circuit case that says that, *U.S. versus Causey*, C-A-U-S-E-Y, 748 F.3rd 310, a 2014 decision. There's a bunch of others that say it too. The references to burying things and so on and hiding things is sufficient to, I think, show by a preponderance of the evidence that he was a participant in the offense.
>
> [Snyder's counsel] made the point of, "Well, we can't prove that Mr. Snyder read these e-mails." That's not really all that significant. What's significant is that Mr. Dalton did what he did and he was working at the behest of Mr. Snyder, and there is a sufficient basis for an inference that he did it at Mr. Snyder's behest. So I think that enhancement applies.

(ECF 586, at 121:3–24).

Judge Kennelly ultimately sentenced Snyder to 21 months imprisonment on both counts, with each sentence to be served concurrently. (ECF 565).

Snyder appealed both of his convictions to the Seventh Circuit. He did not make any arguments about Judge Kennelly's guidelines rulings on appeal. The Seventh Circuit affirmed the convictions. *United States v. Snyder*, 71 F.4th 555, 562 (7th Cir. 2023). Snyder then appealed to the Supreme Court, only seeking review of his bribery conviction. The Supreme Court granted certiorari and sided with Snyder, reversing his bribery conviction and remanding the case for further proceedings consistent with its opinion. *Snyder v. United States*, 603 U.S. 1, 20 (2024). The Supreme Court never mentioned the tax count.

On remand, the Seventh Circuit considered whether the government could retry Snyder on the remaining bribery count consistent with the Supreme Court's interpretation of the statute underlying the charge. *United States v. Snyder*, No. 21-2986, 2024 WL 4834037, at *1 (7th Cir.

Nov. 20, 2024). Neither of the parties' briefs addressed resentencing on the tax count other than to say it would have to occur.[4] The Seventh Circuit ultimately concluded that the government could pursue a new trial against Snyder on the bribery count. *Id.* at *2. That order did not mention the tax count at all. *Id.*

The case was reassigned to Judge Gretchen S. Lund on remand to the district court. (ECF 617). Months later, the government reported that it wished to proceed to sentencing on the tax count, at which point it would dismiss the remaining bribery count. (ECF 634, ¶ 12). Judge Lund acceded to that request. (ECF 639). But before Snyder could be sentenced, Judge Lund recused herself. (ECF 665). The case was then reassigned to the undersigned for sentencing. (ECF 666).

## DISCUSSION

Snyder objects to numerous aspects of the presentence report ("PSR") prepared by probation. The Court has determined that many of these objections do not require a ruling. (ECF 672). But the Court requested additional briefing on two issues: (1) whether reconsidering Judge Kennelly's sentencing rulings falls within the scope of the Seventh Circuit's remand and (2) if so, whether to apply the two-level leader/organizer enhancement under U.S.S.G. § 3B1.1(c).[5]

### I.    Scope of Remand

Courts of appeal may limit the scope of a remand when they return a case to district courts. 28 U.S.C. § 2106. When a limited remand occurs, issues have been waived if they could have been raised on the first appeal but were not. *United States v. Husband*, 312 F.3d 247, 250–51 (7th Cir.

---

[4] Circuit Rule 54 Statement of Position by Appellee USA at ¶ 15, *United States v. Snyder*, No. 21-2986 (7th Cir. Aug. 19, 2024), ECF 75; Response by Appellant James E. Snyder to Court Order of 7/29/2024, *United States v. Snyder*, No. 21-2986 (7th Cir. Aug. 19, 2024), ECF 74.

[5] Snyder's counsel spent part of its brief articulating their position on a factual dispute regarding tax withholdings from his employees. (ECF 676, at 8). Although the Court did not request this part of the briefing, the Court appreciates the addition because it clarifies that the essential facts are not in dispute. (*See* ECF 673, at 1 n. 1).

2002). At the same time, issues that were conclusively decided on the first appeal are not remanded. *Id.* at 251. The Seventh Circuit has previously held that these limitations apply to guideline challenges on limited remands for resentencing. *United States v. Swanson*, 483 F.3d 509 (7th Cir. 2007). For a long time, such challenges were typically precluded by the "law of the case" doctrine, which "precludes a defendant from raising arguments at a re-sentencing that were not challenged on direct appeal, absent intervening legal authority, new evidence, or some other changed circumstances." *United States v. Wilson*, 344 F. App'x 259, 261 (7th Cir. 2009); *see also United States v. Sumner*, 325 F.3d 884, 891–92 (7th Cir. 2003) (applying the same rule in a different case where a defendant raised arguments at re-sentencing that weren't challenged on direct appeal).

The government argues that the Court faces a limited remand here. The Seventh Circuit affirmed both of Snyder's convictions on his first appeal, and Snyder had not appealed Judge Kennelly's decision to apply the leader/organizer enhancement on the tax count. Because the tax conviction has been left undisturbed, the government contends that this is now the "law of the case" which Snyder can no longer reargue. The Court disagrees.

The situation here rings similar to the Supreme Court's 2011 decision in *Pepper v. United States*, 562 U.S. 476 (2011), which disrupted the Seventh Circuit's longstanding precedent in cases invoking the law-of-the-case doctrine. *Pepper* involved a defendant who received a 40-percent downward departure for substantial assistance at his original sentencing. 562 U.S. at 505. After the Eighth Circuit upheld the downward departure but vacated the sentence on other grounds, the case was reassigned to a new district judge on remand. *Id.* The new judge concluded that she was not bound by the prior sentencing. *Id.* at 506. In turn, she only granted the defendant a 20-percent downward departure, even though the Eighth Circuit had affirmed the 40-percent departure. *Id.* at

506 n. 18. The defendant argued that the law-of-the-case doctrine precluded this decision on resentencing, but the Supreme Court disagreed and upheld the change. *Id.* at 506.

Because the Eighth Circuit mandate "did not place any limitations on the discretion of the newly assigned district court judge in resentencing" the defendant, it had issued a general remand for resentencing. *Id.* The Supreme Court explained that the law-of-the-case doctrine "directs a court's discretion" but "does not limit the tribunal's power." *Id.* at 507 (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). A criminal sentence is "a package of sanctions that the district court utilizes to effectuate its sentencing intent." *Id.* (internal quotations omitted). When an appellate court reverses part of a defendant's sentence, the "original sentencing intent may be undermined by altering one portion of the calculus." *Id.* Thus, the Supreme Court held that "an appellate court when reversing one part of a defendant's sentence 'may vacate the entire sentence . . . so that, on remand, the trial court can reconfigure the sentencing plan . . . to satisfy the sentencing factors in 18 U.S.C. § 3553(a).'" *Id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 253 (2008)). And if a court is convinced that a prior decision is "clearly erroneous and would work a manifest injustice," then it has discretion to change course. *Id.* at 506–07 (internal quotations omitted).

Seventh Circuit decisions post-*Pepper* have steered away from its pre-*Pepper* decisions invoked by the government here like *Husband*, *Wilson*, and *Sumner*. Now, "when a case is generally remanded to the district court for re-sentencing, the district court may entertain new arguments as necessary to effectuate its sentencing intent." *United States v. Barnes*¸ 660 F.3d 1000, 1007 (7th Cir. 2011). However, the district court "is not obligated to consider any new evidence or arguments beyond that relevant to the issues raised on appeal." *Id.*

8

Here, the Seventh Circuit's remand was general, not limited. This case was remanded not for resentencing but for a new trial. It just so happens that the new trial has never come about. Still, the original sentencing package came unbundled when the Supreme Court vacated Snyder's bribery conviction. And when the Seventh Circuit remanded the case after green-lighting a new bribery trial, it did not limit the tax count resentencing that would inevitably need to occur.

To be sure, Snyder could have appealed Judge Kennelly's sentencing rulings in his original appeal yet failed to do so. For that reason, *Barnes* suggests this Court does not have to consider his challenge to the leader/organizer enhancement now. But the Court is not prohibited from doing so. Given the short record on the enhancement at the original sentencing, the arguments Snyder raises here, and the implications it could have on his sentencing,[6] the Court will exercise its discretion to revisit the issue.

## II.    Leader/Organizer Enhancement

The Court must now determine whether the leader/organizer sentencing enhancement under U.S.S.G. § 3B1.1(c) can be properly applied. This Court's factual findings "need only be supported only by a preponderance of the evidence." *United States v. Beechler*, 68 F.4th 358, 368 (7th Cir. 2023). Snyder argues that he does not qualify for a two-level sentencing enhancement because he was not "an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). The Court disagrees.

### A.  Legal Standard

To qualify for the enhancement, a defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n. 2. The

---

[6] If the leader/organizer enhancement does not apply, then Snyder would also be eligible for a two-level reduction for being a zero-point offender. U.S.S.G. § 4C1.1(a). Sustaining Snyder's objection would result in his base offense level dropping from 20 to 16. (ECF 670, PSR, ¶¶ 64, 75).

Sentencing Guidelines define a "participant" as a "person who is criminally responsible for the commission of the offense." *Id.* at cmt. n. 1. But for purposes of the enhancement, "a defendant can exercise control over a 'criminally responsible' party . . . even if that individual was never charged, convicted or indicted for the 'criminally responsible' act." *United States v. Causey*, 748 F.3d 310, 321–22 (7th Cir. 2014).

The Court can consider several factors in deciding whether a defendant acted as a leader or organizer. These include "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices," and "the claimed right to a larger share of the fruits of the crime." *Id.* at cmt. n. 4. The Court can also consider "the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

### B.  Dalton's Grand Jury Testimony

Judge Kennelly relied solely on Dalton's emails when he sentenced Snyder. Here, the government points to more. Dalton did not testify at Snyder's trial, but he did testify before a grand jury. (ECF 673, Ex. D). Dalton's grand jury testimony could not have been introduced at trial because it would be hearsay or violate the Sixth Amendment's Confrontation Clause. But the Court can consider it here. *See* FED. R. EVID. 1101(d)(3) ("These rules — except for those on privilege — do not apply to . . . sentencing."); *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005) (introducing grand jury testimony at sentencing does not violate the Confrontation Clause).[7]

---

[7] *Roche* notes that the proper constitutional objection at sentencing, if any, would be for a violation of due process. 415 F.3d at 618. This Court may "use any procedures adequate to reach informed and accurate decisions in the main" at sentencing. *Id.* (internal quotations omitted). The government submitted Dalton's grand jury testimony as part of a filing made nearly two weeks before the deadline for the Court's ordered briefs. (ECF 673, Ex. D). Snyder had access to the testimony and the opportunity to address it in his brief. And Snyder cited the testimony, albeit not to contest the enhancement. (ECF 676, at 8). The Court's use of the testimony is consistent with due process. The Court also finds that Dalton's testimony is reliable considering the extent to which he testified against his own self-interest.

Dalton testified that he was a partner in FFTM with Snyder from its inception until 2008 when he relinquished his company shares. (ECF 673, Ex. D, at 7–8.) After Dalton's short period of ownership ended, Snyder hired Dalton to perform paid financial consulting work for FFTM. (*Id.* at 8, 18.) Dalton testified that he never helped Snyder fill out tax forms or negotiate with the IRS when Snyder faced collection efforts. (*Id.* at 35–36.) But Dalton said he helped prepare profit and loss statements for a couple of years that were sent to Snyder's accountant Daniel Pickart. (*Id.* at 36-40).

Prosecutors presented Dalton with emails he sent in 2012. (*Id.* at 42.) Dalton testified that the emails were his, and that they show he worked on 2010 and 2011 taxes for FFTM and SRC. (*Id.* at 43–44.) He also acknowledged that he was doing this work for pay. (*Id.* at 44.) Dalton said that Snyder regularly moved money between all his bank accounts—personal, company, and political campaign—and that this had tax implications for Snyder. (*Id.* at 45.)

Dalton denied trying to hide these transfers or income more broadly from Pickart. (*Id.* at 45–47.) He also denied that Snyder specifically asked him to hide the transfers to hide income. (*Id.* at 46.) But importantly, he admitted it was possible that "by the time we got to the second set of Excel spreadsheets, they were incorrect enough that I knew they were fabricated." (*Id.* at 47.) Dalton then more bluntly confessed to fabricating the information:

> Q. Would you participate in that fabrication?
>
> A. I did. I created the Excel spreadsheet.
>
> Q. So you're admitting under oath here that you fabricated information that ended up in James Snyder's tax returns?
>
> A. Yes.

(*Id.* at 47–48.)

11

Dalton elaborated that only Snyder stood to benefit financially from having his income look lower on his taxes. (*Id.* at 48). He testified that he did not financially benefit from doing this work for Snyder beyond the payment for his services. (*Id.* at 48–49). Dalton expanded on the role he played, saying he was paid to create these fabricated statements for Snyder and that Snyder was aware of his actions:

> Q. You've indicated that you may have taken action to assist Snyder in [helping make Snyder's income look lower on his 2010 taxes than it actually was]?
>
> A. Yes.
>
> Q. At whose request did you take those actions?
>
> A. The only person that would have made a request would have been James.
>
> Q. And he was paying you, actually, you mentioned for your time or he was supposed to be?
>
> A. Yes.
>
> . . .
>
> Q. And so throughout the time that you're aiding him in this manner, you're communicating with him regularly --
>
> A. Yes.
>
> Q. -- right? And I think Gary is about to show you some of those communications. He's well aware of what it is he's paying you to do; is that a fair statement?
>
> A. Yes.
>
> Q. So you weren't doing anything that James Snyder wasn't aware that you were doing to help him with his 2010 taxes?
>
> A. No.
>
> Q. No you weren't doing anything --
>
> A. I was not doing anything that he was unaware of, unless he wasn't reading his e-mails.

Q. Meaning he was fully aware of what you were doing?

A. He should have been fully aware of what I was doing.

(*Id.* at 48–50).

Prosecutors then showed Dalton the specific emails he sent Snyder on October 6, 2012, and October 8, 2012. When asked about his statement that Pickart "knows we fabricated some of" the information in the profit and loss statements, (Gov. Ex. 25B), Dalton replied that fabricate "is a strong word. And as I read it, I wish I hadn't typed it." (ECF 673, Ex. D, at 54). But he later acknowledged that was a fair characterization. (*Id.*).[8]

### C.  The Leader/Organizer Enhancement Applies

Snyder contends that the two emails between him and Steve Dalton about his 2010 and 2011 taxes that Judge Kennelly relied on do not support application of the enhancement. He argues that Dalton did not engage in any criminal activity, that Dalton was not the person responsible for filing his taxes, and he never directed Dalton to do anything illegal. He also insists the emails were not about the taxes at issue in his tax conviction.

The leader/organizer enhancement applies to Snyder here. He paid Dalton to aid and abet his ongoing efforts to avoid collections on tax debt he owed to the IRS both personally and through FFTM. The emails alone provide ample support for this. Dalton informed Snyder of how he

---

[8]    Q. Well, in fact, you were trying to hide income from the IRS, correct?

A. I think that I was --

Q. On behalf of James Snyder?

A. Right.

Q. Yes?

A. Yes.

(*Id.*).

"buried a lot" to "kill[] more of the incomes" in the profit and loss statements provided to Snyder's accountant. (Gov. Ex. 25A). The emails demonstrate concern for what could be discovered if Snyder's bank accounts were audited. They also show an awareness that in creating the statements, Dalton "fabricated some of" the information so they could try to pull a fast one on Snyder's accountant. (Gov. Ex. 25B). Dalton discussed sending the profit and loss statements *that Snyder paid him to create* directly to Snyder's accountant. (*Id.*). He also noted that he required Snyder's input on how to proceed. (*Id.*).

The emails show Dalton assisting Snyder's criminal efforts to obstruct the IRS. Dalton worked at Snyder's behest solely for Snyder's benefit. And Dalton admitted to the grand jury that he fabricated details which eventually were reflected in Snyder's forms submitted to the IRS. It cannot be known for certain whether Snyder read these specific emails. But an assertion that he was unaware of Dalton's specific conduct is hard to square with the emails, Dalton's testimony, and the fact of his conviction.

The record does lack evidence of *explicit* direction by Snyder. Dalton denies Snyder ever explicitly told him to hide income from his accountant. And Dalton did not testify that Snyder replied to either of his emails with specific instructions on how to hide his income. But Snyder was still the ultimate decision maker and exercised enough control over Dalton to warrant application of the leader/organizer enhancement. Snyder paid Dalton to engage in criminal activity that only Snyder stood to benefit from. Dalton's two emails demonstrate him reporting on his work to Snyder as he went along. Dalton talked of sending work product directly to Snyder's accountant for him. He talked of burying income and fabricating information. He testified that Snyder was aware of or should have known about his actions. It strains credulity to think Dalton went on a rogue mission to help Snyder hide income on his taxes without any input from Snyder himself.

The government need only prove that this enhancement applies by a preponderance of the evidence. The Court finds that this burden has been met.

The case cited by Judge Kennelly at Snyder's first sentencing, *Causey*, supports this conclusion. There, the Seventh Circuit upheld application of the leader/organizer enhancement to a defendant convicted of defrauding borrowers and lenders by falsifying documents and closing fraudulent loans. 748 F.3d at 313–14. Part of the scheme involved recruiting unsuspecting buyers. *Id.* at 14. One of those buyers noticed that the defendant had filled out paperwork that would be submitted in her name with false information that she had made a "major down payment." *Id.* When the buyer told the defendant that she knew she had made no such payment, the defendant told her not to worry and that he had taken care of it. *Id.* The Seventh Circuit said this was enough for the leader/organizer enhancement to apply. *Id.* at 321–22. The defendant brought the buyer into the scheme, got her to engage in fraudulent activity, and eased her nerves when she got concerned about submitting fraudulent information. *Id.* This demonstrated that the defendant exercised control over the buyer and that the buyer was a criminally responsible party. *Id.*

Here, like in *Causey*, Snyder brought Dalton in on his activities by paying him to perform financial work for FFTM. Dalton reported to Snyder on his activities and provided false information to Snyder's accountant so he could lie on his tax forms. Dalton's criminal responsibility is even higher than the *Causey* buyer because he did this knowingly from the get-go. While *Causey* featured more direct evidence of the defendant exercising control, Dalton's emails and grand jury testimony raise a strong enough inference of direct control to overcome this deficiency. Snyder did not farm out an innocent-seeming task to an unwitting accomplice. He paid someone to make him criminally falsified information about his income, and that person gave him what he paid for.

15

Snyder is right that the 2007, 2008, and 2009 tax years were at issue on the tax count. But as the government rightly points out, the criminal conduct charged focused on Snyder's efforts between 2010 and 2013 to lie and fraudulently shield income from the IRS. (ECF 1, at 13–15). He failed to make timely filings between 2007 and 2009 and obstructed IRS efforts to collect the taxes he owed in the years that followed. And the emails that Judge Kennelly relied on at Snyder's first sentencing discuss Dalton's 2012 work on Snyder's 2010 and 2011 tax forms. (Gov. Ex. 25A, 25B). They continued a longstanding effort by Snyder to keep the IRS from collecting on his tax debt. True, the tax debt originated from years prior. But Snyder's tax filings between 2010 and 2013 furthered his efforts to evade collections by falsifying information to make himself and FFTM appear financially incapable of paying. And Dalton's emails, along with his grand jury testimony, show he was a participant in these efforts.

The leader/organizer enhancement properly applies to Snyder. His objection is overruled.

### III.    Other Objections

The Court will also address other objections that the parties have made regarding restitution, tax loss, and the sophisticated means enhancement.

#### A.    Restitution

The PSR calculated restitution, if ordered, to be $96,111.57 based off the tax loss from his failure to pay FFTM's payroll taxes.[9] (ECF 670, ¶ 109). Both the government and Snyder object to this figure.

The government proposes that restitution should include penalties and interest, which would bring the total to $289,425.98. (ECF 644, at 3). To substantiate this figure, the government

---

[9] Both parties agree that Snyder's $29,038 personal tax debt will not be included in any restitution figure because he paid it off in full prior to the indictment. (ECF 671, at 4).

has provided a sheet detailing FFTM's total outstanding balance due to the IRS, organized by quarter across eight tax periods. (ECF 644, Ex. B). These include the periods ending September 30, 2007, December 31, 2007, June 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009, September 30, 2009, December 31, 2009. (*Id.*). The sheet does not specify which parts of the balance are principal, interest, or penalties. (*Id.*).

Snyder argues the figure is lower. He points to a government exhibit from trial—a Form 2751 from the IRS—to indicate that the "Amount Outstanding" was $84,156.55. (Gov. Ex. 34). The form also lists a $39,523.89 penalty, which Snyder argues is the only amount he is liable for. (*Id.*; ECF 677, at 15). But the form only includes three tax periods, all from 2009. (Gov. Ex. 34). Additionally, Snyder states that prior to the indictment, he made a total of $17,687 in payments toward the FFTM-related tax debt. (ECF 677, at 15–16). He bases this off 32 monthly payments of $112 totaling $3,584 and $14,103 worth of tax refunds collected by the IRS. (*Id.*). Snyder does not cite to any evidence verifying the tax refund collections. And the portion of the PSR he cites to in support of the monthly payments refers to payment of personal tax debts, which have already been removed from the PSR calculation. (ECF 670, ¶ 35 ("[T]he IRS granted his request to pay $112 per month toward his *personal* tax debt.") (emphasis added)).

The Sentencing Guidelines typically do not allow interest and penalties to be included in tax loss calculations that determine the base offense level on a criminal count. U.S.S.G. § 2T1.1 cmt. n. 1. But tax loss for guidelines calculation purposes is distinct from tax loss for restitution purposes. When calculating the offense level, the tax loss in a case involving fraudulent statement or document is "the total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1). In other words, it is "the loss that would have resulted had the offense been successfully completed." *Id.* When calculating restitution, by contrast, the tax loss is the *actual loss*. U.S.S.G.

§ 5E1.1. This means repayments must be accounted for in determining the restitution figure. It also means that restitution *may* include both pre-judgment interest. *United States v. Hassebrock*, 663 F.3d 906, 925–26 (7th Cir. 2011) (affirming a restitution figure that included interest up until the date of sentencing). But restitution generally does not include penalties. *See United States v. Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008).

Restitution here would be based off the outstanding balance of the FFTM-related tax debt. The government proposes that Snyder owes $289,425.98, but that amount includes interest *and* penalties. Based on what the government has provided, the Court cannot discern how much of that figure stems from the principal balance and how much is from interest and penalties. Similarly, the Court does not have enough from Snyder to substantiate the extent of his payments and collections. And based on what he has provided, it is not entirely clear that those payments and collections went toward the FFTM debt still outstanding. Further, the basis for his estimates includes a fraction of the tax periods at issue in his conviction.

Based on the information above and other evidence in the record, the Court finds it unnecessary to include interest and penalties in the restitution figure. This Court's authority to include penalties in restitution at all appears limited. This case has gone on for nearly ten years and it has been five years since Snyder was first sentenced. Including the accrual of interest and penalties over that time would be an unduly harsh penalty to Snyder, especially considering restitution was not imposed at the first sentencing. It would effectively punish him for successfully appealing his bribery conviction and this Court will not indulge in such an endeavor.

Excluding penalties and interest, and absent definitive evidence of payments toward the FFTM debt, the PSR's current $96,111.57 figure for restitution is accurate. (ECF 670, ¶ 56). This accounts for the total amount of payroll taxes withheld from FFTM employee paychecks that were

not subsequently kept in a trust account or paid to the IRS. (*Id.*). These figures are supported by a chart previously prepared by the IRS that shows FFTM's payroll taxes owed as of the end date of Snyder's scheme, excluding interest and penalties. (ECF 563, at 7). It accounts for all eight tax periods at issue in the tax conviction. Payments toward the FFTM tax debt must be reduced from the restitution figure, but the Court finds that no evidence has been submitted to support that payments have been made toward the FFTM debt specifically by a preponderance of the evidence. The Court welcomes clarification on this, though. The parties are invited to submit evidence substantiating or disputing payments made by Snyder toward the FFTM payroll tax debt specifically. If Snyder can prove payments toward the payroll tax debt have been made, then the Court will revisit the issue at sentencing and reduce restitution by the amount paid.

**B.  Tax Loss**

The PSR calculated a tax loss of $125,149.57. (ECF 670, ¶ 56). This total was reached by adding the $96,111.57 in payroll tax debt from FFTM and the $29,038 in personal tax debt Snyder incurred. Snyder has previously objected to this figure. (ECF 671, at 10–11). He seems to have walked back this objection in his sentencing memorandum. (ECF 677, at 17). Still, the Court will rule on it to ensure the record reflects it has been resolved because it affects the base offense level.

As stated above, when calculating tax loss to determine the base offense level on a criminal count, the tax loss in a case involving fraudulent statement or document is "the total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1). This does not include interest or penalties. U.S.S.G. § 2T1.1 cmt. n. 1. Unlike the restitution calculation, "[t]he tax loss is not reduced by any payment of the tax subsequent to the commission of the offense." U.S.S.G. § 2T1.1(c)(5). For a tax loss between $40,000 and $100,000, the base offense level is 14. U.S.S.G.

§ 2T4.1(F). If the loss is between $100,000 and $250,000, the base offense level is 16. U.S.S.G. § 2T4.1(F).

The conduct underlying Snyder's conviction involves his interference with efforts to collect on both FFTM payroll taxes and his personal taxes. (ECF 670, ¶¶ 40–56). Thus, the intended losses for both must be considered. And under the Sentencing Guidelines, Snyder's subsequent repayment of his personal tax debt does not factor into the calculation.

No party has disputed that the tax loss from Snyder's personal income taxes is $29,038. The restitution figure the Court has already reached for the FFTM payroll tax debt—$96,111.57—is identical to the tax loss. That figure encapsulates the full intended loss before interest and penalties. (ECF 670, ¶ 56). The sum of these two numbers is $125,149.57, consistent with the PSR's calculation. (*Id.*). Accordingly, Snyder's objection is overruled. The tax loss is $125,149.57 and the base offense level is 16.

### C. Sophisticated Means

Snyder also disputes the application of a sentencing enhancement under U.S.S.G. § 2T1.1(b)(2). That subsection calls for a two-level increase "if the offense involved sophisticated means." *Id.* "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." *Id.* at cmt. n. 5. Snyder insists the government has not met its burden to establish that SRC was set up just to prevent the IRS from collecting Snyder and FFTM's overdue taxes. The Court disagrees.

The record more than adequately reflects that Snyder used SRC, at least in large part, to siphon funds away from FFTM so he could present the company to the IRS as unable to pay its tax debt. (ECF 670, ¶¶ 50–55). As Judge Kennelly pointed out when ruling on this same issue, the Seventh Circuit has held that use of a shell company to facilitate an ongoing scheme is enough to

support the enhancement. *United States v. Knox*, 624 F.3d 865, 872 n. 4 (7th Cir. 2010); ECF 586, at 120–21. The Court here likewise finds that the government has met its burden on this front. Snyder's objection to the sophisticated means enhancement is overruled.

## CONCLUSION

The Court has the discretion to revisit Judge Kennelly's Sentencing Guidelines rulings. But even so, the Court OVERRULES Snyder's objections to the leader/organizer enhancement, tax loss calculation, and sophisticated means enhancement. The tax loss is $125,149.57 and the base offense level is 16. The Court further finds that restitution owed, if imposed, would be $96,111.57 based on the payroll tax debt, but invites the parties to submit additional evidence regarding whether payments toward this debt have been made.

**SO ORDERED** on March 3, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT