**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

UNITED STATES OF AMERICA

v.                                                                    CASE NO. 2:16-CR-160-HAB-JEM

JAMES E SNYDER

## OPINION AND ORDER

A jury previously found Defendant James Snyder ("Snyder") guilty of obstruction of the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a) ("tax count"). (ECF 252). After a new trial on a separate bribery charge and years of appeals which led to that charge being dismissed, the Court sentenced Snyder to thirty-six (36) months of probation. (ECF 696). He is appealing his tax count conviction to the Seventh Circuit for the second time. (ECF 701).

With the deadline for the opening brief on his appeal fast approaching, [1] Snyder returns to this Court to open another new can of worms as he tries to supplement the appellate record. Snyder claims IRS Special Agent Jerry Hatagan's ("Agent Hatagan") testimony at his sentencing hearing proved that he never submitted fake or fraudulent invoices as part of his tax obstruction scheme. This, in his view, uncovered a persistent government lie throughout this case. Snyder now moves to produce grand jury transcripts related to the tax count to determine whether the government presented false information to the grand jury or presented the case at trial on a different theory than

---

[1] Order Granting Motion to Extend Time to File Appellant's Brief, *United States v. Snyder*, 26-1565 (7th Cir. 2026), ECF 11.

the grand jury heard. (ECF 714). But it is not clear Snyder's contention is true, and even if it were it would bear no consequence. As such, his motion will be denied.

## **BACKGROUND**

Given this case's decade-long lifespan, the parties are well aware of its general facts and procedural history. So the Court incorporates its previous recitation of the facts and history from its order on objections to the presentence report (ECF 680) and adds the following:

After the Court ruled on Snyder's presentence objections, Snyder's attorneys called Agent Hatagan to testify at his sentencing. (ECF 711). They did so to re-raise Snyder's objection to the application of the leader/organizer enhancement under U.S.S.G § 3B1.1(c). Counsel and Agent Hatagan engaged in the following colloquy:

> **Q.** Okay. We also reviewed and talked about the relationship between FFTM and SRC and GVC yesterday, right?
> **A.** We did.
> **Q.** Okay. And the invoices that SRC sent to FFTM and GVC, right?
> **A.** Correct.
> **Q.** Okay. And you confirmed a few things I'll just walk through here. *First, you're not aware of any evidence that the invoices were, quote, "false or fraudulent," agreed?*
> **A.** *Correct.*
> **Q.** That you're not sure what SRC was set up for, but that you do know through your investigation, your interviews with Brad [V]oyles, who's the owner of GVC, that GVC took over ownership of FFTM in January 2010 as Snyder's FFTM was financially struggling, right?
> **A.** That is correct.
> **Q.** That Snyder never had any ownership of GVC, right?
> **A.** That is correct.
> **Q.** That Brad [V]oyles, the owner of GVC, is the one who required that the invoices be sent, right?
> **A.** Yes.
> **Q.** *That Brad [V]oyles confirmed that the invoices were for legitimate services, right?*
> **A.** *As best he knew, yes.*
> . . .
> **Q.** And you agreed yesterday that this wasn't – this relationship between FFTM, GVC, and SRC -- it wasn't a shellgame where Mr. Snyder was sending money to

2

himself, right? GVC was completely separate and was owned by Brad [V]oyles, right?
**A.** GVC was owned by Brad [V]oyles.
**Q.** Okay.
**A.** And the -- *the issue in the case was what became of the funds that went to SRC once they were paid by GVC.*
**Q.** The government in some of the files said this was a shell game. So when SRC is invoicing Brad [V]oyles' company, that's really James Snyder invoices himself. That's not correct, agreed?
**A.** Well, SRC was disclosed on the tax returns. Like I said, *the problem we had with SRC is the fact that it was never disclosed to the IRS on the financial statements.*
**Q.** And sorry if I'm not being clear. SRC invoicing FFTM, Brad [V]oyles as FFTM, post-January 2010 -- that's not James Snyder invoicing himself. That's James Snyder invoicing Brad [V]oyles' company?
**A.** He was invoicing, I guess, FFTM, a division of GVC.

(ECF 711, at 19–21) (emphasis added).

According to Snyder, Brad Voyles—the owner of GVC who Agent Hatagan discussed in his testimony—had previously spoken to the FBI. Snyder says that in a statement provided to the FBI, Voyles confirmed that the SRC invoices were legitimate and for marketing services required by GVC.[2]

The government cross-examined Agent Hatagan at the sentencing hearing, and elicited the following additional testimony:

**Q.** Now, you were asked some questions on direct about those invoices from FBI to SRC. Can you explain in short terms how you came upon that trove of invoices?
**A.** Well, I can tell you that we did not receive them from the defendant or through his defense attorney. We received them from GVC, Brad [V]oyles provided those invoices and that was the very first time that we had ever seen them and that we were made aware of them. *And there was no doubt that the revenue stream that was represented by those SRC invoices was never disclosed to the IRS.*
**Q.** And did the invoices show over a number of years -- 2010, 2011, 2012 -- that payments were being made from GVC to SRC?
**A.** Yes.

---

[2] The Court does not have this statement because it was not admitted at trial. It is neither otherwise present on the docket nor provided as an exhibit. Counsel only provided a Bates stamp number. (ECF 714, at 4). Because the government does not contest this characterization in its response, (ECF 716), and its accuracy does not ultimately affect the Court's ruling, the Court assumes for purposes of the motion that this is accurate.

**Q.** And in those invoices, did they say that those payments were for things like consulting fees and data entry?
**A.** Web hosting, a variety of different categories.
**Q.** *Did you find any evidence that Mr. Snyder was performing any web hosting functions in that record?*
**A.** *We did not.*
**Q.** In terms of those funds that were paid from GVC to SRC as a result of those invoices, were those separate and apart from the W-2 wages that Mr. Snyder was paid by GVC?
**A.** Yes.
**Q.** So am I right to say that Mr. Snyder was both receiving a W-2 wage from GVC, correct?
**A.** That is correct.
**Q.** And also getting payments from GVC to SRC after submitting these invoices?
**A.** Yes.
**Q.** And correct me if I am wrong, but in 2010 was the W-2 wage around $140,000?
**A.** That is accurate.
**Q.** And then in addition there was a flow of funds from GVC to SRC for purported web hosting, consulting, data entry, and the like?
**A.** Yes.
**Q.** *Were any of those income streams disclosed in those Form 433-A that were submitted to the IRS?*
**A.** *The initial 433-A that was first filed with the Offer In Compromise that was tendered by the defendant did not disclose the employment income that he received from GVC, and it did not disclose any of the payments that were being made to SRC nor did it disclose the bank account for SRC nor did it disclose the bank account for the campaign.*
**Q.** And who owned SRC?
**A.** SRC was owned solely by the defendant. He was the sole proprietor of SRC.

(ECF 711, at 29–31) (emphasis added).

## **DISCUSSION**

Grand jury proceedings, and the disclosure rules surrounding them, are governed by Rule 6 of the Federal Rules of Criminal Procedure. The proceedings generally remain secret because their proper functioning "depends upon their absolute secrecy." *Matter of Grand Jury Proc., Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991). But the Court may still "authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-

4

jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

Snyder argues that Agent Hatagan's testimony at his sentencing uncovered a persistent government lie throughout this case, possibly dating back to the government's presentation to the grand jury. Thus, he asks the Court to order production of the grand jury transcripts. He believes Agent Hatagan's testimony provides grounds to believe this "lie" was presented to the grand jury and led to his indictment despite a lack of probable cause. Or, in the alternative, Snyder believes it may show the government obtained the indictment on a different theory than the one prosecuted at trial. The Court will deny this request for two reasons.[3]

First, Snyder's conviction at trial cures any defect that could have occurred within the grand jury proceedings. "Even if errors in the grand jury proceedings would have justified the district court in dismissing the indictment prior to trial, the petit jury's subsequent conviction . . . render[s] these errors harmless beyond a reasonable doubt." *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005); *see also United States v. Mechanik*, 475 U.S. 66, 67 (1986) ("[T]he petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted. Therefore, the convictions must stand despite the rule violation."). Snyder argues that *Vincent* and *Mechanik*, among other cases cited by the government, do not apply to his case because they focus on different grand jury violations or feature less grave consequences. Even if this is accurate, it does not matter. The Supreme Court's reasoning in *Mechanik* "does not depend on the nature of the rule at hand."

---

[3] On top of its disputes on the merits, the government argues that the Court lacks jurisdiction to entertain this motion because Snyder has filed his notice of appeal. Although the filing of a notice of appeal traditionally deprives district courts of jurisdiction over a case, Rule 6(e)(3)(E)(ii) appears to contemplate the district court as being the appropriate forum for this kind of motion. Further, because the Court denies Snyder's motion, it need not address whether this motion would be considered an improper attempt by Snyder to expand the record on appeal beyond what Federal Rule of Appellate Procedure 10 permits.

*United States v. Fountain*, 840 F.2d 509, 515 (7th Cir. 1988). Rule 6 is designed "to protect the innocent from being indicted," and a "convicted defendant is not a member of the class of beneficiaries of the rule." *Id.* Thus, Snyder is seeking grand jury transcripts in furtherance of a remedy that is unavailable to him. Ordering the release of the grand jury transcripts would fly in the face of Rule 6(e)(3)(E)(ii).

Second, even if Snyder could still seek dismissal of the indictment, the standard for breaking with "the traditional secrecy of the grand jury" and ordering disclosure of transcripts is high and "deliberately stringent." *Matter of Grand Jury Proc., Special Sept., 1986*, 942 F.2d at 1198. A party seeking disclosure must show (1) "that the material they seek is needed to avoid a possible injustice in another judicial proceeding," (2) "that the need for disclosure is greater than the need for continued secrecy," and (3) "that their request is structured to cover only material so needed." *Id.* This means Snyder must show a "compelling necessity" or a "particularized need." *Id.* By tailoring his request to the transcripts related to the tax count, Snyder satisfies one of these requirements. But he cannot satisfy the others.

The entire premise behind Snyder's motion is based on a confident assertion of fact that is neither born out by the record nor of any legal consequence. Contrary to his claim, Agent Hatagan *did not* authoritatively disprove the falsity of the invoices. His testimony acknowledges that Voyles vouched for the accuracy of the invoices to the best of his knowledge. Voyles's statement to the FBI verifies this. Agent Hatagan also said that he was not aware of evidence that the invoices were "false or fraudulent." But Agent Hatagan also testified on cross-examination that he did not independently verify that the invoices were accurate either. In the Court's view, Agent Hatagan took no position one way or another. His statements on direct and cross appear consistent. His answer to the government on cross was not, as Snyder argues, a mistake that ignored Voyles's

6

statement to the FBI. Snyder's assertion that Agent Hatagan proved the government had lied throughout his case seriously mischaracterizes the testimony. It presented no new facts which reveal a "compelling necessity" requiring disclosure of grand jury transcripts at the eleventh hour.

Further, the tax count has little, if anything, to do with the legitimacy of the invoices. Suppose, for the sake of argument, that Snyder is correct and all the invoices he made out to GVC on behalf of FFTM were for legitimate business expenses. Snyder still invoiced them from SRC, not FFTM, and failed to disclose his SRC income to the IRS. This is a tax fraud case, not a business fraud case. As Agent Hatagan himself testified, "the issue in the case was what became of the funds that went to SRC once they were paid by GVC." (ECF 711, at 21). He further added that "there was no doubt that the revenue stream that was represented by those SRC invoices was never disclosed to the IRS." (ECF 711, at 30). Put another way, whether Snyder got the money from GVC for legitimate services was not the focus of the tax count; it was how he got the money and then hid it from the IRS. So even if the government lied about the invoices being "false or fraudulent," that does not change the fact that the money earned from those invoices were hidden from the IRS. Thus, Snyder does not need the grand jury transcripts to avoid a substantial injustice.[4]

### CONCLUSION

In sum, Snyder's motion mischaracterizes the basis of his tax count prosecution and asserts the revelation of a groundbreaking lie that is neither groundbreaking nor necessarily even a lie. Even if he were right, it would not justify the relief he seeks.

---

[4] Snyder's motion references the government's obligation under *Napue v. Illinois,* 360 U.S. 264 (1959), to not present false or misleading information at trial or before a grand jury. To the extent Snyder argues that the government committed a *Napue* violation, this motion is not the vehicle through which to do it. The only remedy Snyder seeks here is disclosure of the grand jury transcripts. As the Court explained, he cannot receive that remedy for reasons that do not even reach the merits of his assertions. If Snyder believes he can prevail on a *Napue* claim that has not already been waived, he is welcome to take that up with the Seventh Circuit.

Snyder's Motion to Produce Grand Jury Transcripts On An Expedited Basis For The Purposes of Appeal (ECF 714) is DENIED.

**SO ORDERED** on July 1, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT